# No. 24-3321

==============================================================

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

==============================================================

PETER PATAKI

Appellant,

v.

WALMART, INC.; WALMART
STORES, INC.; WAL-MART STORES,
INC.; WAL-MART STORES EAST,
INC.; WAL-MART STORES EAST I, LP;
WALMART STORE NUMBER 5447;
JANE DOE 1-5, MARY DOE 1-5; and/or
DOE CORPORATION 1-5,

Appellees.

ON APPEAL FROM A FINAL ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
No. 1:16-cv-01109-CPO-AMD;  Hon. Christine O'Hearn, U.S.D.J.

---

**APPELLANT'S BRIEF AND REQUIRED APPENDIX (A1-2)**

---

Michael Confusione (MC-6855)
HEGGE & CONFUSIONE, LLC
P.O. Box 366, Mullica Hill, NJ 08062-0366
(800) 790-1550; mc@heggelaw.com
Counsel for Appellant

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT                                          1

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION    1

STATEMENT OF THE ISSUES                                                 1

STATEMENT OF RELATED CASES                                             1

STATEMENT OF THE CASE                                                   2

A.  Procedural History                                                  2

B.  Statement of Facts                                                  2

C.  Rulings Presented for Review                                        9

STANDARD OF REVIEW                                                     14

SUMMARY OF THE ARGUMENT                                                15

ARGUMENT                                                               16

Point 1

The district court erred in excluding in its entirety the testimony of the plaintiff's
liability expert, Jerry Birnbach.                                       16

    A. The district court made clearly erroneous findings of fact that were
material to its decision to exclude Birnbach's testimony, <u>Gen. Elec. Co. v. Joiner</u>,
522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997); <u>Cohen v. Cohen</u>, 125
F.4th 454 (3d Cir. 2025).                                               16

    B.  The district court misapplied the *Daubert* standard (<u>Jones v. SWEPI L.P.</u>,
643 F. Supp. 3d 547 (W.D. Pa. 2022)) to Birnbach's proffered testimony, resulting
in an erroneous view of the law or an improper application of law to the facts
shown by the record, <u>General Elec. Co., 522 U.S. 136</u>; <u>Cohen</u>, 125 F.4th 454

(reversal warranted if there is definite and firm conviction that the lower court committed clear error of judgment in its conclusion).                                        32

     C. The district court's exclusion of Birnbach's testimony also unfairly prejudiced the plaintiff in combating Walmart's arguments that the plaintiff was responsible for failing to obtain clearer or more complete surveillance footage.   38

     D. This erroneous exclusion of the plaintiff's expert was particularly harmful because it was a decision the court made in the middle of the trial when the plaintiff and his counsel could do nothing to change their trial presentation.                                        42

Point 2

Walmart's counsel exceeded fair comment on the evidence and injected unfair prejudice to the plaintiff by suggesting to the jury that the plaintiff's lawyer and medical providers were involved in a conspiracy ring to unlawfully obtain benefits for claimed injuries (not objected to below; raised as plain error)                                        44

CONCLUSION                                        50

Certifications of Compliance                                        attached

# TABLE OF AUTHORITIES

Page(s)

*Cases*

Ayoub v. Spencer,
   550 F.2d 164 (1977) ................................................................ 49
Bethel v. Berkshire Hathaway Homestate Ins. Co.,
   596 F. Supp. 3d 1260 (D. Colo. 2022) ................................... 34
Brescia v. Ireland Coffee-Tea, Inc.,
   73 F.R.D. 673 (1977) ............................................................... 48
Clapper v. Am. Realty Invs., Inc.,
   95 F.4th 309 (5th Cir. 2024) ................................................... 44
Cohen v. Cohen,
   125 F.4th 454 (3d Cir. 2025) ............................................ Passim
Forrest v. Beloit Corp.,
   424 F.3d 344 (3d Cir. 2005) .................................... 15, 45, 50
Gen. Elec. Co. v. Joiner,
   522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) ........... Passim
Go Mobile Flooring, LLC v. Blue Banyan Sols., Inc.,
   663 F. Supp. 3d 1294 (M.D. Fla. 2023) ................................ 35
Gov't of the Virgin Islands v. Mills,
   821 F.3d 448 (3d Cir. 2016) .................................... 15, 44, 50
Greate Bay Hotel & Casino v. Tose,
   34 F.3d 1227 (3d Cir. 1994) .................................................. 15
Greenleaf v. Garlock, Inc.,
   174 F.3d 352 (3d Cir. 1999) .................................................. 15
Herman v. Hess Oil Virgin Islands Corp.,
   524 F.2d 767 (3d Cir. 1975) ............................................ 15, 44
Jones v. SWEPI L.P.,
   643 F. Supp. 3d 547 (W.D. Pa. 2022) ................................. 3, 32
Ne. Women's Ctr., Inc. v. McMonagle,
   689 F. Supp. 465 (E.D. Pa. 1988) .................................... 15, 45
Norris v. Excel Indus., Inc.,
   139 F. Supp. 3d 742 (W.D. Va. 2015) ................................... 35
Price v. Trans Union, L.L.C.,
   839 F.Supp.2d 785 (2012) ..................................................... 48

Smith v. Ford Motor Co.,
  215 F.3d 713 (7th Cir. 2000) ........................................................... 32, 33
Stuhlmacher v. Home Depot U.S.A., Inc.,
  774 F.3d 405 (7th Cir. 2014) ........................................................ 32, 33
U.S. v. Hammer,
  25 F.Supp.2d 518 (1998) ...................................................................... 48
U.S. v. Schwartz,
  325 F.2d 355 (1963) .............................................................................. 49
United States v. Everett,
  972 F. Supp. 1313 (D. Nev. 1997) ...................................................... 39
Waldorf v. Shuta,
  142 F.3d 601 (3d Cir. 1998) ................................................................ 15
Walker v. Soo Line R. Co.,
  208 F.3d 581 (7th Cir. 2000) .............................................................. 33
Whittenburg v. Werner Enters. Inc.,
  561 F.3d 1122 (10th Cir. 2009) .......................................................... 44

*Statutes*

28 U.S.C.A. § 1291 ................................................................... 1, 3, 4, 5
28 U.S.C.A. § 1332 ............................................................................. 1

iv

# Table of Appendix

## Bound with Brief (A1-2)

Notice of Appeal (12/13/24)                                     A1

Final Judgment (11/20/24)                                       A2

## Volume I (A3-A352)

District Court of New Jersey Docket Sheet                       A3

Notice of Removal                                              A32

Petition for Removal                                           A34

    Exhibit A: All Pleadings filed in Superior Court    A37

Final Pretrial Order                                          A55

Proposed Form of Order Granting Motion in Limine to Exclude    A79
Alleged Hearsay Evidence

Defendants' Motion in Limine to Exclude Alleged Hearsay
Statements                                                    A80

Certificate of Service                                        A81

    Exhibit A: Deposition of Peter Pataki            A82

Proposed Form of Order Granting Motion in Limine to Exclude
The Report and Testimony of Liability Expert, Jerry Birnbach   A94

Defendants' Motion in Limine to Exclude the Report and Testimony
Of Plaintiff's Proposed Liability Expert, Jerry Birnbach       A95

Certificate of Service                                        A96

    Exhibit A:  Complaint and Jury Demand            A97
    Exhibit B:  Expert Report                       A101

Exhibit C:  Order in the matter of *Foreacre v. Walmart*        A121

Proposed Form of Order Granting Motion in Limine to Exclude
The Report and Testimony of Valerie V. Parisi, RN, CRRN, CLCP    A123

Defendants' Motion in Limine to Exclude the Report and Testimony
Of Valerie V. Parisi, RN, CRRN, CLCP                            A124

Certificate of Service                                          A125

    Exhibit A: Complaint and Jury Demand        Attached as A97
    Exhibit B: Life Care Plan for Peter Pataki                    A127
    Exhibit C: Deposition and Exhibits of Valerie
    Parisi, RN, CRRN, CLCP                                       A140
    Exhibit D:  Report of Jerald P. Vizzone, D.O. (4/11/17)       A325
    Exhibit E: Reports of Jerald P. Vizzone, D.O.
    (9/18/17 and 3/15/19)                                        A333

## **Volume II (A353-A522)**

    Exhibit F:  Deposition of Jerald P. Vizzone, D.O.            A353

Plaintiff's Motion in Limine to Preclude Testimony Referring to
Collection of Subsidized Insurance Programs and Barring any
Reference to Plaintiff's Immigration Status                     A457

Certificate of Service                                          A460

Proposed Form of Order                                          A461

Notice of Motion in Limine to Preclude the Expert Report of
Rebekah Scherfel of Prizm, LLC as said Expert Report was not
Timely Served                                                  A462

Certificate of Service                                          A463

Proposed Form of Order                                          A464

Notice of Motion in Limine to Preclude the Expert Reports of
Thomas P. Dawson & Dr. Michael Brooks as Said Experts Were Not

Named During the Discovery Period                                          A465

Certificate of Service                                                     A466

Proposed Form of Order                                                     A467

Proposed Form of Order Denying Plaintiff's Motions in Limine
To Preclude the Expert Reports of Dawson and Brooks                       A468

Certificate of Service                                                     A469

    Exhibit A: Complaint and Jury Demand                Attached as A97
    Exhibit B: Docket Sheet                                     A471
    Exhibit C:  Letter Order dated March 8, 2019                A490
    Exhibit D: Plaintiff's letter to Judge Clark (4/10/17)      A492
    Exhibit E: Plaintiff's letter to Judge Clark (7/24/17)      A494
    Exhibit F:  Plaintiff's letter to Judge Clark (12/12/17)    A496
    Exhibit G: Plaintiff's letter to Judge Clark (4/3/18)       A498
    Exhibit H: Plaintiff's letter to Judge O'Hearn (11/3/23)    A500
    Exhibit I: Response to Plaintiff's OTSC                      A503
    Exhibit J: Motion to Withdraw as Attorney                   A510
    Exhibit K: Letter amending discovery to name Dawson         A520

**Volume III (A523-A915)**

    Exhibit L: Healthcare Delivery Summary Reports              A523
    Exhibit M: Letter serving report of Michael L. Brooks       A779
    Exhibit N: Report of Michael L. Brooks, MD                  A781
    Exhibit O: Plaintiff's Initial Disclosures                  A785
    Exhibit P: Defendant's Notice to Produce to Plaintiff       A790
    Exhibit Q: Plaintiff's Answers to Interrogatories           A799
    Exhibit R: Letter scheduling defense IME with Dr. DeFalco   A813
    Exhibit S: Letter confirming IME with Dr. DeFalco           A816
    Exhibit T: Report of Robert DeFalco, Jr., D.O.              A818
    Exhibit U: Supplemental Report of Robert DeFalco, Jr., D.O. A827
    Exhibit V:  Report of Dr. Vizzone (3/15/19)        Attached as A333
    Exhibit W: Notice of Appearance of Defendant's attorneys    A831
    Exhibit X:  Defendant's Subpoenas to Plaintiff's doctors    A836
    Exhibit Y: Defendant's Letter transmitting Subpoenas to
    Plaintiff's counsel                                         A868

Exhibit Z:  Invoices for provider records                           A870
Exhibit AA: Defendant's letter to Dr. Brooks for film review        A877
Exhibit BB: Final Pretrial Order                                    A879

Proposed Form of Order Denying Plaintiff's Motion in Limine to
Preclude the Expert Report of Rebekah Scherfel of Prizm, LLC.       A904

Certificate of Service                                              A905

Exhibit A:  Complaint and Jury Demand              Attached as A97
Exhibit B:  Docket Sheet                           Attached as A471
Exhibit C:  Letter Order dated March 8, 2019       Attached as A490
Exhibit D:  Notices of Appearance of
Defendant's Counsel                                Attached as A831
Exhibit E: Arbitration Decision                                     A910
Exhibit F: Plaintiff's letter amending discovery                   A914

**Volume IV (A916-A1303)**

Exhibit G: Preventive Plus Medical Bill Review                      A916
Exhibit H: Billing Review of Prizm, LLC.                            A927
Exhibit I: Defendant's letter amending discovery with Prizm
Report                                                              A1023
Exhibit J: Emails between counsel regarding Prizm Report            A1025
Exhibit K: Final Pretrial Order                                     A1036

Defendants' Trial Exhibit List                                     A1061

Defendants' Trial Witness List                                     A1064

Certificate of Service of Plaintiff's Opposition to Defendant's
Motion in Limine to Exclude Report of Valerie Parisi               A1066

Certificate of Service of Plaintiff's Opposition to Defendant's
Motion in Limine to Exclude Alleged Hearsay Statements             A1067

Certificate of Service of Plaintiff's Opposition to Defendant's
Motion in Limine to Bar the Expert Report of Jerry Birbach         A1068

Exhibit List/Demonstratives                                        A1069

Proposed Form of Order Denying Plaintiff's Motion to Preclude
References to Collection of Subsidized Insurance Programs and
Immigration Status and Granting Walmart's Cross-Motion to
Preclude Evidence of Future Medical Expenses                    A1072

Certificate of Service                                         A1073

    Exhibit A:  Deposition of Peter Pataki               A1074

Notice of Motion in Limine to Strike the Trial Testimony of Dr.
DeFalco as to Causation and Bar the Addendum Report of Dr.
DeFalco                                                        A1168

Certificate of Service                                         A1172

Proposed Form of Order                                         A1173

Letter enclosing Supplemental Expert Report of Dr. DeFalco    A1174

Letter Order dated April 17, 2018                             A1177

Letter Order dated March 14, 2023                             A1178

Final Pretrial Order                                          A1179

Proposed Form of Order Denying Plaintiff's Motion to Strike   A1203

Certificate of Service                                        A1204

    Exhibit 1: Final Pretrial Order                          A1205
    Exhibit 2: Plaintiff's objection to Dr. DeFalco's Report A1230
    Exhibit 3:  Docket Sheet                                 A1234
    Exhibit 4:  Dr. DeFalco's Report dated March 17, 2023   A1253
    Exhibit 5: Plaintiff's Initial Disclosures      Attached as A785
    Exhibit 6:  Defendant's Notice to Produce        Attached as A790
    Exhibit 7: Plaintiff's Answers to Interrogatories Attached as A799
    Exhibit 8: Letter scheduling defense IME         Attached as A813
    Exhibit 9:  Report of Dr. DeFalco                Attached as A818
    Exhibit 10:  Supplemental Report of Dr. DeFalco  Attached as A1174

Exhibit 11:  Report of Dr. Vizzone (3/15/19)          Attached as A333
Exhibit 12: Defendant's Letter transmitting Subpoenas to
Plaintiff's counsel                                                Attached as A868
Exhibit 13:  Invoices for provider records          Attached as A870

Certification of Service of Motion in Limine to Preclude
Dr. Michael Brooks from Testifying and Providing Opinions
on Causation                                                                    A1265

Proposed Form of Order                                                    A1266
Exhibit A:  Deposition of Dr. Michael L. Brooks          A1267

**Volume V (A1304-A1513)**

Exhibit B: Dr. Michael L. Brooks Trial Testimony          A1304

Exhibit 1: Reports of Dr. Jerald Vizzone, D.O.
(9/18/17, 3/15/19)                                          Attached as A333

Exhibit 2: Deposition of Jerald Vizzone, D.O.          A1350

Exhibit 3: Report of Dr. Brooks (page 1 missing)          A1356

Exhibit 4: Transcript of Motions in limine and
Pretrial Conference                                                    A1359

Exhibit 5:  Deposition of Dr. Brooks          Attached as A1267

Exhibit 6: Letter enclosing Supplemental Expert
Report of Dr. DeFalco                                                A1420

Exhibit 7:  Transcript of Status Conference (Redacted)          A1424

Exhibit 8: Defendant's letter regarding Dr. DeFalco's
Deposition                                                                    A1453

Exhibit 9:  De Bene Esse Testimony of Dr. Michael L. Brooks   A1455

Proposed Form of Order Denying Plaintiff's Motion to Bar Brooks
Causation Opinion and Edit De Bene Esse Deposition          A1482

Certification of Service                                    A1483

Jury Instructions                                          A1484

Jury Verdict Sheet                                         A1511

## CORPORATE DISCLOSURE STATEMENT

Not applicable.

## STATEMENT OF SUBJECT MATTER AND
## APPELLATE JURISDICTION

The District Court had jurisdiction pursuant to 28 U.S.C.A. § 1332. The District Court entered a final order on November 20, 2024 following the jury verdict in the defendant's favor. A2; Tr. Day 4, at 162. Plaintiff filed a timely Notice of Appeal on December 13, 2024. A1. This Court has jurisdiction pursuant to 28 U.S.C.A. § 1291.

## STATEMENT OF THE ISSUES

1.      Did the district court err in granting the defendant's motion to exclude the testimony of the plaintiff's expert witness, Jerry Birnbach?

2.      Did the defendant's counsel unfairly prejudice the plaintiff by suggesting to the jury that the plaintiff's lawyers and medical providers were involved in a conspiracy ring to unlawfully obtain payments for claimed injuries by various persons?

## STATEMENT OF RELATED CASES

None.

## STATEMENT OF THE CASE

### A. PROCEDURAL HISTORY

The plaintiff filed a lawsuit in the state court seeking damages for personal injuries caused by his fall in a Walmart store. A37. Walmart filed an Answer denying the claim, then removed the action to this Court. A34, A37.

The district court decided several motions in limine before trial, including an order granting in part Walmart's motion to exclude the testimony of the plaintiff's liability expert, Jerry Birnbach. A80, A95, A124, A457, A462, A465, A468, A1068, A1168.

The plaintiff's claims were then tried before a jury. At the trial's conclusion, the jury returned a verdict answering "no" to whether the plaintiff had proven that Walmart was negligent. A1511. The district court entered a final judgment memorializing the verdict on November 20, 2024. A2. The plaintiff's timely appeal follows here. A1.

### B. STATEMENT OF FACTS

The plaintiff was shopping inside the Walmart store when his left leg slipped on a clear piece of plastic lying on the floor, causing him to fall near the end of a shopping aisle. Day 1, at 11, 54. He was taken to the emergency room. He was found to have sustained serious permanent injuries from the fall and had to undergo

cervical discectomy and a lumbar spine procedure, inserting metal cages into his back.  Day 1, at 47-49, 57.

The plaintiff described what happened in his trial testimony.  Day 1, at 66.  He had been shopping for about 40 minutes.  Day 1, at 73.  He had picked up a package of chicken and was heading to a cleaning station to wipe it off and place it in his cart. He slipped on a piece of plastic lying on the floor in the aisle and fell.  He affirmed video evidence that showed part of the incident.  Day 1, at 73-78.

Upon falling, the plaintiff felt a constant pressure, like a weight, on his lower back and experienced an electric shock sensation in his right arm, with some discomfort in his left arm. He had a sharp pain shooting down to his right thumb.  Id. He had to sit down on a pallet between two aisles because of the pain he felt, but tried to shake off the pain and "walk it off."  The pain persisted, however.  He continued feeling it primarily in his right hand and a pushing feeling in his lower back.  Id.

The plaintiff saw the clear piece of plastic on the ground where he had slipped. It was about eight inches by four inches and clear.  Day 1, at 78-82.  He asked an employee about it.  Then, he saw the employee kicking the plastic under a nearby shelf.  The plaintiff told the employee that he should pick it up to prevent further accidents, telling the employee he had just fallen on it.  The employee did so.  The video evidence captured this as well. Day 1, at 78-84.

A few minutes later, the plaintiff told a Walmart manager that he fell on a piece of plastic and was experiencing pain in his lower back and tingling in his right arm.  Day 1, at 94.  She asked him about his pain and instructed him to sit down, stating that an ambulance needed to be called.  The manager did not investigate the scene where the plaintiff fell or take photographs.  The plaintiff was asked to fill out an accident report, which he completed.  The police and an ambulance arrived about a minute or so later, and the plaintiff was placed on a stretcher and taken in the ambulance to the hospital.  Id.

Betty Gardner was an eyewitness to some of the events.  She testified that she saw a Walmart employee moving the plastic wrap out of sight under a display after the incident.  A116.

**The Primary Issue at Trial**

The jury had to determine whether Walmart had actual or constructive notice of the plastic on the floor and breached its duty to remove it, causing the plaintiff's fall and injuries.  Day 1, at 29.[1]  The plaintiff asserted that the plastic was on the floor for at least several minutes in a heavily trafficked walking area and that employees allowed the hazard, which they knew or should have known about, to remain.  The plaintiff argued that Walmart's employees had a duty to ensure the

---

[1] The origin, nature, and extent of the plaintiff's injuries was also a major issue at trial, but the jury did not determine these issues because they answered "no" to the first question on the verdict sheet of whether Walmart breached its duty of care.

safety of its customers who were invited to shop inside the store, yet the video evidence showed the employees walking past the area where the plastic was lying. Day 1, at 40-43.  The video evidence showed the plastic remaining on the ground and that the employees could have removed it, but did not.  One employee is seen holding garbage bags and removing trash nearby yet does not return to the area to remove the plastic, simply leaving it unattended.  Day 1, at 43-44.  This led directly to the plaintiff's fall shortly thereafter.  Id.

**Plaintiff's Expert Witness**

In support of his claim that Walmart breached its duty of care, the plaintiff presented the expert opinion of Jerry Birnbach, a Store and Display Designer and Retail Safety Expert.  A101.

In his expert report, Birnbach described the facts at issue.  The incident occurred on June 6, 2015, when Mr. Pataki stepped on a plastic wrap, causing him to fall. Birnbach noted that the fall occurred near an endcap stocked with paper towels in a heavily trafficked aisle leading to the backroom stock area. The eyewitness, Ms. Gardner, reported seeing a Walmart employee move the plastic wrap under a display after the incident.  Birnbach reviewed the Rule 26 Initial Disclosures, photographs, store inspection records, depositions, eyewitness statements, and video footage.  Birnbach also visited and inspected the Walmart store in question.  A101. Birnbach reviewed the deposition of Ms. Britton, the

assistant manager of the Walmart store, noting that Ms. Britton's testimony gave him insight into what the store does for routine inspections, what the maintenance employees are required to do, and how the products are brought out onto the floor.

In formulating his opinion, Birnbach underscored the importance of comparing industry standards with a retailer's safety protocols to determine the cause of slip, trip, and fall incidents in retail environments. As a leading retailer, Walmart has comprehensive safety manuals and employee handbooks outlining proper procedures for maintaining a safe store environment. However, Birnbach's examination revealed that many of these safety rules were not followed, creating unsafe conditions on the day of Mr. Pataki's incident.

Birnbach set forth the specific Walmart regulations that were violated. A112-116. Birnbach observed widespread non-compliance with safety protocols, suggesting that such behavior was tolerated by Walmart store management. Birnbach's report (in its addendum) included illustrations and deposition excerpts supporting his opinion regarding the negligence of store staff in hazard identification, incident documentation, and customer assistance. Figure 1 in his report highlights where Mr. Pataki slipped, identifying it as a high-traffic area that, according to Walmart's handbook, should have been inspected more frequently. Figure 2 presents the camera view of the incident area, noting discrepancies between Walmart's claims and the actual camera coverage.  A112-16.

Mr. Birnbach confirmed Walmart's violations of its own safety policies in his de bene esse testimony, noting that Walmart employees are responsible for knowing these policies. Birnbach testified that his expert opinion was that plastic should be removed from products in the warehouse and not be brought out to the sales floor of the store in the first place because they are a major slipping hazard should they become detached and left on the floor, particularly in heavily trafficked areas like where the plaintiff slipped.  Birnbach based his opinion on his review of the facts and site visit, and his 40 years of experience with Walmart.  Birnbach noted that Walmart's policy, as stated in its employee handbook, requires associates to immediately address (or "cure") any hazardous condition they observe. Walmart commits to providing customers with a hazard-free and safe shopping environment. There is also store lingo that states, "Clean as you go," which means that when you see debris, clean it up immediately – do not wait and come back to get it.  Further, a term, "Continual Zone Defense," is used in retail stores.  This means that every area of the store is required to be inspected.  Birnbach stated that the grocery section where the plaintiff slipped needs to be inspected more often, on an hourly basis at least.  In this case, the plaintiff's expert said the area in question was a cross aisle in the grocery area and would need continual inspection.  A112-116.

Birnbach further noted that, in his expertise and experience in retail, a person's line of sight is between 36 inches and 72 inches off the floor.  Also, in this particular

Walmart store, end caps and signage distract customers from watching where they are going and what is on the floor. This makes it even more imperative for Walmart employees to follow the store's directives and look for anything hazardous on the floor, such as plastic or other debris, and remove it immediately. A112-116.

Birnbach's report includes a photograph (Figure 4) taken during Birnbach's store inspection, documenting two violations of Walmart's safety manual that he observed that day. During his inspection, Birnbach observed a corn husk left on the floor, indicating a failure in floor inspection and maintenance, as no employee addressed the hazard within a 30-minute interval. Additionally, rubber residue streaks were visible on the floor, suggesting improper maintenance practices, as industry standards require regular stripping and waxing to prevent such buildup. A112-116.

Further safety concerns identified by Birnbach included an unattended cleanup water bucket left in a hazardous position due to its low profile and extended mop handle, a direct violation of Walmart's safety guidelines. Figure 5, though not taken at the exact location of the incident, showed further deficiencies in safety protocols, including a liquid spill that remained unaddressed for approximately 60 minutes. Figure 6 illustrates that the floor sweep schedule was not followed, as observed over 30 minutes by Birnbach during his onsite inspection. A112-16.

Birnbach noted further, in Figure 10 of his report, an unattended pallet in the main aisle, violating industry and Walmart standards, with plastic wrap left on boxes that could fall onto the floor. Birnbach's report identified multiple violations of Walmart's policy regarding the movement of pallets across the sales floor during store hours, noting that stacks of boxes were piled too high for employees to monitor effectively. Figures 12 through 28 documented breaches of Walmart's posted safety regulations and non-compliance with Americans with Disabilities Act (ADA) requirements for aisle widths. A112-116.

Based on those findings, Birnbach concluded that Walmart and its staff were negligent in addressing hazardous conditions in the store where Mr. Pataki's incident occurred, and that Mr. Pataki's injuries resulted from Walmart's negligence in failing to maintain a safe and hazard-free environment. A101-116.

## C. RULINGS PRESENTED FOR REVIEW

### 1. Excluding the Plaintiff's Expert Witness

Before the trial began, the district court granted in part and denied in part the defendant's motion in limine to bar Mr. Birnbach's expert testimony. (Trial Day 3, p. 3). The court said the motion was granted "with respect to clearly he can't testify as to any conditions that existed two years after the accident because there is no reasonable inference that any jury could draw that any of those conditions or similar conditions existed two years prior. So, whatever it was that he observed, and there's

9

lots of pictures, I am assuming he took them when he went there, those are not relevant to what the conditions were on the date of the accident." A1363-65 (April 2, 2024 transcript, at pgs. 3-6).

However, the court denied the defendant's motion to exclude Birnbach entirely. Though not certain about whether he added a "tremendous amount to the case," the court said, "However, Walmart is a high-volume retailer that has very detailed policies and procedures with respect to maintenance and things of which this expert appears to have substantial knowledge. He has been qualified as an expert by many courts previously. So I will allow him to testify. But, again, he is going to have a short leash because I think what he is able to testify to is pretty limited. He did not do any of the -- he doesn't make any opinions about friction, for example, or slipping or anything. So I am not really sure what he is going to testify to other than what's in his report that I haven't barred. So that's for the plaintiff to decide but he can't testify as to anything that existed or he observed, other than the general layout of the store, two years later because it's just not relevant. I am assuming he is going to talk about things he talks about in terms of industry standards for maintaining and inspecting a large-volume retail store. So that motion is granted in part and denied in part." A1364-65.

However, Judge O'Hearn revisited her decision in the middle of the trial (Day 3, at 3) and then excluded Birnbach's testimony entirely. Judge O'Hearn expressed

skepticism about Birnbach's relevance as an expert witness, questioning the value of his proposed testimony. The judge noted that she would have barred Birnbach entirely if she had reviewed his deposition video (de bene esse testimony) during the pretrial motion. The judge said that Birnbach's testimony was deficient in expert analysis, as it merely described observable facts from a video, such as the presence of plastic on the floor, without offering substantive professional insight. The judge cited the absence of critical terms like "reasonable degree of safety" or "reasonable degree of care" in Birnbach's deposition—terms essential for establishing industry standards for retailers like Walmart, the judge said. The judge said she doubted Birnbach's ability to provide testimony beyond what an average juror could discern independently. (Day 3, P. 4-5)

Judge O'Hearn concluded that there was a complete absence of expert analysis in Birnbach's proposed testimony. The court ruled that the opinions offered in Mr. Birnbach's deposition, including statements about what Walmart should have done, do not qualify as expert testimony. The judge acknowledged that her initial review had been relatively lenient but that after reviewing his deposition, it became clear that his testimony did not meet the standards for expert opinion in this case. (Day 3, P. 10). The court ruled that his opinions did not go beyond the knowledge of an average juror and, therefore, did not qualify as permissible expert testimony. (Day 3, P. 11). The court addressed the limitations on testimony regarding the

store's conditions, stressing again that observations made two years after the incident were irrelevant. While the testimony was initially expected to cover industry standards for maintaining and inspecting large retail stores, the court said Birnbach provided no such expert analysis. The witness did not testify about industry requirements, such as the expectation for personnel to inspect aisles hourly or maintain inspection logs—practices Walmart allegedly failed to follow. Instead, the testimony was confined to observations from a video, which the jury could interpret independently. The witness merely noted seeing Mr. Pataki and what appeared to be plastic on the floor, details that other witnesses had discussed. The court deemed the testimony inadmissible as expert evidence, as it did not offer scientific opinions or specialized knowledge beyond what an average juror could comprehend. (Day 3, P. 27).

### 2. *Suggesting that the plaintiff's lawyer and medical providers were engaged in a conspiracy ring to unlawfully obtain benefits for fabricated injuries (not objected to below)*

Because no objection was raised below, the district court did not rule on the error the appellant presents for relief here on appeal.

A theme of the defense counsel's argument to the jury was suggesting that the plaintiff, his lawyer, and the medical providers were interconnected and part of a conspiracy ring to unlawfully obtain medical benefits and monies through faked or exaggerated slips and falls. Counsel said business partnerships involved the primary

treating doctor, Vizzone, and his associates. The defense counsel argued to the jury that the MRI, rehab, and surgery centers were all linked to Dr. Vizzone and his partners, suggesting a shared financial interest in the case's outcome. Walmart's counsel said there were concerns about Dr. Vizzone's failure to disclose these affiliations, indicating a lack of transparency in his testimony. Counsel pointed out that Mr. Pataki received treatment at facilities operated by Dr. Vizzone's partners, a fact that was not openly disclosed. Counsel said there should be further scrutiny of courtesy vans transporting individuals from Brooklyn to New Jersey for treatment, which had not been mentioned in depositions. Counsel argued to the jury that these connections between the medical providers and the plaintiff's legal team were deliberately obscured, raising questions about the credibility of the medical evidence presented on the plaintiff's behalf.  Day 4, at 31-36

Walmart's counsel suggested that the medical providers actively seek out patients. Counsel questioned why treatment was sought in Montclair, New Jersey, despite the presence of numerous reputable medical centers in the New York metropolitan area, including Brooklyn. Dr. Vizzone initially described the transportation service as a courtesy, but it was later revealed that he operated an Urgent Care center rather than a transportation service.  Mr. Pataki received treatment from a network associated with Vizzone, Mercadante, and Gangemi, indicating a coordinated group of involved parties. Counsel emphasized that no

13

treatment, evaluation, or consultation from any medical provider outside this connected network existed. Day 4, at 35-37

Walmart's counsel referred to the lawyers and providers involved in the plaintiff's case as a "ring," suggesting a coordinated effort among them. Counsel questioned the absence of other medical professionals in the plaintiff's treatment, such as chiropractors, physical therapists, and a rehab doctor. Counsel told the jury there was also a "ring" involving courtesy vans and undisclosed financial arrangements, implying a lack of transparency in the plaintiff's medical care. Counsel questioned the appropriateness of the plaintiff's attorney directing the plaintiff to see particular doctors, emphasizing that medical care should prioritize patient recovery rather than following a structured process dictated by legal counsel. Day 4, at 35-40.

## STANDARD OF REVIEW

The standard of review for a district court's exclusion of expert testimony is abuse of discretion. The Court will defer to the district court's decision unless it is based on an erroneous view of the law, a clearly erroneous finding of fact, or an improper application of law to fact. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997); Cohen v. Cohen, 125 F.4th 454 (3d Cir. 2025) (reversal warranted if there is definite and firm conviction that the lower court committed clear error of judgment in its conclusion).

The standard of review for improper comments by opposing counsel that was not objected to at trial is plain error. An appellate court can correct an error not raised at trial if the error is (1) plain, (2) affects substantial rights, and (3) seriously affects the fairness, integrity, or public reputation of judicial proceedings.  Gov't of the Virgin Islands v. Mills, 821 F.3d 448 (3d Cir. 2016); see Herman v. Hess Oil Virgin Islands Corp., 524 F.2d 767, 772 (3d Cir. 1975) (reviewing error though noting that no objection was lodged by party's counsel at trial).  A new trial due to attorney misconduct can be granted "where the allegedly improper statements or conduct make it 'reasonably probable' that the verdict was influenced by the resulting prejudice." Forrest v. Beloit Corp., 424 F.3d 344, 351–352 (3d Cir. 2005); Greenleaf v. Garlock, Inc., 174 F.3d 352, 363–364 (3d Cir. 1999); Greate Bay Hotel & Casino v. Tose, 34 F.3d 1227, 1236 (3d Cir. 1994); Waldorf v. Shuta, 142 F.3d 601, 627–28 (3d Cir. 1998).  A new trial may be ordered where counsel engages in improper conduct having a prejudicial effect on the jury.  Ne. Women's Ctr., Inc. v. McMonagle, 689 F. Supp. 465, 471 (E.D. Pa. 1988), aff'd, 868 F.2d 1342 (3d Cir. 1989).

## SUMMARY OF THE ARGUMENT

The district court deprived the plaintiff of a fair trial on his slip and fall claim by suddenly precluding the plaintiff's liability expert from testifying before the jury in the middle of the trial—despite the court's pretrial ruling permitting the expert to

testify about most of his expert opinion that Walmart breached the safety standards that apply to such large retailers.

Moreover, the unfairness of the trial was exacerbated by improper comments that Walmart's counsel consistently made before the jury, suggesting, without sufficient evidence in support, that the plaintiff and his lawyer were involved with various medical providers in a "ring" conspiring to scam Walmart and others out of monetary payments based on concocted accidents or grossly exaggerated injuries. These errors warrant granting the plaintiff a new trial here on appeal.

## ARGUMENT

### Point 1

**The district court erred in excluding in its entirety the testimony of the plaintiff's liability expert, Jerry Birnbach.**

**A. The district court made clearly erroneous findings of fact that were material to its decision to exclude Birnbach's testimony, <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997); <u>Cohen v. Cohen</u>, 125 F.4th 454 (3d Cir. 2025).**

In its midtrial ruling excluding Birnbach's testimony entirely, *the court said that Birnbach's testimony did not "cover industry standards for maintaining and inspecting large retail stores"* -- "The witness did not testify about industry requirements, such as the expectation for personnel to inspect aisles hourly or maintain inspection logs—practices Walmart allegedly failed to follow." The record shows the opposite. Birnbach underscored the importance of comparing industry

standards with a retailer's safety protocols to determine the cause of slip, trip, and fall incidents in retail environments. Birnbach noted that a company's safety manual, an Injury, Illness, and Prevention Program (IIPP), must comply with federal Occupational Safety and Health Administration (OSHA) regulations and other applicable safety standards. These requirements include:

•    A written safety manual: All businesses with employees must have a safety manual covering OSHA standards.

•    Hazard communication: Employers must maintain a hazard communication program, including labels on hazardous chemicals and safety data sheets for employees.

•    Compliance with safety standards: Employers must always comply with OSHA and other national safety standards.

As a leading retailer, Walmart has comprehensive safety manuals and employee handbooks outlining proper procedures for maintaining a safe store environment. Birnbach set forth the specific Walmart regulations that were violated. A112-116. Birnbach confirmed Walmart's violations of its own safety policies in his *de bene esse* testimony, noting that Walmart employees are responsible for knowing these policies. Birnbach testified that his expert opinion was that plastic should be removed from products in the warehouse and not be brought out to the sales floor of the store in the first place because they are a major slipping hazard

should they become detached and left on the floor, particularly in heavily trafficked areas like where the plaintiff slipped.  Birnbach based his opinion on his review of the facts and site visit, as well as his 40 years of experience with Walmart.  Birnbach noted that Walmart's policy, as stated in its employee handbook, requires associates to immediately address (or "cure") any hazardous condition they observe. Walmart commits to providing customers with a hazard-free and safe shopping environment. There is also store lingo that states, "Clean as you go," which means that when you see debris, clean it up immediately – do not wait and come back to get it.  Further, a term, "Continual Zone Defense," is used in retail stores.  This means that every area of the store is required to be inspected.  Birnbach stated that the grocery section where the plaintiff slipped needs to be inspected more often, at least on an hourly basis.  The area in question in this case was a cross aisle in the grocery area and would need continual inspection, the expert said. A112-16.

Birnbach further noted that, in his expertise and experience in retail, a person's line of sight is between 36 inches and 72 inches off the floor.  Also, in this Walmart store, end caps and signage distract customers from watching where they are going and what is on the floor.  This makes it even more imperative for Walmart employees to follow the store's directives and look for anything hazardous on the floor, such as plastic or other debris, and remove it immediately. A112-116.

Birnbach's *de bene esse* testimony was tailored to what the district court indicated was required in the court's pretrial ruling. The court stated that the plaintiff's expert must set forth safety standards and regulations and explain to the jury how, in his opinion, Walmart violated these standards. Birnbach did precisely that. He visited the specific Kearney Walmart store in 2017. In his report and testimony, he cited and discussed the applicable industry safety standards and his on-site observations within the store. He explained to the jury what industry standards must or should have been implemented by Walmart and how this contributed to the plaintiff's slip and fall. Birnbach's expert testimony thus informed the jury of the relevant standard of care that a large retailer like Walmart must follow. This would have assisted the jury in viewing the surveillance footage from the day of the accident and considering the other testimony and evidence.  A112-116.

***The court said that Birnbach's testimony "was confined to observations from a video, which the jury could interpret on their own***. The witness merely noted seeing Mr. Pataki and what appeared to be plastic on the floor, details that had already been extensively discussed by other witnesses."  This contradicts the record. Birnbach's report was based on his site visit and inspection of the Walmart store. A101. Birnbach's examination revealed that many of these safety rules were not followed, creating unsafe conditions on the day of Mr. Pataki's incident.

Birnbach set forth the specific Walmart regulations that were violated. A112-116. Birnbach observed widespread non-compliance with safety protocols, suggesting that such behavior was tolerated by Walmart store management. Birnbach's report (in its addendum) included illustrations and deposition excerpts supporting his opinion regarding the negligence of store staff in hazard identification, incident documentation, and customer assistance. Figure 1 in his report highlights where Mr. Pataki slipped, identifying it as a high-traffic area that, according to Walmart's handbook, should have been inspected more frequently. Figure 2 presents the camera view of the incident area, noting discrepancies between Walmart's claims and the actual camera coverage. A112-116.

Birnbach further noted that, in his expertise and experience in retail, a person's line of sight is between 36 inches and 72 inches off the floor. Also, end caps and signage distract customers from watching where they are going and what is on the floor in this Walmart store. This makes it even more imperative for Walmart employees to follow the store's directives and look for anything hazardous on the floor, such as plastic or other debris, and remove it immediately. A112-116.

Birnbach's report includes a photograph (Figure 4) taken during Birnbach's store inspection, documenting two violations of Walmart's safety manual that he observed that day. During his inspection, Birnbach observed a corn husk left on the floor, indicating a failure in floor inspection and maintenance, as no employee

20

addressed the hazard within a 30-minute interval. Additionally, rubber residue streaks were visible on the floor, suggesting improper maintenance practices, as industry standards require regular stripping and waxing to prevent such buildup. A112-116.

Further safety concerns identified by Birnbach included an unattended cleanup water bucket left in a hazardous position due to its low profile and extended mop handle, a direct violation of Walmart's safety guidelines. Figure 5, though not taken at the exact location of the incident, showed further deficiencies in safety protocols, including a liquid spill that remained unaddressed for approximately 60 minutes. Figure 6 illustrates that the floor sweep schedule was not followed, as observed over 30 minutes by Birnbach during his inspection. A112-116.

Birnbach noted further, in Figure 10 of his report, an unattended pallet in the main aisle, violating industry and Walmart standards, with plastic wrap left on boxes that could fall onto the floor. Birnbach's report identified multiple violations of Walmart's policy regarding the movement of pallets across the sales floor during store hours, noting that stacks of boxes were piled too high for employees to monitor effectively. Figures 12 through 28 documented breaches of Walmart's posted safety regulations and non-compliance with Americans with Disabilities Act (ADA) requirements for aisle widths. A112-116.

***The court said that Birnbach's testimony failed to offer substantive professional insight beyond the ken of an average juror.***  Birnbach's expert report and subsequent *de bene esse* testimony show otherwise. Birnbach offered opinions based partly on his forty years of expertise and experience in safety protocols for large retailers, including Walmart. A112-116.  Birnbach presented his curriculum vitae, confirming his years of experience as a Store Designer, Display Designer, and Retail Safety Expert.  The district court acknowledged that Birnbach had previously testified as an expert in this area.

Birnbach presented testimony beyond the ken of an average juror because Birnbach's expert testimony informed the jury about what type of hazard identification, safety standards, and protocols apply to a large retailer like Walmart. How else would a jury be able to determine, for example, how often and in what manner a large retailer like Walmart must inspect for hazards?  Is it once a day? Once an hour?  Once every 15 minutes?  Is the inspection protocol the same for all hazards, or are some considered more pressing?  Is the inspection duty the same for all store areas, or are some areas, such as the grocery aisles and the area where Plaintiff Pataki fell, subject to more frequent inspections than, for instance, an employee-only area back in the storage area?  The average juror would have no way of knowing any of this, let alone trying to apply such standards to assess the reasonableness of Walmart's conduct in this case.

Birnbach's testimony answers these questions that the average juror would have, enabling the jury to reasonably assess whether Walmart breached its duty of care to its invitee, Mr. Pataki. Birnbach noted that the area where the plaintiff slipped was by an "endcap filled with paper towel[s] that was situated in the main access aisle to the backroom stock area. This area of [the] aisle was heavily trafficked by shoppers as well as employees." A102. Birnbach opined that the slip and fall was a direct result of the negligence of Walmart's staff to keep the store safe and hazard-free. A102. Birnbach explained his assessment:

> It has been my experience that in order to determine the cause of a slip, trip and fall incident in a retail setting that it is essential to review Industry Standards and compare those with the actual retailer's safety rules and regulations.

> Walmart is one of the nation's leading retailers and has an exceptional series of Employee Handbooks, Safety Manuals, Training aids all of which clearly stipulate the required practice for preserving a safe and hazard free store. In my examination of the Walmart mandates, which are similar to the Industry Standard, many of the rules were not adhered to which compromised the level of safety at the time that Mr. Pataki was shopping on June 6, 2015.

> To avoid duplication, the specific Walmart regulations that were violated by the store employees are addressed in the Addendum portion of this report. A factor which was prevalent, front and center, is that within the limited time frame that I reviewed the store and video, the employee lack of compliance was rampant. I can only conclude that this activity was condoned by Store upper management. A103

Birnbach explained the basis for his opinion further in addenda to his expert report. Addendum 1 contained illustrations and deposition text segments showing why Birnbach concluded that there were negligent actions by Store Staff in the

inspection of the store, identifying hazards within the store, failure to follow Corporate Safety Manual Handbook regulations, failure to cure a hazard, failure to assist a customer at the time of an incident, failure to document the incident for future reference and overall Store Manager management of staff members.  A103.

Birnbach cited Walmart's handbook about which areas of the store should be inspected for potential hazards for customers, including heavily trafficked areas like where the plaintiff slipped and fell.  A103.

Birnbach noted that the location where the plaintiff slipped revealed that Walmart had violated two of its regulations in its Safety Manual.  A104. Birnbach's site inspection confirmed this, he noted in his report, coupled with the photographic evidence that Birnbach attached to his report.  Birnbach outlined in his expert report as follows:

> Figure 4. This photo, taken at the time of my store inspection, documents two violations to the Walmart safety manual (Sec Figure 13 Arrow F,G) (Sec Figure 14 Arrow E) (Sec Figure 15 Arrow B,D,F,G) (Sec Figure 16 Arrow A,B,C) (Sec Figure 17 Arrow C) (Sec Figure 18 Arrow B) (Sec Figure 20 Arrow E) (Sec Figure 21 Arrow B,E) (Sec Figure 23 Arrow B). I reviewed this area over a period of thirty minutes and the conditions were allowed to remain, as is, without an employee discovering it, without a sighting of a floor sweep, nor the removal of the bucket. (A) is a com husk allowed to remain on the floor without a department employee, sweep monitor, or any other employee picking it off the floor and curing the hazard. That lack of action revealed that floor inspection was not performed on a 30 minute or preferably less of a time interval for this high-risk area. (B) There were many areas of floor that were very blemished. These rubber residue streaks indicate that the floor was not properly maintained. The Industry Standard would call for ""stripping"" the floor with coarse pads, to remove the residue and old wax coating. A new application of wax or sealer would be applied under a normal

floor maintenance schedule. (C) Clean up water buckets are not to be left unattended by store employees. The extension mop handle and low profile of the bucket are hazardous and called out in the manual as a potential hazard and should not be left on the sales floor.

Figure 5. Although this photo is not associated with the actual location of the incident, it does reflect a deficiency in this store's Safety protocol and staff adherence to preserve the safety regulations. (A) Boxes that overhang boxes below it is considered a hazard condition, and the Walmart safety manual is specific to look for this hazard and align the boxes. The fact that this is allowed to remain in this state is a reflection of the store's lack of complying with company rules. (Figure 5B) (Figure SD) This floor had a crushed grape/liquid spill that was not cleaned up in a reasonable length of time and allowed to exist, undiscovered, for approximately sixty minutes during my store inspection period. (C) Another example of poor floor maintenance and if the substance was sticky, could cause a customer to lose their balance. This floor should have been in better condition which is the normal situation in my previous Walmart Store inspections.

Figure 6. When I passed this area over thirty minutes later, it remained in place which indicated the floor sweep schedule was not being complied with. The same observance to company safety policy appears to be similar to the stores lack of attentive compliance to the store safety regulations at the time of the incident. As mentioned in a prior section, I found the amount of floor and product maintenance excessive for the amount of time I spent in the store and the limited video time frame." A104

Birnbach documented in his expert report several other hazards that he observed that he said further supported his expert opinion that Walmart was negligent, including unattended carts, stacks of pallets, and other obstacles accumulating in heavily trafficked areas making them into hazardous conditions that Walmart "allowed to remain for a long period of time." A105. The negligence that Birnbach observed during his site inspection included unattended pallets with clear wrap around the boxes, which "is left to possibly fall onto the floor. The correct

procedure," Birnbach opined, "should have removed the plastic and discarded it once the wrap was broken open." A105.

Birnbach confirmed that what he observed at the Walmart store in question was "in violation" of Walmart's own Safety Regulations and other standards:

Figure 13 A-1. I found the store during the time of the incident in violation to these Walmart posted Safety regulations. Each item was reflected in previous photos to show the actual example of these rules.

Figure 14 A This critical rule is violated and documented in Figure 1 through Figure 12.

Figure 14 B This rule was violated as documented in Figure 5 through Figure 12. Figure 14 C-E This rule was violated as documented in Figure 5 through Figure 12. Figure 15 A-E Examples of the violations to these rules can be found in Figures 1-12

Figure 16 - 20 These selected regulations with letter reference was observed to be violated through testimony and video. This segment comes from the training portion of the Walmart Safety initiatives. In many cases the regulations are noted in several Walmart publications to stress the importance of them to be adhered to at all times. The testimony and photos reveal many violations to these stressed regulations.

Figure 20A- Section regulations from the ADA Rules addressing minimum aisle widths.

Figure 21 - 26 These selected regulations with letter reference was observed to be violated through testimony and video. This segment comes from the training portion of the Wal mart Safety initiatives. In many cases the regulations are noted in several Walmart publications to stress the importance of them to be adhered to at all times. The testimony and photos reveal many violations to these stressed regulations.

Figure 27 This regulation and call out was in violation when reviewing the Figures in this report all of which were documented at 8 PM at night.

Figure 28 The eye witness was very clear as to the account of the incident ant the observation of the plastic which was moved after the incident by a staff member.

In conclusion, with great certainty, based on my experience in Store Safety procedure find Walmart and their Store Staff negligent in not eliminating a hazardous condition at the location of Mr. Pataki's incident and poorly monitoring the condition of the store prior to the incident. The staff deposition of the Assistant Manager Britton revealed a lack of understanding Walmart Rules and Industry Standards and lack of concern to follow Walmart safety regulations." A106

Birnbach further solidified his expert opinion in his *de bene esse* testimony. Birnbach confirmed his experience as a professional store designer. Tr. 6. "A store designer is a form of architecture which specializes on retail and takes into consideration customer's method of operation and utilizes that when designing a store." Id. Birnbach affirmed his familiarity with display designs – similar to the end pallet display that Walmart had erected and from where the plastic wrap on which Pataki slipped. Tr. 6-7. Birnbach affirmed, as the district court also noted, that he had been an expert witness in more than 50 prior cases. Tr. 7.

Birnbach testified that he holds two degrees in architecture, including a Bachelor of Science in Architectural Technology from the New York Institute and a Bachelor of Architecture from City College of New York. During college, he worked as a quality control engineer and later worked for Franklin Store Corporation, a retail operation. He explained that his continuing education includes reviewing industry

27

documentation, participating in retail design organizations, and taking occasional online courses. Id.

Birnbach defined retail design as involving the construction of a retail space and the design and layout of displays and fixtures used by commercial retailers. He noted that he has decades of experience in retail design, particularly with Walmart, dating back to 1975 and continuing through the present day. His work with Walmart included collaborating with vendors to design store departments and displays and directly designing entire departments for Walmart, including projects such as a shoe department test rollout in Clay, New York, which expanded to 50 additional stores after his concept was selected. Id.

Birnbach emphasized that safety has always been a concern in his work, designing displays and department layouts to minimize hazards. Through his extensive experience, he has become familiar with Walmart's safety policies and procedures, which he has reviewed over the years, including Walmart's employee handbook. He considers Walmart's safety standards to be representative of broader industry standards. Id.

Since 2012, Dr. Birnbach has worked as an expert witness, providing opinions on over 50 cases, predominantly for plaintiffs but also for defendants, including Walmart. He confirmed that he is compensated for his expert work and has also presented at industry conferences, including leading panels with Walmart vendors

and suppliers. Additionally, he testified to being qualified as an expert in court on at least five to ten occasions in store design, display design, and retail safety. Id.

Dr. Birnbach testified that he has authored articles relevant to his field. When questioned about whether these articles appeared in peer-reviewed journals, he explained that the concept of peer review does not formally apply within his industry. However, he clarified that his work has been published in trade magazines, which are open to review and commentary by readers within the industry. Id.

Dr. Birnbach testified that he has over 50 years of experience in the retail industry, including extensive work designing departments for major retailers such as Walmart. He emphasized that his qualifications and expertise have been recognized by retailers who entrusted him with department designs. Id.

Birnbach testified that he has been accepted as an expert in several courts but acknowledged that there have been instances where courts have excluded or limited portions of his opinions. He clarified that, in his view, the exclusions were often partial rather than complete. When confronted with a ruling in the *Janezich v. Walmart* case where his opinion was entirely excluded, Dr. Birnbach confirmed his awareness of that decision but remarked on the jury's ability to form its own conclusions. He was also asked about the *Cook v. Walmart* case, where his opinion was excluded because it reflected common knowledge accessible to ordinary jurors. Dr. Birnbach responded by noting that he has handled over 500 cases, including 500

reports, suggesting the scope of his experience in the field.  He has also been deposed in approximately 50 of those cases. Id.

Dr. Birnbach was questioned about the *Nelson v. Costco* case, where it was asserted that the district court had excluded his opinion and subsequently by the Sixth Circuit Court of Appeals. When asked if he was familiar with that exclusion, Dr. Birnbach responded that, due to his involvement in over 500 cases, he could not recall the specific details of every case mentioned without further context. He explained that simply hearing the names of cases did not trigger his memory regarding the particulars of each decision.  Id.

Dr. Birnbach was asked whether a court concluded that he engaged in deliberate misconduct in the *Erkenbrack v. Menard* case. In response, Dr. Birnbach reiterated his difficulty addressing questions tied to specific case names, explaining that he does not recall case details based solely on their titles, especially given his involvement in numerous cases. He expressed frustration that the questioning persisted despite his prior clarification.

Birnbach advised that he has been doing store design work for Walmart since 1975 and has been involved in one as recently as 2018 or 2019. He worked with Walmart brands Better Homes, Garen, and Mark Eisen. Anytime he conducted a store design, he incorporated a safety measure in the display. As a result, he has

reviewed Walmart's safety documentation, and it is part of his general knowledge. Id.

Birnbach affirmed his expert opinion in his written report. He noted that in his on-site inspection and review of surveillance video, there was debris on the floor that a Walmart employee should have removed. The Walmart Handbook clearly states that all employees are responsible, as they patrol the store and immediately pick up any debris. This is mandated in the Walmart Handbook that associates maintain a safe and hazard-free venue. It is depicted in the video that a store associate has disregarded the fallen plastic and kept walking out of the line of the video. It is his finding that he found at least two Walmart employees who failed to correct a hazardous condition. The Walmart associate did not follow Walmart policy by failing to inspect the area correctly. The hazard was open and obvious, and a Walmart employee should have corrected it. Birnbach noted that the footage shows at least two employees ignoring an obvious hazard in the walkway. He confirmed his opinion that Walmart breached its duty of care to invitee Pataki by failing to follow the safety protocols applicable to a large retailer like Walmart, as reflected in Walmart's written manuals and directives, and that this breach resulted directly in the piece of clear plastic remaining in the heavily trafficked area where the plaintiff then slipped and fell.

**B. The district court misapplied the <u>Daubert</u> standard (<u>Jones v. SWEPI L.P.</u>, 643 F. Supp. 3d 547 (W.D. Pa. 2022)) to Birnbach's proffered testimony, resulting in an erroneous view of the law or an improper application of law to the facts shown by the record, <u>General Elec. Co.</u>, 522 U.S. 136; <u>Cohen</u>, 125 F.4th 454 (reversal warranted if there is definite and firm conviction that the lower court committed clear error of judgment in its conclusion).**

Courts have held that exclusion of a plaintiff's expert testimony in a slip-and-fall case is erroneous if the testimony was based on reliable principles and methods and if the testimony would assist the trier of fact in understanding issues beyond common knowledge, *see, e.g.*, <u>Stuhlmacher v. Home Depot U.S.A., Inc.</u>, 774 F.3d 405 (7th Cir. 2014) (reversing district court's exclusion of expert testimony and emphasizing that the trial judge's role is to determine whether the testimony is pertinent to an issue in the case, not to decide whether the expert's opinion is correct; judge improperly expanded his role beyond gatekeeper to trier of fact). Applying the <u>Daubert</u> standard to Birnbach's testimony shows that the district court failed to apply the standard properly and unfairly prejudiced the plaintiff's liability presentation by excluding the important expert opinion from being considered by the jury.

***The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.*** An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in deciding any fact in the case. <u>Smith v. Ford Motor Co.</u>, 215 F.3d 713, 718 (7th

Cir. 2000). Experts are allowed to posit alternate models to explain their conclusions. Walker v. Soo Line R. Co., 208 F.3d 581, 587 (7th Cir. 2000). "Where an expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations, that testimony satisfies Daubert's relevancy requirement." Smith, 215 F.3d at 718–19. "The question of whether the expert's theory is correct given the circumstances of a particular case is a factual one left for the jury to determine," Stuhlmacher v. Home Depot U.S.A., Inc., 774 F.3d 405 (7th Cir. 2014).

Birnbach's testimony informed the jury of the standard of conduct required of a large retailer like Walmart, helping the jury determine whether Walmart breached the standard of conduct in permitting the plastic to remain on the floor.  This was relevant to whether Walmart had either actual or constructive notice of the plastic and breached its duty to remove it, causing the plaintiff's fall and injuries.  Day 1, at 29.  As explained above, Birnbach presented testimony beyond the ken of an average juror because his testimony informed the jury about what type of hazard identification and safety standards apply to a large retailer like Walmart.

***The testimony is based on sufficient facts or data.*** Birnbach described the facts underlying the plaintiff's case and gathered additional facts from his site inspection and review of Walmart's manual. He rendered his opinion regarding the

specific store in question and the particular area of the store where the slip and fall occurred.

*The testimony is the product of reliable principles and methods.* Birnbach is a Store Designer, Display Designer, and Retail Safety Expert. A101. In formulating his opinion, Birnbach underscored the importance of comparing industry standards with a retailer's safety protocols to determine the cause of slip, trip, and fall incidents in retail environments. As a leading retailer, Walmart has comprehensive safety manuals and employee handbooks outlining proper procedures for maintaining a safe store environment. However, Birnbach's examination revealed that many of these safety rules were not followed, creating unsafe conditions on the day of Mr. Pataki's incident. Birnbach set forth the specific and numerous Walmart regulations that were violated in his report in Addendum 1. A112-116. Mr. Birnbach also confirmed such violations of Walmart policy in his *de bene esse* testimony (as discussed in detail above, incorporated here by reference).

The district court erred in reasoning that Mr. Birnbach's testimony was inadmissible because Walmart safety books are publicly available. An expert may base his or her opinion on available public industry standards, such as medical guidelines, building codes, or product safety standards, cf. Bethel v. Berkshire Hathaway Homestate Ins. Co., 596 F. Supp. 3d 1260 (D. Colo. 2022) (stating expert's testimony concerning industry standards highly relevant and admissible, as it laid

the foundation for the expert's opinions and was helpful to the jury); <u>Go Mobile Flooring, LLC v. Blue Banyan Sols., Inc.</u>, 663 F. Supp. 3d 1294 (M.D. Fla. 2023) (expert testimony regarding industry standards is admissible when relevant and the expert has demonstrated a basis for the opinion); <u>Norris v. Excel Indus., Inc.</u>, 139 F. Supp. 3d 742 (W.D. Va. 2015), <u>aff'd</u>, 654 F. App'x 588 (4th Cir. 2016) (ANSI standards as the established norm for safety requirements).

***The expert has reliably applied the principles and methods to the facts of the case.*** Birnbach set forth the specific and numerous Walmart regulations that were violated in his report in Addendum 1. A112-116. Birnbach observed widespread non-compliance with safety protocols, suggesting that such behavior was tolerated by Walmart store management. Birnbach's report (in its addendum) included illustrations and deposition excerpts supporting his opinion regarding the negligence of store staff in hazard identification, incident documentation, and customer assistance that Birnbach opined led directly to Mr. Pataki's slip and fall. Mr. Birnbach testified that his expert opinion was that plastic should be removed from products in the warehouse and not be brought out to the sales floor of the store; furthermore, Walmart, as a large retailer, was required to conduct a sufficient inspection to identify and remove such hazards – particularly in heavily trafficked areas like where Mr. Pataki fell. Birnbach noted that Walmart's policy, as always stated in its employee handbook, requires associates to immediately address (or

"cure") any hazardous condition they observe. There is store lingo that states, "Clean as you go," which means that when you see debris, clean it up immediately – do not wait and come back to get it.  Further, a term, "Continual Zone Defense," is used in retail stores.  This means that every area of the store is required to be inspected.  Specifically, the grocery section needs a greater inspection period and must be inspected more often, on an hourly basis.  The area in question in this case was a cross aisle in the grocery area and would need continual inspection.

Mr. Birnbach affirmed that, with his expertise and experience in retail, he is also aware that a person's line of sight is between 36 inches and 72 inches off the floor. In this particular Walmart store, end caps and signage distract customers from watching where they are going and what is on the floor. Therefore, it is up to the Walmart employees to follow the store's directives and look for anything hazardous on the floor, such as plastic or other debris.  Walmart's employees breached this standard of care.  During his on-site inspection, Birnbach observed a corn husk left on the floor, indicating a failure in floor inspection and maintenance, as no employee addressed the hazard within a 30-minute interval.  Birnbach noted a liquid spill that remained unaddressed for approximately 60 minutes. The floor sweep schedule was not followed, as observed over 30 minutes by Birnbach during his inspection. Birnbach observed an unattended pallet in the central aisle with plastic wrap left on boxes that could fall onto the floor.

The district court also erred in its pretrial ruling that Birnbach's testimony was precluded "with respect to clearly he can't testify as to any conditions that existed two years after the accident because there is no reasonable inference that any jury could draw that any of those conditions or similar conditions existed two years prior. So whatever it was that he observed, and there's lots of pictures, I am assuming he took them when he went there, those are not relevant to what the conditions were on the date of the accident." A1363-65 (April 2, 2024 transcript, at pages 3-6). The two-year time span between the fall and the expert's site inspection was fodder for cross-examination. It impacted the weight of the expert's opinion but was not grounds to exclude his opinion entirely.

The plaintiff did not contend that the conditions observed by Birnbach during his 2017 site visit were identical to those at the time of the plaintiff's 2015 slip and fall, nor was that required for Birnbach's testimony to be admissible. Birnbach's 2017 inspection and observations, his consideration of the discovery in this case, and his knowledge of the safety standards required of large retailers allowed the jury to decide whether Walmart was negligent at the time in question. Walmart was free to argue that Birnbach's 2017 evaluation did not reflect the conditions at the time of the plaintiff's 2015 fall, but the difference in time was not a valid reason to exclude Birnbach's testimony entirely. Indeed, the jury had before it Walmart's surveillance footage (at least part of it) from the time of the plaintiff's fall. They could have

evaluated the 2015 footage against the site observations and opinion testimony from Birnbach to determine whether Walmart breached its standard of care. Required broom sweeping schedules, plastic wrap containment, and similar topics are not sufficiently familiar to the average audience juror.

**C. The district court's exclusion of Birnbach's testimony also unfairly prejudiced the plaintiff in combating Walmart's arguments that the plaintiff was responsible for failing to obtain clearer or more complete surveillance footage**.

Birnbach detailed, in his report, the locations of the cameras that Walmart claimed were not working at the time in question. Figure 2 of Birnbach's report presents the camera view of the incident area, noting discrepancies between Walmart's claims and the actual camera coverage.

The district court erred in excluding any part of Birnbach's factual observations during his site inspection. A101. Birnbach's 2017 site inspection should not have been precluded in any manner because his observations were factual, not expert, testimony in that regard. The <u>Daubert</u> standard primarily applies to scientific, technical, or other specialized knowledge that assists the trier of fact in understanding the evidence or determining a fact. However, expert testimony based on firsthand observations or practical experience, which does not involve scientific principles or methodologies, is not subject to the same standard, some courts have held, <u>cf.</u> <u>United States v. Everett</u>, 972 F. Supp. 1313 (D. Nev. 1997) (distinguishing between scientific and specialized knowledge derived from observations and

experience, indicating that the latter may not require the same level of scrutiny under Daubert).

These factual aspects of Birnbach's on-site observations were critical to the plaintiff's case, as they refuted Walmart's claim that the plaintiff had somehow failed to present surveillance video from Walmart that would have shown the slip and fall more clearly. This is why Mr. Birnbach's 2017 site inspection was so essential for the jury to hear, particularly given the burden of proof on the plaintiff. Birnbach's testimony would have assisted the plaintiff in countering Walmart's claims regarding the availability of footage and what Walmart provided. As the plaintiff charged below, Walmart's video surveillance was cut, of poor quality, from a far distance, and of minimal duration – points that Birnbach's testimony would have brought to the jury's attention.

Birnbach states in his report, "Figure 2. This photo taken from the location of the only camera (A) that Walmart claimed had a view of the incident area. (B) indicates the area in which another camera was discovered during my store visit; however, Walmart claimed that camera was not able to capture the incident. (C) points to the first and second overhead aisle sign which was defined by testimony as the location of Mr. Pataki falling on the floor. (D) is an arrow illustrating the far distance of the camera that caught the incident and the location and the incident. Figure 3. This photo was taken at the far end of Figure 2 by the distant far wall. (C)

is the same sign identified in Figure 2 as the aisle sign. (B) is the referenced distant camera in Figure 2 that did not capture the incident, in spite of its proximity directly over the incident area." A103. Birnbach testified that the provided surveillance images were distant, bad quality, and had a limited time frame.

Birnbach's testimony combated Walmart's argument and permitted the jury to conclude that Walmart, not the plaintiff, failed to secure the accident scene, preserve the accident report, and complete surveillance footage. During discovery, Walmart stated that close-capture surveillance cameras near the accident scene were not operational at the time of the incident. Consequently, Walmart provided only far-distance, poor-quality, limited-time-frame footage. However, at trial, Walmart's attorney contradicted this position by suggesting to the jury that the plaintiff had received close-capture surveillance images but was deliberately hiding them. Walmart's attorney suggested that the plaintiff was hiding close-capture surveillance footage, urging the jury to question why those images were not presented. Walmart's counsel addressed the surveillance video from 2015, noting that while the footage was available, it was of low quality and did not provide conclusive evidence. Counsel said the plaintiff had access to hours of surveillance footage and the opportunity to request specific video evidence. The existing surveillance system was described as an older, fixed camera system, with no evidence that Walmart made any changes to it. Counsel highlighted that the plaintiff had the opportunity to

request timecards and depose employees who were working on the night of the incident, but failed to do so. It was emphasized that the burden of gathering and presenting evidence rested with the plaintiff, not Walmart. The absence of any Walmart witness being called to testify was attributed to the plaintiff's lack of substantive evidence in support of their claims.

This shift in Walmart's narrative was misleading, and the plaintiff was denied the chance to combat it through Birnbach's testimony. Birnbach's testimony would have directly refuted Walmart's false claim by explaining what surveillance footage was provided and why close-capture footage was unavailable. His testimony would have clarified that Walmart never produced any close-up surveillance images and that the only images provided were far-distance, low-quality footage. The importance of his testimony is further underscored by the fact that, in 2017, two years after the accident, he conducted an independent visit to the Kearny Walmart store and documented the presence of surveillance cameras near the accident site. If cameras were installed and working in 2017, it is highly unlikely that none of them were functional in 2015. By excluding his testimony, the court deprived the jury of the opportunity to evaluate whether Walmart had misrepresented the functionality of its surveillance system. Without Birnbach, the plaintiff had no witness to counter Walmart's assertion, allowing a misrepresentation of the evidence to go unchallenged.

The prejudice caused by the district court's exclusion of even this part of Birnbach's testimony became evident during jury deliberations. The jury submitted a note requesting additional images to determine what was on the floor at the time of the accident, indicating that they struggled to assess the evidence. They asked about pictures taken by the plaintiff as well, possibly suggesting that they believed Walmart's argument that the plaintiff was concealing footage. These jury questions show that they were struggling to evaluate the poor-quality surveillance images that Walmart provided and were influenced by Walmart's attorney's suggestion that the plaintiff was hiding footage.  If Mr. Birnbach had been permitted to testify, he would have clarified that no such close-capture footage had ever been turned over to the plaintiff and that Walmart's claims were misleading. Instead, Walmart was able to mislead the jury into believing the plaintiff had hidden evidence that had never actually been produced.

### D. This erroneous exclusion of the plaintiff's expert was particularly harmful because it was a decision the court made in the middle of the trial when the plaintiff and his counsel could do nothing to change their trial presentation.

The exclusion in the middle of the trial caused great unfair prejudice to the plaintiff, who had relied on at least the partial allowance, in the district court's pretrial ruling, of Birnbach's testimony.  The court told the parties during the April 2 pretrial ruling that the court was denying the defendant's motion in part, noting that Birnbach had been accepted as an expert many times before other courts and

further, "Walmart is a high-volume retailer that has very detailed policies and procedures with respect to maintenance and things of which this expert appears to have substantial knowledge. He has been qualified as an expert by many courts previously. So I will allow him to testify. But, again, he is going to have a short leash because I think what he is able to testify to is pretty limited. He did not do any of the -- he doesn't make any opinions about friction, for example, or slipping or anything. So I am not really sure what he is going to testify to other than what's in his report that I haven't barred. So that's for the plaintiff to decide but he can't testify as to anything that existed or he observed, other than the general layout of the store, two years later because it's just not relevant.  I am assuming he is going to talk about things he talks about in terms of industry standards for maintaining and inspecting a large-volume retail store. So that motion is granted in part and denied in part." A1364-65.

Mr. Birnbach's testimony was preserved for presentation at trial via *de bene esse* testimony.  Mr. Birnbach's testimony was tailored to what the district court had ruled he was permitted to testify about (as summarized above).

The plaintiff then proceeded to trial based on the district court's ruling and his expert's *de bene esse* testimony to be presented before the jury.  When the district court revisited its ruling and announced that Birnbach would be excluded entirely, the plaintiff was left without a key expert to explain Walmart's breach of its standard

of care to invitees like Mr. Pataki. As a result, Walmart was able to shift blame to the plaintiff on the liability question and, as noted above, was able to maintain its suggestion that the plaintiff was hiding surveillance footage.

### Point 2

**Walmart's counsel exceeded fair comment on the evidence and injected unfair prejudice to the plaintiff by suggesting to the jury that the plaintiff's lawyer and medical providers were involved in a conspiracy ring to unlawfully obtain benefits for claimed injuries (not objected to below; raised as plain error)**

Improper and personal attacks against opposing counsel, remarks about matters not in the record, or suggestions of bad motives of the plaintiff or his agents can unfairly bias the jury against a party and are grounds for a new trial, Clapper v. Am. Realty Invs., Inc., 95 F.4th 309 (5th Cir. 2024); Whittenburg v. Werner Enters. Inc., 561 F.3d 1122 (10th Cir. 2009).   Even where such error is not objected to at trial (as in this case), the Court of Appeals can provide relief to the prejudiced party if the error is (1) plain, (2) affects substantial rights, and (3) seriously affects the fairness, integrity, or public reputation of judicial proceedings. Government of the Virgin Islands, 821 F.3d 448; see Herman, 524 F.2d at 772 (reviewing error though noting that no objection was lodged at trial).  A new trial due to attorney misconduct can be granted "where the allegedly improper statements or conduct make it 'reasonably probable' that the verdict was influenced by the resulting prejudice." Forrest v. Beloit Corp., 424 F.3d 344, 351–352 (3d Cir. 2005).  A new trial may be

ordered where counsel engages in improper conduct having a prejudicial effect on the jury.  Ne. Women's Ctr., Inc. v. McMonagle, 689 F. Supp. 465, 471 (E.D. Pa. 1988), aff'd, 868 F.2d 1342 (3d Cir. 1989).

These principles warrant a new trial in this case.  A significant theme of the defense counsel's argument to the jury suggested that the plaintiff, his lawyer, and the medical providers were part of a conspiracy "ring" to unlawfully obtain medical benefits and compensation through faked or exaggerated accidents.  Walmart's counsel said in his opening statement that immediately after the incident, Mr. Pataki

> gets in touch with a gentleman named James DeZao, an attorney, and he puts him in touch with this network of doctors. You are going to hear from Dr. Vizzone, the rehab center, Dr. Vizzone, the imaging center, are all related. These folks are all related. They do this treatment within this small network of doctors that were essentially put together and referred by Mr. DeZao who is the first attorney who was involved in this case. They all have this relationship. Again, he's supposedly living in Brooklyn but all this treatment is supposedly happening in Montclair and Clifton, New Jersey, across the way, and it continues over.  Day 1, p. 60

During the closing argument, Walmart's counsel talked about the credibility of Mr. Pataki, again suggesting that he had played a part in this conspiracy to defraud Walmart.  After telling the jury they had heard no evidence about who Mr. Pataki is, counsel said, "you're allowed to consider where the store is, where he lived, how he got back and forth, how he supports himself in Brooklyn, a place that doesn't even have a Walmart or a cheap place to shop. Not just for the past ten years, but for the time before. You're allowed to ask those questions, and say what do I put in that

scale to help me render a verdict to him? You have nothing. And it's not because of Walmart. He chose not to give you any evidence. There's been no evidence -- the Court's going to charge you that you can consider the interests of a person, but there's no evidence of any disinterested person on the part of the plaintiff that doesn't have a financial interest in the outcome of the case." Day 4, at 506.

Counsel included within the conspiracy ring the plaintiff's prior lawyer (Tr. 509): "Again, it's people that the lawyers hired that had an interest in the outcome of the case. When you talk about the lawyer's team, he admitted it. What do we know? In hours -- he left the ER at 1:42. The lawyer, Dr. Vizzone, also has a direct interest in the case. Then within days there's an investigator that goes out to Ms. Gardner to take a statement, but he doesn't take a statement. He writes something up and has her sign it. Then she says, well, maybe I don't know about this, and maybe I don't know about that … within days, they were out at this woman's house. So there had to be a lawyer hired, a phone call made, a trip there, and if you're going to go to somebody to take a statement from them, don't you take a statement from them? You don't write something up and say, here, sign the second page. And this is true, right? And you sign it. And the first page isn't even initialed. And, in fact, even that statement wasn't even presented to you for you to see or you could evaluate." Day 4, at 509.

46

Counsel told the jury there were suspicious "courtesy vans" as well (Tr. 509-510). "Then we heard about courtesy vans. And, again, we're not in the New York metro area but, literally, evidence is the lawyer sent vans over to Brooklyn, from New Jersey, back again, and back again. Did he say that in his deposition? No. That came out reluctantly. And you are allowed to consider that not only did these providers have interest but they're actually going out in the community and grabbing people."

> Folks, there are very good medical centers in the New York metropolitan area, including in Brooklyn. The only place that you can get treatment is not Montclair, New Jersey, miles and an incredible hassle away. And do you remember what Dr. Vizzone first said, well, I did this as a courtesy? He didn't have a courtesy. He had an Urgent Care center. So this gentleman, when he went for treatment for clearance, he didn't even go to an interested party. He went to another one of Vizzone, Mercadante and Gangemi -- I apologize, I still can't pronounce his name properly -- but that's the group. Everybody's involved and there's vans plucking people from the community to do that as opposed to an attorney. We have a lot of resources. If somebody needs help getting medical treatment, the answer isn't courtesy vans and this type of stuff where they don't even tell you what's going on and they don't even disclose this type of issue.  Day 4, at 510

Counsel told the jury this was a "ring" of fraudsters (Tr. 510-11): "And when finally he admitted, first, the story was the girlfriend but each and every time -- in other words -- this is from the trial transcript -- each and every time that he went from Brooklyn to the office, he ultimately admitted, yeah, I got in the courtesy van, that's who I got. There is absolutely no treatment, no evaluation, no consultation

from outside this team. And I am reluctant to call it a ring but that's a fair description. This is a ring of people involved in all these activities." Tr. 511.

> Everybody's within this ring, which is supplied by courtesy vans and financial -- backdoor financial arrangements and no disclosure whatsoever about really what's going on. So in the question -- this is again from trial, this is what you heard -- "So in this particular case, what's happening is your attorney is directing you to these various doctors, correct? "Yeah, I follow his rules." That's scary. Because that's not what's supposed to happen. Folks, doctors are supposed to try to get you better. That's the purpose of it. The purpose isn't there's rules, you see this guy, you see this guy, you see this guy. Who's directing the care here? Day 4, Tr. 511-512

Counsel said the connections between the medical providers and the plaintiff's legal team were deliberately obscured, raising questions about the plaintiff's credibility and his case. Day 4, at 31-37.

The record must support statements made during closing arguments, and the trial judge has the power to control the scope and content of these arguments. U.S. v. Hammer, 25 F.Supp.2d 518 (1998). Counsel may not argue inferences not supported by record evidence. Brescia v. Ireland Coffee-Tea, Inc., 73 F.R.D. 673 (1977). A new trial is warranted if there is a reasonable probability of influencing the verdict, Price v. Trans Union, L.L.C., 839 F.Supp.2d 785 (2012). Counsel may not make suggestions to the jury that have insufficient basis in the record or draw upon conjecture, U.S. v. Schwartz, 325 F.2d 355 (1963); Ayoub v. Spencer, 550 F.2d 164 (1977).

The statements of Walmart's counsel transgressed these standards. Counsel told the jury, "Everybody's within this ring, which is supplied by courtesy vans and financial -- backdoor financial arrangements and no disclosure whatsoever about really what's going on." There was insufficient trial evidence supporting this argument. Counsel cross-examined Dr. Vizzone about the business relationships among some of the various medical providers, and Vizzone acknowledged some of the business relationships, but no trial evidence showed there was a "ring" to defraud, which Walmart's counsel plainly suggested expanded beyond this case. And no trial evidence supported counsel's suggestion that Mr. Pataki and his lawyer were in this ring. This was speculation not sufficiently supported by the trial evidence. And it was extremely prejudicial because it suggested to the jury, again and again, that the plaintiff and his entire legal and medical team were involved in a "ring" to defraud companies by concocted or exaggerated injury claims.[2] Though not objected to at trial, the Court should grant a new trial for the plaintiff on the grounds of plain error that affected the plaintiff's right to a fair jury trial based on the trial evidence, seriously affecting the fairness of the trial, <u>Government of the</u>

---

[2] Walmart's own proofs undercut counsel's suggestion that there was a conspiracy to defraud. Dr. Brooks told the jury that the plaintiff did not have a herniated disk. Yet Dr. DeFalco, Walmart's other medical witness, acknowledged that he saw a herniated disc in the plaintiff's lumbar and a bulging disc upon reviewing the MRI images. Day 4, at 529.

Virgin Islands, 821 F.3d 448; Forrest v. Beloit Corp., 424 F.3d 344, 351–352 (3d Cir. 2005).

## **CONCLUSION**

The Court should vacate the judgment entered for Walmart and remand for a new trial on the plaintiff's claim.

Respectfully submitted,

/s/ Michael Confusione
Hegge & Confusione, LLC
P.O. Box 366, Mullica Hill, NJ 08062
(800) 790-1550; mc@heggelaw.com
Counsel for Appellant

Dated: May 15, 2025

## CERTIFICATION OF BAR MEMBERSHIP, WORD COUNT, SERVICE, IDENTICAL COMPLIANCE OF BRIEFS, VIRUS CHECK

I certify that I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

I certify that the word count is less than 13,000 words.

I certify that today PDF copies of Appellant's Brief with attached required appendix and separately bound Appendix Volumes were served electronically on counsel of record for Appellee; the required paper copies are being filed via United States Mail upon Office of the Clerk, United States Court of Appeals for the Third Circuit, 21400 United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania 19106-1790.

I certify that the text of the electronic filings and hard copies are identical.

I certify that a virus check was performed with Norton Anti-Virus software, Norton Security Suite Version 5.2.2.3 and that no virus was found.

/s/ Michael Confusione

Dated: May 15, 2025

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

---

**PETER PATAKI,**

       **Plaintiff,**

  **v.**

**WALMART, INC.; WALMART
STORES, INC.; WAL-MART STORES,
INC.; WAL-MART STORES EAST,
INC.; WAL-MART STORES EAST I, LP;
WALMART STORE NUMBER 5447;
JANE DOE 1-5, MARY DOE 1-5; and/or
DOE CORPORATION 1-5,**

       **Defendants.**

**CIVIL ACTION**

**No. 1:16-cv-01109-CPO-AMD**

---

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Plaintiff Peter Pataki appeals to the United States

Court of Appeals for the Third Circuit from the Judgment entered on November 20,

2024 following the jury verdict at trial, from all rulings made by the District Court

during trial, and from all orders entered by the District Court, including the text orders

entered under Docket Nos. 148 (4/3/24), 149 (4/3/24), and 165 (4/26/24).

/s/ Michael Confusione
Hegge & Confusione, LLC
P.O. Box 366, Mullica Hill, NJ 08062
(800) 790-1550; mc@heggelaw.com
(Counsel for Plaintiff-Appellant only
on appeal to Court of Appeals)

Dated:  December 13, 2024

_AO450 (Rev. 5/85)   Judgment in a Civil Case

# UNITED STATES DISTRICT COURT

FOR THE                    DISTRICT OF                    NEW JERSEY

PETER PATAKI                              **JUDGMENT IN A CIVIL CASE**

            Plaintiff

        V.

WALMART, INC., et al.                    Case Number:        16-1109 (CPO)(AMD)


            Defendants.


**Jury Verdict.**   This action came before the Court for a trial by jury.   The issues have been tried and the jury
X   has rendered its verdict.


**Decision by Court.**   This action came to trial or hearing before the Court.   The issues have been tried or heard
☐   and a decision has been rendered.


IT IS ORDERED AND ADJUDGED that judgment of no cause of action is entered in favor of Defendants
WALMART, INC., WALMART STORES, INC., WAL-MART STORES, INC. WAL-MART STORES EAST, INC,
WAL-MART STORES I, LP, WALMART ASSOCIATES, INC., and WALMART STORE NUMBER 5447, and
against Plaintiff PETER PATAKI.


Date:   11/20/24

                                        Christine P. O'Hearn
                                        United States District Judge


A2