# United States Court of Appeals

### *for the*

# Third Circuit

---

Case No. 24-3321

PETER PATAKI,

*Appellant,*

– v. –

WALMART, INC.; WALMART STORES INC.; WAL-MART STORES, INC.;
WAL-MART STORES EAST INC.; WAL-MART STORES I, LP; WALMART
ASSOCIATES, INC.; WALMART STORE NUMBER 5447; JOHN DOE 1-5;
DOE CORPORATION 1-5,

*Appellees.*

---

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

## SUPPLEMENTAL APPENDIX FOR DEFENDANTS-APPELLEES WALMART, INC.; WALMART STORES, INC.; WAL-MART STORES, INC.; WAL-MART STORES EAST, INC.; WAL-MART STORES EAST I, LP; AND WALMART STORE NUMBER 5447

PATRICK J. MCDONNELL
ELISA M. BOODY
MCDONNELL & ASSOCIATES P.C.
860 First Avenue, Suite 5B
King of Prussia, Pennsylvania 19406
500 Route 70 West
Cherry Hill, New Jersey 08002
(856) 429-5300

*Attorneys for Defendants-Appellees Walmart, Inc.; Walmart Stores, Inc.;
Wal-Mart Stores, Inc.; Wal-Mart Stores East, Inc.; Wal-Mart Stores East I,
LP; and Walmart Store Number 5447*

---

## <u>Table of Supplemental Appendix</u>

Transcript of De Bene Esse Trial                                      SA1
Testimony of Gerald Birnbach

Transcript of De Bene Esse Trial                                      SA242
Testimony of Robert DeFalco

```
 1              IN THE UNITED STATES DISTRICT COURT
                    DISTRICT OF NEW JERSEY
 2

 3    PETER PATAKI,

 4         Plaintiff,
                               No. 2:16-cv-01109-MC-JBC
 5    vs.

 6    WALMART, INC., WALMART STORES, INC.,
      WAL-MART STORES, INC.; WAL-MART STORES
 7    EAST 1, LP; WALMART STORE NUMBER
      5447; JANE DOE 1-5, MARY DOE 105; AND/OR
 8    DOE CORPORATION 1-5,

 9         Defendants.

10    _____/

11

12         VIDEOTAPED
           DEPOSITION OF:  GERALD BIRNBACH
13              (Conducted via videoconference)

14         DATE:           November 8, 2024

15         TIME:           3:14 p.m. to 7:28 p.m.

16

17         BEFORE:         KATHLEEN K. OHMAN, RMR
                           Notary Public, State of
18                         Ohio

19

20                         Pages 1 - 242

21

22

23

24

25
```

```
 1   APPEARANCES:

 2         ROOSEVELT JEAN, ESQUIRE
           MAURY WINKLER, ESQUIRE
 3         Law Offices of Roosevelt Jean, LLC
           2 University Plaza, Suite 100
 4         Hackensack, New Jersey 07601
           roosevelt@jeanjustice.com
 5                     Attorneys for Plaintiff

 6         PATRICK J. McDONNELL, ESQUIRE
           McDonnell & Associates, P.C.
 7         860 1st Avenue, Suite 8B
           King of Prussia, Pennsylvania 19406
 8         pmcdonnell@mcda-law.com
                     Attorney for Defendants
 9

10        ALSO PRESENT:

11              Bobbi Baker, Videographer

12

13                I N D E X

14   DIRECT EXAMINATION BY MR. JEAN        Page    4

15   CROSS EXAMINATION BY MR. McDONNELL    Page 173

16   REDIRECT EXAMINATION BY MR. JEAN      Page 234

17   CERTIFICATE OF OATH                   Page 240

18   REPORTER'S CERTIFICATE                Page 241

19   ERRATA SHEET                          Page 242

20

21

22

23

24

25
```

```
 1                    E X H I B I T S

 2   Plaintiff's         Description        Marked

 3   Exhibits P43-A-J  Video Still Shots    Page  6

 4

 5   Defendants'                            Referenced

 6   Exhibit 1 Curriculum Vitae            Page  27

 7   Exhibit 2 Netta Transcript            Page 210

 8   Exhibit 3 Rivera Transcript           Page 221

 9   Exhibit 4 Erkenbrack Case Cite        Page  40

10   Exhibit 5 Cook Case Cite              Page  37

11   Exhibit 6 Janezich Case Cite          Page  37

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 15:14:17 | 1 | THE VIDEOGRAPHER:  Good afternoon.  We are |
| 15:14:18 | 2 | on the record at 3:14 p.m. Eastern time on |
| 15:14:23 | 3 | November 8, 2024, to begin the deposition of |
| 15:14:28 | 4 | Gerald Birnbach in the matter of Peter Pataki |
| 15:14:31 | 5 | versus Walmart, Incorporated, et al. |
| 15:14:34 | 6 | The venue for this case is United States |
| 15:14:36 | 7 | District Court for the District of New Jersey. |
| 15:14:40 | 8 | The case number is 2:16-cv-01109. |
| 15:14:49 | 9 | This deposition is taking place via Zoom |
| 15:14:52 | 10 | videoconference.  The legal videographer is |
| 15:14:54 | 11 | Bobbi Baker, here on behalf of Steno, and the |
| 15:14:57 | 12 | court reporter is Kathleen Ohman, also here on |
| 15:15:00 | 13 | behalf of Steno. |
| 15:15:01 | 14 | Would counsel please identify yourselves |
| 15:15:03 | 15 | and state whom you represent? |
| 15:15:05 | 16 | MR. JEAN:  Good morning.  Roosevelt Jean, |
| 15:15:07 | 17 | last name spelled J-e-a-n, for plaintiff, Peter |
| 15:15:10 | 18 | Pataki. |
| 15:15:13 | 19 | MR. McDONNELL:  Patrick McDonnell on |
| 15:15:14 | 20 | behalf of Walmart. |
| 15:15:18 | 21 | MR. WINKLER:  Maury Winkler on behalf of |
| 15:15:20 | 22 | Pataki. |
| 15:15:22 | 23 | THE VIDEOGRAPHER:  Thank you, counsel. |
| 15:15:23 | 24 | Would the reporter please swear in the |
| 15:15:25 | 25 | witness? |

| | | |
|---|---|---|
| 15:16:02 | 1 | THE REPORTER:  I have a stipulation. |
| 13:01:41 | 2 | The attorneys participating in this |
| 13:01:41 | 3 | deposition acknowledge that I, the court |
| 13:01:41 | 4 | reporter, am not present with the witness |
| 13:01:41 | 5 | and that I will be reporting the proceedings |
| 13:01:41 | 6 | and administering the oath remotely. |
| 13:01:41 | 7 | The parties and their counsel further |
| 13:01:41 | 8 | agree that while I am a licensed notary, the |
| 13:01:41 | 9 | witness may be in a state where I am not |
| 13:01:41 | 10 | licensed.  The parties stipulate that this |
| 13:01:41 | 11 | deposition may be taken before me. |
| 13:01:41 | 12 | If any party does have an objection to |
| 13:01:41 | 13 | this manner of reporting, or anything stated |
| 13:01:41 | 14 | above, please state so now. |
| 13:01:41 | 15 | Hearing none, we can proceed. |
| 13:01:54 | 16 | Would you raise your right hand. |
| 13:01:54 | 17 | Do you solemnly swear to tell the truth, |
| 13:01:54 | 18 | the whole truth and nothing but the truth? |
| 13:01:54 | 19 | THE WITNESS:  I do, but I am not a notary. |
| 13:01:54 | 20 | THE REPORTER:  We're ready. |
| 13:01:54 | 21 | MR. JEAN:  Thank you very much. |
| 13:01:54 | 22 | (Plaintiff's Exhibit Numbers P43-A through |
| 13:01:54 | 23 | P43-J were marked for purposes of |
| 13:01:54 | 24 | identification.) |
| 13:01:54 | 25 | |

| | | |
|---|---|---|
| 13:01:54 | 1 | GERALD BIRNBACH, |
| 13:01:54 | 2 | the witness herein, being first duly sworn on oath, |
| 13:01:54 | 3 | was examined and deposed remotely as follows: |
| 13:01:54 | 4 | DIRECT EXAMINATION |
| 15:16:16 | 5 | BY MR. JEAN: |
| 15:16:30 | 6 | Q.   Good afternoon. |
| 15:16:32 | 7 | A.   Good afternoon. |
| 15:16:33 | 8 | Q.   Could you please introduce yourself to the |
| 15:16:35 | 9 | jury on this video deposition for trial? |
| 15:16:40 | 10 | A.   My name is Gerald Birnbach, I'm referred |
| 15:16:43 | 11 | to as Jerry Birnbach, and I have been asked to |
| 15:16:47 | 12 | attend this meeting. |
| 15:16:49 | 13 | Q.   Mr. Birnbach, what do you do for a living? |
| 15:16:52 | 14 | A.   I have two roles.  One is I am a |
| 15:16:56 | 15 | professional store designer and my other role is to |
| 15:17:01 | 16 | be an expert witness. |
| 15:17:05 | 17 | Q.   How long have you been a store designer? |
| 15:17:08 | 18 | A.   I've been designing stores since 1975. |
| 15:17:12 | 19 | Q.   What is a store designer? |
| 15:17:15 | 20 | A.   A store designer is a form of architecture |
| 15:17:20 | 21 | which specializes on retail and takes into |
| 15:17:22 | 22 | consideration customer's method of operation and |
| 15:17:26 | 23 | utilizes that when designing a store. |
| 15:17:33 | 24 | Q.   Are you familiar with display design? |
| 15:17:35 | 25 | A.   Yes, I am. |

15:17:36  1          I've created and designed and overseen the

15:17:39  2     manufacturing of many, many design of displays that

15:17:45  3     have went into major retailers across America.

15:17:49  4          Q.   You mentioned a second role that you have.

15:17:50  5     Can you tell us about what that is?

15:17:52  6          A.   As an expert witness, I'm called upon to

15:17:55  7     provide an opinion -- could be plaintiff or

15:17:59  8     defendant -- as to my opinion of the documentation

15:18:06  9     that's presented to me, whether or not there's

15:18:09 10     liability and, if so, where it lies.

15:18:15 11          Q.   Sir, could you give us the benefit of your

15:18:18 12     education to do what you currently do now?

15:18:20 13          A.   I hold two degrees in architecture.  The

15:18:23 14     first degree was from the New York Institute in New

15:18:26 15     York City Institution.  I was a four-year program

15:18:29 16     and I received a bachelor of science in

15:18:34 17     architectural technology.

15:18:35 18          Then I went on for a fifth year, which is

15:18:38 19     the professional degree, but it is referred to as a

15:18:40 20     bachelor of architecture, which I obtained from City

15:18:44 21     College of New York.

15:18:47 22          Q.   After that, what did you do for education?

15:18:52 23          A.   During my taught term in college, I worked

15:18:57 24     as a quality control engineer, but after college I

15:19:05 25     was working with Franklin Store Corporation, a

GERALD BIRNBACH
NOVEMBER 08, 2024

JOB NO. 1282576

15:19:09  1  retail operation.

15:19:11  2      Q.   Have you had any continuing education in

15:19:14  3  your craft?

15:19:16  4      A.   My continuing education comprises of

15:19:20  5  reading documentation that's provided to me, joining

15:19:25  6  organizations that deal with current problems in

15:19:29  7  retail design, and occasionally I will involve

15:19:36  8  myself with online education that's made available.

15:19:43  9      Q.   Sir, what is the field of retail design?

15:19:48  10      A.   Retail design entails not only the

15:19:52  11  construction of a retail facility, but the layout

15:19:56  12  and design of the displays and fixtures that the

15:20:00  13  retailer will incorporate within the retail venue.

15:20:06  14      Q.   And when we say "retail," are we talking

15:20:08  15  about commercial stores?

15:20:10  16      A.   Yes.

15:20:11  17      Q.   Okay.  In retail, do you have -- in

15:20:15  18  retail, your retail expertise, have you had any

15:20:19  19  experience with Walmart as part of your credentials?

15:20:23  20      A.   Yes, I've had many years of experience

15:20:25  21  with Walmart.  Offline, I was actually playing

15:20:31  22  tennis with Sam Walton, the founder of Walmart.

15:20:35  23          But my involvement with Walmart consisted

15:20:37  24  of many projects, mainly with vendors who are

15:20:42  25  looking to get their product positioned in Walmart.

```
15:20:45   1            Ten years after working with Franklin
15:20:49   2   Stores, I was on the vendor side where each vendor
15:20:52   3   represented 50 percent of the Walmart jewelry and
15:20:56   4   accessory area.
15:20:58   5            And, afterward, I won big projects with
15:21:03   6   Walmart and designed departments not only for
15:21:09   7   vendors, but I also was called in by Walmart to
15:21:12   8   design departments.
15:21:15   9        Q.   How long have you had experience dealing
15:21:18  10   with Walmart stores in your profession?
15:21:22  11        A.   I would say that my experience with
15:21:25  12   Walmart started in 1975, and it's been ongoing to
15:21:30  13   current date.
15:21:31  14        Q.   2024?
15:21:33  15        A.   Correct.
15:21:34  16        Q.   In the roles that you perform for Walmart,
15:21:39  17   could you tell us a little bit about the details of
15:21:41  18   what you were asked to do?
15:21:45  19        A.   Many projects, which were vendor-related,
15:21:47  20   were developed with the vendor's product offering
15:21:54  21   and determined the best way to present it, whether
15:21:57  22   it was display-wise; or if the vendor was challenged
15:22:02  23   to deal with the entire department.  As an example,
15:22:06  24   we've got first years for children.  We have
15:22:10  25   accessory network, which would have been all of the
```

15:22:14  1  accessory department, and my involvement would be

15:22:17  2  with the vendors in providing the best design or

15:22:21  3  department layout.

15:22:23  4        And then I was asked by Walmart directly

15:22:27  5  to be involved with some of their department design,

15:22:30  6  as well as display incorporation.  As an example,

15:22:37  7  one project, which included ES Original, who was a

15:22:41  8  shoe vendor, my project was to take a test tour,

15:22:46  9  which they gave two test tours out -- one to me, one

15:22:50  10  to the other vendor of shoes -- and my solution won

15:22:55  11  and was a rollout for 50 other stores afterward.

15:22:58  12        It involved a Clay, New York, location and

15:23:02  13  it involved the entire shoe department.

15:23:05  14      Q.   In your working with Walmart, has it

15:23:08  15  involved the issue of safety?

15:23:11  16      A.   Safety is always a concern.  It always has

15:23:15  17  been a concern.  When you design a display, you

15:23:18  18  don't want it to be a safety issue, so you design it

15:23:22  19  as safely as possible.

15:23:24  20      Q.   In your experience with Walmart, is it

15:23:27  21  accurate -- how many years did you say it was

15:23:30  22  before, I preface it?

15:23:32  23      A.   It started in 1975 and continues to date.

15:23:36  24      Q.   So approximately 40 years?

15:23:38  25      A.   Yes.

15:23:39  1      Q.   Okay.  In the approximately 40 years that

15:23:41  2  you've had experience working on Walmart issues,

15:23:46  3  have you come to understand their policies and

15:23:49  4  procedures with regard to safety?

15:23:52  5      A.   Yes, I have.

15:23:54  6      Q.   And how have you come to learn this

15:23:57  7  information?

15:23:58  8      A.   It comes through cases similar to the one

15:24:02  9  that we are reviewing.  I probably have addressed

15:24:06 10  over 500 -- sorry, over 50 Walmart projects in which

15:24:12 11  I've provided opinions.  Some have been directly for

15:24:15 12  Walmart and some have been for plaintiffs taking an

15:24:21 13  action against Walmart.

15:24:23 14      Q.   Okay.  So is that 50 years or 40 years,

15:24:25 15  just to be clear?

15:24:29 16      A.   I would say it's 40 plus years.

15:24:31 17      Q.   Okay.  Thank you.

15:24:33 18           So in your 40 plus years with your

15:24:36 19  experience of Walmart, have you read their written

15:24:39 20  policies and procedures with regard to the issue of

15:24:42 21  safety?

15:24:43 22      A.   Yes, I have.

15:24:44 23      Q.   Okay.  Have you assisted in providing

15:24:47 24  information on best practices on safety to Walmart?

15:24:52 25      A.   Yes, I have.

15:24:53  1        Q.    And that's been for the past over 40

15:24:56  2    years?

15:24:56  3        A.    Well, it occurred in the early part of my

15:25:00  4    career as a designer of display, and since 2012 I've

15:25:08  5    been working as an expert and I've provided expert

15:25:11  6    opinion pertaining to Walmart.

15:25:14  7        Q.    Now, when you do your expert opinion work,

15:25:18  8    do you do it for plaintiff?  Defendant?  Who do you

15:25:21  9    do it for?

15:25:22  10       A.    I do it for both.  I would say majority is

15:25:25  11   plaintiff.  And I have done, as I said before,

15:25:31  12   approximately 50 cases, two of which were defendant

15:25:36  13   and the addition with them, the others, would have

15:25:39  14   been for the plaintiff.

15:25:41  15       Q.    Do you receive a fee for the time that you

15:25:42  16   spend in doing the work of reviewing and providing

15:25:46  17   an opinion?

15:25:47  18       A.    Yes, I do.

15:25:48  19       Q.    Okay.  Is that customary in the practice?

15:25:51  20       A.    As far as I know.

15:25:53  21       Q.    Okay.  You've seen written Walmart

15:25:57  22   policies over the past 40 plus years with regard to

15:26:00  23   safety; is that true?

15:26:01  24       A.    Yes.

15:26:02  25       Q.    Okay.  Now, additionally, to your

15:26:07  1   knowledge of Walmart that you've already talked

15:26:09  2   about, are you familiar with industry standards for

15:26:12  3   other stores like Walmart?

15:26:14  4        A.   Yes, I am.

15:26:18  5        Q.   Okay.  And in your doing expert work, do

15:26:22  6   you compare the industry standards as well as the

15:26:25  7   Walmart standards, if required?

15:26:29  8        A.   Walmart happens to be one of the better

15:26:31  9   ones in defining standard, and they have an

15:26:35 10   extensive book that is given to new employees that

15:26:40 11   discusses a subject, so the answer is "yes" to your

15:26:44 12   question, and I would consider Walmart standard

15:26:48 13   almost the industry standard.

15:26:51 14        Q.   And this expert that -- you say a book?

15:26:54 15   Did I hear that correctly?

15:26:56 16        A.   Well, you say -- I call it a handbook.

15:26:57 17   It's given out to new employees.

15:27:00 18        Q.   Have you seen this handbook?

15:27:03 19        A.   Many times.

15:27:04 20        Q.   And you've read this handbook?

15:27:06 21        A.   I have.

15:27:07 22        Q.   And you are familiar with this handbook;

15:27:08 23   is that a fair statement?

15:27:09 24        A.   Yes.

15:27:10 25        Q.   Okay.  In addition to the credentials that

15:27:15  1   you've talked about today, are there any other

15:27:18  2   relevant qualifications that you have as your

15:27:21  3   pedigree to provide testimony in cases like this?

15:27:28  4       A.   Well, I would say there might be -- I

15:27:32  5   can't really put a gauge on how qualified these

15:27:35  6   items are, but I have held conferences at industry

15:27:40  7   meetings in Chicago, McCormick Center.  I was the

15:27:44  8   master of ceremony.  It was my subject matter.

15:27:48  9           I actually had Walmart vendors and

15:27:51 10   suppliers as part of my panel, and we discussed

15:27:55 11   certain aspects of Walmart design and store

15:27:59 12   locations and display.

15:28:01 13       Q.   Now, could you tell the jury what is the

15:28:04 14   study of design and display?  Is there a particular

15:28:07 15   language in the industry that tells us what is

15:28:10 16   design and display?

15:28:12 17       A.   Well, display is a -- is an item of

15:28:17 18   product -- I'm sorry -- that can be pulled away from

15:28:23 19   the department and featured any other time of the

15:28:28 20   year to -- typically, the product is within a

15:28:33 21   department and it's an ongoing basic item.

15:28:38 22           But there are seasonal items, such as

15:28:40 23   Christmas ornaments or Christmas lights, or

15:28:43 24   Coca-Cola during a 4th of July, and those items tend

15:28:49 25   to be promoted by Walmart depending on what they are

15:28:53  1   and the time of the year.

15:28:54  2          So the answer is that there are basic

15:28:56  3   department assignments for product and then

15:29:00  4   sometimes the product is pulled for promotion.

15:29:05  5      Q.   And those issues that you talked about, is

15:29:07  6   that from your experience as dealing with the issue

15:29:11  7   of safety as well?

15:29:12  8      A.   Well, it's but my issue both from a

15:29:14  9   standpoint of having to deal with it as a designer

15:29:17 10   as well as a expert.

15:29:21 11      Q.   Have you been qualified as an expert in

15:29:24 12   other jurisdictions -- well, first question.  Have

15:29:28 13   you been qualified previously in court?

15:29:32 14      A.   Yes, I have.

15:29:33 15      Q.   How many times, approximately?

15:29:36 16      A.   I would say at least five to ten.

15:29:39 17      Q.   Okay.

15:29:41 18          MR. JEAN:  At this time the plaintiff

15:29:43 19      offers Mr. Jerry Birnbach as an expert in store

15:29:49 20      design, display design and as a retail safety

15:29:52 21      expert.

15:29:56 22          MR. McDONNELL:  Mr. Birnbach, would you

15:29:58 23      agree you are not a licensed architect?

15:30:00 24          THE WITNESS:  That is correct.

15:30:01 25          MR. McDONNELL:  You never passed the

15:30:02  1   architect exam?

15:30:03  2       THE WITNESS:  That is correct.

15:30:05  3       MR. McDONNELL:  In fact, you failed the

15:30:06  4   architect exam twice in the state of

15:30:08  5   Connecticut in the late seventies.

15:30:11  6       THE WITNESS:  It depends on your

15:30:12  7   definition of "failed."

15:30:13  8       MR. McDONNELL:  Well, "failed" would mean

15:30:15  9   that they did not register you as an architect

15:30:18  10  and you did not get a license in the field of

15:30:20  11  architecture.

15:30:21  12      THE WITNESS:  That is correct.

15:30:22  13      MR. McDONNELL:  You never passed the New

15:30:23  14  Jersey architect exam.

15:30:25  15      THE WITNESS:  I passed three out of four

15:30:26  16  parts two years consecutively; however, there

15:30:31  17  weren't four out of four, which is the

15:30:33  18  requirement.

15:30:34  19      MR. McDONNELL:  Sir, you understand that

15:30:35  20  in order to hold yourself out as a professional

15:30:37  21  or registered architect you have to pass the

15:30:40  22  exam?

15:30:41  23      THE WITNESS:  That's correct.

15:30:41  24      MR. McDONNELL:  And you failed it twice.

15:30:44  25      THE WITNESS:  Correct.

15:30:45  1        MR. McDONNELL:  Okay.  Sir, and you also

15:30:47  2   never passed the New Jersey architect exam.

15:30:49  3        THE WITNESS:  I never took it.

15:30:50  4        MR. McDONNELL:  Okay.  And you are

15:30:51  5   familiar with the purpose of these boards of

15:30:53  6   architects, which is to hold out minimum

15:30:55  7   standards for architects, or people who hold

15:30:59  8   themselves out as professionals in the field of

15:31:01  9   architecture.

15:31:02  10       THE WITNESS:  Correct.  Designing

15:31:03  11  structural elements.

15:31:04  12       MR. McDONNELL:  Okay.  And would you agree

15:31:05  13  that you don't hold any professional license of

15:31:07  14  any type in any state?

15:31:12  15       THE WITNESS:  I would consider my being

15:31:14  16  recognized by the AIA as an associate member

15:31:19  17  would qualify me as a member of that

15:31:23  18  organization, which is the American Institute

15:31:25  19  of Architects, and would be associated with

15:31:28  20  that, but it would not qualify me as an

15:31:30  21  architect.

15:31:32  22       MR. McDONNELL:  Sir, when you talk about

15:31:33  23  the AIA, you were an associate member of that

15:31:36  24  group, correct?

15:31:37  25       THE WITNESS:  That's what I said.

15:31:38  1        MR. McDONNELL:  Okay.  And there's a

15:31:39  2    status of a member, which requires you to be a

15:31:42  3    professional architect or a registered

15:31:43  4    architect, correct?

15:31:44  5        THE WITNESS:  That is correct.

15:31:45  6        MR. McDONNELL:  And there's also they

15:31:47  7    allow you to join the organization.  In other

15:31:49  8    words, you can be part of the social group if

15:31:53  9    you have a degree in architecture, correct?

15:31:54 10        THE WITNESS:  That is correct.

15:31:55 11        MR. McDONNELL:  And would you also agree

15:31:56 12    that no state, including the state of New

15:31:58 13    Jersey, the state of New York, where you live,

15:32:00 14    permits somebody who is an associate in the AIA

15:32:04 15    to practice the field of architecture?

15:32:08 16        THE WITNESS:  That is correct.

15:32:10 17        MR. McDONNELL:  Now, you agree that, in

15:32:12 18    terms of formal education, you would not be

15:32:17 19    allowed to stamp or submit plans in any state

15:32:22 20    or any municipality, correct?

15:32:24 21        THE WITNESS:  I can submit plans.  I just

15:32:27 22    have it -- I have to have them signed off by a

15:32:29 23    professional architect.

15:32:31 24        MR. McDONNELL:  So you agree that if --

15:32:31 25    you describe this work, you say you are a store

15:32:36  1   designer, your name did not appear on a single

15:32:38  2   design for any Walmart store or any other

15:32:41  3   retail store in the country?

15:32:43  4       THE WITNESS:  Well, that's not correct.

15:32:45  5       MR. McDONNELL:  Okay.  Well, sir, in order

15:32:46  6   to have your name -- you understand what I mean

15:32:48  7   by "stamped plans," correct?

15:32:49  8       THE WITNESS:  Yes.

15:32:50  9       MR. McDONNELL:  Okay.  The plans have to

15:32:51 10   say -- they have to be stamped by either a

15:32:53 11   registered architect or a professional

15:32:55 12   engineer, correct?

15:32:56 13       THE WITNESS:  That is correct.

15:32:57 14       MR. McDONNELL:  Okay.  And you are

15:32:59 15   neither, correct?

15:33:00 16       THE WITNESS:  I think we established that.

15:33:02 17       MR. McDONNELL:  Okay.  So with respect to

15:33:03 18   any plans for any store design -- we are

15:33:07 19   talking about the store first, the structure --

15:33:08 20   your name does not appear on a single plan

15:33:12 21   registered in any courthouse or any

15:33:15 22   municipality as being a architect who designed

15:33:18 23   a Walmart store.

15:33:20 24       THE WITNESS:  As a structural designer,

15:33:21 25   correct.

15:33:22  1        MR. McDONNELL:  Okay.  So when you talk

15:33:23  2    about -- you said you designed displays,

15:33:27  3    correct?

15:33:28  4        THE WITNESS:  That's correct.

15:33:29  5        MR. McDONNELL:  And you designed them for

15:33:30  6    --

15:33:31  7        THE WITNESS:  For products.

15:33:32  8        MR. McDONNELL:  Okay.  And you designed

15:33:33  9    them for vendors, correct?

15:33:34 10        THE WITNESS:  As well as Walmart.

15:33:35 11    Correct.

15:33:36 12        MR. McDONNELL:  Okay.  So let's first

15:33:37 13    we'll talk about vendors.  With respect to

15:33:39 14    vendors, some company that sells things to

15:33:42 15    Walmart might come to you and ask you to

15:33:46 16    design, let's say, like, a PDQ display or one

15:33:49 17    of those displays that we drop down in the

15:33:52 18    middle of an aisle correct?

15:33:53 19        THE WITNESS:  Yes.

15:33:54 20        MR. McDONNELL:  Okay.  And that particular

15:33:56 21    field doesn't require you to be a professional

15:33:58 22    design professional, correct?

15:34:01 23        THE WITNESS:  Doesn't require you to be an

15:34:02 24    architectural -- registered architect.

15:34:04 25        MR. McDONNELL:  Okay.  But you agree that

15:34:07  1   the two professional design professionals are

15:34:10  2   professional engineers, it's a PD designation,

15:34:13  3   and the RV designation, correct?

15:34:16  4       THE WITNESS:  Neither one are required

15:34:19  5   when you do the work directly.

15:34:21  6       MR. McDONNELL:  Okay.  In fact, you don't

15:34:21  7   even need an architecture degree to design

15:34:24  8   display, correct?

15:34:25  9       THE WITNESS:  That is correct.

15:34:25 10       MR. McDONNELL:  You could be a interior

15:34:27 11   designer, for example?

15:34:28 12       THE WITNESS:  If you are familiar with

15:34:29 13   retail.

15:34:31 14       MR. McDONNELL:  Sure.  Now, in terms of --

15:34:32 15   of safety policies, you agree that you didn't

15:34:37 16   draft any safety policies for Walmart?

15:34:42 17       THE WITNESS:  Correct.

15:34:42 18       MR. McDONNELL:  Okay.  And the last time

15:34:43 19   you actually worked for a department store was

15:34:46 20   this Franklin chain in 1970 and 1975, correct?

15:34:50 21       THE WITNESS:  Well, you used the word

15:34:50 22   "department store."  Would you like to define

15:34:53 23   that, please?

15:34:55 24       MR. McDONNELL:  Okay.  Well, Franklin was

15:34:56 25   a department store, correct?

15:34:57  1      THE WITNESS:  It was a mass retailer.

15:35:00  2      MR. McDONNELL:  When you say "mass

15:35:01  3  retailer," 60,000 square feet, correct?

15:35:04  4      THE WITNESS:  Yes.

15:35:04  5      MR. McDONNELL:  Okay.  About the size of a

15:35:06  6  small supermarket today, correct?

15:35:08  7      THE WITNESS:  Correct.

15:35:09  8      MR. McDONNELL:  Okay.  And that was

15:35:10  9  between the years of 1970 to '75, almost 50

15:35:13  10 years ago, correct?

15:35:15  11     THE WITNESS:  That's correct.

15:35:16  12     MR. McDONNELL:  And now you claim on your

15:35:17  13 CV that you were in charge of all new design

15:35:19  14 and construction review.  But, again, you

15:35:22  15 weren't a registered design professional,

15:35:23  16 correct?

15:35:26  17     THE WITNESS:  I was not a registered

15:35:26  18 architect.  That's correct.

15:35:28  19     MR. McDONNELL:  Okay.  And would you agree

15:35:31  20 that, at least as far as the training that you

15:35:34  21 put on your CV, it was three hours in ice

15:35:38  22 management, sidewalk maintenance and safety

15:35:41  23 maintenance, correct?

15:35:42  24     THE WITNESS:  That's in addition to the

15:35:43  25 vast amount of experience I had working with

15:35:46  1   the retailer.

15:35:48  2       MR. McDONNELL:  Well, let's talk about

15:35:49  3   what you mean by "vast amounts of experience."

15:35:52  4   You -- this is what you post on your CV as

15:35:55  5   being your study.

15:36:05  6       THE WITNESS:  Is that a question?

15:36:06  7       MR. McDONNELL:  Yeah, I'm sorry.  I'm

15:36:07  8   going to show you your CV.

15:36:10  9       Sir, you put this on your CV, correct?

15:36:13 10   You completed these three courses.

15:36:15 11       THE WITNESS:  That is at the end of the CV

15:36:17 12   in advance to additional course work I've taken

15:36:21 13   beyond my degrees.

15:36:23 14       MR. McDONNELL:  Okay, sir.  When we look

15:36:23 15   at a closeup, this is given by the Accredited

15:36:27 16   Snow Contractors Association, correct?

15:36:29 17       THE WITNESS:  Yes.

15:36:30 18       MR. McDONNELL:  So this organization has

15:36:31 19   to do with snow contractors, correct?

15:36:34 20       THE WITNESS:  Yes.

15:36:34 21       MR. McDONNELL:  And this is a course in

15:36:36 22   sidewalk maintenance for snow contractors,

15:36:38 23   correct?

15:36:39 24       THE WITNESS:  That's correct.

15:36:41 25       MR. McDONNELL:  And this is in charge of

15:36:42  1   safety policies -- safety for snow contractors,

15:36:48  2   correct?

15:36:49  3        THE WITNESS:  That's correct.

15:36:50  4        MR. McDONNELL:  But in terms of any sort

15:36:51  5   of policies you've ever done, or training

15:36:54  6   you've ever done for retail stores, you agree

15:36:57  7   that you haven't -- have no certification from

15:37:01  8   any professional organization that says that

15:37:04  9   you are qualified to write safety policies,

15:37:08 10   correct?

15:37:10 11        THE WITNESS:  When it deals with safety

15:37:11 12   policies, I have written them.  I just have not

15:37:15 13   have written them for major retailers.

15:37:18 14        MR. McDONNELL:  Now, you agree that New

15:37:19 15   Jersey, in particular, requires professional

15:37:21 16   licenses for practically every profession,

15:37:23 17   including cosmetologists and hair stylists,

15:37:26 18   correct?

15:37:27 19        THE WITNESS:  When they are working on a

15:37:28 20   particular project that it stipulates their

15:37:30 21   expertise.

15:37:31 22        MR. McDONNELL:  Sir, New Jersey also

15:37:34 23   requires licenses for contractors, correct?

15:37:36 24        THE WITNESS:  Yes.

15:37:37 25        MR. McDONNELL:  And you are not a licensed

15:37:38   1   contractor, are you?

15:37:40   2       THE WITNESS:  Nor do I have to be.

15:37:41   3       MR. McDONNELL:  Okay.  And you are not a

15:37:42   4   licensed home or building inspector in the

15:37:45   5   state of New Jersey or any other state,

15:37:46   6   correct?

15:37:47   7       THE WITNESS:  Nor do I have to be.

15:37:48   8       MR. McDONNELL:  Nor did you -- nor have

15:37:49   9   you ever served as a New Jersey code official

15:37:52  10   or New York code official, correct?

15:37:55  11       THE WITNESS:  I've dealt with a lot of New

15:37:56  12   Jersey cases.

15:37:56  13       MR. McDONNELL:  Sir, we've all dealt with

15:37:58  14   cases.  As counsel, I've dealt with cases.

15:38:01  15   Please answer my question, which is, have you

15:38:03  16   ever served as a code official for either in

15:38:07  17   New Jersey or New York?

15:38:09  18       THE WITNESS:  No.  No, I have not.

15:38:10  19       MR. McDONNELL:  Have you ever -- have you

15:38:11  20   ever served as a code official in any other

15:38:13  21   state?

15:38:14  22       THE WITNESS:  No.

15:38:15  23       MR. McDONNELL:  So would you agree that

15:38:16  24   you've never been a person in charge of

15:38:18  25   enforcing safety codes for any particular

15:38:21  1 | municipality or state?

15:38:25  2 |     THE WITNESS:  That's up to the retailer.

15:38:26  3 | No, I have not.

15:38:27  4 |     MR. McDONNELL:  And, sir, you are not even

15:38:28  5 | authorized or have the credentials to serve as

15:38:31  6 | a code official for either the state of New

15:38:33  7 | Jersey, correct?

15:38:34  8 |     THE WITNESS:  Nor is it required.  No,

15:38:35  9 | that's correct.

15:38:36 10 |     MR. McDONNELL:  Okay.  Sir, you say "nor

15:38:38 11 | is it required."  You understand that New

15:38:39 12 | Jersey has code officials that go out and

15:38:41 13 | inspect properties, correct?

15:38:45 14 |     THE WITNESS:  That's -- that's a general

15:38:46 15 | statement.  No, that is not correct.

15:38:48 16 |     MR. McDONNELL:  That's not correct.

15:38:49 17 |     So if we look up and New Jersey has code

15:38:52 18 | officials and has adopted building code that

15:38:55 19 | requires code officials inspecting, you are not

15:38:58 20 | familiar with that idea?

15:38:59 21 |     THE WITNESS:  I am familiar with it and it

15:39:00 22 | is to deal with the code.  This is not a code

15:39:02 23 | issue.

15:39:03 24 |     MR. McDONNELL:  All right.  Now, you also

15:39:04 25 | never served as an OSHA inspector, correct?

| | | |
|---|---|---|
| 15:39:08 | 1 | THE WITNESS:  It's not an OSHA issue |
| 15:39:10 | 2 | either. |
| 15:39:10 | 3 | MR. McDONNELL:  Okay.  And you've also |
| 15:39:10 | 4 | never served on any professional committees for |
| 15:39:14 | 5 | either architects or engineers because you are |
| 15:39:16 | 6 | not a registered design professional, correct? |
| 15:39:18 | 7 | THE WITNESS:  Well, you are assuming that |
| 15:39:19 | 8 | one has to do with the other.  That's not |
| 15:39:22 | 9 | correct. |
| 15:39:22 | 10 | MR. McDONNELL:  Sir, well, the answer to |
| 15:39:23 | 11 | my question is you have never served on any |
| 15:39:25 | 12 | professional committee for any group of |
| 15:39:27 | 13 | architects or engineers, correct? |
| 15:39:29 | 14 | THE WITNESS:  That's correct. |
| 15:39:29 | 15 | MR. McDONNELL:  Okay.  And none of these |
| 15:39:31 | 16 | committees that you talked about, or these |
| 15:39:34 | 17 | other things on your resume, have ever been |
| 15:39:37 | 18 | accepted by the state of New Jersey as being a |
| 15:39:40 | 19 | professional accreditation or professional |
| 15:39:42 | 20 | certification, correct? |
| 15:39:43 | 21 | THE WITNESS:  When it comes to the |
| 15:39:44 | 22 | projects that you are referring to, that is |
| 15:39:46 | 23 | correct. |
| 15:39:48 | 24 | MR. McDONNELL:  You also agree you hold no |
| 15:39:50 | 25 | professional certifications. |

| | | |
|---|---|---|
| 15:39:53 | 1 | THE WITNESS:  Other than years of |
| 15:39:54 | 2 | experience in store design. |
| 15:39:56 | 3 | MR. McDONNELL:  Okay.  And when you say |
| 15:39:58 | 4 | "store design," what you are really saying is |
| 15:40:00 | 5 | display designs because store design, again, |
| 15:40:02 | 6 | requires registered design professionals, |
| 15:40:05 | 7 | correct? |
| 15:40:06 | 8 | THE WITNESS:  No, not correct. |
| 15:40:07 | 9 | MR. McDONNELL:  Okay.  So you are saying |
| 15:40:09 | 10 | you could walk in tomorrow with a plan and file |
| 15:40:12 | 11 | it in the state of New Jersey? |
| 15:40:15 | 12 | THE WITNESS:  No, I am not saying that. |
| 15:40:17 | 13 | MR. McDONNELL:  Okay.  Sir, you also on |
| 15:40:19 | 14 | your CV say something about FIASP.  What is the |
| 15:40:23 | 15 | FIASP? |
| 15:40:24 | 16 | THE WITNESS:  It's a fellow that was -- |
| 15:40:27 | 17 | honorarium that was bestowed upon me. |
| 15:40:32 | 18 | MR. McDONNELL:  Okay.  So this is, again, |
| 15:40:32 | 19 | not a professional certification that's |
| 15:40:35 | 20 | recognized anywhere, correct? |
| 15:40:37 | 21 | THE WITNESS:  Anywhere.  It's not a |
| 15:40:38 | 22 | professional -- no, it's not a professional |
| 15:40:40 | 23 | certification. |
| 15:40:41 | 24 | MR. McDONNELL:  Okay.  So when you say |
| 15:40:43 | 25 | FIASP, I think of the New York state facade |

| | | |
|---|---|---|
| 15:40:46 | 1 | inspection program.  You are not part of that |
| 15:40:50 | 2 | program, correct? |
| 15:40:50 | 3 | THE WITNESS:  No. |
| 15:40:51 | 4 | MR. McDONNELL:  Because that program, |
| 15:40:51 | 5 | again, requires you to be a registered design |
| 15:40:54 | 6 | professional, correct? |
| 15:40:56 | 7 | THE WITNESS:  I think you've made that a |
| 15:40:57 | 8 | point very clear.  Yes, that is correct. |
| 15:41:00 | 9 | MR. McDONNELL:  Okay.  So let's talk about |
| 15:41:01 | 10 | the next area.  You agree you don't have any |
| 15:41:05 | 11 | MBA or degree in management. |
| 15:41:08 | 12 | THE WITNESS:  Correct. |
| 15:41:10 | 13 | MR. McDONNELL:  And you have written no |
| 15:41:12 | 14 | books or articles on retail management, |
| 15:41:13 | 15 | correct? |
| 15:41:15 | 16 | THE WITNESS:  You've have just put in the |
| 15:41:16 | 17 | word "retail."  Do you want to use retail |
| 15:41:18 | 18 | management or do you want to use management? |
| 15:41:21 | 19 | MR. McDONNELL:  Have you written any books |
| 15:41:22 | 20 | or articles on management? |
| 15:41:24 | 21 | THE WITNESS:  I've written articles. |
| 15:41:25 | 22 | MR. McDONNELL:  Okay.  And where -- have |
| 15:41:26 | 23 | those articles appeared in peer-reviewed |
| 15:41:30 | 24 | journals for other professionals to either |
| 15:41:32 | 25 | comment or accepted for publication? |

15:41:34  1      THE WITNESS:  Yes.

15:41:35  2      MR. McDONNELL:  Okay.  What article did

15:41:35  3  you write on your CV that you indicate appeared

15:41:39  4  in a peer-reviewed publication?

15:41:43  5      THE WITNESS:  Peer-reviewed doesn't exist

15:41:44  6  to my industry, but anyone reading a magazine

15:41:49  7  has the right to review it and comment.

15:41:51  8      MR. McDONNELL:  Okay.  So you are saying

15:41:52  9  that you had an article that maybe appeared in

15:41:54 10  a magazine?

15:41:55 11      THE WITNESS:  In a trade magazine.

15:41:57 12      MR. McDONNELL:  Okay.  And you also have

15:42:00 13  never been a manager of a big box store, a

15:42:02 14  supermarket, department store or even a corner

15:42:05 15  market, correct?

15:42:06 16      THE WITNESS:  Correct.

15:42:07 17      MR. McDONNELL:  In fact, you never even

15:42:09 18  managed a WaWa or convenient store, correct?

15:42:11 19      THE WITNESS:  That's correct.

15:42:12 20      MR. McDONNELL:  And the last -- I

15:42:14 21  understand the last time you actually worked on

15:42:17 22  the floor of a department store was when you

15:42:19 23  worked at Lord and Taylor when you were 16,

15:42:21 24  correct?

15:42:23 25      THE WITNESS:  Are you specific to

```
15:42:24  1  | department store or a store?
15:42:27  2  |     MR. McDONNELL:  Sir, even the work you did
15:42:29  3  | with Franklin, you claimed you were designing
15:42:31  4  | the stores, correct?
15:42:33  5  |     THE WITNESS:  Discount stores, correct,
15:42:34  6  | and ladies apparel.
15:42:38  7  |     MR. McDONNELL:  Right.  But you were not
15:42:39  8  | managing the employees in that particular
15:42:41  9  | department, correct?
15:42:43 10  |     THE WITNESS:  That is correct.
15:42:44 11  |     MR. McDONNELL:  So the last time you
15:42:44 12  | actually worked in a retail store was at Lord
15:42:47 13  | and Taylor when you were 16, correct?
15:42:51 14  |     THE WITNESS:  That's correct.
15:42:52 15  |     MR. McDONNELL:  Okay.  So would you agree
15:42:53 16  | that everybody working at Walmart that evening,
15:42:56 17  | including the managers, had more day-to-day
15:43:00 18  | experience managing a retail store than what
15:43:02 19  | you had?
15:43:03 20  |     THE WITNESS:  I wouldn't agree with you on
15:43:04 21  | that.
15:43:04 22  |     MR. McDONNELL:  Okay.  So what experience
15:43:06 23  | have you had managing a retail store?
15:43:11 24  |     THE WITNESS:  I've -- managing is
15:43:12 25  | different than overseeing and observing, and
```

15:43:16  1   that's 50 years of experience.

15:43:18  2        MR. McDONNELL:  Okay.  Whether or not you

15:43:20  3   are a self-acclaimed observer, my question is

15:43:24  4   in terms of being a manager, being in charge of

15:43:27  5   other employees or retail store, you would

15:43:29  6   agree that everybody who worked at that store

15:43:31  7   had more experience than you do?

15:43:35  8        THE WITNESS:  Perhaps in managing that one

15:43:37  9   type of store, yes.

15:43:38 10        MR. McDONNELL:  Well, sir, how many

15:43:39 11   employees does the manager of that store

15:43:41 12   manage?

15:43:42 13        THE WITNESS:  That store is specific to a

15:43:45 14   particular industry classification, and that

15:43:50 15   individual who works under a manager is

15:43:52 16   familiar with that industry's venue.

15:43:57 17        MR. McDONNELL:  Sir, my question is, to

15:43:58 18   get to the point that I was asking you, the

15:44:03 19   manager of that store that particular evening

15:44:05 20   has more experience managing retail employees

15:44:08 21   than you do, correct?

15:44:09 22        THE WITNESS:  If they follow their rules

15:44:11 23   and regulations, yes.

15:44:12 24        MR. McDONNELL:  Okay.  Well, let's -- we

15:44:13 25   are not going to get into your opinion yet.

15:44:15   1   We'll get into that later.  But I'm asking

15:44:17   2   right now about your experience versus the

15:44:19   3   manager of the store's experience.

15:44:21   4        You understand my questions, correct?

15:44:22   5        THE WITNESS:  Yes.

15:44:23   6        MR. McDONNELL:  Okay.  So back to

15:44:25   7   experience.  Would you agree that the manager

15:44:27   8   of the store that evening had more experience

15:44:30   9   than you did managing retail employees?

15:44:34  10        THE WITNESS:  In management, yes.

15:44:35  11        MR. McDONNELL:  Okay.  And would you agree

15:44:36  12   that every assistant manager that was working

15:44:39  13   that evening had more real-world experience

15:44:41  14   managing retail employees than you do?

15:44:44  15        THE WITNESS:  They had -- perhaps.  I

15:44:47  16   don't know the CVs of each individual that you

15:44:50  17   are referring to, but I would say in order for

15:44:53  18   them to obtain that job position, they would

15:44:56  19   have experience in retail management.

15:44:58  20        MR. McDONNELL:  Okay.  Well, sir, I think

15:44:59  21   we agree that you had zero experience in retail

15:45:02  22   management, correct?

15:45:04  23        THE WITNESS:  I don't know what you refer

15:45:05  24   to as zero experience.  I've been 50 years

15:45:09  25   involved with the retail.  I've dealt with the

15:45:11  1  retailers and I've been on-site for many

15:45:15  2  retailers, including Walmart, and have designed

15:45:18  3  many departments for Walmart, so they wouldn't

15:45:21  4  qualify me if I was not qualified.

15:45:23  5      MR. McDONNELL:  Sir, I know you say that

15:45:24  6  you design things for Walmart, but when we talk

15:45:27  7  about what you design, you are designing

15:45:28  8  displays within the store, correct?

15:45:31  9      THE WITNESS:  No.

15:45:31 10      MR. McDONNELL:  Okay.  So you claim you've

15:45:32 11  done more than that?

15:45:34 12      THE WITNESS:  Correct.

15:45:34 13      MR. McDONNELL:  Okay.  And when you talk

15:45:36 14  about design displays, you agree this case

15:45:39 15  doesn't have anything to do with the design of

15:45:41 16  displays?

15:45:42 17      THE WITNESS:  Oh, I wouldn't say that.

15:45:44 18      MR. McDONNELL:  Okay.  Well, you are not

15:45:45 19  offering any opinion, you didn't put any

15:45:47 20  opinion in your report that you are going to

15:45:49 21  say that there was any displays that are

15:45:51 22  defective that evening, correct?

15:45:52 23      THE WITNESS:  I don't think that this has

15:45:53 24  to do with display defect.  You were talking

15:45:56 25  about capacity prior to this day, talking about

15:45:59  1   defect.

15:46:01  2       I don't believe that the capacity was

15:46:02  3   adequate, otherwise they would not have brought

15:46:05  4   so many products onto the floor.

15:46:07  5       MR. McDONNELL:  Sir, please listen to my

15:46:09  6   question.  My question is, in your report you

15:46:14  7   didn't offer any opinion that any of the

15:46:17  8   displays were defective, correct?

15:46:22  9       THE WITNESS:  I don't believe that the

15:46:24 10   displays were defective.

15:46:25 11       MR. McDONNELL:  Okay.  And you also agree

15:46:26 12   that if you look at your report, sir, you

15:46:28 13   didn't offer any opinion that the displays

15:46:31 14   lacked capacity.

15:46:34 15       THE WITNESS:  That was a secondary issue

15:46:36 16   and I would have addressed it, if asked, but I

15:46:40 17   wasn't asked.

15:46:41 18       MR. McDONNELL:  Okay.  Well, sir, I'm

15:46:42 19   asking you about the opinions that you offered

15:46:43 20   in your report.  You understand that, correct?

15:46:45 21       THE WITNESS:  Yes.

15:46:46 22       MR. McDONNELL:  Okay.  So with respect to

15:46:47 23   your report, you are not going to offer any

15:46:49 24   opinion, based upon your report, that there was

15:46:52 25   any problem with displays, correct?

15:46:55  1      THE WITNESS:  Well, are you telling me or

15:46:56  2   you are asking me?

15:46:58  3      MR. McDONNELL:  Well, sir, you wrote a

15:46:58  4   report, correct?

15:47:00  5      THE WITNESS:  I wrote a report, correct,

15:47:01  6   based on my findings of the documentation in

15:47:05  7   the video that was provided to me.

15:47:08  8      MR. McDONNELL:  Sure.  Sir, so when you

15:47:10  9   say you wrote a report, you understand that the

15:47:11  10  opinions you are going to give today are based

15:47:13  11  upon what you wrote in your report, correct?

15:47:19  12      THE WITNESS:  They will be -- majority

15:47:21  13  will be based on my -- on the material provided

15:47:25  14  to me.

15:47:26  15      MR. McDONNELL:  Okay.  So would you agree

15:47:28  16  that there's no state or licensing board that

15:47:30  17  has to approve retail displays, correct?

15:47:34  18      THE WITNESS:  That is correct.

15:47:35  19      MR. McDONNELL:  Now, you testified that

15:47:37  20  you have been accepted as an expert in some

15:47:39  21  courts, correct?

15:47:41  22      THE WITNESS:  Yes.

15:47:42  23      MR. McDONNELL:  Okay.  You agree that at

15:47:43  24  least six courts -- at least six that I

15:47:46  25  found -- have either excluded or limited your

| | | |
|---|---|---|
| 15:47:48 | 1 | opinion, correct? |
| 15:47:50 | 2 | THE WITNESS:  Well, you make it sound like |
| 15:47:52 | 3 | entire opinion.  I don't believe it was entire |
| 15:47:54 | 4 | opinion.  It was partial opinion. |
| 15:47:56 | 5 | MR. McDONNELL:  Well, sir, let's talk |
| 15:47:57 | 6 | about the Janezich case first.  Janezich versus |
| 15:48:01 | 7 | Walmart, the court found that your opinions |
| 15:48:03 | 8 | were something the jurors could determine |
| 15:48:05 | 9 | themselves and could apply their own safety |
| 15:48:08 | 10 | policies, and excluded your opinion entirely, |
| 15:48:11 | 11 | correct? |
| 15:48:13 | 12 | THE WITNESS:  Yes, because the jury could |
| 15:48:14 | 13 | make the decision upon themselves. |
| 15:48:15 | 14 | MR. McDONNELL:  Sure. |
| 15:48:16 | 15 | THE WITNESS:  I don't know that. |
| 15:48:18 | 16 | MR. McDONNELL:  You don't know that in |
| 15:48:20 | 17 | Janezich versus Walmart the judge completely |
| 15:48:22 | 18 | excluded your opinion? |
| 15:48:24 | 19 | THE WITNESS:  No, I know that.  I just |
| 15:48:25 | 20 | don't know if the jury is capable of making |
| 15:48:27 | 21 | their own opinion. |
| 15:48:29 | 22 | MR. McDONNELL:  Okay.  And would you agree |
| 15:48:31 | 23 | that in the Cook versus Walmart case they |
| 15:48:34 | 24 | excluded your opinion because it basically |
| 15:48:36 | 25 | involved nothing more than the experience of |

15:48:38  1   ordinary jurors going to retail stores,

15:48:40  2   correct?

15:48:41  3        THE WITNESS:  Well, the problem is that

15:48:43  4   I've done over 500 cases --

15:48:44  5        MR. McDONNELL:  Sir, sir, I'm asking you

15:48:46  6   --

15:48:46  7        THE WITNESS:  I don't know --

15:48:48  8        MR. JEAN:  Objection.  Objection.

15:48:49  9   Objection.

15:48:51 10        Allow the witness to conclude his answer,

15:48:56 11   please.  Allow him to finish his answer.

15:49:01 12        MR. McDONNELL:  Okay.  I'm going to move

15:49:02 13   to strike his answer because the witness

15:49:04 14   understands the question I'm asking.

15:49:06 15        I've asked you --

15:49:09 16        MR. JEAN:  Allow him to finish his answer,

15:49:11 17   please.

15:49:12 18        MR. McDONNELL:  Yeah, I'm moving to

15:49:12 19   strike.

15:49:13 20        I'm asking you this question, and please

15:49:14 21   listen to me carefully.  In the Cook versus

15:49:18 22   Walmart case, isn't it a fact that your opinion

15:49:21 23   was excluded?

15:49:23 24        THE WITNESS:  My response to that question

15:49:25 25   is, I am not, after doing 500 cases, familiar

15:49:29  1   with each case by its name.  If you would give

15:49:32  2   me a little bit more of the particulars,

15:49:34  3   perhaps I could recall it.

15:49:36  4       MR. McDONNELL:  Okay.  Would you also

15:49:37  5   agree in the Nelson versus Costco case, your

15:49:40  6   opinion was first precluded by the district

15:49:44  7   court judge and then precluded by the Sixth

15:49:46  8   Circuit Court of Appeals, which is the case

15:49:49  9   right below the Supreme Court.

15:49:51 10       Are you not familiar with the opinion in

15:49:53 11   Nelson versus Costco was excluded as well?

15:49:57 12       THE WITNESS:  Are you finished with the

15:49:58 13   question?

15:49:59 14       MR. McDONNELL:  Yes.

15:49:59 15       THE WITNESS:  The answer to that question

15:50:01 16   is, again, as I stated in the prior case,

15:50:04 17   having done over 500 cases, I cannot recall the

15:50:08 18   particulars of each particular case that you

15:50:10 19   are bringing up without some type out of mental

15:50:15 20   recognition as to the case.  Names of cases do

15:50:18 21   not jar my memory.

15:50:20 22       MR. McDONNELL:  Okay.  Sir, you mentioned

15:50:21 23   500 cases you've been involved in.  These were

15:50:24 24   cases where you attempted to proffer your

15:50:27 25   opinion and the judge said your opinion was

15:50:29  1   excluded.

15:50:30  2       Are you saying you don't remember those

15:50:32  3   cases?

15:50:33  4       THE WITNESS:  I think I just heard you say

15:50:35  5   500 cases were excluded?

15:50:38  6       MR. McDONNELL:  No, sir.  I said you claim

15:50:39  7   you've been involved in 500 cases, correct?

15:50:42  8       THE WITNESS:  Yes.

15:50:43  9       MR. McDONNELL:  Okay.  And would you agree

15:50:45 10   that you haven't testified in 500 cases?

15:50:48 11       THE WITNESS:  Correct.

15:50:49 12       MR. McDONNELL:  Okay.  And I'm saying,

15:50:50 13   among the cases that you attempted to testify

15:50:54 14   in, I've named one, two, three, four cases

15:50:59 15   where the judge excluded your opinion, correct?

15:51:02 16       THE WITNESS:  Well, if you say so, I have

15:51:04 17   to assume that they are correct.

15:51:06 18       MR. McDONNELL:  Okay, sir.  And would you

15:51:07 19   agree in the Erkenbrack versus Menard case, the

15:51:11 20   court concluded you engaged in deliberate

15:51:14 21   misconduct, correct?

15:51:16 22       THE WITNESS:  I'm finding it difficult to

15:51:17 23   understand why, when I say to you that I do not

15:51:21 24   recognize case names or any particulars, you

15:51:25 25   continue to ask me about a case name.

```
15:51:27  1        MR. McDONNELL:  Well, do you not

15:51:28  2   remember -- you don't remember the Erkenbrack

15:51:31  3   case?

15:51:32  4        THE WITNESS:  Out of 500 cases, I'm sorry,

15:51:33  5   I do not remember.

15:51:35  6        MR. McDONNELL:  Okay.  Well, aren't the

15:51:36  7   cases where the court has excluded your

15:51:38  8   opinion, wouldn't that be remarkable to you in

15:51:40  9   some way?

15:51:41 10        THE WITNESS:  If it's brought up to my

15:51:43 11   attention.  Prior to this particular event and

15:51:47 12   testimony, it has not been brought to my

15:51:49 13   attention.

15:51:50 14        MR. McDONNELL:  So nobody has brought to

15:51:51 15   your attention before that you were found to

15:51:54 16   have committed misconduct in the Erkenbrack

15:51:57 17   case?  I'll show you the opinion.  Maybe this

15:51:59 18   will help.

15:52:00 19        MR. JEAN:  Objection.  Objection.

15:52:00 20        Let's go off the record.

15:52:04 21        MR. McDONNELL:  Sure.

15:52:05 22        THE VIDEOGRAPHER:  We are now off the

15:52:06 23   record.  The time is 3:51 p.m. Eastern time.

15:52:09 24        (Discussion off the record.)

15:56:58 25        MR. McDONNELL:  Back on the record.
```

| | | |
|---|---|---|
| 15:56:59 | 1 | MR. JEAN:  Okay.  Before we go back on the |
| 15:57:00 | 2 | record. |
| 15:57:01 | 3 | (Discussion off the record.) |
| 15:58:15 | 4 | MR. McDONNELL:  All right.  We are back |
| 15:58:16 | 5 | on. |
| 15:58:17 | 6 | THE VIDEOGRAPHER:  We are not back on. |
| 15:58:20 | 7 | Are you ready, Mr. Jean? |
| 15:58:21 | 8 | MR. McDONNELL:  Okay. |
| 15:58:23 | 9 | MR. JEAN:  I'm ready. |
| 15:58:24 | 10 | THE VIDEOGRAPHER:  All right.  We are now |
| 15:58:26 | 11 | on the record.  The time is 3:58 p.m. Eastern |
| 15:58:29 | 12 | time. |
| 15:58:31 | 13 | MR. JEAN:  So, objection.  Counsel is |
| 15:58:33 | 14 | placing a document in front of a jury which is |
| 15:58:35 | 15 | impermissible, and that is it.  I reserve the |
| 15:58:39 | 16 | right to a motion to strike. |
| 15:58:42 | 17 | MR. McDONNELL:  Okay.  My response is that |
| 15:58:43 | 18 | this is for impeachment purposes, and the |
| 15:58:45 | 19 | witness has invited me to show him this |
| 15:58:48 | 20 | document because he has claimed that he doesn't |
| 15:58:50 | 21 | remember this particular case. |
| 15:58:52 | 22 | So my question, sir, is, does this refresh |
| 15:58:54 | 23 | your recollection that in the Eddie Erkenbrack |
| 15:58:58 | 24 | case that the court granted defendant's motion |
| 15:59:04 | 25 | to -- |

15:59:09  1      THE WITNESS:  You spoke much faster than I

15:59:11  2  can read.

15:59:12  3      MR. McDONNELL:  Okay.  Do you see this in

15:59:14  4  paragraph five, defendant's motion to exclude

15:59:16  5  plaintiff's expert, Jerry Birnbach, and strike

15:59:18  6  his report is granted.

15:59:23  7      Do you see that?

15:59:24  8      THE WITNESS:  I do see that.

15:59:25  9      MR. McDONNELL:  Okay.  And this was

15:59:26 10  July 19, 2021, correct?

15:59:30 11      THE WITNESS:  Is there an explanation as

15:59:32 12  to why it's not acceptable?

15:59:34 13      MR. McDONNELL:  Sure.  And, sir, will you

15:59:36 14  agree that apparently, even though this was

15:59:39 15  during the time of this case, you don't have

15:59:42 16  any recollection that another judge excluded

15:59:44 17  you?

15:59:47 18      THE WITNESS:  Correct.

15:59:47 19      MR. McDONNELL:  Okay.  Now, it goes to

15:59:49 20  specifics of why you were excluded.  Defendant

15:59:54 21  moved the court to exclude Jerry Birnbach as an

15:59:57 22  expert and strike his expert report, require

16:00:00 23  that he attest to destroying confidential

16:00:02 24  documents, contact of other parties that he has

16:00:04 25  obtained confidential documents from and award

16:00:09  1   attorney's fees.

16:00:10  2        Plaintiff does not object to the court

16:00:12  3   excluding Mr. Birnbach as an expert and

16:00:12  4   striking his expert report.

16:00:12  5        The court finds this to be an appropriate

16:00:14  6   sanction for Mr. Birnbach's alleged misconduct

16:00:17  7   in the case.

16:00:18  8        Do you see that?

16:00:19  9        THE WITNESS:  I still don't know what the

16:00:21 10   alleged misconduct is.

16:00:22 11        MR. McDONNELL:  Okay.  Sir, okay.  Whether

16:00:23 12   or not you recall it or not, did this refresh

16:00:27 13   your recollection that your opinion was

16:00:29 14   stricken in this case in Minnesota?

16:00:32 15        THE WITNESS:  No, because it was not

16:00:33 16   brought to my attention.

16:00:35 17        MR. McDONNELL:  Okay.  Now, I also asked

16:00:37 18   you about the Janezich case and you saying you

16:00:40 19   don't remember the Janezich case.

16:00:43 20        MR. JEAN:  Objection.  Motion to strike.

16:00:44 21   Relevance.

16:00:47 22        MR. McDONNELL:  Okay.  Again, this is

16:00:48 23   another case that he was excluded from

16:00:51 24   testifying and he has said he doesn't remember

16:00:54 25   the details of that case.

16:00:56  1        So, sir, do you remember the details of

16:00:58  2   why you were excluded in the Janezich case?

16:01:01  3        THE WITNESS:  Was it a full exclusion or

16:01:03  4   partial?

16:01:05  5        MR. McDONNELL:  Sir, I'm asking you, do

16:01:06  6   you remember, and then I'll show you the

16:01:09  7   Janizech case.

16:01:10  8        THE WITNESS:  No, I don't remember.

16:01:11  9        MR. McDONNELL:  Okay.  So Janezich --

16:01:14 10        MR. JEAN:  Objection.  Motion to strike.

16:01:16 11   Relevance.

16:01:19 12        Objection.  Counsel is providing some

16:01:20 13   document to a jury that he has never forwarded

16:01:22 14   to our attention.

16:01:25 15        MR. McDONNELL:  Okay, sir.  I asked you do

16:01:27 16   you remember testifying or offering an opinion

16:01:29 17   in the Janezich case?

16:01:33 18        THE WITNESS:  No.

16:01:34 19        MR. McDONNELL:  Okay.  So you don't

16:01:34 20   remember this case?

16:01:36 21        THE WITNESS:  At this moment, no.

16:01:38 22        MR. McDONNELL:  Okay.  And let's look at

16:01:40 23   the ruling the court made.  It is ordered that

16:01:53 24   defendant Walmart's motion to exclude

16:01:55 25   plaintiff's retained expert, Jerry Birnbach, is

16:01:58  1  granted.

16:01:58  2       See, in this case the court excluded your

16:02:01  3  entire opinion.

16:02:05  4       THE WITNESS:  Okay.

16:02:08  5       MR. McDONNELL:  Okay.  You see -- further,

16:02:09  6  the court found, because Mr. Birnbach's

16:02:12  7  opinions, including his opinion that

16:02:15  8  plaintiff's method of exiting the store was

16:02:16  9  normal, do not require specialized knowledge

16:02:18 10  and are opinions a layperson can form by

16:02:21 11  reviewing the video footage, listening to

16:02:22 12  witnesses and reviewing defendant's safety

16:02:24 13  manual, the court finds Mr. Birnbach's opinions

16:02:27 14  would not be helpful to a jury and don't

16:02:29 15  satisfy the standard.

16:02:30 16       Do you see that?

16:02:32 17       THE WITNESS:  I'm sorry?

16:02:34 18       MR. McDONNELL:  Do you see that that's the

16:02:35 19  basis why your opinion was excluded?

16:02:37 20       THE WITNESS:  Yes, because the jury would

16:02:38 21  have known on their own, as I said before.

16:02:42 22       MR. McDONNELL:  Right.  And do you see

16:02:43 23  that further above there, At best, Mr.

16:02:46 24  Birnbach's testimony about defendant's failure

16:02:48 25  to adhere to its own policies would be

16:02:49  1   unhelpful and unnecessary.

16:02:51  2       Mr. Birnbach simply concludes what a

16:02:53  3   layperson is capable of concluding for

16:02:54  4   themselves.

16:02:56  5       At worst, however, Mr. Birnbach's opinions

16:02:56  6   could waste valuable trial time, be

16:03:00  7   duplicative, prejudicial and confusing to a

16:03:00  8   jury.

16:03:03  9       That's why your opinions were excluded,

16:03:04 10   correct?

16:03:05 11       THE WITNESS:  Yes, because they felt the

16:03:08 12   jury could make that decision on their own.

16:03:10 13       MR. McDONNELL:  Okay.  So you agree that's

16:03:11 14   two cases right now where your opinions were

16:03:13 15   excluded?

16:03:15 16       THE WITNESS:  Out of 500, yes.

16:03:16 17       MR. McDONNELL:  Well, when you say that,

16:03:17 18   out of 500, you wrote 500 reports, correct?

16:03:20 19       THE WITNESS:  Correct.

16:03:21 20       MR. McDONNELL:  Okay.  Now, do you

16:03:23 21   remember the Cook versus Walmart case?

16:03:26 22       THE WITNESS:  No.

16:03:45 23       MR. JEAN:  Same objection, relevance, and

16:03:48 24   also showing the jury a document that has never

16:03:51 25   been shared with counsel.

16:03:53   1       MR. McDONNELL:  Okay.  Mr. Birnbach, does

16:03:55   2   this refresh your recollection that another

16:03:57   3   court excluded your opinion?

16:04:02   4       I'm sorry.  I want to make sure I got the

16:04:04   5   right page on Birnbach's name.

16:04:08   6       Okay.  This is where it starts the expert

16:04:10   7   area.  Concluded, I would exclude Birnbach's

16:04:12   8   testimony because it concerns matters of the

16:04:14   9   every-day knowledge and experience of a lay

16:04:17  10   juror.

16:04:17  11       Here a jury would be capable of reviewing

16:04:19  12   the surveillance video and deciding for itself

16:04:22  13   what happened.  The case is not about

16:04:24  14   complicated technical facts or scientific

16:04:27  15   evidence.  Further --

16:04:27  16       MR. JEAN:  Objection.  Hearsay.

16:04:29  17       MR. McDONNELL:  I'm not finished, though,

16:04:29  18   right?

16:04:30  19       Furthermore, the court may not consider

16:04:32  20   Walmart's internal policy and procedures to

16:04:35  21   determine the standard of care.

16:04:37  22       Sir, do you remember this particular case

16:04:38  23   where you were excluded?

16:04:41  24       THE WITNESS:  No, but I understand the

16:04:43  25   reason why I was excluded.

16:04:52  1      MR. McDONNELL:  Sir, will you agree that

16:04:53  2  when you testified earlier that some courts

16:04:56  3  have permitted your opinion, other courts have

16:05:01  4  excluded your opinion?

16:05:05  5      THE WITNESS:  When the court felt that my

16:05:07  6  opinion could be arrived by a common juror.

16:05:11  7      MR. McDONNELL:  Sir, will you agree that

16:05:12  8  you didn't provide any testable data in this

16:05:17  9  case, correct?

16:05:17 10      THE WITNESS:  According to two judges,

16:05:18 11  that is correct.

16:05:19 12      MR. McDONNELL:  Sir, I'm asking about this

16:05:21 13  case.  Would you agree that you didn't measure,

16:05:22 14  for example, the co-efficient of friction of

16:05:26 15  the floor?

16:05:27 16      THE WITNESS:  Well, I wouldn't do that,

16:05:28 17  and I don't think it's necessary.  No, I did

16:05:31 18  not.

16:05:31 19      MR. McDONNELL:  Okay.  And, sir, would you

16:05:33 20  agree you didn't test the co-efficient of

16:05:35 21  friction or the difference between the plastic

16:05:37 22  and the floor, correct?

16:05:41 23      THE WITNESS:  Are we talking about this

16:05:42 24  case now?

16:05:43 25      MR. McDONNELL:  Yes, we are, sir.  I'm

16:05:44  1    asking you what you did in this case.

16:05:46  2        Did you do any testing on the plastic that

16:05:48  3    you claim is involved in the accident?

16:05:51  4        THE WITNESS:  No, it wasn't preserved.

16:05:53  5        MR. McDONNELL:  Okay.  Did you do any

16:05:54  6    testing on the shoes that Mr. Pataki was

16:05:57  7    wearing at the time of the accident?

16:05:59  8        THE WITNESS:  No, it was not preserved.

16:06:02  9        MR. McDONNELL:  Okay.  Did you ask to look

16:06:06  10   at the shoes that Mr. Pataki was wearing?

16:06:08  11       THE WITNESS:  I felt that was irrelevant.

16:06:10  12       MR. McDONNELL:  Okay.  And would you agree

16:06:12  13   that you didn't do any forensic enhancement of

16:06:14  14   the video, correct?

16:06:16  15       THE WITNESS:  I did not touch the video.

16:06:17  16   Correct.

16:06:18  17       MR. McDONNELL:  Okay.  And, in fact, you

16:06:19  18   are not going to offer any opinion that

16:06:21  19   Walmart's policies are below the standard of

16:06:24  20   care, correct?

16:06:28  21       THE WITNESS:  Walmart's corporation's

16:06:29  22   policies are not below the standard of care.

16:06:32  23       MR. McDONNELL:  Okay.  In fact, you've

16:06:33  24   testified before that they are exceptional,

16:06:35  25   correct?

| | | |
|---|---|---|
| 16:06:36 | 1 | THE WITNESS:  That is correct. |
| 16:06:37 | 2 | MR. McDONNELL:  Okay.  And would you also |
| 16:06:38 | 3 | agree that what Mr. -- what the standard you |
| 16:06:42 | 4 | are arguing about is that a maintenance person |
| 16:06:44 | 5 | should have picked this plastic off the floor |
| 16:06:47 | 6 | before Mr. Pataki fell? |
| 16:06:49 | 7 | THE WITNESS:  My statement is that all |
| 16:06:53 | 8 | Walmart employees should have inspected and |
| 16:06:55 | 9 | picked up the plastic. |
| 16:06:57 | 10 | MR. McDONNELL:  Okay, sir.  And would you |
| 16:06:59 | 11 | agree that that doesn't require an architect to |
| 16:07:02 | 12 | say that an employee, if they see something on |
| 16:07:05 | 13 | the floor, should pick it up, correct? |
| 16:07:07 | 14 | THE WITNESS:  No, it's in the handbook, so |
| 16:07:09 | 15 | they know it. |
| 16:07:10 | 16 | MR. McDONNELL:  Okay.  But, sir, not just |
| 16:07:12 | 17 | is it in the handbook, would you agree that |
| 16:07:14 | 18 | it's not something that a jury needs an expert |
| 16:07:17 | 19 | for to tell them that an employee should pick |
| 16:07:21 | 20 | something off the floor if they see it, |
| 16:07:23 | 21 | correct? |
| 16:07:24 | 22 | THE WITNESS:  I can't make that |
| 16:07:25 | 23 | correction -- I can't make that assumption that |
| 16:07:27 | 24 | a jury is qualified or not qualified. |
| 16:07:29 | 25 | MR. McDONNELL:  Well, sir, you understand |

16:07:30  1  the idea of common sense, correct?

16:07:33  2      THE WITNESS:  Sure.

16:07:34  3      MR. McDONNELL:  And would you agree that

16:07:35  4  from the moment most of us are raised properly,

16:07:38  5  we are told to pick things off the floor

16:07:41  6  because someone could trip on them, correct?

16:07:43  7      THE WITNESS:  I would agree.

16:07:44  8      MR. McDONNELL:  Okay.  Sir, and is what

16:07:45  9  you are saying today, in this case, any

16:07:47  10  different from that the Walmart employees

16:07:50  11  should look around and if they see something on

16:07:52  12  the floor, they pick it up?

16:07:54  13      THE WITNESS:  That's correct.

16:07:55  14      MR. McDONNELL:  Okay.  And would you agree

16:07:56  15  that they don't need somebody who went to

16:08:00  16  school for architecture to tell them to pick

16:08:03  17  something off the floor if they see it,

16:08:05  18  correct?

16:08:08  19      THE WITNESS:  My relevance would be to

16:08:10  20  determine how and why the plastic was on the

16:08:14  21  floor.

16:08:15  22      MR. McDONNELL:  Okay.  Well, sir, would

16:08:16  23  you agree that that's based upon a review of

16:08:19  24  the video, correct?

16:08:20  25      THE WITNESS:  No, the video is not of the

16:08:22  1   highest quality because there were cameras that

16:08:25  2   were closer that should have been utilized and

16:08:27  3   weren't.

16:08:28  4       MR. McDONNELL:  Well, sir, did you, as

16:08:29  5   part of your opinion, and that opinion is --

16:08:32  6   I'm going to move to strike that opinion

16:08:34  7   because I don't believe the court permitted you

16:08:36  8   to offer that.

16:08:37  9       But, in any event, would you agree you

16:08:38 10   didn't ask for the camera diagram or understand

16:08:41 11   the location of where the cameras were pointed

16:08:44 12   at at the time of the incident, correct?

16:08:48 13       THE WITNESS:  I saw cameras, but I don't

16:08:49 14   know where they were pointed at the time of the

16:08:51 15   incident.

16:08:52 16       MR. McDONNELL:  Right.  Sure.

16:08:52 17       And you also don't know what the

16:08:55 18   capability of those cameras were, correct?

16:08:59 19       THE WITNESS:  I do not know the

16:08:59 20   capability, other than it was positioned

16:09:02 21   directly over the area.

16:09:03 22       MR. McDONNELL:  And, sir, are you familiar

16:09:05 23   with the idea that sometimes stores will post

16:09:08 24   fake domes so people will think they're being

16:09:13 25   watched?

16:09:13  1      THE WITNESS:  Yes, I checked for that.

16:09:15  2      MR. McDONNELL:  Okay, sir.  Well, do you

16:09:16  3  know whether or not any of those cameras were

16:09:18  4  there at the time of the incident?

16:09:20  5      THE WITNESS:  Based on other Walmart

16:09:21  6  documentation, I would suspect, I don't know

16:09:23  7  for sure, that they would have been activated.

16:09:27  8      MR. McDONNELL:  Okay.  So, sir, you are

16:09:29  9  not an expert in store security, are you?

16:09:31 10      THE WITNESS:  Not unless their diagrams

16:09:34 11  are provided to me.

16:09:35 12      MR. McDONNELL:  Okay, sir.  And you didn't

16:09:36 13  review any diagrams whatsoever, correct?

16:09:38 14      THE WITNESS:  That's correct.

16:09:39 15      MR. McDONNELL:  And you didn't ask for any

16:09:40 16  camera diagrams, correct?

16:09:42 17      THE WITNESS:  Other than the initial

16:09:44 18  discovery that was asked for.

16:09:46 19      MR. McDONNELL:  Okay.  And, sir, would you

16:09:48 20  also agree that when we talk of what the

16:09:51 21  evidence is in this case, you don't have any

16:09:53 22  special ability to look at video cameras and

16:09:55 23  know what's going on, correct?

16:09:59 24      THE WITNESS:  I could look at the

16:10:00 25  specifications of a video camera and make a

16:10:03  1   determination.

16:10:04  2        MR. McDONNELL:  Sir, what experience do

16:10:05  3   you have in video cameras?

16:10:08  4        THE WITNESS:  It would be the angle of the

16:10:09  5   optics, and some video cameras have a wider

16:10:14  6   angle lens than in others.

16:10:17  7        MR. McDONNELL:  So you are not offering

16:10:17  8   that opinion in this case, are you?

16:10:19  9        THE WITNESS:  No.

16:10:19  10        MR. McDONNELL:  Okay.  So you simply

16:10:22  11   looked at the video and you are going to tell

16:10:24  12   the jury what you see in the video, correct?

16:10:27  13        THE WITNESS:  Yes.

16:10:27  14        MR. McDONNELL:  Okay.  And would you agree

16:10:28  15   that you don't need an architecture degree or

16:10:30  16   an experience in designing store displays to

16:10:32  17   look at a video and say what's in the video,

16:10:35  18   correct?

16:10:37  19        THE WITNESS:  I would not totally agree

16:10:39  20   with that statement.  No, I don't find that

16:10:41  21   correct.

16:10:41  22        MR. McDONNELL:  Okay.  And would you also

16:10:44  23   show that Mr. Pataki didn't trip over a display

16:10:51  24   or an unattended pallet or an unattended

16:10:53  25   trolley cart, correct?

GERALD BIRNBACH
NOVEMBER 08, 2024

JOB NO. 1282576

16:11:00  1      THE WITNESS:  Your definition of

16:11:00  2   "unattended"?

16:11:02  3      MR. McDONNELL:  Sir, did he trip on a

16:11:04  4   display?

16:11:05  5      THE WITNESS:  Yes.

16:11:06  6      MR. McDONNELL:  Okay.

16:11:07  7      THE WITNESS:  Well, he tripped on a

16:11:08  8   product that was on the display.

16:11:09  9      MR. McDONNELL:  Okay, sir.  You are not

16:11:11 10   going to offer any opinion that Mr. Pataki

16:11:13 11   tripped on a display, correct?

16:11:19 12      THE WITNESS:  Whether it was a display or

16:11:20 13   plastic on the ground, I can't be certain,

16:11:22 14   based on the optics of the video.

16:11:25 15      MR. McDONNELL:  So are you saying, sir,

16:11:26 16   that you are going to offer an opinion in this

16:11:28 17   case that Mr. Pataki may have tripped on the

16:11:30 18   display itself?

16:11:31 19      THE WITNESS:  I'm going to offer an

16:11:32 20   opinion that he tripped.

16:11:33 21      MR. McDONNELL:  Okay.  All right.  And

16:11:38 22   what was -- are you going to offer an

16:11:39 23   opinion -- did you do any measurements or did

16:11:42 24   you do anything with the display that would say

16:11:44 25   that display was defective?

| | | |
|---|---|---|
| 16:11:45 | 1 | THE WITNESS:  I was not there at the time |
| 16:11:47 | 2 | so I would not be able to make that |
| 16:11:49 | 3 | determination. |
| 16:11:49 | 4 | MR. McDONNELL:  And you didn't make that |
| 16:11:51 | 5 | determination in your report, correct? |
| 16:11:54 | 6 | THE WITNESS:  The report addresses other |
| 16:11:57 | 7 | subject matter. |
| 16:11:57 | 8 | MR. McDONNELL:  Okay.  And, sir, would you |
| 16:11:59 | 9 | agree that New Jersey hasn't made any specific |
| 16:12:01 | 10 | laws concerning the policies a retailer has to |
| 16:12:05 | 11 | have, correct? |
| 16:12:08 | 12 | THE WITNESS:  It doesn't fall under New |
| 16:12:09 | 13 | Jersey's jurisdiction. |
| 16:12:11 | 14 | MR. McDONNELL:  Okay.  And, sir, you also |
| 16:12:13 | 15 | agree that New Jersey doesn't have any specific |
| 16:12:15 | 16 | laws about how retailers are supposed to stock |
| 16:12:17 | 17 | merchandise, correct? |
| 16:12:20 | 18 | THE WITNESS:  No.  The retailer does. |
| 16:12:21 | 19 | MR. McDONNELL:  Okay, sir.  And you agree |
| 16:12:22 | 20 | that your report doesn't cite any New Jersey |
| 16:12:24 | 21 | state law applicable to retailers, correct? |
| 16:12:28 | 22 | THE WITNESS:  No, it shows the retailer is |
| 16:12:29 | 23 | in violation of -- |
| 16:12:31 | 24 | MR. McDONNELL:  Sir, do you know how to |
| 16:12:32 | 25 | answer a question yes or no? |

16:12:34  1      THE WITNESS:  Do you not answer a

16:12:34  2   question -- to ask a question that could be

16:12:37  3   answered yes or no?

16:12:38  4      MR. McDONNELL:  Yes, sir.  Well, listen to

16:12:39  5   my question carefully.  I said, you have your

16:12:41  6   report in front of you, correct?

16:12:43  7      THE WITNESS:  I don't have it in front of

16:12:44  8   me, no, but I'm familiar with it.

16:12:45  9      MR. McDONNELL:  You really don't have your

16:12:47 10   report in front of you?

16:12:48 11      THE WITNESS:  No, I expect the defense

16:12:50 12   attorneys or plaintiff attorneys to provide the

16:12:52 13   report.

16:12:54 14      MR. McDONNELL:  Okay.  Sir, will you

16:12:57 15   agree, at least from your memory, your report

16:12:59 16   doesn't cite any -- any federal laws applicable

16:13:03 17   to retailers, correct?

16:13:04 18      THE WITNESS:  I don't believe a federal

16:13:05 19   law is -- should be imposed in this particular

16:13:09 20   case.

16:13:10 21      MR. McDONNELL:  Okay.  And your report

16:13:11 22   doesn't cite any kind of OSHA standard related

16:13:14 23   to workplace safety, correct?

16:13:16 24      THE WITNESS:  Same answer.

16:13:17 25      MR. McDONNELL:  Okay.  And you agree that

16:13:20  1  New Jersey has never adopted Walmart's policies

16:13:23  2  as a standard of care or said that other

16:13:26  3  retailers are required to follow, correct?

16:13:29  4      THE WITNESS:  I don't follow the line of

16:13:30  5  question, but that's correct.

16:13:32  6      MR. McDONNELL:  Okay.  And, sir, you are

16:13:34  7  familiar with the fact that companies can

16:13:36  8  certainly issue guidelines that exceed or that

16:13:39  9  are better than state law, correct?

16:13:41 10      THE WITNESS:  Yes.

16:13:41 11      MR. McDONNELL:  And you agree that the

16:13:42 12  court, the judge in this case, is going to tell

16:13:44 13  the jury what law Walmart and other retailers

16:13:47 14  and land possessors are required to follow,

16:13:50 15  correct?

16:13:50 16      THE WITNESS:  Well, I think it goes beyond

16:13:52 17  the law.

16:13:53 18      MR. McDONNELL:  Okay.  So, sir, you are

16:13:54 19  not going to try to tell the jury what the law

16:13:56 20  is, are you?

16:13:58 21      THE WITNESS:  No.

16:13:58 22      MR. McDONNELL:  Okay.  So, sir, I'm -- I'm

16:14:09 23  trying to look at your CV, again, sir, and

16:14:14 24  let's just see if we can agree with some things

16:14:17 25  after all these questions.

16:14:18  1        You are not an expert in retail

16:14:20  2   management, correct?

16:14:22  3        THE WITNESS:  What is your definition of

16:14:24  4   "retail management"?

16:14:25  5        MR. McDONNELL:  Sir, we've already asked

16:14:26  6   20 questions about this and I just want to make

16:14:28  7   sure that we can recap.

16:14:31  8        You have no experience in the field of

16:14:33  9   retail management, correct?

16:14:35 10        THE WITNESS:  As part of my recap, I'd

16:14:36 11   like to know your definition of "management."

16:14:39 12        MR. McDONNELL:  Okay, sir.  Being in a

16:14:40 13   store and having to manage hundreds of

16:14:43 14   employees on a Sunday night in New Jersey.

16:14:47 15        THE WITNESS:  I believe you are using the

16:14:48 16   same word in a sentence as the definition.  Can

16:14:51 17   you rephrase your definition?

16:14:53 18        MR. McDONNELL:  Yes, sir.  If you don't

16:14:54 19   want to answer my question, that's fine.  We'll

16:14:56 20   --

16:14:57 21        THE WITNESS:  I don't know why you make

16:14:58 22   that assumption.  I want to answer your

16:15:00 23   question.  I'm asking you to be specific.

16:15:02 24        MR. McDONNELL:  Sure.  Sir, do you know

16:15:04 25   what "retail" means?

16:15:05  1      THE WITNESS:  Yes.

16:15:06  2      MR. McDONNELL:  Do you know what

16:15:06  3  "management" means?

16:15:08  4      THE WITNESS:  I'm asking what is your

16:15:09  5  definition of "management."  I know what it

16:15:12  6  means.

16:15:13  7      MR. McDONNELL:  You tell me what

16:15:14  8  "management" means because it's my job here to

16:15:17  9  ask questions and you give answers.

16:15:19 10      What's your definition of "management"?

16:15:21 11      THE WITNESS:  Management is the people who

16:15:22 12  are in charge of the store and their oversight

16:15:27 13  to be certain that store employees are

16:15:29 14  following the mandates of the corporation.

16:15:32 15      MR. McDONNELL:  Okay.  And, sir --

16:15:36 16      THE WITNESS:  Are we in agreement?

16:15:37 17      MR. McDONNELL:  We are in agreement.

16:15:38 18      In that particular field, we'll agree that

16:15:40 19  you don't have any specific education into that

16:15:43 20  field, retail management.

16:15:45 21      THE WITNESS:  "Education" meaning

16:15:47 22  architectural degrees or store experience?

16:15:51 23      MR. McDONNELL:  Sir, let's talk about

16:15:53 24  education first.  That wasn't what you studied

16:15:56 25  in school, correct?

16:15:59   1        THE WITNESS:  What wasn't what I studied

16:16:00   2   in school?

16:16:04   3        MR. McDONNELL:  Retail management.

16:16:06   4        THE WITNESS:  Well, based on my definition

16:16:08   5   of "management," I would say that school taught

16:16:12   6   me that the end user of whatever is designed

16:16:17   7   needs to be placed in a safe environment.

16:16:20   8        MR. McDONNELL:  Okay, sir.  And you are

16:16:22   9   going to offer an opinion today -- I'm sorry.

16:16:26  10   Strike that.

16:16:26  11        You are not going to offer an opinion

16:16:28  12   today that the displays failed to meet a

16:16:31  13   specific industry standard, correct?

16:16:37  14        THE WITNESS:  And that's generalization.

16:16:40  15   I don't believe that the display was the

16:16:42  16   culprit.

16:16:43  17        MR. McDONNELL:  Okay.  Well, that's good

16:16:44  18   to clear up.  So what you do, generally, is

16:16:48  19   design displays.  You are not saying the

16:16:51  20   displays at Walmart failed to meet the standard

16:16:53  21   of care, correct?

16:16:55  22        THE WITNESS:  Correct.

16:16:58  23        MR. McDONNELL:  And would you agree that

16:16:59  24   the defect in this case was a piece of plastic

16:17:02  25   on the floor, correct?

16:17:06  1        THE WITNESS:  Correct.

16:17:06  2        MR. McDONNELL:  Okay.  And would you agree

16:17:08  3    that you don't have any knowledge about how

16:17:10  4    that plastic came to be on the floor?

16:17:13  5        THE WITNESS:  Correct.

16:17:20  6        I do know other plastic was on the floor.

16:17:23  7        MR. McDONNELL:  Sir, I think you answered

16:17:25  8    my question.  I'll move to strike your

16:17:26  9    editorialization.

16:17:31 10        Okay.  We can -- can stop my questioning.

16:17:34 11    At this point I would move to exclude Dr.

16:17:36 12    Birnbach as an expert in the case, as set forth

16:17:40 13    in the prior decisions that have considered his

16:17:43 14    opinion when he's merely expressing a topic of

16:17:47 15    common sense.

16:17:48 16        He doesn't have -- he's not offering any

16:17:49 17    sort of opinion that the displays were

16:17:52 18    defective.  He has conducted no scientific or

16:17:56 19    technical analysis of anything, and he's simply

16:17:59 20    going to offer today that the store's employees

16:18:01 21    should look around and see what they see and

16:18:03 22    pick up things if they think they are a trip

16:18:06 23    hazard, which is a matter of common sense.

16:18:08 24        But you can continue your examination, Mr.

16:18:09 25    Jean.

| | | |
|---|---|---|
| 16:18:12 | 1 | MR. JEAN:  Jean.  Thank you very much. |
| 16:18:15 | 2 | So, point one, the witness direct |
| 16:18:20 | 3 | examination focused on his credentials in store |
| 16:18:23 | 4 | design, display design and retail safety. |
| 16:18:27 | 5 | I believe I've established a foundation |
| 16:18:29 | 6 | for him to be qualified as an expert in this |
| 16:18:35 | 7 | case. |
| 16:18:36 | 8 | Furthermore, the cases that Mr. McDonnell |
| 16:18:44 | 9 | has articulated as the basis for his exclusion |
| 16:18:48 | 10 | of this witness has not been provided to me.  I |
| 16:18:53 | 11 | have not had the opportunity to read it to find |
| 16:18:56 | 12 | out whether or not the correlation that he is |
| 16:19:00 | 13 | attempting to make between whatever was in |
| 16:19:03 | 14 | those cases and in this particular case |
| 16:19:05 | 15 | intersect. |
| 16:19:07 | 16 | So I'm prepared to proceed; however, for |
| 16:19:08 | 17 | all, we are going to take -- I need a |
| 16:19:13 | 18 | five-minute break, if that's okay.  And then -- |
| 16:19:15 | 19 | MR. McDONNELL:  With that, since you -- |
| 16:19:17 | 20 | since you brought that up, let me take one |
| 16:19:19 | 21 | minute just to follow up on that one aspect. |
| 16:19:22 | 22 | Sir, you testified that you provided |
| 16:19:26 | 23 | expert opinions for Walmart. |
| 16:19:28 | 24 | MR. JEAN:  Again, objection.  Motion to |
| 16:19:30 | 25 | strike.  Counsel has put something on the |

16:19:32  1   screen that he has never shared with me.  I

16:19:34  2   don't know what it is, and now he's presenting

16:19:38  3   it to a jury.

16:19:38  4       It has some law firm's name on it.  It's

16:19:41  5   named Exhibit D.  I don't know what this is.

16:19:47  6       MR. McDONNELL:  Right.  This was filed in

16:19:49  7   the court in Colorado.

16:19:50  8       MR. JEAN:  Counsel, can we go off the

16:19:50  9   record and can you give this stuff to me that

16:19:54 10   you are now placing --

16:19:55 11       MR. McDONNELL:  No.  It's impeachment

16:19:56 12   evidence.  I don't have to give it to you.

16:20:00 13       MR. JEAN:  You are not going to give me --

16:20:01 14   you are not going to give me the document that

16:20:02 15   you are now presenting in front of a jury?

16:20:04 16       MR. McDONNELL:  No.  I don't have to.

16:20:07 17   Whether the jury sees it or not, I'm

16:20:09 18   cross-examining, the jury may allow.

16:20:13 19       Sir, do you see this is a list of case

16:20:14 20   that you prepared that you were involved with,

16:20:16 21   correct?

16:20:16 22       MR. JEAN:  Counsel, can you give me --

16:20:16 23   objection.

16:20:17 24       Counsel, can you give this to me, please?

16:20:19 25       MR. McDONNELL:  They are on the screen.

16:20:21  1        MR. JEAN:  No.  Can you give me a hard

16:20:22  2    copy?  Could you send that to me in my email,

16:20:24  3    please, so I can have it?

16:20:25  4        MR. McDONNELL:  Yeah, I'll give it to you

16:20:27  5    after the testimony.

16:20:29  6        Sir, can you see on the screen that this

16:20:32  7    is a list of cases that you were involved in?

16:20:39  8        THE WITNESS:  I have three reports to

16:20:39  9    these cases.

16:20:41 10        MR. McDONNELL:  Okay, sir.  First of all,

16:20:42 11    it's not 500, correct?  We are looking from

16:20:45 12    20 -- I think if we look at the time period, it

16:20:47 13    looks from 2012, 2017, and this is from 2019.

16:20:55 14    Certainly, there are a lot of cases on here but

16:20:57 15    there's not 500 cases, correct?

16:21:01 16        THE WITNESS:  That's correct.

16:21:01 17        MR. McDONNELL:  Okay.  And in every case

16:21:03 18    that you've testified for Walmart, you

16:21:04 19    testified here's Walmart, you were the

16:21:07 20    plaintiff's expert, correct?

16:21:09 21        THE WITNESS:  No.

16:21:10 22        MR. McDONNELL:  That's what this says, you

16:21:13 23    were the plaintiff's expert.  Here's where you

16:21:15 24    were a defendant's expert in DJS.

16:21:19 25        THE WITNESS:  You asked me a question.

16:21:19  1  The question is that this ended up pointing to

16:21:20  2  all of the Walmart cases.

16:21:22  3      Each one of my -- my Excel sheets can be

16:21:26  4  sorted by defendant, and we can determine

16:21:30  5  whether or not that's true.

16:21:32  6      There was an Alaska case that I remember

16:21:35  7  that was for Walmart, and it represented the

16:21:40  8  defendant.

16:21:41  9      MR. McDONNELL:  Okay.  So let's look

16:21:43 10  through 2012.  2012.  The times you represented

16:21:46 11  defendants you represented JC Penney in 2012,

16:21:49 12  correct?  Target in 2014.  Ikea in 2014.  Hobby

16:21:56 13  Lobby, 2015.  Pechin's in 2016.  GE and

16:22:04 14  Kroger's, Academy.  I don't know what it is.

16:22:12 15      Would you agree that at least since 2012

16:22:15 16  you haven't represented any cases -- you

16:22:17 17  haven't represented Walmart in any cases?

16:22:19 18      THE WITNESS:  Well, unfortunately, I think

16:22:21 19  you're using some documentation that was

16:22:23 20  generated way back when.  There were two other

16:22:26 21  attorneys involved with this case.  We are now

16:22:29 22  on the third attorney.

16:22:31 23      And if you had asked a third attorney to

16:22:33 24  provide this, you would have a more current

16:22:36 25  case list that took you to 2023.

16:22:40  1       MR. McDONNELL:  Okay.  So I'm talking

16:22:42  2   right now, at least up until the time of this

16:22:44  3   case, 2019, looks like you have cases involving

16:22:48  4   Mr. DeZao, he was a plaintiff's lawyer, and

16:22:53  5   then you had two other cases involving Mr.

16:22:55  6   DeZao, so it appears three cases involving Mr.

16:22:55  7   DeZao's law firm is on this list, correct?

16:22:58  8   Actually, four cases involving Mr. DeZao

16:23:01  9   because this is Pataki.

16:23:04 10       THE WITNESS:  Yes.

16:23:05 11       MR. McDONNELL:  Would you agree that at

16:23:06 12   least up until the time of this filing, which

16:23:09 13   was January of 2019, you haven't provided any

16:23:12 14   opinions for Walmart?

16:23:15 15       THE WITNESS:  My first case as a defendant

16:23:16 16   for Walmart, I don't recall what year it was.

16:23:19 17   It was in the earlier in my involvement.  I

16:23:22 18   would think it was prior to 2018, but I don't

16:23:26 19   know.  It was the state of Alaska.

16:23:28 20       MR. McDONNELL:  Okay.  So sometime in

16:23:30 21   Alaska, you think at some point you might have

16:23:33 22   offered an opinion for a law firm that was

16:23:35 23   representing Walmart, correct?

16:23:36 24       THE WITNESS:  Yes.

16:23:37 25       MR. McDONNELL:  Okay.  And you agree that

16:23:38  1  all these cases you are not working for Target

16:23:40  2  or anything else, you are working for the law

16:23:42  3  firm that retained you, correct?

16:23:44  4       THE WITNESS:  That's correct.

16:23:44  5       MR. McDONNELL:  Okay.  So when you said

16:23:45  6  earlier that you've done, quote, work like this

16:23:48  7  for Walmart, what you are saying is that you

16:23:50  8  think on one occasion, in Alaska, you may have

16:23:54  9  offered an opinion for an Alaska law firm,

16:23:58 10  correct?

16:24:00 11       THE WITNESS:  I believe that that's one

16:24:01 12  opinion, yes.

16:24:02 13       I believe there were two cases that would

16:24:05 14  have dealt with Walmart as a defendant that I

16:24:08 15  worked directly with the defendant's attorney.

16:24:11 16       MR. McDONNELL:  Right.  So other than

16:24:13 17  that, if we look at what's been filed of record

16:24:16 18  in the court, at least in this Colorado case,

16:24:18 19  you wouldn't have something filed in a court if

16:24:20 20  it was incorrect, would you?

16:24:22 21       THE WITNESS:  No.

16:24:23 22       MR. McDONNELL:  Okay.  So if we see this

16:24:25 23  docket number filed in the District Court of

16:24:27 24  Colorado, anything that would be filed like

16:24:29 25  that would be correct, right?

16:24:30  1      THE WITNESS:  Yes.

16:24:31  2      MR. McDONNELL:  Okay.  So would you like

16:24:34  3  to go back and correct your testimony that you

16:24:37  4  haven't done any work for Walmart like this,

16:24:39  5  but you may have done work for a Walmart firm

16:24:42  6  some time before 2012, correct?

16:24:46  7      THE WITNESS:  Well, I do believe that

16:24:48  8  Walmart has to approve my use, but if you --

16:24:50  9  but I don't know that for sure, so I will agree

16:24:54 10  to your statement and the answer is, yes, that

16:24:58 11  is correct.

16:24:58 12      MR. McDONNELL:  Okay.  That's all I have.

16:25:02 13      MR. JEAN:  Five minutes.  Thank you.

16:25:04 14      THE VIDEOGRAPHER:  We are now off the

16:25:05 15  record.  The time is 4:24 p.m. Eastern time.

16:25:09 16      (Break taken.)

16:30:52 17      MR. McDONNELL:  Rule 30 -- Rule 30 of the

16:30:54 18  Federal Rules of Civil Procedure.  Depositions

16:30:57 19  by oral examination.  It says, specifically,

16:30:59 20  with respect to objections.  Okay.

16:31:09 21      An objection at the time of the

16:31:11 22  examination, whether to evidence, to a party's

16:31:13 23  conduct, to the officer's qualifications, to

16:31:16 24  the manner of taking deposition, or to any

16:31:19 25  other aspect of the deposition, must be noted

16:31:21  1  on the record, but the examination still

16:31:23  2  proceeds.

16:31:25  3      The testimony is taken subject to any

16:31:27  4  objection.

16:31:28  5      An objection must be stated concisely in a

16:31:30  6  non-argumentative and non-suggestive manner.

16:31:35  7  The person must instruct the witness not to

16:31:37  8  answer only when necessary to preserve a

16:31:39  9  privilege, to enforce a limitation ordered by

16:31:41 10  the court, or to present a motion under Rule

16:31:44 11  30(b)(3).

16:31:45 12      I ask that we proceed in this fashion.  If

16:31:47 13  there is an objection to anything, that the

16:31:50 14  objection is made, but, quote, the examination

16:31:53 15  still proceeds, and a court will make the

16:31:55 16  ruling.

16:31:56 17      But when you stop it, when you insist that

16:31:59 18  we go off the record, that's not the way the

16:32:01 19  rules are.

16:32:02 20      So as long as we can proceed according to

16:32:05 21  the rules, I apologize if my tone seem pointed,

16:32:08 22  but that is the rule.  If you look at it, it's

16:32:11 23  30(c)(2).

16:32:24 24      THE VIDEOGRAPHER:  We are now on the

16:32:25 25  record.  The time is 4:32 p.m. Eastern time.

16:32:31  1   BY MR. JEAN:

16:32:34  2       Q.   Mr. Birnbach --

16:32:35  3       A.   Yes.

16:32:35  4       Q.   -- good evening.  We are back after a

16:32:39  5   little break.

16:32:40  6            So I wanted to pick up with your

16:32:45  7   experience in store design, display design, and

16:32:53  8   retail safety.  Did Walmart ever pay you for your

16:33:01  9   expertise in these areas?

16:33:03 10       A.   Yes.

16:33:05 11       Q.   Let's talk about store design.  In what

16:33:10 12   context did Walmart pay you to give information on

16:33:14 13   store design?

16:33:18 14       A.   It would be on projects that Walmart

16:33:22 15   initiated that required my design expertise.

16:33:31 16       Q.   How long has that been -- sorry.  Go

16:33:32 17   ahead.

16:33:33 18       A.   Now, one of the areas, which I'm not

16:33:37 19   avoiding, is that Walmart could have paid the vendor

16:33:44 20   to utilize my services because most of the time a

16:33:49 21   vendor was involved.

16:33:51 22            So I don't know -- I received direct

16:33:55 23   payment from Walmart.  I also have a feeling that

16:33:59 24   some of the Walmart work that I did, which would

16:34:02 25   have been directly for Walmart, but did involve a

16:34:05   1   vendor, might have had the vendor's participation in

16:34:08   2   the compensation.

16:34:11   3        Q.   So with regard to store design --

16:34:14   4            MR. McDONNELL:  I'm sorry.  I'm going to

16:34:15   5        object and move to strike.  And the basis of my

16:34:18   6        objection is that whatever he did with store

16:34:21   7        design or display design is completely

16:34:23   8        unrelated to the opinions that he's going to

16:34:25   9        offer in this case.

16:34:26  10            You can proceed, Mr. Jean.

16:34:28  11   BY MR. JEAN:

16:34:29  12        Q.   With regard to store design, how long have

16:34:30  13   you been doing store design for Walmart?

16:34:34  14            MR. McDONNELL:  Objection to the question

16:34:35  15        because it's irrelevant to what this witness is

16:34:37  16        going to testify to, if he has conceded that he

16:34:40  17        doesn't have any opinions that the design at

16:34:42  18        Walmart was defective.

16:34:44  19            MR. JEAN:  And I hear you, counsel, and

16:34:45  20        per the rules that we discussed earlier, your

16:34:48  21        objection is noted.

16:34:49  22            I'm going to ask the question again and

16:34:51  23        the judge will make that determination.

16:34:52  24   BY MR. JEAN:

16:34:53  25        Q.   Sir, with regard to store design, since

```
16:34:55  1   when have you been doing the store design work for

16:34:58  2   Walmart?

16:35:00  3        A.   Since 1975.

16:35:03  4        Q.   And that continues today?

16:35:05  5        A.   Yes.

16:35:06  6        Q.   And when was the last time you did work --

16:35:09  7   well, when was the last time Walmart called you and

16:35:13  8   asked for your opinion on store design?

16:35:16  9             MR. McDONNELL:  Objection.  Same

16:35:17 10        objection, that this has nothing to do with

16:35:20 11        issues in this case.

16:35:23 12             MR. JEAN:  Thank you.

16:35:23 13   BY MR. JEAN:

16:35:23 14        Q.   Sir -- sir, when was the last time that

16:35:25 15   Walmart called you for your expertise on store

16:35:28 16   design?

16:35:32 17        A.   If -- memory is going to have to serve me

16:35:34 18   well on 2009.

16:35:36 19        Q.   Now, with regard to display design, you

16:35:40 20   continue to receive requests from Walmart to -- for

16:35:43 21   your expertise on display design?

16:35:46 22             MR. McDONNELL:  Objection.  Relevance.

16:35:48 23             MR. JEAN:  Thank you.

16:35:51 24   BY MR. JEAN:

16:35:52 25        Q.   That's part of your expertise?
```

GERALD BIRNBACH
NOVEMBER 08, 2024

JOB NO. 1282576

16:35:54   1        A.   When it comes to design, currently it

16:35:56   2   would be a vendor who would utilize my services, and

16:36:00   3   the last time would have been probably 2018 and '19.

16:36:09   4        Q.   Now, with regard to the third issue for

16:36:11   5   which I offered you as an expert, retail safety

16:36:15   6   expert, have you done work for Walmart with regard

16:36:18   7   to retail safety expert?

16:36:23   8        A.   Not currently, but I was deeply involved

16:36:27   9   with Walmart's major brand of Home -- Better Homes

16:36:31  10   and Garden, as well as Mark Eisen .

16:36:35  11        Q.   Okay.  What --

16:36:37  12             MR. McDONNELL:  I'm sorry.  Objection.

16:36:38  13        Move to strike.

16:36:39  14             Again, the fact that he may have designed

16:36:42  15        some feature in the store or some sort of

16:36:44  16        display has nothing to do with the issues in

16:36:46  17        this case.

16:36:47  18   BY MR. JEAN:

16:36:48  19        Q.   What work did you do with regard to safety

16:36:52  20   for Walmart?

16:36:56  21        A.   Any time I did a design, it would have

16:37:00  22   incorporated a safety measure.  Whether it was doing

16:37:05  23   a vintage shop, which is different than the vendor

16:37:08  24   display, or it was working with Walmart on a bid

16:37:12  25   purpose, which I did win for the vision center.  Any

16:37:17  1   one of those would have incorporated a safety

16:37:21  2   factor.

16:37:23  3          MR. McDONNELL:  Again, objection and move

16:37:24  4       to strike as this topic has nothing to do with

16:37:27  5       the opinions that this witness is going to

16:37:29  6       offer in this case.

16:37:30  7   BY MR. JEAN:

16:37:30  8       Q.   With regard to your expertise in retail

16:37:33  9   safety expert, did you review Walmart's safety

16:37:39 10   documentation in order to provide an opinion?

16:37:41 11       A.   Yes.

16:37:44 12       Q.   How long have you had these documentation?

16:37:49 13       A.   Looks since 2018.

16:37:51 14       Q.   And has that also been part of your

16:37:53 15   general knowledge since 2018?

16:37:55 16       A.   As it pertains to this particular case or

16:37:58 17   other Walmart cases?

16:37:59 18       Q.   Let's talk about other Walmart cases.

16:38:02 19   Have you had any standing knowledge of the Walmart's

16:38:05 20   safety standards?

16:38:07 21          MR. McDONNELL:  I'm going --

16:38:08 22          THE WITNESS:  Yes.

16:38:08 23          MR. McDONNELL:  Hold on a second.

16:38:09 24          I'm going to object that this Walmart

16:38:12 25       safety standards are capable of being

16:38:14   1      understood by the ordinary juror, just as

16:38:17   2      though they are understood by the ordinary

16:38:18   3      Walmart person.  They are written to be

16:38:22   4      understood by the ordinary person as part of

16:38:24   5      their training.

16:38:26   6         MR. JEAN:  Thank you.

16:38:27   7  BY MR. JEAN:

16:38:27   8      Q.  With regard to Walmart's safety standards,

16:38:33   9  when you did work for Walmart did you read the

16:38:38  10  Walmart safety standards?

16:38:43  11      A.  When I worked for Walmart, they did not

16:38:46  12  provide me with safety standards.  Those are

16:38:49  13  standards that I've learned over time working for a

16:38:53  14  mass retailer, as well as working for the vendor, as

16:38:56  15  well as working for outside vendors to Walmart

16:39:01  16  stores.

16:39:02  17      Q.  Okay.  Now, in this case -- well, how did

16:39:06  18  you first learn about Mr. Peter Pataki?

16:39:12  19      A.  It would have been provided to me by Mr.

16:39:14  20  DeZao, who I was doing some work for, and he

16:39:19  21  utilized my services as an expert witness.

16:39:23  22      Q.  And you authored a report around August

16:39:26  23  17, 2017; is that true?

16:39:29  24      A.  Yes.

16:39:30  25      Q.  Okay.  And what was the purpose of your

```
16:39:33  1   report?  What did you seek to ascertain?
16:39:38  2        A.   The purpose of the report is to determine
16:39:42  3   liability when it pertains to a particular case, and
16:39:45  4   in this case my findings showed or proved to me that
16:39:52  5   it was the retailer who was remiss in following
16:39:55  6   their own safety standards.
16:39:58  7            MR. McDONNELL:  Objection.  Move to
16:39:59  8        strike.  I'm sorry.  Objection.  Move to
16:40:00  9        strike.
16:40:01 10            There has been no fit (phonetic) and it's
16:40:03 11        not outside the understanding of a typical
16:40:06 12        juror, if that's his opinion he's going to
16:40:09 13        offer.
16:40:10 14   BY MR. JEAN:
16:40:10 15        Q.   So back to my question, sir.  Tell the
16:40:14 16   jury what was your -- the goal for authoring the
16:40:18 17   report.
16:40:19 18            MR. McDONNELL:  Objection.  Relevance.
16:40:23 19            MR. JEAN:  The relevance is why we are
16:40:24 20        here.  I'm prepared to proceed.
16:40:26 21   BY MR. JEAN:
16:40:27 22        Q.   Tell the jury what was your purpose of
16:40:29 23   writing the report?
16:40:30 24        A.   The purpose of writing a report was to
16:40:33 25   express my opinion in terms of the liability and who
```

16:40:37  1   was responsible for the incident.

16:40:39  2       Q.   And --

16:40:40  3            MR. McDONNELL:  Objection.  I'm sorry.

16:40:41  4       Objection.  Move to strike.

16:40:43  5            The witness has conceded that he intends

16:40:46  6       to offer the ultimate opinion and he's not

16:40:48  7       applying technical knowledge, but he's just

16:40:51  8       giving his overall net opinion as to who was at

16:40:53  9       fault.

16:40:54  10           MR. JEAN:  This is incorrect, as a matter

16:40:56  11      of what he has said, but I don't want to argue.

16:40:59  12      Let's continue.

16:41:00  13  BY MR. JEAN:

16:41:00  14      Q.   Sir, you authored a report in this case;

16:41:02  15  is that a fact?

16:41:03  16      A.   Yes.

16:41:03  17      Q.   Okay.  Now, I want the jury to understand

16:41:07  18  the purpose of writing this report was to what?

16:41:12  19      A.   The purpose of the report was to review

16:41:14  20  the documentation and that, as an expert, make an

16:41:18  21  opinion as to where I felt the liability fell in

16:41:22  22  this particular case.

16:41:23  23      Q.   Now, without --

16:41:24  24           MR. McDONNELL:  Objection.  I'm sorry.

16:41:25  25      I'm sorry.  Hold on a second.  Objection.  Move

| | | |
|---|---|---|
| 16:41:28 | 1 | to strike. |
| 16:41:31 | 2 | It has nothing to do with what an expert |
| 16:41:33 | 3 | is supposed to do as to make a determination of |
| 16:41:36 | 4 | liability. |
| 16:41:37 | 5 | An expert is supposed to apply their |
| 16:41:40 | 6 | specialized knowledge to certain facts and |
| 16:41:42 | 7 | offer an opinion that's outside of the general |
| 16:41:44 | 8 | understanding of the jurors, and that's not |
| 16:41:46 | 9 | what this witness has indicated he did. |
| 16:41:47 | 10 | BY MR. JEAN: |
| 16:41:48 | 11 | Q.   Well, sir, Mr. Birnbach, did you utilize |
| 16:41:53 | 12 | your special knowledge and articulate that special |
| 16:41:57 | 13 | knowledge in a report that you drafted? |
| 16:42:00 | 14 | A.   Yes, I did. |
| 16:42:02 | 15 | Q.   And before you tell us anything about your |
| 16:42:08 | 16 | report, did you review any documents in preparation |
| 16:42:13 | 17 | to provide this special knowledge to the jury? |
| 16:42:17 | 18 | A.   The only documentation that was provided |
| 16:42:20 | 19 | to me came from events, and it included a video.  I |
| 16:42:25 | 20 | relied on the video to provide an opinion. |
| 16:42:29 | 21 | Q.   Now, I have a report that you drafted |
| 16:42:30 | 22 | October 7, 2017.  Do you have that documentation in |
| 16:42:36 | 23 | front of you? |
| 16:42:37 | 24 | A.   No, I do not, but I would ask you to cite |
| 16:42:40 | 25 | it. |

GERALD BIRNBACH
NOVEMBER 08, 2024

16:42:40  1      Q.   Sure.  So the document that I have

16:42:43  2   includes that you reviewed a Rule 26 disclosure; is

16:42:46  3   that right?

16:42:47  4           MR. McDONNELL:  Objection.  Leading.

16:42:48  5      Cannot tell the witness what he relied upon.

16:42:51  6   BY MR. JEAN:

16:42:52  7      Q.   Well, let's do the following.  Sir,

16:42:53  8   let's -- I'm going to take a moment.  Do you have

16:42:56  9   your report in your person?  I know we are doing

16:42:59 10   this via Zoom, but do you have your report?  If so,

16:43:02 11   I'm going to ask that you consult your report.

16:43:06 12      A.   Can I ask you to share the screen?

16:43:08 13      Q.   Well, what I would like to do, let's do

16:43:11 14   this.  Let's go off the record and I do not want to

16:43:15 15   provide anything in front of a jury, so off the

16:43:18 16   record.

16:43:19 17           THE VIDEOGRAPHER:  We are going off the

16:43:20 18      record.  The time is 4:43 p.m. Eastern time.

16:43:29 19           MR. McDONNELL:  I'm sorry.  We have to

16:43:29 20      stay on the record.  That's what the rules say,

16:43:30 21      but stay on the record.  We are staying on the

16:43:31 22      video record.

16:43:33 23           MR. JEAN:  No, we are off the video

16:43:35 24      record.

16:43:36 25           MR. McDONNELL:  No, we are not.  This is

| | | |
|---|---|---|
| 16:43:37 | 1 | for the jury.  Remember, the deposition |
| 16:43:38 | 2 | continues.  The testimony is taken. |
| 16:43:39 | 3 | If your expert doesn't have his report |
| 16:43:41 | 4 | this front of him, that's relevant evidence.  I |
| 16:43:43 | 5 | want to get back on the video evidence.  I |
| 16:43:46 | 6 | haven't agreed to go off the video.  Let's go |
| 16:43:48 | 7 | back on.  You can't provide --  you can't |
| 16:43:50 | 8 | provide an expert -- |
| 16:43:50 | 9 | MR. JEAN:  That's fine. |
| 16:43:51 | 10 | MR. McDONNELL:  Yeah. |
| 16:43:53 | 11 | MR. JEAN:  That's fine.  I just didn't |
| 16:43:54 | 12 | want to produce his expert report to the jury, |
| 16:43:56 | 13 | so I didn't want to taint a jury. |
| 16:43:59 | 14 | BY MR. JEAN: |
| 16:44:00 | 15 | Q.   But, sir, you have your -- |
| 16:44:02 | 16 | THE VIDEOGRAPHER:  Do you want us to go |
| 16:44:03 | 17 | back on the record, sir? |
| 16:44:05 | 18 | MR. McDONNELL:  Yeah, we are back on the |
| 16:44:06 | 19 | record. |
| 16:44:06 | 20 | MR. JEAN:  That's fine. |
| 16:44:08 | 21 | BY MR. JEAN: |
| 16:44:08 | 22 | Q.   Sir, do you have your expert report? |
| 16:44:08 | 23 | MR. McDONNELL:  You have to go back on the |
| 16:44:09 | 24 | record. |
| 16:44:10 | 25 | MR. JEAN:  Sure.  Let's go back on the |

16:44:11  1        record.  That's fine.

16:44:12  2              THE WITNESS:  Yes, I did.

16:44:12  3              THE VIDEOGRAPHER:  We are now on the

16:44:13  4        record.  The time is 4:44 p.m. Eastern time.

16:44:18  5              THE WITNESS:  I have the report.

16:44:19  6   BY MR. JEAN:

16:44:20  7        Q.   Okay.  And, then, if counsel wants to mark

16:44:22  8   that documentation.  It's already marked for

16:44:25  9   identification as P4, on the record, previously.

16:44:29 10              (Plaintiff's Exhibit Number P4 was marked

16:44:29 11   for purposes of identification.)

16:44:29 12   BY MR. JEAN:

16:44:30 13        Q.   But you have your report that you drafted;

16:44:32 14   is that right?

16:44:33 15        A.   Yes.

16:44:34 16        Q.   When did you draft that report?

16:44:38 17        A.   According to this, it was in the year

16:44:41 18   2017, October.

16:44:44 19        Q.   Okay.  And prior -- and did you state the

16:44:48 20   documents that you reviewed as a basis for

16:44:51 21   formulating your opinion?

16:44:53 22        A.   Yes.

16:44:54 23        Q.   Tell the jury, or list for the jury, the

16:44:57 24   things that you reviewed prior to making your

16:45:00 25   determination that you'll tell them about.

16:45:03  1      A.    Okay.  It was a Rule 26 initial

16:45:05  2  disclosure, photos off the video, photos taken at

16:45:10  3  store inspection, a store inspection, the

16:45:15  4  interrogatories that were final, the deposition of

16:45:18  5  Mr. Pataki, the deposition of Ms. Britton

16:45:21  6  (phonetic), Ms. Garner (phonetic) eye witness

16:45:25  7  statement, video of incident and the defendant's

16:45:29  8  interrogatory answers.

16:45:32  9      Q.    Are these documents that you just

16:45:35 10  articulated, which sounds like ten particular

16:45:39 11  documents, are those documents typically relied upon

16:45:43 12  by experts in the field in formulating an opinion?

16:45:48 13      A.    Honestly, I cannot answer what other

16:45:51 14  experts use.  These are documents that I'm used to

16:45:55 15  getting and can make an opinion based on these

16:45:58 16  documents.

16:45:59 17      Q.    And that is the Rule 26 Disclosure, number

16:46:01 18  one; photos of the video, number two; photos taken

16:46:05 19  of the store inspection, number three; store

16:46:08 20  inspection of the final interrogatories; deposition

16:46:13 21  of Mr. Peter Pataki; deposition of Britton; Ms.

16:46:16 22  Garner eye witness statement; video of incident; and

16:46:21 23  defendant's interrogatory answers; is that correct?

16:46:23 24           MR. McDONNELL:  Objection.  Objection.

16:46:24 25      Leading and cumulative.

16:46:27  1   BY MR. JEAN:

16:46:27  2        Q.   Is that all correct, sir?

16:46:29  3        A.   Those are all the items that I've

16:46:30  4   indicated on my report, yes.

16:46:32  5        Q.   So to tell the jury, the method for you

16:46:36  6   formulating your opinion is you reviewed these

16:46:39  7   documentation and you also use your special

16:46:42  8   expertise prior to formulating the opinion; is that

16:46:45  9   correct?

16:46:45 10        A.   Yes.

16:46:46 11        Q.   Okay.  So who is -- well, and these

16:46:50 12   documents, those documents that you found useful in

16:46:53 13   formulating your opinion as an expert; is that

16:46:56 14   correct?

16:46:56 15        A.   Yes.

16:46:57 16        Q.   Okay.  Who is Britton?  You mentioned

16:47:01 17   deposition of Britton.  Who is that?

16:47:03 18        A.   That is an assistant manager of that

16:47:06 19   particular Walmart store at the time of the

16:47:08 20   incident.

16:47:09 21        Q.   Why was that particular document useful

16:47:12 22   for you in formulating your opinion?

16:47:17 23        A.   It gives you insight as to what they do as

16:47:21 24   a routine inspection, what some of the maintenance

16:47:24 25   people are required to do, and in terms of how

| | | |
|---|---|---|
| 16:47:28 | 1 | product is brought out onto the floor. |
| 16:47:32 | 2 | Q.   And you also read the deposition of |
| 16:47:33 | 3 | Mr. Peter Pataki.  And why was that useful for you |
| 16:47:38 | 4 | in formulating your opinion? |
| 16:47:39 | 5 | A.   Basically, utilizing that to determine |
| 16:47:41 | 6 | what was his complaint and claim. |
| 16:47:46 | 7 | Q.   You also reviewed the video.  Why was the |
| 16:47:48 | 8 | video important for you to have in authoring your |
| 16:47:53 | 9 | report? |
| 16:47:55 | 10 | A.   The video concurs what these people are |
| 16:47:59 | 11 | saying. |
| 16:48:00 | 12 | Q.   Okay.  Now, I would like to share my |
| 16:48:05 | 13 | screen, and for that reason only I just ask that we |
| 16:48:09 | 14 | go off the record just so that I can set that up. |
| 16:48:13 | 15 | MR. McDONNELL:  No objection to going off |
| 16:48:14 | 16 | the record for that reason. |
| 16:48:15 | 17 | MR. JEAN:  Thank you.  That's it. |
| 16:48:17 | 18 | THE VIDEOGRAPHER:  Going off the record. |
| 16:48:18 | 19 | The time is 4:48 p.m. Eastern time. |
| 16:48:23 | 20 | (Discussion off the record.) |
| 16:50:56 | 21 | THE VIDEOGRAPHER:  We are now on the |
| 16:50:57 | 22 | record.  The time is 4:50 p.m. Eastern time. |
| 16:51:00 | 23 | BY MR. JEAN: |
| 16:51:01 | 24 | Q.   Okay.  Now, Mr. Birnbach, you were talking |
| 16:51:06 | 25 | about documents that you reviewed.  Here, could you |

16:51:10  1  tell us what's in front of us on the screen?  Let's

16:51:14  2  start to the upper left-hand corner.  What is on the

16:51:18  3  upper left-hand corner?

16:51:20  4      A.   The upper left-hand corner is showing a

16:51:23  5  camera view looking down towards the display that's

16:51:28  6  in question, where the incident occurred.  It's

16:51:30  7  showing two individuals -- two individual men in

16:51:36  8  white shirts and a woman with her child/girl, coming

16:51:40  9  towards us.

16:51:43 10      Q.   Now, moving to the right upper.  What do

16:51:47 11  you see?

16:51:49 12      A.   We see a similar video of the event or the

16:51:55 13  event area.  We see the person who is furthest away

16:52:02 14  down the aisle at the display in question, and we

16:52:07 15  see another individual man with a white shirt

16:52:11 16  approaching that area.

16:52:13 17          We see the woman out of the visit --

16:52:15 18  video.

16:52:17 19          MR. McDONNELL:  Objection.  Move to strike

16:52:18 20      all this.  This is precisely what he did.

16:52:21 21      Other courts have excluded his opinion.  It's

16:52:23 22      simply showing video stills and narrating.

16:52:26 23          The jury will see the videos.  This is

16:52:28 24      cumulative to what the videos, understanding of

16:52:31 25      what it shows will be.

16:52:32  1          MR. JEAN:  Thank you.

16:52:32  2     BY MR. JEAN:

16:52:33  3          Q.   And continuing with my identification.

16:52:35  4     Next is the third -- the third image is on the

16:52:40  5     left-hand side of the screen.  What is it?

16:52:43  6          A.   It's, again, a view of the incident area;

16:52:46  7     two men, one further down the aisle at the area of

16:52:51  8     the incident; and the woman and child have now

16:52:55  9     disappeared.

16:52:56 10          Q.   Now moving to your right.  What is on the

16:52:58 11     right-hand side?

16:53:01 12          A.   It is, again, woman out of view and two

16:53:05 13     men, one male approaching the area of incident and

16:53:09 14     one at the area of incident.

16:53:10 15          Q.   Now --

16:53:12 16          MR. McDONNELL:  Objection.  I'm sorry.

16:53:13 17     Objection.  Move to strike all this.

16:53:15 18          This is cumulative and it's not helpful

16:53:17 19     for the jury to have somebody simply describe

16:53:20 20     what they believe they saw in the video still.

16:53:22 21     BY MR. JEAN:

16:53:23 22          Q.   The next thing is the photograph on the

16:53:27 23     bottom.  What is that?

16:53:30 24          A.   Can you make it larger?

16:53:31 25          There is a third individual, who is coming

16:53:35  1   into the picture, that is approaching the area of

16:53:37  2   the incident.

16:53:40  3          Not just scrolling down, but is it

16:53:42  4   possible to make it larger?

16:53:45  5          Q.   I would like to --

16:53:47  6          A.   If not, there is a third person who is

16:53:51  7   clearly in view that I do see in image number four.

16:53:58  8          Q.   Okay.  Now, the bottom photograph, you

16:54:02  9   identify what that is?

16:54:06 10          A.   Well, again, I see the person who is

16:54:11 11   furthest down the aisle, still in place, and the

16:54:14 12   person who is walking down the aisle, who was the

16:54:18 13   middle picture -- the middle figure in Figure Number

16:54:22 14   1, is now approaching the area of incident, and

16:54:27 15   there's a third individual who is on the left-hand

16:54:29 16   side walking out towards the end caps.

16:54:33 17          Q.   Okay.  Now, these are -- these are

16:54:36 18   photographs that you obtained how?

16:54:40 19          A.   I believe they are my screen shots taken

16:54:43 20   from the video provided to me.

16:54:46 21          Q.   And what does -- and when you reviewed the

16:54:51 22   video, what did the video depict?

16:54:54 23          MR. McDONNELL:  Objection.  Cumulative.

16:54:55 24          And this particular expert, what he sees

16:54:58 25      in the video isn't relevant to the case.

16:55:01   1            MR. JEAN:  Counsel, we disagree.  Thank

16:55:03   2      you.

16:55:03   3   BY MR. JEAN:

16:55:04   4      Q.   Counsel -- rather, Mr. Birnbach, the still

16:55:06   5   shots of the video, you reviewed them; is that

16:55:09   6   right?

16:55:10   7      A.   Yes, I reviewed the video as well.

16:55:13   8      Q.   Okay.  And these particular photographs

16:55:15   9   that we've marked, and it is noted as Pataki 51,

16:55:18  10   Bates stamped, but P4, what was your purpose of

16:55:22  11   reviewing these particular still shots?

16:55:28  12      A.   The purpose of it was to concur with the

16:55:31  13   depositions.

16:55:33  14      Q.   Okay.  And in this -- there are some

16:55:35  15   arrows that are indicated, for example, upper

16:55:38  16   left-hand corner.  What does that arrow depict?

16:55:46  17      A.   I'm sorry, but what I'm being shown does

16:55:49  18   not show arrows.  If there are, I do not make them

16:55:52  19   out.

16:55:54  20      Q.   Do you see my screen moving now?

16:55:56  21      A.   Yes, I do.

16:55:57  22      Q.   Okay.  So focusing your attention on the

16:56:00  23   first photograph, do you see that?

16:56:03  24      A.   Yes.

16:56:04  25      Q.   Do you see an arrow that's indicated here?

GERALD BIRNBACH
NOVEMBER 08, 2024

16:56:06   1        A.    Would you move the cursor over to what you

16:56:09   2   see as the arrow?

16:56:11   3        Q.    Right here.

16:56:14   4        A.    See, I don't see the cursor.

16:56:17   5        Q.    Perhaps there's something getting lost.

16:56:19   6        A.    It's very -- it's very possible that --

16:56:21   7   oh, I now see the cursor.  Okay.  Okay.  Understood.

16:56:27   8            And you are moving the cursor down towards

16:56:30   9   individual number one, who is furthest down the

16:56:33  10   aisle.

16:56:34  11        Q.    Right.  You identify that -- did you

16:56:36  12   identify that, who that was, in writing your report?

16:56:42  13        A.    I believe so.  I would need you to go to

16:56:44  14   the report to identify that individual.

16:56:50  15        Q.    Could you look at your report, in order to

16:56:52  16   refresh your recollection, by looking at what's

16:56:55  17   labeled addendum one?

16:57:11  18        A.    Yes.

16:57:12  19        Q.    Okay.

16:57:14  20        A.    I'm there and I'm scrolling down to my

16:57:18  21   figure.

16:57:44  22        Q.    Do you see the page labeled addendum one?

16:57:48  23        A.    I think I'm looking at my addendum, which

16:57:52  24   does not correlate to what I'm being shown.  Let

16:57:58  25   me -- just give me a few more seconds here.  I'm

| | | |
|---|---|---|
| 16:58:14 | 1 | sorry. |
| 16:58:15 | 2 | I'm not able to see these images in the |
| 16:58:18 | 3 | addendum that I've reviewed in my documentation, but |
| 16:58:23 | 4 | the question is regarding the individual furthest |
| 16:58:28 | 5 | down the page, or the image, and has one -- has the |
| 16:58:35 | 6 | right leg in front of the leg foot; is that correct. |
| 16:58:37 | 7 | Q.   Correct. |
| 16:58:38 | 8 | MR. McDONNELL:  Objection.  Relevance. |
| 16:58:40 | 9 | BY MR. JEAN: |
| 16:58:41 | 10 | Q.   Did you identify this as Mr. George -- |
| 16:58:43 | 11 | Mr. Peter Pataki? |
| 16:58:44 | 12 | A.   Yes, I have. |
| 16:58:45 | 13 | Q.   And Mr. Pataki is observed in the upper |
| 16:58:48 | 14 | left-hand corner and then as well as the upper |
| 16:58:51 | 15 | right-hand corner; is that right? |
| 16:58:53 | 16 | MR. McDONNELL:  Objection.  Leading and |
| 16:58:54 | 17 | cumulative. |
| 16:58:55 | 18 | THE WITNESS:  It's interesting that the |
| 16:58:57 | 19 | arrows, I don't know why are appearing.  Okay. |
| 16:59:01 | 20 | So I have identified in image number one a |
| 16:59:05 | 21 | red arrow to an individual, and I declare that |
| 16:59:09 | 22 | to be Mr. Pataki. |
| 16:59:11 | 23 | And now your second -- your next question? |
| 16:59:14 | 24 | BY MR. JEAN: |
| | 25 | |

16:59:14  1        Q.   Okay.  In all of these photographs there

16:59:16  2   is a red arrow, is that right?

16:59:17  3        A.   Yes.  Correct.

16:59:19  4        Q.   And what was the purpose of the arrow

16:59:21  5   being indicated in these images?

16:59:25  6        A.   I think that in my narrative of these

16:59:28  7   particular images, I'm describing the arrow pointing

16:59:31  8   to Mr. Pataki.

16:59:34  9             MR. McDONNELL:  Objection.  I'm sorry.

16:59:35 10        Objection, which is exactly what this witness

16:59:38 11        is doing is simply narrating a video and still

16:59:41 12        pictures, which a juror can do, and it's

16:59:44 13        cumulative to the jury just looking at the

16:59:47 14        video themselves.

16:59:48 15             MR. JEAN:  Thank you.

16:59:48 16   BY MR. JEAN:

16:59:49 17        Q.   And these videos show Mr. Pataki falling

16:59:52 18   at the Walmart store; is that correct?

16:59:53 19             MR. McDONNELL:  Objection.  Leading.

16:59:54 20   BY MR. JEAN:

16:59:54 21        Q.   Okay.  And in part of your report, your

16:59:58 22   goal was to provide an opinion as to how Mr. Pataki

17:00:05 23   fell at the Walmart; is that right?

17:00:06 24             MR. McDONNELL:  Objection.  Leading.

         25

```
17:00:08  1    BY MR. JEAN:
17:00:08  2        Q.   Sir?
17:00:11  3        A.   My objection -- my object was to define
17:00:14  4    whether Walmart was doing what they were supposed to
17:00:17  5    be doing, or Mr. Pataki was incorrectly acting as a
17:00:23  6    customer at that particular location.
17:00:26  7        Q.   Okay.
17:00:27  8            MR. McDONNELL:  Objection.  Move to
17:00:28  9        strike.  That's not appropriate subject for
17:00:32 10        expert testimony.
17:00:32 11            MR. JEAN:  Thank you.
17:00:33 12            MR. McDONNELL:  This witness is merely
17:00:34 13        giving a net opinion.
17:00:38 14            MR. JEAN:  And I'm going to go off the
17:00:39 15        record so I can take this off my screen.
17:00:44 16            Just off the video record.  I don't want
17:00:46 17        my stuff showing.  Is my screen still showing
17:00:50 18        or no?
17:00:51 19            THE WITNESS:  No.
17:01:45 20            MR. JEAN:  I'm going to keep off the video
17:01:48 21        record, so I can just manage this
17:01:48 22        share-screening device without sharing
17:01:48 23        everything on my screen with the jury.
17:01:50 24            MR. McDONNELL:  Yeah.
17:01:51 25            THE VIDEOGRAPHER:  Going off the record.
```

17:01:52  1      The time is 5:01 p.m. Eastern time.

17:01:55  2           MR. JEAN:  Yeah, I don't want my other

17:01:57  3      stuff being shown.

17:01:58  4           THE VIDEOGRAPHER:  No problem.

17:01:59  5           MR. JEAN:  Does everyone see my screen or

17:02:01  6      no?

17:02:02  7           MR. McDONNELL:  Of course.

17:02:03  8           MR. JEAN:  It's nothing inappropriate, so

17:02:05  9      we are all good.

17:02:09  10          MR. McDONNELL:  Yeah.  We are still on the

17:02:10  11     steno.

17:02:11  12          Objection.  All we have done for almost 45

17:02:13  13     minutes is establish that this witness looked

17:02:16  14     at the video and some pictures, so it's got

17:02:20  15     limited probative value and it's outweighed by

17:02:23  16     the waste of time and potential prejudice.

17:02:26  17          MR. JEAN:  Well, counsel, if you can wait

17:02:27  18     with your objections, and -- you know, I have

17:02:29  19     nothing to say.  Let's move forward.  Okay.

17:02:34  20          We are back on the video record, please.

17:02:39  21          THE VIDEOGRAPHER:  We are now on the

17:02:39  22     record.  The time is 5:02 p.m. Eastern time.

17:02:43  23  BY MR. JEAN:

17:02:44  24     Q.   Okay.  Mr. Birnbach, I'm showing you

17:02:47  25  what's been marked for identification as P43-A.

| | | |
|---|---|---|
| 17:02:50 | 1 | It's a particular point of view. |
| 17:02:57 | 2 | Have you seen that before? |
| 17:02:59 | 3 | A.   Yes. |
| 17:02:59 | 4 | MR. McDONNELL:  Objection.  Objection. |
| 17:03:00 | 5 | Move to strike.  I'll move to strike any of |
| 17:03:03 | 6 | this just continuing showing video stills |
| 17:03:05 | 7 | asking this witness to narrate it. |
| 17:03:08 | 8 | I'm sorry.  You've already had him testify |
| 17:03:10 | 9 | that he's seen the video and that he's seen |
| 17:03:13 | 10 | these pictures. |
| 17:03:14 | 11 | MR. JEAN:  No, sir.  I'm prepared to |
| 17:03:15 | 12 | proceed.  I hear your objection.  Your |
| 17:03:17 | 13 | objection is noted.  I'm going to continue to |
| 17:03:20 | 14 | lay my foundation so I can get through my case. |
| 17:03:22 | 15 | Thank you. |
| 17:03:23 | 16 | BY MR. JEAN: |
| 17:03:23 | 17 | Q.   Now, I'm showing you what's been marked |
| 17:03:24 | 18 | for identification as P43-A.  Do you see that? |
| 17:03:28 | 19 | A.   Yes. |
| 17:03:29 | 20 | Q.   It's -- and do you see the time stamp, |
| 17:03:31 | 21 | which is on this particular video? |
| 17:03:35 | 22 | A.   I do, yes. |
| 17:03:36 | 23 | Q.   Okay.  You've seen this prior to authoring |
| 17:03:39 | 24 | your report; is that correct? |
| 17:03:40 | 25 | A.   Yes. |

17:03:41  1        Q.    Okay.  Next, as part of my foundation, do

17:03:44  2    you see P43-B?  Do you see that?

17:03:47  3        A.    Yes.

17:03:48  4        Q.    Okay.  And that's -- what time is listed

17:03:51  5    on the video?

17:03:54  6              MR. McDONNELL:  Again -- again, objection.

17:03:55  7        Relevance.

17:03:57  8              The witness showing his stills is going to

17:04:00  9        be cumulative to what the jury has already

17:04:02 10        seen.

17:04:02 11              It appears as though plaintiff's counsel's

17:04:05 12        purpose is to simply have this witness narrate

17:04:06 13        still pictures of the video, which they can see

17:04:10 14        and the jury can see and make their own

17:04:12 15        judgments about.

17:04:13 16              MR. JEAN:  That is incorrect.

17:04:14 17              And, counsel, for the record, what I'm

17:04:15 18        doing is establishing the foundation as to what

17:04:19 19        the witness relied upon, which I assume the

17:04:23 20        jury will also see, so they can have a full

17:04:27 21        understanding as to what his opinion is.

17:04:30 22              Counsel, Roosevelt Jean, is continuing to

17:04:34 23        establish the foundation.  I'm prepared to

17:04:36 24        proceed.  Now --

17:04:37 25              MR. McDONNELL:  I'm sorry.  You already

GERALD BIRNBACH
NOVEMBER 08, 2024

JOB NO. 1282576

17:04:38   1        had him testify that he's seen the video and

17:04:41   2        that he's seen the stills, so what you are

17:04:43   3        doing right now is just using this witness as a

17:04:47   4        conduit to show the stills and to show the

17:04:48   5        video over again, since I assume we'll be

17:04:51   6        seeing them at trial and I assume we'll be

17:04:53   7        seeing them from Mr. Pataki.

17:04:54   8            It's cumulative, it's a waste of time, and

17:04:57   9        it's not relevant to what Mr. -- what this

17:05:00   10       particular witness thinks he sees in the video.

17:05:02   11       He's not a video expert.

17:05:04   12           MR. JEAN:  I would never waste the jury's

17:05:06   13       time and I'm prepared to proceed.

17:05:07   14   BY MR. JEAN:

17:05:08   15       Q.   So P43-B, what time is that?

17:05:11   16           MR. McDONNELL:  Objection, for the record.

17:05:13   17       The picture has a time stamp.  You are wasting

17:05:15   18       time.

17:05:16   19           MR. JEAN:  I would never waste a jury's

17:05:18   20       time.

17:05:19   21   BY MR. JEAN:

17:05:20   22       Q.   P43-B, what is that date?  What is that

17:05:23   23   time stamp, sir?

17:05:24   24           MR. McDONNELL:  Objection.

17:05:25   25           THE WITNESS:  It's 8:00 and 50 seconds.

17:05:29  1        It's not -- yes, 50 seconds.

17:05:32  2   BY MR. JEAN:

17:05:33  3        Q.   And did you find that relevant in

17:05:34  4   formulating your opinion in this matter?

17:05:36  5        A.   Yes, because it's prior to the incident.

17:05:39  6        Q.   Okay.  P43-C, for the record.  Have you

17:05:42  7   seen that before?

17:05:43  8        A.   Yes.

17:05:44  9        Q.   What is that?

17:05:49 10        A.   That means what is the photograph

17:05:50 11   depicting?

17:05:52 12        Q.   Exactly.  What is depicted in P -- tell

17:05:55 13   the jury, what is depicted on P43-C?

17:05:59 14           MR. McDONNELL:  Objection.  Relevance.

17:06:00 15        Objection.  Relevance.

17:06:02 16           MR. JEAN:  Relevance is establishing the

17:06:03 17        foundation of this witness's testimony.  I'm

17:06:05 18        prepared to proceed.

17:06:06 19   BY MR. JEAN:

17:06:07 20        Q.   P43-C, what is depicted in this video?

17:06:10 21           MR. McDONNELL:  Objection to what this

17:06:10 22        witness is narrating.

17:06:12 23           The jury, at some point, if the video is

17:06:14 24        admissible, you can show the jury the video.

17:06:17 25        We don't need to need this witness to narrate

17:06:18  1        the video.

17:06:20  2             MR. JEAN:  I think the jury needs to see

17:06:21  3        it.

17:06:22  4   BY MR. JEAN:

17:06:22  5        Q.   Again, P43-C.  What is depicted in P43-C?

17:06:27  6        A.   Well, certainly I'm going to spend time on

17:06:31  7   the negative because there's plenty of positive

17:06:35  8   within the image.

17:06:37  9             But the negative aspect is that there is

17:06:40 10   off to the column side, just left of the vertical

17:06:46 11   column that has the American flag draped on it, just

17:06:50 12   left of it is an abandoned shopping cart.

17:06:54 13             To the right of the column is what appears

17:06:57 14   to be another shopping cart, with an individual, but

17:07:00 15   there's something on the ground which I cannot

17:07:03 16   determine.

17:07:05 17             I do see a -- what appears to be a rack

17:07:09 18   that's just above the word EDT, where there's an

17:07:15 19   individual on the phone -- appears to be a phone --

17:07:18 20   looking away from anything and traveling with what

17:07:25 21   appears to be some kind of a U-boat or method of

17:07:30 22   transporting product, and behind him is an

17:07:34 23   overloaded something, which is being managed by an

17:07:39 24   individual.

17:07:43 25             I can't determine that it is a customer or

17:07:45  1  not, but it doesn't look -- it's kind of an item

17:07:50  2  that an attendee would call attention to and perhaps

17:07:55  3  advise the customer not to be transporting something

17:07:58  4  of that nature.

17:08:00  5      And I also see down to the area of

17:08:03  6  incident.

17:08:04  7      Q.   The area of incident --

17:08:05  8           MR. McDONNELL:   I'm sorry.   Objection.

17:08:06  9      Relevance to what this person sees in the

17:08:10 10      foreground, which is at least 60, 70 feet away

17:08:13 11      from the accident.   Probably closer to 100.

17:08:15 12      Relevance.

17:08:16 13           MR. JEAN:   The relevance is the foundation

17:08:19 14      that the witness is providing as the basis for

17:08:20 15      his ultimate conclusion.   I'm prepared to

17:08:23 16      proceed.

17:08:23 17  BY MR. JEAN:

17:08:24 18      Q.   Now, in P43-C, did you note the time stamp

17:08:27 19  at that particular time?

17:08:29 20      A.   Yes.   It's 8:04:41 p.m.

17:08:35 21      Q.   Okay.   And you've seen this video before;

17:08:37 22  is that correct?

17:08:38 23      A.   Yes.

17:08:39 24      Q.   And in showing this to the jury, this is

17:08:42 25  part of the foundation that led to your ultimate

17:08:45  1    conclusion; is that correct?

17:08:46  2         A.    That's correct.

17:08:47  3         Q.    Do you see the area where Mr. Pataki would

17:08:50  4    eventually fall depicted in P43-C?

17:08:53  5         A.    I do.

17:08:54  6         Q.    And where is that?

17:08:56  7         A.    It would be at the far end of that aisle

17:09:00  8    where your cursor is now pointing.

17:09:02  9         Q.    In this particular area here; is that

17:09:05 10    correct?

17:09:05 11         A.    Yes.

17:09:06 12         Q.    Okay.  Now, we are going --

17:09:10 13              MR. McDONNELL:  Let me just note again,

17:09:12 14         P43, in context, the gentleman on the phone

17:09:17 15         isn't a Walmart employee.  The Walmart employee

17:09:19 16         is to the right, and both Walmart employees are

17:09:22 17         to the right of this.

17:09:23 18              And right now the witness is suggesting

17:09:25 19         that somebody is on the phone from Walmart.

17:09:28 20         That's not the video, because I had the video

17:09:30 21         up.

17:09:30 22              Objection.  Move to strike all this.

17:09:32 23              The witness -- the witness isn't even

17:09:35 24         narrating what's on the video correctly, which

17:09:39 25         is why any probative value of having this

17:09:41  1      gentleman look at a video and give an opinion

17:09:44  2      upon a still is outweighed by the prejudicial

17:09:47  3      fact of the fact that he doesn't even know what

17:09:49  4      he's describing.

17:09:50  5          MR. JEAN:  Thank you, sir.

17:09:50  6  BY MR. JEAN:

17:09:51  7      Q.   And P43-C, are these garbage bags that we

17:09:55  8  see here?

17:09:57  9      A.   Honestly, it's out of focus.  I can't

17:09:59 10  tell -- I can't determine offhand exactly what they

17:10:02 11  are.

17:10:03 12          It just is -- it looks, to me, as too

17:10:07 13  high.  It doesn't look like product at all.

17:10:12 14      Q.   Okay.  So these two things here, they

17:10:16 15  are -- did you see these previously when you

17:10:19 16  reviewed your video -- with the video?

17:10:22 17      A.   I didn't.  I believe, if you go back to my

17:10:24 18  transcript, you are going to see that I did not

17:10:27 19  state that that was a Walmart employee on the phone.

17:10:30 20  I was not sure of what that position -- that

17:10:32 21  individual was.

17:10:34 22      Q.   Next I'm going to go to P43-D.  P43-D.

17:10:39 23  Have you seen that before?

17:10:40 24      A.   Yes.

17:10:42 25      Q.   Was that part of the foundation for

17:10:44  1  authoring your report?

17:10:46  2        MR. McDONNELL:  Again, objection.

17:10:47  3     Relevance to what this particular witness is

17:10:50  4     saying about the video.  The jury can see the

17:10:53  5     video.

17:10:53  6        MR. JEAN:  Well, counsel, you'll know the

17:10:54  7     relevance after you allow him to answer my

17:10:57  8     question, which is, number One, what is it and,

17:10:59  9     two, did he find anything significant, so let

17:11:02 10     me proceed, please.

17:11:03 11  BY MR. JEAN:

17:11:03 12     Q.   So P43-D, have you seen that before?

17:11:07 13     A.   Yes.

17:11:08 14     Q.   And what is the date stamp of that

17:11:10 15  particular still shot?

17:11:13 16     A.   It's 8:00 p.m., four minutes, 51 seconds.

17:11:18 17     Q.   Did you find this particular snapshot

17:11:21 18  helpful in articulating your report?

17:11:25 19     A.   Yes.

17:11:26 20     Q.   Tell the jury why.

17:11:29 21     A.   Because I see an individual in a white

17:11:32 22  coat who's transporting material that should not be

17:11:37 23  transported the way it is at that time of day.

17:11:42 24        MR. McDONNELL:  Objection.  Relevance to a

17:11:44 25     piece of plastic being on the floor.

| | | |
|---|---|---|
| 17:11:46 | 1 | BY MR. JEAN: |
| 17:11:46 | 2 | Q.   And do you see a piece of plastic on the |
| 17:11:49 | 3 | floor depicted in P43-D? |
| 17:11:51 | 4 | MR. McDONNELL: Objection.  Objection. |
| 17:11:52 | 5 | Relevance to what this witness sees, because he |
| 17:11:55 | 6 | doesn't have levels of observation any better |
| 17:11:58 | 7 | than any other juror. |
| 17:11:59 | 8 | MR. JEAN:  Thank you. |
| 17:12:00 | 9 | BY MR. JEAN: |
| 17:12:00 | 10 | Q.   And, in P43-D, I'm going to point to an |
| 17:12:03 | 11 | area here.  Do you see -- here.  Do you see this |
| 17:12:05 | 12 | area? |
| 17:12:06 | 13 | A.   Yes. |
| 17:12:06 | 14 | MR. McDONNELL:  Objection.  Relevance. |
| 17:12:08 | 15 | BY MR. JEAN: |
| 17:12:08 | 16 | Q.   Okay.  When you saw this particular area |
| 17:12:10 | 17 | in P43-D in this video, was this particular area |
| 17:12:14 | 18 | significant for you in drafting your report? |
| 17:12:17 | 19 | A.   Yes. |
| 17:12:18 | 20 | MR. McDONNELL:  Objection.  Leading and |
| 17:12:18 | 21 | relevance. |
| 17:12:20 | 22 | BY MR. JEAN: |
| 17:12:20 | 23 | Q.   Tell the jury why this particular area was |
| 17:12:22 | 24 | important to you in articulating your report, this |
| 17:12:26 | 25 | particular P43-D.  Tell the jury why. |

17:12:28  1        A.   Because there is debris on the floor and

17:12:30  2    it should be picked up by a Walmart employee.

17:12:33  3        Q.   What is the --

17:12:35  4             MR. McDONNELL:  Objection.  Objection.

17:12:35  5        Move to strike.

17:12:37  6    BY MR. JEAN:

17:12:37  7        Q.   Okay.  And you say -- you say that it

17:12:39  8    should be picked up by a Walmart employee.  Do you

17:12:42  9    have any policies or procedures that would assist

17:12:45  10   the jury in understanding why you said that?  If so,

17:12:48  11   please tell us.

17:12:49  12            MR. McDONNELL:  Objection.  Relevance.

17:12:52  13   BY MR. JEAN:

17:12:52  14       Q.   Tell the jury, what is the basis of that

17:12:55  15   opinion?  Tell us, sir.

17:12:57  16       A.   In the Walmart handbook it is clearly

17:13:00  17   defined that all employees are responsible, as they

17:13:04  18   patrol through the store, regardless of what

17:13:07  19   assignment they are on, that they patrol the floor

17:13:10  20   and if they see any debris, they should immediately

17:13:14  21   pick up that debris.

17:13:16  22       Q.   Okay.

17:13:17  23            MR. McDONNELL:  Objection.  Move -- I'm

17:13:19  24       sorry.  Objection move to strike what is,

17:13:21  25       essentially, well within the ken of a jury.  It

17:13:24  1        doesn't need a nonregistered architect to tell

17:13:27  2        them the employee should pick stuff up that

17:13:30  3        they see.  That's not an expert within.

17:13:32  4             MR. JEAN:  Thank you, sir.

17:13:33  5             MR. McDONNELL:  It doesn't require any

17:13:34  6        scientific analysis and it's not something a

17:13:37  7        jury doesn't already know.

17:13:38  8             MR. JEAN:  Thank you, sir.

17:13:39  9   BY MR. JEAN:

17:13:39 10        Q.   And in P43-D, this is the area with debris

17:13:43 11   that you were talking about, correct?

17:13:45 12        A.   Yes.

17:13:46 13             MR. McDONNELL:  Objection.  Relevance and

17:13:47 14        that this witness does not know what it is.

17:13:48 15        The jury will have to decide what it is.

17:13:50 16   BY MR. JEAN:

17:13:51 17        Q.   Sir, what is your -- do you have an

17:13:54 18   opinion on -- on debris being on a floor at Walmart

17:13:59 19   at 8:04:51 p.m.?

17:14:02 20             MR. McDONNELL:  Objection.  This

17:14:03 21        particular witness is not qualified by

17:14:05 22        education or experience to give any opinion of

17:14:07 23        what he sees in a video.  We can all see the

17:14:10 24        video.

         25

17:14:11  1  BY MR. JEAN:

17:14:11  2      Q.   Okay.  Sir --

17:14:13  3           MR. McDONNELL:  You are -- you are,

17:14:14  4      essentially, asking this particular witness to

17:14:16  5      deliver your argument.  This is your

17:14:17  6      opportunity to do this, but you cannot do this.

17:14:20  7      This is not expert testimony.  Move to strike.

17:14:24  8           MR. JEAN:  Let me ask the question.  Let

17:14:25  9      me ask the question.  Let me ask the question.

17:14:26 10  BY MR. JEAN:

17:14:26 11      Q.   Mr. Birnbach, through the pedigree that

17:14:30 12  you described earlier about your experience reading

17:14:38 13  Walmart material, and having worked with Walmart,

17:14:43 14  and the other pedigree that you had described

17:14:47 15  earlier, in reviewing the Walmart materials, did you

17:14:53 16  get a basis of understanding what a Walmart employee

17:15:01 17  should do if they ever saw a piece of debris just

17:15:10 18  hanging out on the ground at 8:04:51 seconds at

17:15:18 19  Walmart?

17:15:19 20           MR. McDONNELL:  Objection.  Move to

17:15:20 21      strike.  It's leading.  It's argumentative, and

17:15:23 22      it's not something that is the subject of an

17:15:25 23      expert opinion.

17:15:27 24           The jury can interpret the policies from

17:15:29 25      Walmart, which are written in plain language

17:15:31  1          arguably at a sixth or seventh grade level.

17:15:34  2     BY MR. JEAN:

17:15:34  3          Q.    So, Mr. Birnbach, I want you to understand

17:15:36  4     my question, and if you don't understand it, I'm

17:15:38  5     going to repeat it.  Did you understand my question?

17:15:40  6          A.    Yes, I did.

17:15:41  7          Q.    Please answer my question.

17:15:43  8          A.    The Walmart employee, according to the

17:15:45  9     Walmart handbook, which is given to new -- new --

17:15:50  10    all new employees, requires that the Walmart

17:15:54  11    associate picks up any debris that they see on the

17:15:59  12    floor in their travel throughout the store.

17:16:02  13         Q.    Okay.

17:16:03  14              MR. McDONNELL:  Objection.  Move to

17:16:04  15         strike.  That's not an expert opinion.

17:16:06  16              He's simply saying what -- repeating what

17:16:08  17         the manual says, and the jury can understand

17:16:10  18         the manual, which isn't really in dispute.

17:16:13  19    BY MR. JEAN:

17:16:14  20         Q.    Sir, Mr. Birnbach, from your 45 years plus

17:16:17  21    experience with Walmart, the -- the material that

17:16:21  22    you received from Walmart, was that for public

17:16:25  23    consumption or was that private information that was

17:16:27  24    just for Walmart employees?

17:16:29  25              MR. McDONNELL:  Objection.  Objection.

17:16:31  1      Objection to the form of the question.  Whether

17:16:33  2      it's for public consumption doesn't really

17:16:35  3      matter because the jury will be permitted to

17:16:38  4      view those policies and determine what they

17:16:41  5      say.

17:16:42  6          This witness is not adding anything to the

17:16:44  7      policies other than what they say, which is if

17:16:47  8      an employee sees something, he should pick it

17:16:50  9      up.  Relevance.

17:16:51 10  BY MR. JEAN:

17:16:52 11      Q.   Back to my question, sir.  The documents

17:16:55 12  that you reviewed that had Walmart name on it, was

17:16:59 13  that for public consumption, everyone can see it, or

17:17:02 14  was that something you just got because of your

17:17:04 15  particular work for Walmart?

17:17:06 16          MR. McDONNELL:  Objection.  Relevance.  As

17:17:07 17      to whether or not he saw it or not, the jury

17:17:10 18      will see the policies.

17:17:11 19  BY MR. JEAN:

17:17:12 20      Q.   Please answer the question, sir.

17:17:13 21      A.   The documentation I received had

17:17:15 22  "confidential" stamped on every page, so I assume

17:17:20 23  that it was not for me to disclose, whether or not

17:17:24 24  an employee can share it, I don't know, but it

17:17:28 25  certainly is something that the employee is

17:17:31  1    responsible of knowing.

17:17:33  2        Q.    Are you telling this jury that you had

17:17:35  3    privy to information that was not available to the

17:17:41  4    average juror?  Is that what you are telling us?

17:17:44  5            MR. McDONNELL:  Objection.  Move to

17:17:44  6        strike.  That's not what's happening.

17:17:46  7            The jury is going to see the policies.

17:17:48  8        The question really is is whether or not this

17:17:50  9        witness, by virtue of education or experience,

17:17:53  10        is giving any sort of specialized or technical

17:17:57  11        knowledge the jury doesn't know.

17:17:58  12            The jury can read the policies and

17:18:00  13        understand that they are supposed to pick

17:18:03  14        things off the floor.  This is not expert

17:18:06  15        testimony.

17:18:06  16            MR. JEAN:  Thank you, sir.

17:18:07  17    BY MR. JEAN:

17:18:08  18        Q.    Sir, can you answer the question?

17:18:09  19            MR. McDONNELL:  Move to strike.

17:18:09  20    BY MR. JEAN:

17:18:10  21        Q.    Could you answer the question, please?

17:18:12  22        A.    The handbook is provided to me by the

17:18:18  23    defense attorney, marked "confidential," not for me

17:18:22  24    to share.  Whether a new employee shares that

17:18:27  25    information or has the same document marked

17:18:31  1   "confidential," I do not know.

17:18:33  2         I just know that I was not allowed to

17:18:36  3   share that information outside of this particular

17:18:40  4   case, which would include the two attorneys.

17:18:45  5         MR. McDONNELL:  Objection.  Move to

17:18:46  6      strike.  Relevance.

17:18:47  7   BY MR. JEAN:

17:18:48  8      Q.   I understand.

17:18:48  9         Sir, so the relevance of these two

17:18:53 10   individuals -- well, this individual with garbage

17:18:56 11   bags and the debris where Mr. Pataki would

17:18:59 12   eventually fall in P43-C, this particular

17:19:03 13   individual, is he supposed to pick up the debris, if

17:19:06 14   he sees it?

17:19:07 15         MR. McDONNELL:  Objection.  Relevance.

17:19:08 16      That's not the topic of expert testimony.  The

17:19:12 17      jury can draw their own conclusion and read the

17:19:15 18      policy and make their own decisions.  This is

17:19:18 19      not anything that an expert has to do.

17:19:20 20   BY MR. JEAN:

17:19:20 21      Q.   So, Mr. Birnbach, if a Walmart employee,

17:19:22 22   who has garbage bags in his hand at 8:04:41 seconds

17:19:28 23   and he sees debris on the ground, according to your

17:19:32 24   knowledge and your expertise, working with Walmart,

17:19:36 25   what is that employee supposed to do?

| | | |
|---|---|---|
| 17:19:38 | 1 | MR. McDONNELL:  Objection.  It assumes |
| 17:19:40 | 2 | facts in evidence. |
| 17:19:40 | 3 | There's no evidence that this particular |
| 17:19:42 | 4 | employee, walking with garbage bags, saw |
| 17:19:45 | 5 | plastic on the floor. |
| 17:19:48 | 6 | BY MR. JEAN: |
| 17:19:49 | 7 | Q.   Did you answer? |
| 17:19:50 | 8 | A.   An employee, when they see debris on the |
| 17:19:53 | 9 | floor, is required to pick it up. |
| 17:19:57 | 10 | BY MR. JEAN: |
| 17:19:58 | 11 | Q.   Why? |
| 17:19:59 | 12 | MR. McDONNELL:  Objection.  Relevance. |
| 17:20:00 | 13 | This is not expert testimony. |
| 17:20:02 | 14 | BY MR. JEAN: |
| 17:20:03 | 15 | Q.   Why, sir? |
| 17:20:04 | 16 | A.   Because as an expert and have dealt with |
| 17:20:08 | 17 | many cases, it is a fact that many people will trip |
| 17:20:12 | 18 | over objects that are left on the floor by the |
| 17:20:16 | 19 | associate. |
| 17:20:18 | 20 | Q.   And, from your experience, is -- on a |
| 17:20:22 | 21 | concrete floor like this in Walmart, should you have |
| 17:20:24 | 22 | plastic just hanging out on the ground? |
| 17:20:27 | 23 | MR. McDONNELL:  Objection.  Objection. |
| 17:20:29 | 24 | Move to strike. |
| 17:20:30 | 25 | It's not a concrete floor.  It's a wood |

17:20:33  1       floor, as this photograph shows.  Wood

17:20:35  2       laminate.

17:20:36  3   BY MR. JEAN:

17:20:36  4       Q.   Sir, from your experience, should you have

17:20:38  5   plastic hanging out on a Walmart floor at 8:40 --

17:20:41  6   8:04 in the evening?

17:20:43  7            MR. McDONNELL:  Objection.  Move to

17:20:44  8       strike.  This is not expert testimony.

17:20:46  9   BY MR. JEAN:

17:20:47 10       Q.   In your expert opinion, sir, should a

17:20:50 11   store have plastic just hanging out on the floor?

17:20:54 12            MR. McDONNELL:  Objection.  Move to

17:20:55 13       strike.

17:20:56 14            Simply saying it's an expert opinion

17:20:59 15       doesn't make it so.  Again, again -- the

17:21:01 16       jury -- the jury can read policies, and this is

17:21:04 17       not expert testimony.

17:21:06 18            You are simply getting this person, who is

17:21:09 19       not a registered architect, but has an

17:21:12 20       architectural background, simply say people

17:21:14 21       should pick things off the ground that they

17:21:16 22       see.  That's not expert testimony.

17:21:19 23            THE WITNESS:  The associate handbook for

17:21:20 24       Walmart stipulates that a Walmart associate,

17:21:23 25       when they see debris on the floor, should pick

17:21:26  1        it up.  That's a Walmart mandate.

17:21:29  2              MR. McDONNELL:  Objection.  Move to

17:21:29  3        strike.

17:21:31  4  BY MR. JEAN:

17:21:31  5        Q.   What do you mean by "Walmart mandate"?

17:21:34  6              MR. McDONNELL:  Objection.  Move to

17:21:35  7        strike.

17:21:37  8              A jury will see the policies and

17:21:41  9        determine -- you got to let me finish my

17:21:43 10        objection.  Objection.  Move to strike.

17:21:45 11  BY MR. JEAN:

17:21:46 12        Q.   Answer the question, sir.

17:21:48 13        A.   Would you repeat the question, please?

17:21:51 14        Q.   What do you mean by a "Walmart mandate"?

17:21:52 15  Explain that to the jury, please.

17:21:56 16        A.   Walmart creates a handbook, which is well

17:22:00 17  done.  It's distributed to new employees.  They are

17:22:05 18  asked to read it and to memorize it, to know

17:22:08 19  everything that's within those documents -- within

17:22:12 20  that document, including the manager and assistant

17:22:15 21  manager.

17:22:16 22              And the associate is required, as a

17:22:20 23  mandate by corporate Walmart, to provide a safe and

17:22:25 24  hazard-free venue, and if they see debris on the

17:22:30 25  ground, they are to pick it up because Walmart has

17:22:33  1  deemed it to be unsafe and a hazard.

17:22:37  2         MR. McDONNELL:  Objection.  Objection.

17:22:38  3      Move to strike.  None of that is expert

17:22:41  4      testimony.

17:22:41  5  BY MR. JEAN:

17:22:41  6      Q.   According to your knowledge of the Walmart

17:22:44  7  manual, what is the interval of time that Walmart

17:22:49  8  states that, upon seeing something like a piece of

17:22:53  9  plastic on the ground, that you should pick it up?

17:22:56 10  Should it be a minute?  Should it be an hour?

17:22:59 11  Should it be something else?  Tell the jury.

17:23:02 12         MR. McDONNELL:  Objection.  Objection.

17:23:02 13      Move to strike.

17:23:03 14         There's no evidence that anybody from

17:23:04 15      Walmart saw the plastic on the ground prior to

17:23:07 16      the incident.  Assumes facts not in evidence.

17:23:09 17  BY MR. JEAN:

17:23:10 18      Q.   Can you tell the jury, please?

17:23:11 19      A.   The Walmart mandate calls for immediate

17:23:15 20  response.

17:23:17 21      Q.   Okay.  And so, for example, in P43-C, this

17:23:21 22  individual lugging garbage, would that individual

17:23:23 23  have a responsibility of picking up plastic that he

17:23:26 24  sees in his line of sight?

17:23:28 25         MR. McDONNELL:  Objection.  Move to

17:23:29   1      strike.  It's cumulative and we don't know

17:23:32   2      whether he saw it.

17:23:33   3         Mr. Pataki didn't see it.

17:23:34   4   BY MR. JEAN:

17:23:35   5      Q.  Okay.  So back -- did you hear my

17:23:37   6   question, sir?  If so, I want you to answer.  Answer

17:23:39   7   my question.

17:23:40   8      A.  It depends on whether that employee saw

17:23:42   9   the plastic.

17:23:44   10      Q.  And --

17:23:45   11         MR. McDONNELL:  Objection.  Move to

17:23:46   12      strike.  It just is not expert testimony.

17:23:49   13   BY MR. JEAN:

17:23:49   14      Q.  From your knowledge and your expertise, is

17:23:52   15   a Walmart employee supposed to ignore plastic on the

17:23:56   16   ground or be vigilant to try to find if there's

17:24:00   17   plastic on the ground?

17:24:01   18         MR. McDONNELL:  Objection.  It assumes

17:24:01   19      facts in evidence that there was plastic on the

17:24:07   20      ground and that the Walmart employee could see

17:24:09   21      it.

17:24:09   22         Doesn't know anything.  No basis for this

17:24:10   23      expert's opinion on that basis.

17:24:13   24   BY MR. JEAN:

17:24:14   25      Q.  Could you answer the question, sir?

17:24:15   1          A.    I can answer the question.

17:24:17   2          Q.    Please.

17:24:18   3          A.    I do find it particularly strange that the

17:24:22   4    defense attorney has to comment beyond the

17:24:24   5    objection.

17:24:26   6          Q.    That's okay.

17:24:27   7                MR. McDONNELL:  Objection.  Objection.

17:24:28   8          Move to strike.

17:24:31   9    BY MR. JEAN:

17:24:31  10          Q.    Go ahead, sir.

17:24:32  11                MR. McDONNELL:  The witness's job is to

17:24:33  12          answer questions, not comment upon the

17:24:35  13          performance of attorneys.

17:24:36  14                We can comment on other things, but let's

17:24:39  15          focus on the case.  I have to make my

17:24:42  16          objection, sir.

17:24:42  17    BY MR. JEAN:

17:24:43  18          Q.    Could you answer the question, sir, if you

17:24:44  19    remember the question?

17:24:45  20          A.    I'm sorry.  Would you please repeat the

17:24:47  21    question?

17:24:48  22          Q.    I have another question.  Whose

17:24:50  23    responsibility was it to remove the plastic depicted

17:24:53  24    at the far end here at 8:04:41 seconds?  Whose

17:24:58  25    responsibility was that?

17:24:59  1              MR. McDONNELL:  Objection.  Objection.

17:25:02  2              MR. JEAN:  I'm still speaking.  I'm still

17:25:03  3         speaking.

17:25:04  4              MR. McDONNELL:  Finish it.

17:25:05  5              MR. JEAN:  Let me get the question out.

17:25:06  6         Let me get the question out before you object.

17:25:08  7         Let me ask the question.  Let me get a period

17:25:11  8         in, and a breath, then you can make your

17:25:13  9         objection.

17:25:14 10    BY MR. JEAN:

17:25:14 11         Q.   Sir, at 8:04:41 seconds, on P43-C, based

17:25:23 12    upon your 40-some-odd years of experience, working

17:25:29 13    with Walmart stores, and as an expert in store

17:25:33 14    design, display design and retail safety, could you

17:25:36 15    tell the jury -- tell the jury whose responsibility

17:25:40 16    was it to pick up plastic depicted in P43-C where

17:25:47 17    Mr. Pataki fell?

17:25:48 18              MR. McDONNELL:  Objection.  Move to

17:25:49 19         strike.

17:25:50 20              The answer to the question is

17:25:52 21         argumentative.  It's cumulative.  It's been

17:25:54 22         asked and answered and it's not a subject of

17:25:57 23         expert testimony.

17:25:58 24    BY MR. JEAN:

17:25:59 25         Q.   Sir, answer the question, please.

17:26:01  1        A.   The Walmart handbook requires a Walmart

17:26:04  2   associate, when they discover that item that's on

17:26:09  3   the floor, to pick it up and remove it.

17:26:12  4             MR. McDONNELL:  Objection, to the extent

17:26:13  5        that this witness purports to give a

17:26:16  6        restatement of the case law that the judge will

17:26:19  7        give.

17:26:20  8   BY MR. JEAN:

17:26:22  9        Q.   And why should you remove plastic off the

17:26:24 10   ground?

17:26:25 11             MR. McDONNELL:  Objection.

17:26:26 12             This witness is not a plastic expert.  He

17:26:28 13        didn't do any co-efficient of friction testing

17:26:31 14        on the plastic.  This isn't expert testimony.

17:26:35 15        This is factual testimony.

17:26:37 16   BY MR. JEAN:

17:26:38 17        Q.   Could you answer the question?

17:26:39 18             MR. McDONNELL:  Asked and answered.  It's

17:26:41 19        also been asked and answered about 25 times.

17:26:43 20             THE WITNESS:  Co-efficient of friction has

17:26:46 21        nothing to do with the plastic on the floor.

17:26:48 22             MR. McDONNELL:  Objection.  Objection.

17:26:51 23             THE WITNESS:  Any debris -- any debris --

17:26:52 24        any debris on the floor is considered

17:26:55 25        unacceptable by Walmart Corporation and

17:26:58  1      requires an associate to pick it up.

17:27:01  2          MR. McDONNELL:  Objection.  Move to

17:27:02  3      strike.

17:27:02  4          He's responding, objection, to not even

17:27:06  5      questions, and the purpose of my objection is

17:27:08  6      to say that this is factorship.  It's not a

17:27:11  7      topic of expert.

17:27:12  8          The jury can see the manual.  It's written

17:27:15  9      for people just like the jury to read and

17:27:17 10      understand.  There's nothing this expert is

17:27:19 11      adding at all to the case.

17:27:21 12          MR. JEAN:  Thank you.

17:27:23 13          And I'm going to take a two-minute break,

17:27:25 14      so go off the video record.  I'm going to

17:27:28 15      leave, so off the record.

17:27:30 16          THE VIDEOGRAPHER:  We are now off the

17:27:31 17      record.  The time is 5:27 p.m. Eastern time.

17:27:35 18          (Break taken.)

17:28:38 19          THE VIDEOGRAPHER:  We are now on the

17:28:46 20      record.  The time is 5:28 p.m. Eastern time.

17:28:51 21  BY MR. JEAN:

17:28:54 22      Q.   Now, I have a question for you.  Mr.

17:29:05 23  Birnbach, plastic wrapping of material, based upon

17:29:14 24  your expert opinion in doing work for Walmart,

17:29:17 25  should that ever be on the sales floor?

17:29:19  1          MR. McDONNELL:  Objection.

17:29:21  2          Off video.  He's not an expert of plastic

17:29:24  3     material on the ground.  The jury can see the

17:29:26  4     policies and make a factual determination.

17:29:30  5  BY MR. JEAN:

17:29:31  6     Q.   Sir, could you answer the question?

17:29:32  7     A.   The answer to the question is, no, plastic

17:29:35  8  wrap should not be on the ground.

17:29:38  9     Q.   Well, no.  Understood.

17:29:40 10          Now, wrapping of -- wrapping of

17:29:45 11  merchandise, once the wrapping gets to the

17:29:50 12  warehouse, should it leave the warehouse and go onto

17:29:52 13  the sales floor?

17:29:54 14          MR. McDONNELL:  Objection.  Relevance to

17:29:58 15     the case -- relevance to the case because we

17:29:59 16     don't have any idea where this plastic came

17:30:01 17     from.  You are assuming facts not in evidence.

17:30:05 18          THE WITNESS:  According to the assistant

17:30:06 19     manager, plastic wrapping should be removed at

17:30:12 20     times.

17:30:13 21          My own expert opinion is that plastic

17:30:18 22     wrapping should be removed in the warehouse at

17:30:22 23     all times before it's brought out to the sales

17:30:25 24     floor.

17:30:26 25          MR. McDONNELL:  Objection.  Objection.

17:30:27   1        That's a net opinion that may have nothing to

17:30:30   2        do with the case because there has been no one

17:30:33   3        that has testified this plastic is plastic

17:30:35   4        wrapping from the sales floor as opposed to a

17:30:39   5        plastic bag that's fallen.

17:30:40   6            Assumes facts not in evidence.  That's

17:30:42   7        completely irrelevant to what this person

17:30:44   8        thinks about plastic on the floor.

17:30:47   9    BY MR. JEAN:

17:30:47  10        Q.   Sir, what is the basis for that opinion?

17:30:52  11        A.   Years of experience both in the retail,

17:30:53  12    working for retailer, and my experience as a vendor.

17:30:59  13        Q.   Okay.

17:30:59  14            MR. McDONNELL:  Objection.  Move to

17:31:00  15        strike.

17:31:01  16    BY MR. JEAN:

17:31:03  17        Q.   P43-D.  Do you see P43-D?

17:31:06  18        A.   Yes.

17:31:07  19        Q.   What is it?

17:31:09  20            MR. McDONNELL:  Objection.  Relevance to

17:31:10  21        what this witness is going to see in the video.

17:31:12  22            Again, plaintiff's counsel could just

17:31:15  23        continue to simply have this individual narrate

17:31:18  24        video stills, which most courts that have

17:31:22  25        addressed this particular tactic have excluded

17:31:26  1        as having nothing to do with expert testimony.

17:31:28  2             MR. JEAN:  I think the jury needs to see

17:31:30  3        it.

17:31:30  4    BY MR. JEAN:

17:31:31  5        Q.   P43-D.  Tell the jury what that is.

17:31:33  6        A.   It appears to me, as an expert, that the

17:31:36  7    individual in the white coat, who he works for

17:31:40  8    Walmart, is walking further down the aisle and

17:31:43  9    closer to the incident area, and the item marked --

17:31:47 10    or the item, which is assumed to be plastic on the

17:31:51 11    ground, appears to be straight in front of him.

17:31:55 12        Q.   Now, have you seen this particular image

17:31:58 13    marked 8:04:51 seconds before today; is that

17:32:03 14    correct?

17:32:04 15        A.   Yes, that is correct.

17:32:06 16        Q.   When you -- before --

17:32:09 17             MR. McDONNELL:  Objection -- again, I'm

17:32:10 18        sorry.  Objection.

17:32:11 19             MR. JEAN:  Let me finish.  You can't keep

17:32:12 20        objecting and cut me off.  Let me --

17:32:16 21             MR. McDONNELL:  I'm responding to the last

17:32:17 22        one.

17:32:17 23             Objection.  Move to strike.  The witness

17:32:18 24        has just testified, I looked at the video, it

17:32:22 25        appears to be in front of him.  None of this is

17:32:25  1      expert testimony, and I would exclude it all as

17:32:27  2      403.

17:32:30  3           What a person who designs store displays

17:32:33  4      thinks about what a Walmart employee may or may

17:32:35  5      not have seen is not an issue in this case.

17:32:38  6      This is so outside his area of expertise.

17:32:42  7           It's a net opinion.

17:32:45  8  BY MR. JEAN:

17:32:46  9      Q.   Okay.  Now, back to my question.  We are

17:32:48 10  at P43-D.  What time is that?

17:32:53 11      A.   8:04:51 seconds p.m.

17:32:56 12      Q.   When you saw that before drafting your

17:33:00 13  report, did it have any significance to you?

17:33:04 14      A.   Yes.  The Walmart employee walking down

17:33:07 15  the aisle now has a better view of the contaminant

17:33:10 16  that's on the ground.

17:33:13 17      Q.   When you say --

17:33:14 18           MR. McDONNELL:  Objection.  Objection.

17:33:15 19      Relevance, and objection that that's not the

17:33:19 20      subject of the expert testimony.

17:33:22 21           Having somebody look at a video and give

17:33:24 22      his opinion about what they see in the video is

17:33:27 23      not expert testimony.  He doesn't know what

17:33:29 24      this gentleman sees.

17:33:30 25           This is absurd, and move to strike, like

| | |
|---|---|
| 17:33:34 | 1 |

17:33:34  1      all of it up to now.  None of this is expert

17:33:36  2      testimony.  None of it.

17:33:37  3   BY MR. JEAN:

17:33:38  4      Q.   When you said "contaminant," what do you

17:33:40  5   mean by that?

17:33:42  6      A.   I mean the plastic that's on the floor.

17:33:48  7      Q.   The plastic on the floor depicted in

17:33:50  8   P43-D?

17:33:51  9      A.   Yes.

17:33:52  10         MR. McDONNELL:  Objection.  That assumes

17:33:53  11      facts not in evidence.  We don't know what was

17:33:55  12      on the floor.

17:33:56  13  BY MR. JEAN:

17:33:59  14     Q.   I'm now showing you P43-E, as in Edward.

17:34:04  15  What is that?

17:34:10  16     A.   That's the same view taken a few minutes

17:34:14  17  later.

17:34:17  18     Q.   And a few minutes later, what do you mean

17:34:19  19  by "a few"?  Tell the jury what you mean by that.

17:34:23  20         MR. McDONNELL:  Objection.  I'm sorry.

17:34:23  21         This video has time stamps on it.  This is

17:34:26  22      a waste of time and it's cumulative and it's

17:34:30  23      not expert testimony to have a person who

17:34:32  24      designs displays comment and narrate the video

17:34:35  25      and video stills.

17:34:37  1          There's just nothing under the rules that

17:34:39  2      allows that.  Other than this witness saying

17:34:43  3      that Walmart people should pick up things off

17:34:45  4      the floor, if that's expert testimony --

17:34:47  5      whatever is in the video, it's juries decide

17:34:52  6      and make a factual determination, but we can go

17:34:56  7      on.

17:35:02  8          THE WITNESS:  The time is 8:06:00.

17:35:06  9          MR. McDONNELL:  Objection.

17:35:06  10          Literally, the plaintiff's lawyer is

17:35:08  11      having the witness do nothing but read the time

17:35:11  12      stamp on the video still.  How is this expert

17:35:13  13      testimony?

17:35:16  14  BY MR. JEAN:

17:35:17  15      Q.   P43-E.  Did you find P43-E, which is

17:35:22  16  marked at 8:06, to be relevant in your opinion?

17:35:33  17      A.   I'm not sure what was written, but I can

17:35:36  18  tell you, based on your line of questioning, that I

17:35:40  19  have yet to see the shopping cart on the left of the

17:35:45  20  column, or the items that are on the floor right of

17:35:49  21  the column, and that they've been moved over this

17:35:54  22  period of time, as well as a -- what appears to be a

17:36:01  23  transporter that's after this line of showcases and

17:36:05  24  next to the second column, that has not moved, and

17:36:09  25  it's a safety hazard.

17:36:11   1          MR. McDONNELL:  Objection.  Relevance to
17:36:13   2     any other issue in the video other than what
17:36:15   3     brings us here today, which is the -- the
17:36:18   4     plastic.
17:36:19   5          This witness -- Mr. Pataki didn't trip on
17:36:21   6     anything else not seen in the video.
17:36:23   7          And move to strike any testimony about
17:36:25   8     anything else that's not related to the
17:36:27   9     accident.
17:36:29  10          MR. JEAN:  Thank you.
17:36:29  11   BY MR. JEAN:
17:36:29  12     Q.   So I'm going to go back to P43.  Let's go
17:36:32  13   all the way back.  Let's go all the way back to --
17:36:36  14   let's go back to P43-C.
17:36:39  15          Do you see where I have my little --
17:36:41  16     A.   Yes.
17:36:42  17     Q.   Okay.  P43-C is at 8:04:41 seconds; true?
17:36:47  18     A.   Yes.
17:36:48  19          MR. McDONNELL:  Objection.  Relevance.
17:36:50  20     Objection.
17:36:50  21          This witness is just -- now the lawyer is
17:36:53  22     also testifying about what's in the video.  The
17:36:56  23     jury can look at the video and draw their own
17:36:58  24     conclusions.
          25

17:36:59   1   BY MR. JEAN:

17:37:00   2        Q.   P43-D we see the same area depicted,

17:37:02   3   right?

17:37:03   4             MR. McDONNELL:  Objection.  Now we are

17:37:04   5        cumulative and we just keep going back over the

17:37:07   6        same testimony.

17:37:07   7   BY MR. JEAN:

17:37:08   8        Q.   Is that right, sir?

17:37:09   9        A.   Same area in terms of the view from the

17:37:11  10   camera and the -- and the view from the camera is

17:37:15  11   showing an Walmart associate walking down the aisle

17:37:19  12   and looking straight at the -- or looking what

17:37:23  13   appears to be at the debris that's on the floor.

17:37:28  14             MR. McDONNELL:  Objection.  Asked and

17:37:29  15        answered.  Relevance, and this is not expert

17:37:32  16        testimony.

17:37:32  17   BY MR. JEAN:

17:37:33  18        Q.   At 8:04:51 seconds we have debris on the

17:37:37  19   ground and a Walmart employee walking towards the

17:37:40  20   debris; is that accurate?

17:37:42  21        A.   Yes.

17:37:43  22             MR. McDONNELL:  Objection.  Hold on a

17:37:44  23        second.  Objection.  It's leading.  It's

17:37:45  24        argumentative.

17:37:47  25             I thought that you were calling this

| | | |
|---|---|---|
| 17:37:49 | 1 | expert as a witness to give some sort of |
| 17:37:52 | 2 | opinion to assist the jury with technical |
| 17:37:55 | 3 | knowledge or skill.  Instead what we are seeing |
| 17:37:57 | 4 | is you are showing pictures to him. |
| 17:37:59 | 5 | Counsel is testifying and arguing and the |
| 17:38:01 | 6 | witness is simply offering net opinions.  There |
| 17:38:05 | 7 | has been nothing -- there has been nothing |
| 17:38:06 | 8 | testified to today where this witness applied |
| 17:38:08 | 9 | expert or specialized technical knowledge |
| 17:38:11 | 10 | that's outside a jury's understanding. |
| 17:38:14 | 11 | BY MR. JEAN: |
| 17:38:14 | 12 | Q.   On P43-E, we have the same debris still |
| 17:38:18 | 13 | there two minutes later, right? |
| 17:38:21 | 14 | MR. McDONNELL:  Objection.  Objection. |
| 17:38:22 | 15 | It's leading.  It's argumentative.  It's |
| 17:38:25 | 16 | cumulative of what he already testified to. |
| 17:38:29 | 17 | You can make these arguments to the jury |
| 17:38:30 | 18 | with the video, but you can't just simply call |
| 17:38:33 | 19 | a witness to make in your case.  It's argument. |
| 17:38:37 | 20 | BY MR. JEAN: |
| 17:38:38 | 21 | Q.   It's 8:06 p.m., right? |
| 17:38:41 | 22 | A.   Yes. |
| 17:38:43 | 23 | Q.   From your expertise in reading Walmart |
| 17:38:45 | 24 | employees, is there any particular policy that talks |
| 17:38:49 | 25 | about debris being on the ground and still being on |

17:38:51  1   the ground two minutes after it was on the ground?

17:38:55  2          MR. McDONNELL:  I'm sorry.  Objection.

17:38:56  3       This has been asked and answered.  This is

17:38:58  4       cumulative.

17:39:00  5          I advised -- I advised this counsel

17:39:02  6       beforehand that I do have times limit.  Right

17:39:04  7       now it's 5:38.  We've been at this for two

17:39:08  8       hours and he's not asked a single question that

17:39:12  9       asked the witness to apply technical knowledge

17:39:14 10       or skull.

17:39:14 11          You are making argument.

17:39:16 12   BY MR. JEAN:

17:39:16 13       Q.   Did you answer -- did you hear the

17:39:17 14   question, sir?

17:39:18 15       A.   Yes, I did.

17:39:19 16       Q.   Answer it, please.

17:39:21 17       A.   My answer to your question would be that

17:39:24 18   the image depicts that the store associate, who was

17:39:29 19   appearing in the prior image, has disregarded the

17:39:34 20   fallen plastic and kept on moving and now is out of

17:39:38 21   line or appears to be out of the picture.

17:39:41 22          MR. McDONNELL:  Objection.  Move to

17:39:42 23       strike.  Speculation.

17:39:44 24   BY MR. JEAN:

17:39:45 25       Q.   At 8:04:51 seconds -- withdrawn.

17:39:50  1        MR. McDONNELL:  I'm sorry.  One second.

17:39:52  2    One second.  Counsel, are you simply going to

17:39:54  3    go over the same five stills over and over

17:39:56  4    again and make argument?  Because I'm going to

17:39:58  5    move to strike the whole video for misconduct

17:40:00  6    at this point.

17:40:01  7        We are 5:39 and you are going over the

17:40:03  8    same pictures over and over again, and you are

17:40:06  9    making argument, and the witness is making

17:40:07 10    argument.

17:40:08 11        Where is any of this an application of

17:40:11 12    technical skill or knowledge that can assist

17:40:14 13    the jury that's outside their common

17:40:16 14    understanding.

17:40:16 15        You are showing a still and you are making

17:40:18 16    an argument.  The jury will hear the policy,

17:40:20 17    Walmart people are supposed to pick up objects

17:40:23 18    off the floor that they see.

17:40:26 19        What are you doing right now, other than

17:40:27 20    making argument and going over and over again

17:40:30 21    at a point where I was kind enough to make a

17:40:33 22    last-minute accommodation so we could have this

17:40:35 23    deposition, and none of it has been an

17:40:38 24    application of technical knowledge.

17:40:41 25        Can you cover new ground?  You are showing

```
17:40:42  1        the same picture.  This witness -- this has
17:40:44  2        already been covered.
17:40:47  3             MR. JEAN:  Sir, to use that language, and
17:40:48  4        I appreciate counsel.
17:40:50  5   BY MR. JEAN:
17:40:51  6        Q.   Sir, could you use your technical
17:40:53  7   knowledge that you've acquired over 40 years and
17:40:56  8   tell me, when you reviewed this 8:04:51 seconds,
17:41:00  9   based upon your technical knowledge, what did your
17:41:02 10   technical knowledge tell you about the Walmart
17:41:06 11   employee walking towards the debris?
17:41:08 12             MR. McDONNELL:  Okay.  Objection and move
17:41:10 13        to strike.  Asking the question what technical
17:41:14 14        knowledge, did he make measurements, did he
17:41:16 15        measure anything.  Is there anything that a
17:41:18 16        jury could look at this picture and form their
17:41:20 17        own conclusions?
17:41:21 18        Simply saying technical knowledge or
17:41:23 19        specialized, this is not specialized knowledge.
17:41:26 20        This is looking at a video, or picture still,
17:41:29 21        and giving a net opinion.  What technical
17:41:32 22        knowledge?  What's the technical knowledge part
17:41:34 23        of it, Mr. Jean?
17:41:35 24        If you want to ask the question did he use
17:41:38 25        co-efficient of friction, did he take a
```

| | | |
|---|---|---|
| 17:41:40 | 1 | measurement.  Is there something about the |
| 17:41:41 | 2 | floor.  Other than that, you are simply showing |
| 17:41:43 | 3 | pictures of them and saying if somebody saw |
| 17:41:46 | 4 | this, do you think it should have been picked |
| 17:41:48 | 5 | up. |
| 17:41:48 | 6 | This is abusive.  You know that I don't |
| 17:41:50 | 7 | have this kind of time.  I've already called my |
| 17:41:53 | 8 | wife and told her to cancel dinner |
| 17:41:55 | 9 | reservations.  This has been going on for two |
| 17:41:58 | 10 | hours.  You haven't asked a single question |
| 17:42:00 | 11 | that has to do with engineering or architecture |
| 17:42:01 | 12 | or anything.  You are simply making argument. |
| 17:42:04 | 13 | BY MR. JEAN: |
| 17:42:05 | 14 | Q.   Mr. Birnbach, can you answer the question, |
| 17:42:06 | 15 | please? |
| 17:42:10 | 16 | A.   Will you repeat the question, please? |
| 17:42:11 | 17 | Q.   Okay.  So I would like for you to call |
| 17:42:14 | 18 | upon your technical knowledge on this particular |
| 17:42:16 | 19 | document, P43-D, with the Walmart employee walking |
| 17:42:20 | 20 | towards the debris.  What is your technical |
| 17:42:23 | 21 | knowledge?  Tell the jury.  Educate them.  Tell them |
| 17:42:26 | 22 | the particular responsibility that that particular |
| 17:42:28 | 23 | individual has. |
| 17:42:30 | 24 | MR. McDONNELL:  Okay.  Objection.  Move to |
| 17:42:31 | 25 | strike. |

17:42:32  1      There's no possible -- yeah, there's no

17:42:37  2  possible technical knowledge that this applies.

17:42:39  3      You've had this gentleman testify that, in

17:42:41  4  his opinion, he thinks Walmart employees should

17:42:44  5  see this and pick it up, and that's what the

17:42:46  6  policy says.

17:42:47  7      But as far as technical ability, no, he

17:42:50  8  hasn't drawn drawings, he hasn't made

17:42:52  9  measurements, he hasn't applied anything

17:42:54 10  related to architecture or display design.

17:42:56 11  That was established in voir dire.

17:42:59 12      You are simply abusing me right now by

17:43:00 13  keeping me here and showing him the same

17:43:03 14  picture over and over again, asking the same

17:43:06 15  questions, but now you are saying applying

17:43:08 16  technical knowledge.

17:43:09 17      Please move on to a new area or else I'm

17:43:10 18  going to get the judge on the phone.

17:43:13 19      MR. JEAN:  So I have no intent on abusing

17:43:16 20  any human being, but the --

17:43:17 21      MR. McDONNELL:  It is abusive.

17:43:18 22      MR. JEAN:  -- the reason why we are here

17:43:19 23  at this late hour is you keep objecting to

17:43:21 24  every single question that I ask.  That is why

17:43:24 25  we are still here.  If you will --

GERALD BIRNBACH                                          JOB NO. 1282576
NOVEMBER 08, 2024

17:43:27   1        MR. McDONNELL:  None of these questions

17:43:28   2     are technical.  Like, let's move on.  You've

17:43:32   3     shown this witness -- have you not shown this

17:43:34   4     witness the same picture seven or eight times

17:43:36   5     and asked seven or eight questions about it?

17:43:38   6     You know, move on.

17:43:43   7        MR. JEAN:  I am prepared to proceed with

17:43:45   8     my questions.  Thank you very much.

17:43:47   9   BY MR. JEAN:

17:43:47  10     Q.   Can -- Mr. Birnbach --

17:43:48  11        MR. McDONNELL:  Then I'm going to object

17:43:49  12     and I'm not going to agree to this deposition.

17:43:51  13     We are going to adjourn it and we are going to

17:43:52  14     have this witness come into court --

17:43:54  15        MR. JEAN:  You are not.

17:43:55  16        MR. McDONNELL:  -- because this is not

17:43:56  17     appropriate, the situation where a witness

17:43:58  18     simply -- where you simply don't follow the

17:44:01  19     rules and ask the question over and over again

17:44:06  20     and abuse people's time.

17:44:09  21        There's no way a judge will let you ask

17:44:12  22     five of these questions, Mr. Jean.  You are

17:44:15  23     simply asking somebody, who has not applied any

17:44:18  24     technical knowledge or any technical skill to

17:44:20  25     this, what he sees in a video.

17:44:22  1      Why are you doing this?

17:44:23  2      I'm happy to take a break, look at your

17:44:28  3   notes and see if this particular witness isn't

17:44:31  4   going to just say the same thing over and over

17:44:33  5   again about a picture and whether you have

17:44:35  6   something to ask of him that is about design,

17:44:36  7   store design, or safety design, or anything

17:44:40  8   other than his policy that he thinks employees

17:44:43  9   should pick things up.

17:44:45 10      That's all that's been covered in two and

17:44:48 11   a half -- two hours and 45 minutes.

17:44:50 12      Otherwise, I cannot agree to do this by

17:44:53 13   deposition and we need to have this witness

17:44:55 14   brought in front of the judge and have him voir

17:44:57 15   dire and have him make a decision about whether

17:45:00 16   or not anything that this witness says is

17:45:02 17   qualified, because I'm not going to be here

17:45:04 18   until eleven o'clock at night where you ask the

17:45:06 19   same question.

17:45:07 20      MR. JEAN:  Objection, sir.  Counsel, if

17:45:09 21   you can make your objection, got it, then we

17:45:11 22   can go to the judge and say strike it.  But

17:45:14 23   each time you add language on the record, we

17:45:16 24   are here longer.

17:45:17 25      MR. McDONNELL:  Yeah, I'm not going to be

17:45:18  1   intimidated into not objecting to making

17:45:21  2   appropriate objections by you just simply

17:45:23  3   wasting my time, okay?

17:45:25  4        Are you going to move on or are you going

17:45:27  5   to ask 12 more questions about the same

17:45:28  6   picture?  Because if you are going to do that,

17:45:30  7   I'm going to adjourn -- I'm going to ask to

17:45:33  8   adjourn the deposition, which I have the right

17:45:36  9   to, and I'm going to file a motion for

17:45:37  10  protective order because I'm not going to stay

17:45:39  11  here until eleven o'clock at night where you

17:45:41  12  ask the same question over and over again in an

17:45:43  13  argumentative, leading fashion, and simply

17:45:46  14  change a word.  I'm not going to do it.

17:45:50  15       MR. JEAN:  Can I proceed?

17:45:51  16       MR. McDONNELL:  No, not if you are not

17:45:52  17  going to ask new questions.  Instead, I would

17:45:55  18  say I'm going to file a motion for protective

17:45:57  19  order and this is my oral motion for protective

17:46:00  20  order.

17:46:01  21       We've been here since three o'clock.  This

17:46:03  22  witness has admitted that he's not going to

17:46:06  23  offer any opinions that the display of this --

17:46:09  24  the display design of the store is defective.

17:46:12  25       He's not going to offer any opinion that

17:46:14  1  the displays were defective.  He's not going to

17:46:18  2  offer an opinion of Walmart's policies --

17:46:20  3       MR. JEAN:  Now you are testifying.

17:46:20  4  Counsel, you are testifying.

17:46:22  5       MR. McDONNELL:  No, I'm making a motion.

17:46:23  6  I'm making an oral motion for protective order

17:46:26  7  that in this particular situation Mr. Jean has

17:46:28  8  had the same four pictures on the screen and

17:46:30  9  he's asked over and over again about fact

17:46:32 10  questions, what the witness sees -- what the

17:46:35 11  witness sees in the picture and whether or not

17:46:37 12  the employee should have seen or picked it up.

17:46:39 13  None of that is expert testimony.

17:46:41 14       So if we are going to be here and that's

17:46:43 15  what's going to proceed for the remainder of

17:46:45 16  the evening, I would ask that we adjourn this

17:46:48 17  deposition, we show the transcript this far to

17:46:51 18  the judge, and we have her make a decision

17:46:53 19  about whether or not anything of this is expert

17:46:56 20  testimony, otherwise we are wasting our time.

17:46:58 21       MR. JEAN:  I'm not adjourning.

17:46:59 22       MR. McDONNELL:  We have Monday that we can

17:47:01 23  do it.

17:47:02 24       MR. JEAN:  I'm not adjourning.

17:47:03 25       MR. McDONNELL:  I'm filing a motion right

17:47:04  1   now.  Oral motion.  We can try to get the judge

17:47:06  2   on the phone.

17:47:07  3       MR. JEAN:  You keep objecting to every

17:47:08  4   question that I ask.  What I'm doing -- let me

17:47:11  5   finish, please.  Please.  Give me the respect

17:47:14  6   of an attorney.  Let me finish my statement,

17:47:16  7   please.  Please.  Pretty please.

17:47:19  8       What I'm doing, and have attempted to do,

17:47:22  9   is to lay the foundation of fact so that I can

17:47:26 10   then get to the conclusion, but every time I

17:47:29 11   open my mouth and ask a question to establish

17:47:32 12   the foundation to ultimately lead to the

17:47:35 13   conclusion, you object.

17:47:38 14       This transcript is riddled with your

17:47:41 15   language, rather than my language or the

17:47:45 16   plaintiff's expert.  The reason why we are here

17:47:48 17   at this late hour is because of your speaking

17:47:52 18   objections.

17:47:52 19       I'd like to be able to finish laying the

17:47:55 20   foundation so I can get to my conclusion,

17:47:57 21   please.

17:47:59 22       MR. McDONNELL:  Okay.  It's clear to me,

17:48:00 23   then, that this particular attorney doesn't

17:48:02 24   understand what it means to lay the foundation,

17:48:04 25   because in this particular situation, laying

| | | |
|---|---|---|
| 17:48:07 | 1 | the foundation doesn't mean having an expert |
| 17:48:10 | 2 | witness look at photographs and testify about |
| 17:48:13 | 3 | facts. |
| 17:48:14 | 4 | The assumption is that the jury is going |
| 17:48:16 | 5 | to have seen the video, the video is going to |
| 17:48:19 | 6 | be shown to your client, and then this |
| 17:48:21 | 7 | particular witness is going to offer some sort |
| 17:48:23 | 8 | of technical expertise or something extra. |
| 17:48:26 | 9 | But you are not laying a foundation in the |
| 17:48:28 | 10 | last series of questions.  You are arguing. |
| 17:48:30 | 11 | You are saying should this have been picked up |
| 17:48:33 | 12 | or should this have been seen, or suggesting |
| 17:48:35 | 13 | things that are in the video. |
| 17:48:36 | 14 | These are all factual issues for the jury. |
| 17:48:39 | 15 | It has nothing to do with what I thought Mr. |
| 17:48:41 | 16 | Birnbach was going to be here. |
| 17:48:43 | 17 | The judge said she has given you very |
| 17:48:45 | 18 | limited issue to talk about a particular policy |
| 17:48:47 | 19 | or procedure or something, but all you are |
| 17:48:49 | 20 | doing right now is asking this witness to adopt |
| 17:48:52 | 21 | your argument.  That's all you are doing. |
| 17:48:55 | 22 | So if you are going to do something |
| 17:48:56 | 23 | different, I won't have to object. |
| 17:49:03 | 24 | MR. JEAN:  Are you done?  I'd like to |
| 17:49:07 | 25 | continue, please.  Are you done?  Are you done? |

17:49:10  1        MR. McDONNELL:  Yeah.  I'm not going to

17:49:11  2    continue if this is what's going to happen.

17:49:14  3    I'm not going to do it.

17:49:15  4        I agreed to be courteous.  If this is

17:49:17  5    what's going to be done, it should be done in

17:49:20  6    front of a judge because what's happened so far

17:49:22  7    has nothing to do with expert testimony.  It's

17:49:26  8    taken two hours -- almost three hours of my

17:49:28  9    time two days before trial for a witness that

17:49:30 10    could have been put in the can six months ago

17:49:32 11    and the judge could have looked at the

17:49:34 12    deposition and made decisions.

17:49:36 13        So do you have ten more minutes of

17:49:38 14    questions that are relevant --

17:49:38 15        MR. JEAN:  No, I don't.  That's not

17:49:39 16    accurate.  I do not have ten more minutes.  I'm

17:49:41 17    going to continue protecting my client's

17:49:43 18    interests, if I cannot be obstructed by your

17:49:46 19    objections.

17:49:47 20        MR. McDONNELL:  Then you can't do it

17:49:48 21    tonight because I'm not going to stay here.

17:49:51 22    It's 5:49, and if you have ten minutes of

17:49:56 23    questioning --

17:49:57 24        MR. JEAN:  No, I don't.

17:49:58 25        MR. McDONNELL:  Or else we adjourn.

| | | |
|---|---|---|
| 17:50:00 | 1 | We'll have to adjourn it and I'll file a |
| 17:50:02 | 2 | motion and we'll have the court rule. |
| 17:50:06 | 3 | Can we get a daily transcript, Ms. Ohman? |
| 17:50:10 | 4 | MR. JEAN:  No, we are not doing that. |
| 17:50:11 | 5 | So to be clear, please allow another |
| 17:50:14 | 6 | attorney to finish his sentence, please. |
| 17:50:17 | 7 | Please. |
| 17:50:18 | 8 | This witness has a health issue that |
| 17:50:19 | 9 | prevented him from being in court.  I would |
| 17:50:22 | 10 | have loved for him to be in court. |
| 17:50:24 | 11 | He's provided me with a doctor's note |
| 17:50:26 | 12 | telling me that he cannot be in court. |
| 17:50:28 | 13 | I thank you, counsel, for opening up your |
| 17:50:30 | 14 | three o'clock schedule, but, to be clear, the |
| 17:50:32 | 15 | reason why we are still here is every time I |
| 17:50:35 | 16 | say something you object with speaking |
| 17:50:37 | 17 | objections. |
| 17:50:38 | 18 | I get it.  Make your objection.  Boom, |
| 17:50:40 | 19 | objection, then you can strike it later if the |
| 17:50:42 | 20 | court sees fit, but when you keep talking, we |
| 17:50:46 | 21 | keep being here. |
| 17:50:47 | 22 | So make your objection, boom, but you keep |
| 17:50:50 | 23 | making speaking objections.  That's why we are |
| 17:50:52 | 24 | here.  Let me finish. |
| 17:50:53 | 25 | MR. McDONNELL:  Okay.  Are you done? |

```
17:51:05   1        Yeah, I don't know what your intent is.
17:51:08   2        MR. JEAN:  I'm prepared to --
17:51:10   3        MR. McDONNELL:  You are prepared to do the
17:51:11   4   same thing over and over again, and I don't
17:51:13   5   have to tolerate that.  I'm entitled to, under
17:51:15   6   the rules, to adjourn the deposition and file a
17:51:18   7   motion, and that's what I'm proposing, if this
17:51:20   8   is the way you are going to conduct this
17:51:22   9   deposition.
17:51:23  10        If I was in front of a judge, in front of
17:51:25  11   jury -- by the way, I'd like to know when you
17:51:27  12   first heard of Mr. Birnbach's health issue.
17:51:30  13   You mentioned COVID.  This isn't something that
17:51:33  14   happened last week or two weeks.  Trial was
17:51:34  15   adjourned months ago.
17:51:34  16        You chose to not call the witness in a
17:51:36  17   timely fashion.  I understand his schedule and
17:51:39  18   health things has forced me to take a
17:51:41  19   deposition on Friday, on the weekend before
17:51:43  20   trial, and then you are proceeding to ask
17:51:45  21   questions in an argumentative fashion.  You are
17:51:48  22   asking the same questions over and over again
17:51:50  23   and forcing me to object.
17:51:52  24        MR. JEAN:  That is --
17:51:53  25        MR. McDONNELL:  Let's adjourn the
```

| | | |
|---|---|---|
| 17:51:54 | 1 | deposition. |
| 17:51:55 | 2 | MR. JEAN:  No. |
| 17:51:56 | 3 | MR. McDONNELL:  We can adjourn the |
| 17:51:57 | 4 | deposition and we can then go in front of a |
| 17:51:59 | 5 | judge and have her make ruling, because right |
| 17:52:01 | 6 | now you are saying, I don't care whether I do |
| 17:52:03 | 7 | it right or not.  I'm going to be here and keep |
| 17:52:07 | 8 | you here forever. |
| 17:52:08 | 9 | How much longer do you have? |
| 17:52:09 | 10 | MR. JEAN:  I want to be able to finish. |
| 17:52:11 | 11 | And for the record, so that I can answer |
| 17:52:12 | 12 | your question as an officer of the court, I |
| 17:52:14 | 13 | contacted Mr. Birnbach's staff.  They advised, |
| 17:52:17 | 14 | I learned -- |
| 17:52:19 | 15 | MR. McDONNELL:  When? |
| 17:52:19 | 16 | MR. JEAN:  I learned for the first time |
| 17:52:21 | 17 | this week, when attempting to secure Mr. |
| 17:52:26 | 18 | Birnbach live, that he has a health issue, and |
| 17:52:30 | 19 | I'm going to respect that. |
| 17:52:33 | 20 | Counsel, I want to move on, please. |
| 17:52:35 | 21 | MR. McDONNELL:  Okay.  Well, |
| 17:52:35 | 22 | Mr. Roosevelt, when did he first have this |
| 17:52:39 | 23 | health issue and -- |
| 17:52:40 | 24 | MR. JEAN:  I'm not going to answer your |
| 17:52:42 | 25 | questions.  We can do it in correspondence.  I |

| | | |
|---|---|---|
| 17:52:44 | 1 | want to proceed. |
| 17:52:45 | 2 | MR. McDONNELL:  I'm not -- |
| 17:52:46 | 3 | MR. JEAN:  I'm not answering your |
| 17:52:46 | 4 | questions.  I'm not answering your questions. |
| 17:52:50 | 5 | MR. McDONNELL:  You've made a |
| 17:52:51 | 6 | representation -- now you are talking over me. |
| 17:52:53 | 7 | MR. JEAN:  Are we still in front of a |
| 17:52:55 | 8 | jury, by the way?  I'm not answering your |
| 17:52:57 | 9 | questions on the record.  I will do it on paper |
| 17:53:00 | 10 | so that there's a clear record.  I want to be |
| 17:53:02 | 11 | done with my deposition.  I'm going to finish |
| 17:53:06 | 12 | my deposition. |
| 17:53:07 | 13 | All questions, I will answer them on paper |
| 17:53:10 | 14 | as a fact, and attach certifications and |
| 17:53:15 | 15 | whatever documents I have. |
| 17:53:16 | 16 | Let me finish representing my client, |
| 17:53:18 | 17 | please. |
| 17:53:19 | 18 | MR. McDONNELL:  Because what -- because |
| 17:53:22 | 19 | what I've just heard is you first contacted |
| 17:53:24 | 20 | this witness for live testimony a week ago. |
| 17:53:26 | 21 | MR. JEAN:  That is incorrect. |
| 17:53:30 | 22 | MR. McDONNELL:  Well, then, we can have |
| 17:53:31 | 23 | Mr. Birnbach -- Mr. Birnbach, when did your |
| 17:53:33 | 24 | health problem arise? |
| 17:53:35 | 25 | MR. JEAN:  Do not answer that question |

17:53:36  1   because I'm still on my direct examination.

17:53:38  2   I'll still on my direct examination.

17:53:40  3        MR. McDONNELL:  You opened --

17:53:42  4        MR. JEAN:  You are obstructing my

17:53:43  5   deposition.

17:53:44  6        MR. McDONNELL:  I have filed a motion.

17:53:46  7        MR. JEAN:  You are obstructing my

17:53:47  8   deposition.

17:53:48  9        MR. McDONNELL:  Yeah.

17:53:50 10        MR. JEAN:  You are obstructing my

17:53:51 11   deposition.

17:53:52 12        MR. McDONNELL:  Let's get with it, then,

17:53:54 13   because I'm going to ask him these questions.

17:53:57 14        MR. JEAN:  What does it mean, get with it?

17:53:59 15   What does that mean?

17:53:59 16        MR. McDONNELL:  Move.  Ask a new question.

17:54:02 17   This is what I agreed to.

17:54:07 18        MR. JEAN:  So, counsel, I'm going to take

17:54:09 19   a 30-second break.  I'm going to get up and

17:54:11 20   take a 30-second break.  Thank you.  Off the

17:54:15 21   record.

17:54:15 22        THE VIDEOGRAPHER:  We are now off the

17:54:16 23   record.  The time is 5:54 p.m. Eastern time.

17:54:21 24        (Break taken.)

17:57:41 25        THE VIDEOGRAPHER:  We are now on the

| | | |
|---|---|---|
| 17:57:52 | 1 | record.  The time is 5:57 p.m. Eastern time. |
| 17:57:56 | 2 | BY MR. JEAN: |
| 17:57:58 | 3 | Q.   We are back on the record, sir, and I am |
| 17:58:01 | 4 | going to continue with my questions. |
| 17:58:04 | 5 | Next question I'm going to ask is another |
| 17:58:06 | 6 | exhibit, P43-F.  Do you see P43-F before you?  If |
| 17:58:11 | 7 | so, identify what is it? |
| 17:58:13 | 8 | A.   Yes.  What is it?  It's time stamped at |
| 17:58:16 | 9 | 8:06:23 and it shows a gentleman, black pants, white |
| 17:58:22 | 10 | shirt, walking down the aisle. |
| 17:58:24 | 11 | MR. McDONNELL:  Objection.  Relevance. |
| 17:58:25 | 12 | Objection.  Relevance.  Move to strike. |
| 17:58:28 | 13 | Cumulative.  Not expert testimony. |
| 17:58:30 | 14 | BY MR. JEAN: |
| 17:58:31 | 15 | Q.   So -- well, sir, I'm going to ask you this |
| 17:58:34 | 16 | particular slide that you've identified, was it |
| 17:58:37 | 17 | helpful to you in formulating your opinion? |
| 17:58:40 | 18 | MR. McDONNELL:  Objection.  Relevant.  Not |
| 17:58:42 | 19 | expert testimony.  Cumulative. |
| 17:58:45 | 20 | BY MR. JEAN: |
| 17:58:46 | 21 | Q.   Can you answer? |
| 17:58:48 | 22 | A.   It's still showing the carriages and the |
| 17:58:51 | 23 | product off to the column -- off to the side of the |
| 17:58:54 | 24 | column one, which is closest to us to the left. |
| 17:58:58 | 25 | Column two to the items that are positioned to the |

17:59:00  1  right.

17:59:02  2         That there is a problem with the store,

17:59:06  3  and it should be noted that the woman to the left

17:59:11  4  that's in black walking away from us in the image,

17:59:14  5  is right where the people come out of the warehouse

17:59:18  6  and it is in direct view of the area of question

17:59:23  7  where the incident occurred.

17:59:26  8         MR. McDONNELL:  Objection.  Relevance.

17:59:29  9  BY MR. JEAN:

17:59:29 10     Q.   Okay, sir.  Thank you.

17:59:30 11         MR. McDONNELL:  He's simply describing a

17:59:32 12      picture that the jury can see.

17:59:34 13         MR. JEAN:  I don't want to argue.  Let's

17:59:35 14      not argue.  Let's not argue so we can get out

17:59:36 15      of here, please.  Let's not argue.

17:59:40 16  BY MR. JEAN:

17:59:41 17     Q.   Sir, are you familiar with the term called

17:59:43 18  "clean as you go"?

17:59:45 19     A.   Yes.

17:59:45 20     Q.   And what is that?  Is that a particular

17:59:48 21  special language?  What does that mean?

17:59:51 22     A.   You know, different retailers have

17:59:53 23  different ways of expressing that, but, basically,

17:59:55 24  what it's saying is when you see debris, clean it up

17:59:59 25  immediately.  Don't wait to come back.

18:00:02  1      Q.   Okay.  And, sir, did you have an

18:00:03  2  opportunity to -- just yes or no.  Did you have an

18:00:06  3  opportunity to visit this particular Walmart store?

18:00:09  4      A.   Yes.

18:00:09  5      Q.   Did you have an opportunity to look on the

18:00:11  6  ground to see the substance -- when did you go to

18:00:13  7  the Walmart store?

18:00:16  8      A.   I believe, to my report, it probably is

18:00:20  9  August -- it was a year or two after.  Let me just

18:00:27 10  go back to the report.

18:00:30 11           And I don't believe that --

18:00:40 12           MR. McDONNELL:  Yeah, objection.  Move to

18:00:42 13      strike any related visit at the store and what

18:00:45 14      he observed.  The court has already ruled that

18:00:46 15      that's not in the case.

18:00:52 16           THE WITNESS:  I don't have the exact date,

18:00:53 17      but it would have been about the year after the

18:00:57 18      event.

18:00:57 19  BY MR. JEAN:

18:00:58 20      Q.   Okay.  And the year after the event, did

18:01:01 21  you have an opportunity to look -- just answer this

18:01:04 22  specific question -- look on the ground to see what

18:01:06 23  type of flooring it was?

18:01:08 24      A.   Yes.

18:01:10 25      Q.   What was that type of flooring?  Just that

```
18:01:13   1    question.

18:01:14   2         A.   Vinyl.  Composition OR pure vinyl.

18:01:19   3         Q.   Repeat, please.

18:01:20   4         A.   Pure vinyl or vinyl composition.

18:01:23   5         Q.   Okay.  Based upon your education, training

18:01:25   6    and experience, when you have a vinyl floor and a

18:01:29   7    plastic on the ground, is that something that is of

18:01:34   8    concern to Walmart management, from your expertise?

18:01:37   9              MR. McDONNELL:  Objection.  That's nowhere

18:01:39  10         in his report as a specific testing of the

18:01:43  11         vinyl on the floor or the plastic on the floor.

18:01:45  12         None of this is in his report.

18:01:47  13    BY MR. JEAN:

18:01:48  14         Q.   Answer the question, please.

18:01:49  15         A.   The Walmart handbook states, and it kind

18:01:53  16    of is, to me, irrelevant, the type of flooring.

18:01:57  17    What's relevant is the fact that plastic wrap was

18:02:02  18    allowed to remain on the floor, and because of that

18:02:05  19    it's a hazardous area.

18:02:07  20              MR. McDONNELL:  Objection.  Move to

18:02:08  21         strike.

18:02:09  22         There has been no evidence that it's

18:02:10  23         plastic wrap.  Been no evidence specifically

18:02:13  24         what he slipped on.

          25
```

| | | |
|---|---|---|
| 18:02:15 | 1 | BY MR. JEAN: |
| 18:02:15 | 2 | Q. Sir -- |
| 18:02:17 | 3 | MR. McDONNELL: If he slipped on anything. |
| 18:02:18 | 4 | BY MR. JEAN: |
| 18:02:19 | 5 | Q. Well, Mr. Birnbach, when we began this |
| 18:02:22 | 6 | deposition hours ago, you said you reviewed the |
| 18:02:24 | 7 | deposition of Peter Pataki; is that correct? |
| 18:02:26 | 8 | A. Yes. |
| 18:02:27 | 9 | Q. Was that part of the foundation that you |
| 18:02:28 | 10 | are using now to provide testimony? |
| 18:02:32 | 11 | A. It's part of it, yes. |
| 18:02:34 | 12 | Q. Okay. And did Mr. Pataki state in his |
| 18:02:38 | 13 | deposition -- well, I'm not -- lead him. |
| 18:02:41 | 14 | When you read Mr. -- when you read Mr. |
| 18:02:44 | 15 | Pataki's deposition, what did you walk away from |
| 18:02:49 | 16 | that reading to understand as to what caused him to |
| 18:02:53 | 17 | fall? |
| 18:02:55 | 18 | MR. McDONNELL: Relevance. |
| 18:02:59 | 19 | THE WITNESS: It was a plastic wrap that |
| 18:03:00 | 20 | was on the floor. |
| 18:03:01 | 21 | BY MR. JEAN: |
| 18:03:02 | 22 | Q. Okay. Thank you. |
| 18:03:05 | 23 | And did you see P43-G prior to today? |
| 18:03:10 | 24 | A. Yes. |
| 18:03:11 | 25 | Q. And what time is that? |

| | | |
|---|---|---|
| 18:03:15 | 1 | A. Eight p.m., six minutes, 28 seconds. |
| 18:03:20 | 2 | MR. McDONNELL: Objection. Move to |
| 18:03:21 | 3 | strike. |
| 18:03:21 | 4 | BY MR. JEAN: |
| 18:03:22 | 5 | Q. Thank you. |
| 18:03:23 | 6 | And P43-H, do you see that? |
| 18:03:25 | 7 | A. Yes. |
| 18:03:26 | 8 | Q. And what is that? |
| 18:03:30 | 9 | A. That's an image showing the individual |
| 18:03:33 | 10 | with the white shirt, black pants is further down |
| 18:03:36 | 11 | the aisle. |
| 18:03:38 | 12 | Q. And do you know who that person is with |
| 18:03:40 | 13 | white shirt, black pants? |
| 18:03:41 | 14 | A. Mr. Pataki. |
| 18:03:43 | 15 | Q. And what time is noted? Tell the jury. |
| 18:03:47 | 16 | A. Eight p.m., six minutes, 30 seconds. |
| 18:03:53 | 17 | Q. I'm showing you what's been marked for |
| 18:03:54 | 18 | identification as P43-I. Do you see that? |
| 18:03:58 | 19 | A. I do. |
| 18:03:59 | 20 | MR. McDONNELL: Objection. |
| 18:03:59 | 21 | All you are having this witness do is |
| 18:04:01 | 22 | describe what he sees in a video and read the |
| 18:04:03 | 23 | time. The jury can see that. |
| 18:04:05 | 24 | MR. JEAN: I'm allowed to do that. |
| 18:04:07 | 25 | MR. McDONNELL: Objection. |

| | | |
|---|---|---|
| 18:04:07 | 1 | MR. JEAN:  I'm allowed to do it.  I'm |
| 18:04:09 | 2 | allowed to do that.  That's how I'm presenting |
| 18:04:11 | 3 | my case. |
| 18:04:12 | 4 | BY MR. JEAN: |
| 18:04:12 | 5 | Q.   Now, P43-I, what is it?  Identify for the |
| 18:04:16 | 6 | jury. |
| 18:04:16 | 7 | MR. McDONNELL:  Objection.  It's also |
| 18:04:18 | 8 | asked and answered. |
| 18:04:19 | 9 | MR. JEAN:  Good. |
| 18:04:20 | 10 | BY MR. JEAN: |
| 18:04:21 | 11 | Q.   P43-I, what is it? |
| 18:04:23 | 12 | A.   It's showing an individual down by the |
| 18:04:25 | 13 | area of question on the floor. |
| 18:04:28 | 14 | Q.   You've seen -- |
| 18:04:31 | 15 | MR. McDONNELL:  Objection.  Objection. |
| 18:04:32 | 16 | This is nothing but a factual recitation |
| 18:04:35 | 17 | of the video the jury will have already seen |
| 18:04:38 | 18 | previous.  This is cumulative. |
| 18:04:41 | 19 | BY MR. JEAN: |
| 18:04:43 | 20 | Q.   What time is P43-I? |
| 18:04:48 | 21 | A.   Eight p.m., six minutes, 33 seconds. |
| 18:04:53 | 22 | MR. McDONNELL:  Objection.  Move to |
| 18:04:54 | 23 | strike. |
| 18:04:54 | 24 | It's just simply having the witness read |
| 18:04:56 | 25 | time stamps. |

18:04:57  1   BY MR. JEAN:

18:04:57  2        Q.   Now, P43-J.  Do you see that?

18:05:00  3        A.   Yes.

18:05:01  4             MR. McDONNELL:  Objection.  Relevance as

18:05:03  5        to whether or not he sees it or doesn't sees

18:05:05  6        it.

18:05:06  7   BY MR. JEAN:

18:05:06  8        Q.   What is P43-J?

18:05:13  9        A.   It's an image of the incident area.  It's

18:05:20 10   time is 8:06:37.  It's showing that the shopping

18:05:24 11   carts that we discussed earlier is hazardous, are

18:05:28 12   still allowed to remain in the view, and it's

18:05:31 13   showing that customers are approaching the area in

18:05:36 14   which the individual plaintiff fell.

18:05:41 15             MR. McDONNELL:  Objection to the relevance

18:05:42 16        of shopping carts that have nothing to do with

18:05:45 17        this particular accident.

18:05:46 18             Objection.  None of this is anything other

18:05:48 19        than this witness describing still from the

18:05:51 20        video, as the jury can see for itself.

18:05:53 21   BY MR. JEAN:

18:05:54 22        Q.   Sir, you used the language "hazardous."

18:05:56 23   Could you tell the jury what you meant by that?

18:05:59 24        A.   According to the Walmart handbook, they

18:06:02 25   are -- these shopping carts and Hi-Los are not

18:06:06   1   allowed on the shopping floor prior to 9:00 p.m. at

18:06:11   2   night, and we see by the time stamp that the store

18:06:15   3   has allowed them to remain for a period of time on

18:06:20   4   the floor without moving them off the floor, which

18:06:23   5   is a violation to the handbook.

18:06:27   6           MR. McDONNELL:  Objection.  Relevance.

18:06:28   7       Move to strike.

18:06:29   8           These Hi-Los, Mr. Pataki didn't trip on a

18:06:32   9       Hi-Lo, didn't hurt himself on a Hi-Lo.

18:06:35   10      Whatever is pictured in the Hi-Lo has nothing

18:06:38   11      to do with this accident.

18:06:39   12  BY MR. JEAN:

18:06:40   13      Q.   Sir, could you tell the jury the

18:06:41   14  relevance, from your expertise, as to the items that

18:06:46   15  you see that are not removed from the ground to Mr.

18:06:48   16  Pataki's fall?

18:06:51   17      A.   It's showing that the store has a low

18:06:54   18  level of safety when it comes to maintaining this

18:06:58   19  store; that they are much more interested in moving

18:07:02   20  merchandise around.

18:07:03   21          MR. McDONNELL:  Objection.  Move to

18:07:04   22      strike.

18:07:05   23          He's, essentially, attempting to argue

18:07:08   24      character evidence or habit evidence, or the

18:07:10   25      fact that there might be a Hi-Lo over there

18:07:13  1        means something about the debris.

18:07:14  2             This is a case about plastic on the floor,

18:07:16  3        not about a Hi-Lo -- no, let me finish.  It's

18:07:20  4        not a Hi-Lo.

18:07:22  5             MR. JEAN:  You are testifying, but go

18:07:23  6        ahead.

18:07:23  7             MR. McDONNELL:  No, I'm now making an

18:07:24  8        objection.

18:07:28  9   BY MR. JEAN:

18:07:29 10        Q.   Sir, what does it mean -- what is a

18:07:31 11   continual zone defense?  What does that mean?

18:07:35 12        A.   That every area of the store is required

18:07:39 13   to be inspected, and certainly groceries, which the

18:07:44 14   Walmart assistant manager agrees needs a greater

18:07:47 15   period or a greater length of inspection more often

18:07:53 16   than on an hourly basis, and this area, which is a

18:07:58 17   cross aisle in the grocery area, would require that

18:08:01 18   kind of attention.

18:08:03 19             MR. McDONNELL:  Objection.  Relevance.

18:08:05 20        He's simply restating what a manager had to

18:08:08 21        say.  He's not an expert in management, and the

18:08:10 22        fact that a grocery aisle requires more

18:08:13 23        attention or less attention isn't an issue in

18:08:15 24        the case.

18:08:16 25             The question is what caused Mr. Pataki to

```
18:08:18   1        fall further down that aisle.

18:08:19   2   BY MR. JEAN:

18:08:20   3        Q.   Sir, in your 40-some-odd years of

18:08:23   4   experience and knowledge of Walmart, what -- tell

18:08:26   5   the jury your specialized knowledge as to what type

18:08:29   6   of attention a cross aisle is supposed to receive?

18:08:33   7             MR. McDONNELL:  Objection.  Relevance.

18:08:34   8         This witness has already testified about

18:08:36   9        his level of knowledge and what he said as he

18:08:39  10        helped vendors build displays and Walmart build

18:08:42  11        displays.  There's nothing about that

18:08:44  12        experience that has anything to do with what

18:08:46  13        you are asking him.

18:08:47  14         This case, as you said over and over, is

18:08:49  15        involving plastic on the floor and it's further

18:08:52  16        down the aisle, and you are simply arguing.

18:08:55  17             MR. JEAN:  You are testifying, counsel.

18:08:56  18   BY MR. JEAN:

18:08:56  19        Q.   Could you answer the question, Mr.

18:08:57  20   Birnbach, please?

18:08:58  21        A.   Yes.  Based on my expertise, I'm not

18:09:03  22   search as to the product that's on the Hi-Lo that's

18:09:06  23   next to a refrigerated case, but I do know that it's

18:09:10  24   been allowed to stand outside of refrigeration and

18:09:14  25   has a good chance of spoiling, if not refrigerated.
```

| | | |
|---|---|---|
| 18:09:18 | 1 | It doesn't seem to be a concern of any of |
| 18:09:21 | 2 | the employee people who are passing by that |
| 18:09:25 | 3 | particular space, and as part of that lack of |
| 18:09:28 | 4 | attention for that product, there is a lack of |
| 18:09:31 | 5 | attention for the item that's on the ground. |
| 18:09:35 | 6 | MR. McDONNELL: Yeah. Objection and move |
| 18:09:37 | 7 | to strike any argument, which is what this is, |
| 18:09:39 | 8 | that somehow something on some other part of |
| 18:09:42 | 9 | the store has anything to do with a piece of |
| 18:09:44 | 10 | plastic in the store. |
| 18:09:45 | 11 | This witness doesn't have anything to do |
| 18:09:47 | 12 | with refrigeration or even what's in those |
| 18:09:50 | 13 | cases. |
| 18:09:51 | 14 | BY MR. JEAN: |
| 18:09:52 | 15 | Q. Now, sir, in your -- your experience that |
| 18:10:00 | 16 | you've talked about, when I established the |
| 18:10:03 | 17 | foundation of your expertise, when you look at |
| 18:10:07 | 18 | P43-J, which notes 8:06:37 seconds, and you look at |
| 18:10:22 | 19 | P43-C, which is 8:04:41 seconds, did you learn from |
| 18:10:31 | 20 | your expertise what is the appropriate action for a |
| 18:10:34 | 21 | Walmart employee when observing a piece of plastic |
| 18:10:39 | 22 | or debris on the ground? |
| 18:10:42 | 23 | MR. McDONNELL: Objection. This question |
| 18:10:43 | 24 | has been asked at least 20 times over -- and |
| 18:10:47 | 25 | answered at least 20 times, so I don't |

| | | |
|---|---|---|
| 18:10:49 | 1 | understand why this particular counsel keeps |
| 18:10:52 | 2 | asking the same question over and over again |
| 18:10:54 | 3 | and adding to his expertise. |
| 18:10:57 | 4 | As a point of fact, this particular |
| 18:10:59 | 5 | witness hasn't been qualified as a retail |
| 18:11:01 | 6 | manager or anything other than he worked with |
| 18:11:03 | 7 | Walmart occasionally to build displays, so |
| 18:11:06 | 8 | what's the value, again, of having this |
| 18:11:08 | 9 | witness, again, saying the same question, which |
| 18:11:10 | 10 | is a Walmart employee should pick something up |
| 18:11:12 | 11 | when they see it, which isn't an expert opinion |
| 18:11:15 | 12 | anyway. |
| 18:11:16 | 13 | BY MR. JEAN: |
| 18:11:16 | 14 | Q.  Are you going to answer the question? |
| 18:11:19 | 15 | A.  Ask your question. |
| 18:11:20 | 16 | Q.  So I'm going to ask the question so that |
| 18:11:22 | 17 | you understand it, and I understand there may be an |
| 18:11:25 | 18 | objection, but nevertheless, here's the question. |
| 18:11:26 | 19 | Just listen to the question that I'm asking you. |
| 18:11:30 | 20 | As a retail safety expert, that I |
| 18:11:34 | 21 | attempted to qualify you as, when you look at the |
| 18:11:38 | 22 | following facts, P43-C at 8:04:41 seconds, with a |
| 18:11:49 | 23 | employee transporting trash, then look at P43-I, |
| 18:12:00 | 24 | which is 8:06:33 seconds, do you have an opinion, |
| 18:12:07 | 25 | based upon a reasonable degree of certainty in the |

18:12:11  1   field of store design, display design and retail

18:12:14  2   safety, as to what occurred here?

18:12:17  3           MR. McDONNELL:  Objection.  Excuse me.

18:12:20  4       Objection.  This question is cumulative.

18:12:23  5           It's asked and answered.  Simply prefacing

18:12:26  6       it and saying as a retail expert has nothing to

18:12:28  7       do with the question in this particular

18:12:30  8       situation.  You are simply repeating same

18:12:33  9       question you've asked probably since about

18:12:36  10      4:30.

18:12:39  11  BY MR. JEAN:

18:12:40  12      Q.   Did you --

18:12:41  13          MR. McDONNELL:  Asked and answered.  It's

18:12:42  14      argumentative and it's not really relevant to

18:12:44  15      the issues the jury is going to have to decide,

18:12:46  16      what some person, who has never managed a store

18:12:50  17      thinks about X.

18:12:54  18          THE WITNESS:  Walmart associate -- to

18:12:56  19      answer the question, the Walmart associate has

18:12:58  20      failed to correct a hazardous condition.

18:13:02  21          MR. McDONNELL:  Objection.  Move to

18:13:03  22      strike.

18:13:04  23          This particular witness does not know

18:13:06  24      what, if anything, a Walmart employee saw or

18:13:08  25      didn't see.

GERALD BIRNBACH                                    JOB NO. 1282576
NOVEMBER 08, 2024

| | | |
|---|---|---|
| 18:13:10 | 1 | BY MR. JEAN: |
| 18:13:11 | 2 | Q.   Sir, did you state -- |
| 18:13:12 | 3 | MR. McDONNELL:   It's speculating. |
| 18:13:13 | 4 | BY MR. JEAN: |
| 18:13:14 | 5 | Q.   Sir, did you state that within a |
| 18:13:16 | 6 | reasonable degree of certainty in the field of store |
| 18:13:19 | 7 | design, display design and retail safety? |
| 18:13:21 | 8 | A.   Yes. |
| 18:13:22 | 9 | MR. McDONNELL:   Objection.   Move to |
| 18:13:22 | 10 | strike. |
| 18:13:23 | 11 | BY MR. JEAN: |
| 18:13:23 | 12 | Q.   Okay.   You've reviewed the deposition |
| 18:13:26 | 13 | testimony of Ms. Britton.   Who is Mr. Britton? |
| 18:13:30 | 14 | MR. McDONNELL:   Objection.   Move to strike |
| 18:13:32 | 15 | anything about Ms. Britton.   There's nothing in |
| 18:13:34 | 16 | his report that specifically describes anything |
| 18:13:36 | 17 | Ms. Britton said.   He said he reviewed it and |
| 18:13:39 | 18 | -- |
| 18:13:39 | 19 | MR. JEAN:   You are testifying, counsel. |
| 18:13:41 | 20 | You are testifying.   You are testifying. |
| 18:13:42 | 21 | MR. McDONNELL:   And nothing -- and nothing |
| 18:13:43 | 22 | in the report says anything about Ms. Britton. |
| 18:13:46 | 23 | So if he's going to use this witness to simply |
| 18:13:50 | 24 | just regurgitate what -- |
| 18:13:52 | 25 | MR. JEAN:   That's not true, counsel. |

18:13:54  1          MR. McDONNELL:  Move to strike.

18:13:55  2   BY MR. JEAN:

18:13:56  3          Q.   Sir, you have your report in front of you,

18:13:57  4   right?

18:13:58  5          A.   Yes.

18:13:58  6          Q.   I want you to go to page five.  And I want

18:14:00  7   you to read -- I want you to read it to yourself.

18:14:05  8   Look at the bottom of your report, page five.

18:14:21  9          A.   Yes.

18:14:22 10          Q.   Okay.  Do you have an understanding, based

18:14:25 11   upon review of your report, what, if any, opinion

18:14:29 12   you had with regard to Assistant Manager Britain?

18:14:33 13          A.   She's mentioned in the report, and it's my

18:14:46 14   findings that she did -- she accepted a lot of what

18:14:51 15   Walmart's failures were.

18:14:54 16          MR. McDONNELL:  Objection.  Objection.

18:14:55 17      Move to strike.

18:14:57 18      He's not a retail management expert.  You

18:15:01 19      haven't proffered him as a retail management.

18:15:04 20      In a simple statement, that in his net opinion,

18:15:06 21      she revealed a lack of understanding Walmart's

18:15:08 22      industry standards is not a substantive expert

18:15:15 23      opinion.

18:15:16 24   BY MR. JEAN:

18:15:16 25          Q.   Well, Mr. Birnbach, was that your opinion

18:15:18   1   that Assistant Manager Britton revealed a lack of

18:15:21   2   understanding of Walmart rules and industry

18:15:22   3   standards?

18:15:23   4        A.   Yes.

18:15:24   5        Q.   And what was the basis for you saying

18:15:26   6   that?  What's the facts that support that?

18:15:28   7             MR. McDONNELL:  Objection.  Move to

18:15:29   8        strike.  Objection to the question.

18:15:32   9             This expert has not been qualified as an

18:15:34  10        expert in retail management.  This expert

18:15:37  11        hasn't been qualified in anything of those

18:15:40  12        areas and it's a simple net opinion.

18:15:43  13   BY MR. JEAN:

18:15:44  14        Q.   Okay.  So, again, Mr. Birnbach, based upon

18:15:46  15   your understanding of Walmart policy, what is the

18:15:48  16   basis for you stating that?

18:15:51  17        A.   That she did not follow Walmart policy.

18:15:54  18        Q.   What particular policy are you talking

18:15:55  19   about?  Tell the jury.

18:15:57  20        A.   Inspection is one item, and did not

18:16:01  21   inspect the area correctly.

18:16:03  22        Q.   How do you know that?  Tell the jury.

18:16:05  23        A.   It was open --

18:16:05  24             MR. McDONNELL:  Hold on a second.

18:16:07  25        Objection.

18:16:07  1              Just saying how do you know that, tell the

18:16:09  2         jury, those aren't proper questions.  Ask the

18:16:12  3         proper questions.

18:16:14  4              MR. JEAN:  They are.  They are.

18:16:14  5              MR. McDONNELL:  You are arguing.

18:16:15  6              MR. JEAN:  I'm not arguing.

18:16:17  7              Thank you, sir.

18:16:17  8   BY MR. JEAN:

18:16:18  9       Q.   Mr. Birnbach, could you please answer that

18:16:19 10   question?  How do you know that?  Tell the jury

18:16:21 11   what -- from your review of the things that you

18:16:23 12   reviewed, why do you say that?  Tell the jury.

18:16:26 13              MR. McDONNELL:  Objection.  In the report,

18:16:26 14         she doesn't mention anything other than --

18:16:29 15              MR. JEAN:  You are testifying, counsel.

18:16:30 16         You are being obstructive.

18:16:32 17              MR. McDONNELL:  I'm not testifying.  I'm

18:16:33 18         objecting.

18:16:34 19              MR. JEAN:  Thank you.

18:16:34 20              THE WITNESS:  The hazard was open and

18:16:36 21         obvious.  It should have been corrected by any

18:16:39 22         and all Walmart employees.

18:16:41 23   BY MR. JEAN:

18:16:43 24       Q.   Does that include the individual --

18:16:47 25   individual/individuals depicted on P43-C with the

| | | |
|---|---|---|
| 18:16:53 | 1 | garbage bags as well as P43-D, again, with the |
| 18:16:57 | 2 | garbage bags? |
| 18:16:58 | 3 | MR. McDONNELL:  Objection.  Move to |
| 18:16:58 | 4 | strike.  This is now cumulative. |
| 18:17:00 | 5 | This is asked probably about the 20th |
| 18:17:02 | 6 | time.  And, again, it assumes a certain fact |
| 18:17:05 | 7 | not in evidence, which is that these particular |
| 18:17:06 | 8 | employees saw something on the floor. |
| 18:17:10 | 9 | BY MR. JEAN: |
| 18:17:11 | 10 | Q.   Sir, I want to be clear.  For example, |
| 18:17:16 | 11 | Mr. McDonnell just talked about these employees.  I |
| 18:17:19 | 12 | want to draw your attention to these employees |
| 18:17:21 | 13 | depicted in P43-C and P43-D. |
| 18:17:26 | 14 | These particular employees of Walmart, |
| 18:17:30 | 15 | based upon your 40 plus years of knowledge of |
| 18:17:34 | 16 | Walmart policy, these particular employees, as |
| 18:17:39 | 17 | articulated by Mr. McDonnell, did they have a duty |
| 18:17:43 | 18 | to pick up trash and plastic on the ground? |
| 18:17:47 | 19 | MR. McDONNELL:  Objection.  Move to |
| 18:17:48 | 20 | strike.  This is asked and answered.  This is |
| 18:17:50 | 21 | an argumentative question.  It's cumulative. |
| 18:17:54 | 22 | It's been asked 35 times. |
| 18:17:56 | 23 | We understand.  And understand -- no, the |
| 18:18:00 | 24 | question has been asked and answered, and I've |
| 18:18:02 | 25 | got about five more minutes tolerance for this |

| | | |
|---|---|---|
| 18:18:04 | 1 | and we'll have to adjourn this. |
| 18:18:07 | 2 | BY MR. JEAN: |
| 18:18:07 | 3 | Q.   Can you answer the question? |
| 18:18:09 | 4 | A.   This is employee information.  The two |
| 18:18:10 | 5 | employees are in different areas and probably |
| 18:18:14 | 6 | reviewing different lines of sight. |
| 18:18:17 | 7 | What is obvious is the speck of white |
| 18:18:21 | 8 | that's occurring right of the column two.  That's |
| 18:18:28 | 9 | been there since the beginning of our conversation. |
| 18:18:31 | 10 | It has not been picked up.  It was the |
| 18:18:34 | 11 | responsibility of both of those individuals to pick |
| 18:18:36 | 12 | this debris up, and both have ignored that |
| 18:18:40 | 13 | particular item. |
| 18:18:41 | 14 | And one can assume, if they were ignoring |
| 18:18:44 | 15 | that item, which is in plain sight of both |
| 18:18:46 | 16 | employees, that the plastic at the other end should |
| 18:18:49 | 17 | have been picked up at least by the individual |
| 18:18:52 | 18 | walking towards it. |
| 18:18:54 | 19 | MR. McDONNELL:  Objection.  Move to |
| 18:18:55 | 20 | strike.  This is all speculative, and this has |
| 18:18:57 | 21 | nothing to do with expert testimony. |
| 18:18:59 | 22 | This is just this individual looking at a |
| 18:19:01 | 23 | video and giving a net opinion. |
| 18:19:04 | 24 | BY MR. JEAN: |
| 18:19:04 | 25 | Q.   Sir, were you speculating when you just |

| | | |
|---|---|---|
| 18:19:07 | 1 | made that statement for the jury? |
| 18:19:08 | 2 | A.   No. |
| 18:19:09 | 3 | Q.   Tell the jury why you were not |
| 18:19:10 | 4 | speculating. |
| 18:19:12 | 5 | A.   Because it's open and obvious.  It's |
| 18:19:13 | 6 | obvious that there's debris on the floor.  It has |
| 18:19:16 | 7 | not been picked up, and we've reviewed in the video |
| 18:19:19 | 8 | the two people walking by that debris and not |
| 18:19:22 | 9 | picking it up. |
| 18:19:23 | 10 |         MR. McDONNELL:  Yeah.  And, again, |
| 18:19:23 | 11 |     objection.  All this witness is doing is giving |
| 18:19:26 | 12 |     his impression of a video.  It has nothing to |
| 18:19:29 | 13 |     do with expert testimony. |
| 18:19:30 | 14 |         There's nothing about building displays or |
| 18:19:32 | 15 |     designs in a store that has anything to do with |
| 18:19:36 | 16 |     what this witness has testified to at this |
| 18:19:38 | 17 |     point for three hours and 20 minutes. |
| 18:19:41 | 18 | BY MR. JEAN: |
| 18:19:41 | 19 |     Q.   Sir, as a retail safety expert -- and you |
| 18:19:44 | 20 | are a retail safety expert; is that true? |
| 18:19:46 | 21 |     A.   Yes. |
| 18:19:47 | 22 |         MR. McDONNELL:  Objection.  It's |
| 18:19:49 | 23 |     argumentative.  It is asked and answered. |
| 18:19:51 | 24 |         You know, you can't preface all your |
| 18:19:53 | 25 |     questions with a particular loop.  You are |

18:19:56   1   responding to objections now instead of asking

18:19:58   2   new questions in a non-leading fashion.

18:20:00   3       You are arguing.  You've been arguing for

18:20:03   4   two hours.

18:20:04   5       MR. JEAN:  I don't want to argue.

18:20:06   6       MR. McDONNELL:  Stop it.  Then stop just

18:20:07   7   simply asking the person, who is not qualified

18:20:10   8   to give a certain opinion, over and over again

18:20:13   9   as a retail -- as a retail safety or what do

18:20:19   10   you preface what do you think you see in this

18:20:20   11   video.  That's not what experts are for.

18:20:23   12       He's not applying any technical knowledge.

18:20:26   13   He's applying something that's within the ken

18:20:29   14   of a reasonable juror.  Please move on.

18:20:31   15       MR. JEAN:  I will never stop having ken

18:20:34   16   for a client.

18:20:36   17       MR. McDONNELL:  You know, I can never --

18:20:36   18   what you are doing is abusive.  It's abusing

18:20:39   19   the people here.  It's Friday night.  You've

18:20:41   20   been asked nothing but the same question over

18:20:44   21   and over and over again, the same specific

18:20:46   22   pictures over and over again.  It's abusive.

18:20:52   23       It's abusive of everybody who is sitting

18:20:54   24   here because you didn't get this witness

18:20:57   25   deposed months ago.

GERALD BIRNBACH                                          JOB NO. 1282576
NOVEMBER 08, 2024

| | | |
|---|---|---|
| 18:21:00 | 1 | BY MR. JEAN: |
| 18:21:06 | 2 | Q.   Sir, Mr. Birnbach, do you have an opinion, |
| 18:21:08 | 3 | based upon a reasonable degree of certainty, in the |
| 18:21:12 | 4 | field of store design, display design, any |
| 18:21:15 | 5 | particular retail safety, as to the actions of |
| 18:21:19 | 6 | Walmart on June 7, 2015? |
| 18:21:23 | 7 | MR. McDONNELL:  Objection.  It's |
| 18:21:24 | 8 | cumulative.  Move to strike. |
| 18:21:27 | 9 | You've been asking the same question over |
| 18:21:29 | 10 | and over and over. |
| 18:21:31 | 11 | MR. JEAN:  The sooner you let me finish, |
| 18:21:33 | 12 | the sooner we get out of here, so let me |
| 18:21:34 | 13 | finish. |
| 18:21:35 | 14 | MR. McDONNELL:  No, sir.  That's not the |
| 18:21:36 | 15 | way it works.  If you are going to continue |
| 18:21:38 | 16 | asking abusive questions and hold me here until |
| 18:21:41 | 17 | eleven o'clock at night -- |
| 18:21:43 | 18 | MR. JEAN:  I'm not abusing anyone. |
| 18:21:44 | 19 | MR. McDONNELL:  -- and I'm supposed to |
| 18:21:45 | 20 | stop objecting to things that are clearly not |
| 18:21:46 | 21 | covered by it. |
| 18:21:47 | 22 | MR. JEAN:  Your objection is noted.  Your |
| 18:21:49 | 23 | objection is noted.  Now let me -- your |
| 18:21:52 | 24 | objection is noted.  Your objection is noted. |
| 18:21:52 | 25 | MR. McDONNELL:  You are asking the same |

| | | |
|---|---|---|
| 18:21:54 | 1 | questions -- |
| 18:21:54 | 2 | MR. JEAN:  I'm going to ask my question. |
| 18:21:56 | 3 | BY MR. JEAN: |
| 18:21:56 | 4 | Q.   Sir, did you hear my question, Mr. |
| 18:21:58 | 5 | Birnbach? |
| 18:21:59 | 6 | A.   Yes. |
| 18:21:59 | 7 | Q.   If so, answer. |
| 18:22:01 | 8 | A.   I do consider that a new question. |
| 18:22:03 | 9 | Q.   Could you answer it, please? |
| 18:22:05 | 10 | MR. McDONNELL:  Objection.  Move to strike |
| 18:22:06 | 11 | the witness's commentary.  If this continues -- |
| 18:22:08 | 12 | off the record. |
| 18:22:09 | 13 | If this continues -- |
| 18:22:10 | 14 | MR. JEAN:  No, we are not off the record. |
| 18:22:12 | 15 | MR. McDONNELL:  Stay on the record. |
| 18:22:14 | 16 | But if this continues, I'm going to move |
| 18:22:14 | 17 | for sanctions and for my time.  This is |
| 18:22:19 | 18 | absolutely abusive. |
| 18:22:21 | 19 | BY MR. JEAN: |
| 18:22:22 | 20 | Q.   Mr. Birnbach -- |
| 18:22:23 | 21 | A.   Yes. |
| 18:22:24 | 22 | Q.   -- did you hear the question?  If so -- |
| 18:22:26 | 23 | A.   I did hear it. |
| 18:22:27 | 24 | Q.   Okay. |
| 18:22:28 | 25 | A.   It's my professional evaluation that |

| | | |
|---|---|---|
| 18:22:32 | 1 | Walmart failed to follow their own directives.  It |
| 18:22:38 | 2 | was to demand both, and that the case, the problem |
| 18:22:42 | 3 | of Mr. Pataki falling, was a result of Walmart's |
| 18:22:46 | 4 | failures. |
| 18:22:47 | 5 | MR. McDONNELL:  Objection and move to |
| 18:22:48 | 6 | strike. |
| 18:22:49 | 7 | First of all, describing yourself as a |
| 18:22:51 | 8 | professional, he can't vouch for his own |
| 18:22:53 | 9 | professional.  The court will decide what he |
| 18:22:54 | 10 | has expertise in. |
| 18:22:57 | 11 | And, again, this is cumulative.  He's |
| 18:22:59 | 12 | repeated this opinion 25 times.  If he thinks |
| 18:23:03 | 13 | the person is negligent because he didn't see |
| 18:23:05 | 14 | the plastic, pick it up, which is not an expert |
| 18:23:08 | 15 | opinion. |
| 18:23:10 | 16 | BY MR. JEAN: |
| 18:23:11 | 17 | Q.  Was that opinion based upon a reasonable |
| 18:23:12 | 18 | degree of certainty? |
| 18:23:14 | 19 | A.  Yes, sir. |
| 18:23:14 | 20 | MR. JEAN:  Thank you.  That's all I have. |
| 18:23:17 | 21 | MR. McDONNELL:  Are you done? |
| 18:23:18 | 22 | MR. JEAN:  Yes, sir. |
| 18:23:22 | 23 | THE VIDEOGRAPHER:  If there are no further |
| 18:23:23 | 24 | questions, I would like -- |
| 18:23:25 | 25 | MR. McDONNELL:  No, I have some questions. |

18:23:27  1          THE VIDEOGRAPHER:  Okay.

18:23:29  2                  CROSS-EXAMINATION

18:23:29  3  BY MR. McDONNELL:

18:23:30  4      Q.   Sir, you testified that the condition is

18:23:37  5  open and obvious, correct?

18:23:40  6      A.   Yes.

18:23:41  7      Q.   So it was open and obvious also to Mr.

18:23:43  8  Pataki?

18:23:47  9      A.   No.

18:23:47 10      Q.   Okay.  Well, sir, so you are saying that

18:23:50 11  Mr. Pataki, did he report any sort of visual

18:23:53 12  problem?

18:23:54 13      A.   No.

18:23:54 14      Q.   Did he report that he was distracted by

18:23:57 15  anything at the time that he walked towards the

18:23:59 16  area?

18:23:59 17      A.   Yes.

18:24:01 18      Q.   What did he say he was distracted by?

18:24:04 19      A.   Product and signage.

18:24:06 20      Q.   In fact, he testified he was distracted by

18:24:08 21  product and signage?

18:24:10 22      A.   As an expert I know he was.  That's why --

18:24:12 23      Q.   Okay.  When you say "as an expert," what

18:24:14 24  was he shopping for that time?

18:24:19 25      A.   It's a promotional aisle.  It's impulse,

18:24:23   1   and Walmart is trying to -- impulse is method of

18:24:25   2   sales.

18:24:27   3         Q.   Okay.  Did Mr. Pataki testify in his

18:24:28   4   deposition that he was distracted at the time of the

18:24:31   5   accident?

18:24:32   6         A.   Well, Mr. Pataki claims he was not looking

18:24:34   7   downward.  He was looking at the product.

18:24:37   8         Q.   Okay.  Did he testify he was looking at

18:24:39   9   the product?

18:24:41  10         A.   I don't recall offhand in his -- in his

18:24:44  11   deposition whether he specifically states that it's

18:24:49  12   product, but he was distracted.

18:24:51  13         Q.   What was he looking for?  What was he

18:24:53  14   looking at at the time right before he fell?

18:24:59  15         A.   I don't recall.

18:25:01  16         Q.   Did Mr. Pataki ever indicate what he was

18:25:03  17   looking for?

18:25:04  18         A.   I believe he did state that he had

18:25:07  19   something on his mind, but that would not be unusual

18:25:10  20   for impulses to take over.

18:25:13  21         Q.   So you agree that one of the causes of the

18:25:15  22   accident is, for whatever reason, Mr. Pataki was

18:25:17  23   distracted and didn't see what you characterized as

18:25:21  24   an open and obvious condition?

18:25:24  25              MR. JEAN:  Object to form.

18:25:25  1          THE WITNESS:  I don't know if that was a

18:25:25  2      cause, no.

18:25:26  3  BY MR. McDONNELL:

18:25:27  4      Q.   Okay.  Sir, did you look at the video in

18:25:32  5  terms of what he did afterwards?

18:25:35  6      A.   Afterward doesn't matter.

18:25:37  7      Q.   Okay.  Whether or not it matters or not,

18:25:39  8  did you look at what he did afterwards?

18:25:42  9      A.   Yes, but it doesn't matter.

18:25:44 10      Q.   Did Mr. Pataki pick up anything on the

18:25:46 11  floor after he fell?

18:25:48 12      A.   I don't recall.

18:25:49 13      Q.   Okay.  Did Mr. Pataki look at a piece of

18:25:53 14  plastic or hold up a piece of plastic?

18:25:56 15      A.   I don't recall.  That's for the Walmart

18:25:58 16  associate to determine.

18:25:59 17      Q.   Sir, you understand how cross-examination

18:26:01 18  works.  I'm asking you questions that call for a yes

18:26:04 19  or no answer.  Do you understand that?

18:26:05 20      A.   Yes.

18:26:06 21      Q.   Okay.  So yes or no, sir.  Did Mr. Pataki,

18:26:08 22  after he fell, look down at the ground and see

18:26:12 23  anything?

18:26:13 24      A.   Maybe.

18:26:14 25      Q.   Okay.  Did Mr. Pataki, after he fell, look

| | | |
|---|---|---|
| 18:26:17 | 1 | down and pick anything up off the ground? |
| 18:26:20 | 2 | A.   I don't recall. |
| 18:26:22 | 3 | Q.   Okay.  So did Mr. Pataki, at any time, go |
| 18:26:26 | 4 | back and touch what was on the ground? |
| 18:26:30 | 5 | A.   Difficult to determine from this |
| 18:26:32 | 6 | perspective.  I do not believe so. |
| 18:26:34 | 7 | Q.   Did Mr. Pataki ever kick -- go back and |
| 18:26:37 | 8 | kick what was on the ground? |
| 18:26:39 | 9 | A.   I believe it's in his deposition that -- |
| 18:26:43 | 10 | well, I don't think it was Mr. Pataki that stated |
| 18:26:47 | 11 | that.  I don't know. |
| 18:26:49 | 12 | Q.   Do you recall in the video seeing Mr. |
| 18:26:51 | 13 | Pataki kick the plastic? |
| 18:26:56 | 14 | A.   I don't recall the time frame in which he |
| 18:26:59 | 15 | did or did not kick the plastic. |
| 18:27:03 | 16 | Q.   You'll agree that, prior to the accident, |
| 18:27:04 | 17 | multiple people walked through the same area and |
| 18:27:08 | 18 | nobody tripped and fell? |
| 18:27:12 | 19 | A.   I don't know if they walked exactly where |
| 18:27:15 | 20 | he walked. |
| 18:27:16 | 21 | Q.   Well, how many people walked through the |
| 18:27:19 | 22 | area during the time right before he fell? |
| 18:27:22 | 23 | A.   I'd have to go back to the video to count. |
| 18:27:24 | 24 | Q.   Okay.  Sir, would you agree there are |
| 18:27:26 | 25 | skylights that are located right above the area of |

18:27:29  1    the incident?

18:27:31  2         A.   My understanding is that off to a side.

18:27:35  3         Q.   Okay.  And would you agree there's also

18:27:37  4    bright fluorescent lighting right over the area?

18:27:40  5         A.   There is fluorescent lighting.  I don't

18:27:42  6    know the level of luminance.

18:27:46  7         Q.   Okay.  And, sir, did you measure where

18:27:49  8    the --

18:27:51  9              MR. McDONNELL:  Take this off the screen,

18:27:53 10         Mr. Jean, the video.

18:27:56 11              MR. JEAN:  I'm sorry, sir?

18:27:57 12              MR. McDONNELL:  You are still sharing your

18:27:58 13         screen.  I'm going to start to share some

18:28:01 14         stuff.

18:28:02 15              MR. JEAN:  Madam court reporter, let me if

18:28:04 16         I could -- are we -- can we do it?

18:28:08 17              Are we off?  Are we off?

18:28:10 18              THE VIDEOGRAPHER:  No, I got your screen

18:28:11 19         off.

18:28:12 20              MR. JEAN:  Thank you.  Appreciate it.

18:28:14 21    BY MR. McDONNELL:

18:28:14 22         Q.   Okay.  Where are the skylights in

18:28:17 23    relationship to the accident area?

18:28:23 24         A.   They are after the fact.

18:28:26 25         Q.   I don't know what you mean by "after the

18:28:28  1   fact."  Would you agree there are skylights --

18:28:31  2        A.   They are behind the point of incident.

18:28:33  3        Q.   So you said they are behind the point of

18:28:37  4   incident?

18:28:38  5        A.   Based on the photography, yes.

18:28:44  6        Q.   Mr. Birnbach, didn't you take photographs

18:28:46  7   that showed skylights down that entire line right

18:28:49  8   over the area of the accident?

18:28:52  9        A.   Are you -- are you stating that I

18:28:54 10   inspected the store?

18:28:57 11        Q.   I'm saying, don't you have photographs

18:29:00 12   that show skylights above the area of the accident?

18:29:06 13        A.   I show skylights nearby the accident.  I

18:29:09 14   don't believe they are directly over the incident

18:29:11 15   area.

18:29:13 16        Q.   Do you know where they are in relationship

18:29:14 17   to the incident area?

18:29:16 18        A.   I don't know if that's relevant, so I

18:29:17 19   would not have paid attention.

18:29:20 20        Q.   I'm not asking you whether or not you

18:29:21 21   think it's relevant.  I'm saying -- asking you

18:29:23 22   whether or not there are skylights that go directly

18:29:26 23   down the line of sight.

18:29:27 24        A.   I don't know.  I don't know.

18:29:31 25        Q.   Let me show you a portion of a photograph

18:29:35  1   you took.

18:29:41  2          MR. JEAN:  Can we identify whatever we are

18:29:43  3      showing with an exhibit tab so I can make a

18:29:45  4      note, please?

18:29:46  5          MR. McDONNELL:  Sure.

18:29:47  6          MR. JEAN:  Thank you.

18:29:49  7   BY MR. McDONNELL:

18:30:24  8      Q.   This is Figure 2 from your report.  Just

18:30:25  9   give me a second.  I'm having a problem.

18:31:01 10          Do you agree that this is --

18:31:04 11          MR. JEAN:  What are we seeing?  Can you

18:31:05 12      identify what you are showing?

18:31:07 13          MR. McDONNELL:  Yes, Figure 2 from his

18:31:09 14      report.

18:31:10 15   BY MR. McDONNELL:

18:31:10 16      Q.   Sir, can you agree that the picture you

18:31:13 17   took --

18:31:14 18          MR. JEAN:  Hold on.  Can we just -- so we

18:31:16 19      can create a record, is this going to be

18:31:19 20      attached to the transcript so we can know what

18:31:21 21      we are talking about?  What is it that we are

18:31:22 22      talking about?  I just want to be clear.

18:31:23 23          MR. McDONNELL:  It's already identified as

18:31:24 24      picture two from his --

18:31:25 25          MR. JEAN:  Again --

18:31:28  1          MR. McDONNELL:   Identified -- identified
18:31:28  2       this is picture two from his report.
18:31:31  3          MR. JEAN:   Picture two.
18:31:32  4          MR. McDONNELL:   Okay.
18:31:32  5  BY MR. McDONNELL:
18:31:33  6       Q.   So, sir, you agree this is a picture you
18:31:35  7  took showing the skylights that are above this
18:31:38  8  particular area, correct?
18:31:41  9       A.   I don't consider it a skylight above that
18:31:44 10  area.  It's where the fluorescent lights are.
18:31:48 11       Q.   Okay.  Sir, you can see there's a line of
18:31:50 12  flourescent lights, correct?
18:31:52 13       A.   Yeah.
18:31:52 14       Q.   If you look in the right side all along
18:31:54 15  that area, there's the end of a skylight that goes
18:31:57 16  almost right above those fluorescent lights,
18:31:59 17  correct?
18:32:01 18       A.   Almost meaning ten feet away?
18:32:02 19       Q.   It's not ten feet away.  I'll show you
18:32:05 20  another photograph you took, which isn't ten feet
18:32:08 21  away.
18:32:22 22          See the photo where the skylight is almost
18:32:25 23  directly above the fluorescent lighting?
18:32:27 24          MR. JEAN:   What are we looking at, please?
18:32:29 25          MR. McDONNELL:   This is picture three.

18:32:31  1          MR. JEAN:  Pic three.

18:32:33  2   BY MR. McDONNELL:

18:32:33  3      Q.   Do you see that this picture shows that

18:32:36  4   there's skylights directly above the fluorescent

18:32:39  5   lights?

18:32:39  6      A.   No, I do not see that.  I'm sorry.

18:32:41  7      Q.   Okay.  I'll help you out.  Does that help

18:32:48  8   you?

18:32:51  9      A.   I see an area to the right of the letter C

18:32:56 10   that could be a skylight.  I don't know.  It's over

18:33:02 11   the incident area.

18:33:03 12      Q.   Right.  So this is right before, but do

18:33:05 13   you see that when we look at the prior picture,

18:33:08 14   there's a line of skylights that is, essentially,

18:33:11 15   within about a foot of the fluorescent lighting,

18:33:16 16   correct?

18:33:17 17      A.   That's correct.

18:33:18 18      Q.   Okay.  So this particular area of the

18:33:22 19   store, this bright fluorescent lighting over it and

18:33:26 20   there's skylights over it, correct?

18:33:28 21      A.   Based on what you -- yes.

18:33:32 22      Q.   As a matter of fact, one of the

18:33:33 23   photographs that you took shows a combination of the

18:33:46 24   skylight and the fluorescent lights creates these

18:33:50 25   kind of bright areas on the floor, correct?

18:33:54   1        A.    Correct.

18:33:55   2        Q.    Okay.  And you can see how kind of the

18:33:57   3   area kind of -- can kind of go out.  It doesn't fall

18:34:01   4   in kind of a direct line.  So part of the lighting

18:34:04   5   is the skylights and part of it is the fluorescent

18:34:08   6   lighting, correct?

18:34:08   7        A.    Correct.

18:34:09   8        Q.    Okay.  So when we look at -- so when we

18:34:15   9   look at the video, part of what we are seeing on the

18:34:20  10   floor is a combination of skylights and fluorescent

18:34:25  11   lighting, correct?

18:34:26  12        A.    Yes.

18:34:28  13        Q.    In fact, if we look at the video --

18:34:59  14        MR. JEAN:  What are we looking at?

18:35:01  15        MR. McDONNELL:  We are looking at the

18:35:02  16   video, and the time stamp says 8:06:19.

18:35:06  17   BY MR. McDONNELL:

18:35:06  18        Q.    So when we look at the video, and you see

18:35:15  19   the movement of the video, we have both fluorescent

18:35:24  20   lighting and skylighting in the area of the

18:35:32  21   accident, correct?

18:35:35  22        A.    Yes.

18:35:38  23        Q.    So would you agree that Mr. Pataki walked

18:35:45  24   directly towards the area of the accident?

18:35:53  25        A.    I see that.

18:35:54  1        Q.    Okay.  So we first look at the video, you

18:35:57  2    agree that this is 8:01.  There's a number of people

18:36:04  3    that walk right through the area where he falls

18:36:08  4    right before the accident, correct?

18:36:10  5        A.    Yes.

18:36:13  6        Q.    You see there was a woman that turned her

18:36:16  7    cart right around?  Do you see how that woman turned

18:36:20  8    right around the corner right where Mr. Pataki fell,

18:36:23  9    correct?

18:36:23 10        A.    I believe so, yes.

18:36:24 11        Q.    I can help you.

18:36:26 12        A.    Yes.

18:36:26 13        Q.    See that woman, she's standing right where

18:36:28 14    Mr. Pataki fell, correct?

18:36:30 15        A.    That's correct.

18:36:30 16        Q.    And that's 8:01:37, correct?

18:36:33 17        A.    Yes.

18:36:34 18        Q.    Okay.  Did you bother to count how many

18:36:37 19    people walked through the exact same area where Mr.

18:36:40 20    Pataki fell before he fell?

18:36:42 21        A.    Well, you used the term "exact same area."

18:36:44 22    I don't -- I know -- are we talking about the actual

18:36:47 23    location where he slipped and fell or are we --

18:36:50 24        Q.    Sure.

18:36:50 25        A.    -- are we talking an exact location?

18:36:53  1      Q.   Let's talk about first the exact location.

18:36:56  2  Would you agree that people are walking in the

18:36:58  3  general vicinity of where he fell?

18:37:01  4      A.   Yes, they are in the general vicinity.

18:37:02  5      Q.   Okay.  So would you agree whatever this

18:37:05  6  plastic was, it wasn't particularly big because we

18:37:07  7  have people walking right near it and they are not

18:37:10  8  falling, correct?

18:37:11  9      A.   Well, we should also agree that the

18:37:13  10  camera, which is photographing this, is not what the

18:37:16  11  human eye is going to see when they are walking down

18:37:19  12  the aisle.

18:37:20  13      Q.   Okay.  So I don't think I asked you that

18:37:22  14  question, sir, did I?  I believe I asked you whether

18:37:24  15  or not there were people that walked through the

18:37:27  16  area where Mr. Pataki did, right?  Did you hear that

18:37:30  17  question?

18:37:30  18      A.   Yes.  I heard it, yes.

18:37:31  19      Q.   Okay.  So now at 8:05:30, do you agree

18:37:35  20  that we see Mr. Pataki over by the refrigerated

18:37:37  21  area?  I'll blow it up for you.  See Mr. Pataki with

18:37:42  22  the white jacket and the -- and the sleeves?

18:37:45  23      A.   Yes.

18:37:46  24      Q.   Okay.  This is 8:05:52.  Mr. Pataki walks

18:38:03  25  in a circle.  I'll get you right to where it's cued

| | | |
|---|---|---|
| 18:38:06 | 1 | up. |
| 18:38:08 | 2 | You can agree that Mr. Pataki then walks |
| 18:38:10 | 3 | directly to that area and he falls, correct? |
| 18:38:14 | 4 | A.   Yes. |
| 18:38:15 | 5 | Q.   And then he gets immediately up, and we |
| 18:38:19 | 6 | agree he doesn't look at the ground. |
| 18:38:23 | 7 | A.   Are you leading the witness? |
| 18:38:25 | 8 | Q.   I'm sorry, sir.  I'm cross-examining you, |
| 18:38:27 | 9 | sir.  You understand how this works.  Sir -- |
| 18:38:30 | 10 | A.   Yeah, it sounds like -- it sounds like you |
| 18:38:33 | 11 | are feeding me information that I don't see. |
| 18:38:35 | 12 | Q.   Okay.  Do you want me to show you again? |
| 18:38:38 | 13 | A.   Please. |
| 18:38:39 | 14 | Q.   Let's look at it again.  Do you see where |
| 18:38:41 | 15 | Mr. Pataki is, up in this corner of the picture? |
| 18:38:44 | 16 | A.   Yes. |
| 18:38:45 | 17 | Q.   Okay.  So we'll go again.  See 8:06:05 Mr. |
| 18:38:51 | 18 | Pataki is now near this section, and I'll blow it up |
| 18:39:00 | 19 | for you.  He walks toward the area.  You see him |
| 18:39:10 | 20 | walking? |
| 18:39:11 | 21 | A.   Yeah. |
| 18:39:12 | 22 | Q.   And he walks right onto a condition which |
| 18:39:15 | 23 | you say was open and obvious, correct? |
| 18:39:17 | 24 | A.   Yes. |
| 18:39:18 | 25 | Q.   And then he gets right up, correct? |

18:39:20   1        A.    That's correct.

18:39:22   2        Q.    Now, do you see that he doesn't -- he's

18:39:24   3   not looking down or anything else like that of what

18:39:27   4   he allegedly fell in, correct?

18:39:29   5        A.    Correct.

18:39:29   6        Q.    Okay.  And if we look at this particular

18:39:32   7   area, you are saying the plastic remained on the

18:39:34   8   floor, correct?

18:39:39   9        A.    I saw it before the fall.  I don't see it

18:39:42  10   now.

18:39:43  11        Q.    Okay.  All right.  So let's take a look at

18:39:59  12   the next video.  It's divided in two sections.  And

18:40:04  13   would you agree that Mr. Pataki comes back in the

18:40:11  14   area and he walks right past it, correct?  That's at

18:40:15  15   8:09:02.

18:40:17  16        Do you see him walk right by the area?

18:40:19  17        A.    Yes.

18:40:19  18        Q.    Okay.  And you see that Mr. Pataki didn't

18:40:21  19   go back down and look at a piece of plastic,

18:40:23  20   correct?

18:40:24  21        A.    Correct.

18:40:25  22        MR. JEAN:  Objection.  Relevance.

18:40:26  23   BY MR. McDONNELL:

18:40:27  24        Q.    Sir, you agree that he --

18:40:29  25        MR. JEAN:  Objection, counsel.  Objection.

18:40:30   1   Relevance, because the questions that I asked

18:40:36   2   were about the fall before -- rather, let me

18:40:41   3   say that again.  The questions that I asked

18:40:43   4   were narrowly tailored to before the fall and

18:40:48   5   further counsel had a conversation regarding

18:40:52   6   photographs after the fall.

18:40:55   7        Counsel, you asked me not to provide that

18:40:58   8   photograph, and I agreed that that photograph,

18:41:01   9   which was after the fall, was not relevant.

18:41:05  10        Now, counsel, you are now using this

18:41:09  11   expert, after I never asked him any questions

18:41:12  12   about after the fall, you are now going beyond

18:41:17  13   my direct examination, so your questions are

18:41:19  14   impermissible and, as a result, I make a motion

18:41:23  15   to strike these questions about after the fall.

18:41:27  16        MR. McDONNELL:  Yeah, I disagree.  You had

18:41:29  17   this witness testify that he fell in debris and

18:41:31  18   I'm showing that after the accident he didn't

18:41:33  19   behave as though someone that fell in debris.

18:41:37  20        We can go back on.  They are speaking

18:41:39  21   objections.

18:41:40  22        MR. JEAN:  Say that again, that he didn't

18:41:41  23   behave like what?

18:41:43  24        MR. McDONNELL:  He didn't behave like

18:41:46  25   somebody -- he didn't behave like somebody that

18:41:46  1        slipped on something on the floor.

18:41:48  2            MR. JEAN:  He didn't behave like someone

18:41:48  3        who slipped on the floor.

18:41:50  4            Okay.  So this expert is not brought in in

18:41:54  5        terms of behavioral sciences.  We never offered

18:41:58  6        him regarding whether or not a person is

18:42:00  7        supposed to act in a certain way, so your

18:42:04  8        question -- your question -- your question is

18:42:06  9        beyond what I offered him for.

18:42:08  10           MR. McDONNELL:  Okay.  I disagree.  I

18:42:10  11       think he said he fell on the plastic and that

18:42:12  12       that's what he fell in, so we can go back on.

18:42:16  13  BY MR. McDONNELL:

18:42:16  14       Q.   Sir, so you saw the video where Mr. Pataki

18:42:19  15  just got right up, correct?

18:42:21  16       A.   Yes.

18:42:21  17       Q.   Okay.  And you also agree Mr. Pataki

18:42:25  18  didn't take a picture of anything, correct?

18:42:27  19           MR. JEAN:  Objection.  Relevance.

18:42:28  20  BY MR. McDONNELL:

18:42:28  21       Q.   Excuse me?  Mr. Pataki didn't take a

18:42:30  22  picture of anything that he allegedly fell in?

18:42:34  23           MR. JEAN:  Objection.  Relevance.  Move to

18:42:35  24       strike.

18:42:39  25           THE WITNESS:  I don't if he had that

18:42:39   1        capability.  I don't know.

18:42:40   2   BY MR. McDONNELL:

18:42:41   3        Q.   Well, we see him later on his cell phone

18:42:43   4   --

18:42:43   5        A.   I didn't see it.

18:42:45   6        Q.   Okay.  So you didn't see the part of the

18:42:47   7   video where Mr. Pataki was walking around the store

18:42:50   8   after with his cell phone?

18:42:51   9             MR. JEAN:  Objection.  Move to strike.

18:42:52  10             THE WITNESS:  No.

18:42:53  11   BY MR. McDONNELL:

18:42:53  12        Q.   Okay.  So, sir, if I understand what your

18:42:55  13   testimony is, your testimony is that this was an

18:42:59  14   open and obvious condition, correct?

18:43:01  15        A.   For Walmart employees.

18:43:04  16        Q.   Okay.  So let's talk about that.

18:43:07  17             Sir, you showed a certain portion of a

18:43:09  18   video.  Get up to your point.  I think it was eight

18:43:19  19   --

18:43:20  20             MR. JEAN:  Can we just state for the

18:43:22  21        record as you are going through this where we

18:43:22  22        are so it's identified also in the transcript,

18:43:25  23        the time stamp, please?

18:43:28  24             MR. McDONNELL:  Sure.  Yeah, yeah, yeah.

          25

18:43:28   1    BY MR. McDONNELL:

18:43:29   2        Q.   So I believe you said 8:04 there were two

18:43:31   3    people that were walking with the trash.  Let me

18:43:33   4    just get you there.

18:43:34   5             MR. JEAN:  But now we are going through,

18:43:34   6        for the record, 8:03:36 --

18:43:38   7             MR. McDONNELL:  Hold on.  It's all time

18:43:39   8        stamped.

18:43:39   9             MR. JEAN:  8:04 --

18:43:40  10    BY MR. McDONNELL:

18:43:41  11        Q.   8:04:38 these two individuals are walking

18:43:44  12    through the store with what looks to be cardboard

18:43:47  13    trash, correct?

18:43:49  14        A.   Yes.

18:43:50  15        Q.   Okay.  And they are walking -- and let's

18:43:52  16    just stop for a second.  Do you see how there's

18:43:56  17    people ahead of them?

18:43:57  18        A.   Yes.

18:43:58  19        Q.   You see the person with the red -- the red

18:44:00  20    --

18:44:02  21        A.   Yes.

18:44:02  22        Q.   -- the red jacket?  And you just said

18:44:03  23    before that just before we see on video may not be

18:44:07  24    necessarily what those people see, correct?

18:44:10  25        A.   I'm sorry.  I don't follow your line of

18:44:12  1  questioning.

18:44:13  2      Q.   You testified earlier that just because we

18:44:16  3  see a video, that doesn't necessarily mean that

18:44:19  4  that's what the people are seeing on the floor;

18:44:21  5  correct?

18:44:23  6      A.   That's possible, yeah.

18:44:23  7      Q.   Okay.  But in this case, if you look, in

18:44:25  8  the line of sight of these two people pushing the

18:44:30  9  trash can, there's a person with a red shirt and a

18:44:33 10  shopping cart, correct?

18:44:34 11      A.   Yes.

18:44:35 12          MR. JEAN:  Could you let that play to be

18:44:36 13      fair?  Let that play.

18:44:38 14          MR. McDONNELL:  Sir, you have to stop

18:44:38 15      doing this.  This is my cross-examination.  You

18:44:41 16      need to object to questions or not, but you

18:44:44 17      can't tell me what to do on my question.  You

18:44:47 18      can come back on this video.

18:44:50 19          MR. JEAN:  I don't want to --

18:44:51 20          MR. McDONNELL:  This is outrageous.  No,

18:44:52 21      you need to be quiet unless you have an

18:44:55 22      objection.  You can't tell me what to do.

18:44:56 23  BY MR. McDONNELL:

18:44:57 24      Q.   Sir, can you see this video, at 8:04:49,

18:44:59 25  there's a man in red standing -- or a woman in red

18:45:02  1   standing between the people with trash and the area

18:45:05  2   of the accident?

18:45:06  3        A.   Yes.

18:45:07  4        Q.   Okay.  And you agree that those

18:45:09  5   individuals can't see through that woman, or man?

18:45:13  6        A.   I agree to what?

18:45:15  7        Q.   You agree that the people that are on the

18:45:18  8   floor can't necessarily see through that woman?

18:45:23  9             MR. JEAN:  Objection.

18:45:25  10             THE WITNESS:  I don't know --

18:45:26  11   BY MR. McDONNELL:

18:45:27  12        Q.   And you don't know one way or the other

18:45:29  13   whether or not their view of whatever it was that

18:45:31  14   Mr. Pataki claims he fell on was being blocked by

18:45:34  15   that person?

18:45:35  16             MR. JEAN:  Objection.

18:45:36  17             THE WITNESS:  I don't think they were even

18:45:36  18        looking at that person.  They appear to be

18:45:39  19        looking down the aisle.

18:45:41  20   BY MR. McDONNELL:

18:45:41  21        Q.   Okay.  Sir, whatever they were looking at

18:45:43  22   between the area of the incident and where they are

18:45:47  23   walking, there's somebody standing in their way,

18:45:50  24   correct?

18:45:50  25        A.   Yeah.

18:45:51   1        Q.    Okay.  So let's continue.  So they walk to
18:45:56   2    this particular part, this woman moves, and they
18:46:00   3    start to turn, correct?
18:46:01   4        A.    Yes.
18:46:02   5        Q.    Okay.  And you agree they are at least two
18:46:05   6    aisles away from that particular area where Mr.
18:46:09   7    Pataki fell, correct?
18:46:12   8        A.    Yes.
18:46:12   9        Q.    Okay.  And would you agree that at this
18:46:17  10    time they have to look down the aisle where they are
18:46:21  11    going, correct?
18:46:22  12        A.    No.
18:46:23  13        Q.    Okay.  You don't think they do.  All
18:46:25  14    right.
18:46:25  15            And do you see the other person that's
18:46:27  16    right in front of them at this point, right before
18:46:31  17    they make the turn, in the blue jacket next to them?
18:46:35  18        A.    First two is in front of them.  Now he's
18:46:38  19    next to them.  What do you want me to look at?
18:46:40  20        Q.    All right.  So do you see, as they are
18:46:43  21    pushing the cart, first there's a person in red and
18:46:47  22    then there's a person that walks right in front of
18:46:50  23    them before they turn the aisle?
18:46:52  24        A.    Correct.
18:46:52  25        Q.    Okay.  And they walk down the aisle,

```
18:46:54   1   correct?

18:46:55   2        A.   Yeah.

18:46:55   3        Q.   Okay.  So when we look at this, you are

18:47:00   4   saying those people that were walking down the aisle

18:47:02   5   should have seen a condition that Mr. Pataki didn't

18:47:05   6   see, correct?

18:47:05   7        A.   Walking down which aisle?

18:47:09   8        Q.   Well, I'm sorry.  We just saw them.  They

18:47:11   9   walk down at least two aisles --

18:47:13  10        A.   Which aisle?  Come down two aisles.

18:47:16  11        Q.   Well, I'm talking about the individuals

18:47:18  12   that you said should have seen the condition on the

18:47:20  13   floor.

18:47:21  14        A.   Right.  Right now they are looking down

18:47:22  15   the main black -- back aisle.  Is that the one you

18:47:25  16   are referring to?

18:47:26  17        Q.   Sure.  So then they make a turn, correct?

18:47:28  18        A.   Yeah, they should have seen it on the

18:47:31  19   floor.

18:47:31  20        Q.   So that's your opinion, that from this

18:47:33  21   distance, they should have seen the object on the

18:47:35  22   floor, correct?

18:47:36  23        A.   Yes.

18:47:37  24        Q.   Okay.  So let's look where Mr. Pataki was.

18:47:45  25   Now, you are saying Mr. Pataki shouldn't have seen
```

| | | |
|---|---|---|
| 18:47:49 | 1 | the area from this distance, correct? |
| 18:47:51 | 2 | A.   That's correct. |
| 18:47:52 | 3 | Q.   Okay.  So then you are saying Mr. Pataki |
| 18:47:55 | 4 | shouldn't have seen the object at this distance, |
| 18:47:57 | 5 | correct? |
| 18:47:58 | 6 | A.   Correct. |
| 18:47:59 | 7 | Q.   And then you are saying he shouldn't have |
| 18:48:01 | 8 | seen it at this distance, correct? |
| 18:48:04 | 9 | A.   Correct. |
| 18:48:04 | 10 | Q.   And then you are saying he shouldn't have |
| 18:48:07 | 11 | seen it at this distance, correct? |
| 18:48:09 | 12 | A.   Correct. |
| 18:48:09 | 13 | Q.   You agree with me that there was no |
| 18:48:11 | 14 | customers in front of Mr. Pataki, correct? |
| 18:48:13 | 15 | A.   Correct. |
| 18:48:13 | 16 | Q.   And Mr. Pataki didn't have any shopping |
| 18:48:15 | 17 | cart, correct? |
| 18:48:16 | 18 | A.   Correct. |
| 18:48:16 | 19 | Q.   And Mr. Pataki didn't testify that he was |
| 18:48:19 | 20 | purchasing anything from those particular end caps, |
| 18:48:21 | 21 | correct? |
| 18:48:22 | 22 | A.   Correct. |
| 18:48:23 | 23 | Q.   Okay.  And there's nothing blocking Mr. |
| 18:48:25 | 24 | Pataki's vision, correct? |
| 18:48:29 | 25 | A.   Which direction? |

18:48:32   1          Q.   Sir, you see the video, correct?

18:48:35   2          A.   In which direction?

18:48:37   3          Q.   Sir, in the direction that he's walking.

18:48:39   4          A.   Okay.  That's -- that's definitive, yes.

18:48:42   5   (Cross-talking).

18:48:43   6          Q.   And you've testified before that people

18:48:46   7   should look in the direction where they walk,

18:48:48   8   correct?

18:48:49   9          A.   No.  I testified before that this store is

18:48:51  10   providing end caps and signage that distracts.

18:48:55  11          Q.   Sir, do I need to pull your old testimony

18:48:58  12   up where you said that even customers have to look

18:49:00  13   where they are going?  You are not denying that, do

18:49:02  14   you?

18:49:03  15          A.   No, I never said that.  I'm denying that.

18:49:05  16          Q.   You deny that you ever said that customers

18:49:05  17   should look where they are going?

18:49:07  18          A.   Yes, they should be looking -- they should

18:49:08  19   assume that the floor in front of them is clean.

18:49:12  20          Q.   All right.  Well, we'll have to get a

18:49:15  21   second, I'll have to pull up your transcript where

18:49:18  22   you said customers should look where they are going.

18:49:20  23               You don't think customers should have to

18:49:20  24   look where they are going?

18:49:21  25          A.   Is that a different case you want to refer

18:49:23  1   to?

18:49:23  2       Q.   That's -- yes or no.  Have you testified

18:49:26  3   previously customers --

18:49:29  4       A.   I'm sorry.  I can't answer.

18:49:29  5       Q.   Sir, let me get my question out.  Have you

18:49:32  6   testified previously that customers should look

18:49:36  7   where they are going and look in the direction of

18:49:38  8   where they are walking?

18:49:40  9       A.   Based on that particular --

18:49:42 10       Q.   Sir, yes or no.  Have you testified --

18:49:43 11   have you testified before -- my question is --

18:49:47 12       A.   I can't answer yes or no.

18:49:49 13       Q.   Okay.  So you don't remember that

18:49:50 14   testimony?  Give me a second.

18:49:51 15       A.   I remember all my testimony.

18:49:52 16       Q.   Okay.  So you are saying today that you

18:49:55 17   never testified that customers should look where

18:49:58 18   they are walking?

18:50:01 19       A.   I'm testifying that you are not giving me

18:50:03 20   the full description.

18:50:04 21       Q.   Sure.  Well, my question is, sir, did you

18:50:07 22   or did you not testify in a prior case that

18:50:11 23   customers should look where they are going?

18:50:14 24       A.   Depends on the case facts.  I probably did

18:50:17 25   say that.

18:50:18   1        Q.   Okay.  So what would it depend -- if

18:50:20   2   customers generally are supposed to look where they

18:50:23   3   are walking, would you agree that Mr. Pataki,

18:50:25   4   generally, was supposed to be looking where he was

18:50:28   5   going?

18:50:29   6        A.   Because the case facts are different.

18:50:31   7        Q.   Okay.  So let's look at where -- so you

18:50:33   8   are saying that Mr. Pataki -- would you agree that

18:50:35   9   Mr. Pataki, at this point, was much closer to the

18:50:38  10   area than the two gentlemen who were moving the

18:50:41  11   trash in the store?

18:50:42  12        A.   It's their responsibility --

18:50:46  13        Q.   Sir, I'm not asking you response -- I'm

18:50:48  14   asking about distance.

18:50:49  15             Would you agree that Mr. Pataki was

18:50:51  16   physically closer to the area and had no

18:50:54  17   obstructions before he fell?

18:50:56  18        A.   Yes.

18:50:57  19        Q.   Okay.  And would you also agree that he

18:51:00  20   then walked in point, again, straight ahead, nothing

18:51:03  21   blocking his view, correct?

18:51:05  22        A.   Yes.

18:51:07  23        Q.   And he took another step straight ahead.

18:51:09  24   Nothing blocking his view, correct?

18:51:12  25        A.   Go right up to where he gets in front of

| | | |
|---|---|---|
| 18:51:14 | 1 | the display. |
| 18:51:16 | 2 | Q.   Sir, at some point, if you want to go to |
| 18:51:18 | 3 | law school and get a law degree and do what I do, |
| 18:51:20 | 4 | you can ask questions however I want.  Listen to my |
| 18:51:24 | 5 | questions. |
| 18:51:25 | 6 | Sir, would you agree that at this point |
| 18:51:26 | 7 | he's directly in front, has a clear view of what you |
| 18:51:29 | 8 | say is open and obvious? |
| 18:51:31 | 9 | A.   I don't know if he has a clear view. |
| 18:51:33 | 10 | Q.   Okay.  Well, sir, what is obstructing his |
| 18:51:36 | 11 | view -- |
| 18:51:36 | 12 | MR. JEAN:  Objection.  No, objection.  No, |
| 18:51:38 | 13 | objection.  Allow him to finish whatever answer |
| 18:51:41 | 14 | he's providing. |
| 18:51:42 | 15 | MR. McDONNELL:  It's noted. |
| 18:51:43 | 16 | BY MR. McDONNELL: |
| 18:51:43 | 17 | Q.   Yes or no, sir?  What is -- |
| 18:51:45 | 18 | MR. JEAN:  No, it's not.  Let him finish. |
| 18:51:47 | 19 | Objection.  Let him finish his statement, |
| 18:51:50 | 20 | pause, then ask whatever question you are going |
| 18:51:54 | 21 | to ask, please. |
| 18:51:55 | 22 | BY MR. McDONNELL: |
| 18:51:55 | 23 | Q.   Sir, yes or no? |
| 18:51:57 | 24 | MR. JEAN:  He did not finish his answer. |
| | 25 | |

18:52:00  1          MR. McDONNELL:  Sir -- sir, you are

18:52:00  2      interrupting me.

18:52:01  3  BY MR. McDONNELL:

18:52:02  4      Q.   Yes -- yes or no?

18:52:02  5          MR. McDONNELL:  It's called redirect, sir.

18:52:05  6          MR. JEAN:  No, it's called allowing him to

18:52:07  7      answer.

18:52:08  8          MR. McDONNELL:  Mr. Jean, I'm not going to

18:52:10  9      argue with you.  It's now 7:00 at night we've

18:52:12 10      been at this.  I'm going to ask my question.

18:52:15 11      If you want to ask redirect, fine.

18:52:17 12  BY MR. McDONNELL:

18:52:17 13      Q.   Sir, would you agree that there's nothing

18:52:19 14  obstructing Mr. Pataki's view right now?  Yes or no?

18:52:22 15      A.   Yes, there is nothing -- there is nothing

18:52:24 16  obstructing his view.

18:52:25 17      Q.   Okay.  Let's take another step.  Now,

18:52:30 18  would you agree that right here there's nothing

18:52:32 19  obstructing his view?

18:52:34 20      A.   Right.

18:52:34 21      Q.   Okay.  Now he takes another step.  Again,

18:52:38 22  nothing obstructing his view?

18:52:40 23      A.   I agree.

18:52:40 24      Q.   We can take another step.  Nothing

18:52:43 25  obstructing his view?

| | | |
|---|---|---|
| 18:52:44 | 1 | A.   I agree. |
| 18:52:45 | 2 | Q.   Now we take another step.  Nothing |
| 18:52:47 | 3 | obstructing his view? |
| 18:52:48 | 4 | A.   I agree. |
| 18:52:49 | 5 | Q.   Now we take another step.  Nothing |
| 18:52:50 | 6 | obstructing his view and he falls, correct? |
| 18:52:55 | 7 | A.   He doesn't fall there. |
| 18:52:58 | 8 | Q.   You don't see it? |
| 18:53:00 | 9 | A.   He doesn't fall there. |
| 18:53:03 | 10 | Q.   Okay.  So you don't see -- so what we are |
| 18:53:06 | 11 | looking, you don't see him start to fall in the |
| 18:53:09 | 12 | video? |
| 18:53:09 | 13 | A.   No. |
| 18:53:10 | 14 | Q.   And you are the one that thinks that you |
| 18:53:12 | 15 | -- |
| 18:53:12 | 16 | A.   Oh, I'm sorry.  I'm sorry.  Yes, he's |
| 18:53:15 | 17 | starting to fall.  Right. |
| 18:53:18 | 18 | Q.   And then he falls and he gets right up, |
| 18:53:21 | 19 | correct, and walks immediately away? |
| 18:53:23 | 20 | A.   Yeah. |
| 18:53:24 | 21 | Q.   Okay.  And would you agree, sir, that he |
| 18:53:26 | 22 | didn't look down whatever at something that was on |
| 18:53:30 | 23 | the ground, correct? |
| 18:53:31 | 24 | A.   Would not be expected for the customer to |
| 18:53:33 | 25 | look down. |

18:53:34  1      Q.   Sir, you don't have any idea what's

18:53:36  2   expected or not expected because you are not an

18:53:39  3   expert on how people fall down.  My question is --

18:53:42  4      A.   It's your opinion.  I'm sorry.  I don't

18:53:44  5   agree with that.

18:53:44  6      Q.   Sure.  I'm asking a factual question.  Did

18:53:47  7   Mr. Pataki, after falling, look down on the ground

18:53:50  8   and see anything that he may have fallen on?

18:53:54  9      A.   After the fact, yes.  Maybe he did.  I

18:53:56  10  don't recall because (Talking simultaneously).

18:54:00  11     Q.   So --

18:54:04  12          THE REPORTER:  You are talking on top.  I

18:54:05  13     can't get it.

18:54:07  14  BY MR. McDONNELL:

18:54:08  15     Q.   So let's look back again.  He falls and he

18:54:10  16  gets straight up, correct?

18:54:13  17     A.   Yes.

18:54:14  18     Q.   Okay.  Then he walks away from the area,

18:54:16  19  correct?

18:54:17  20     A.   Yes.

18:54:18  21     Q.   Okay.  So, at that point, would you agree

18:54:25  22  it's several minutes before Mr. Pataki comes in the

18:54:29  23  area?

18:54:30  24          MR. JEAN:  Objection.  Relevance.

18:54:33  25          THE WITNESS:  You used the term "at that

18:54:34   1       point."  What point do you referring to?

18:54:37   2   BY MR. McDONNELL:

18:54:37   3       Q.   Sir, there is a time on the screen, 8:07,

18:54:40   4   correct?

18:54:42   5           MR. JEAN:  Objection.  Relevance.  Move to

18:54:44   6       strike.

18:54:46   7           THE WITNESS:  The time has moved there.

18:54:47   8   BY MR. McDONNELL:

18:54:48   9       Q.   So Mr. Pataki walks directly towards a

18:54:51  10   condition that you say is open and obvious, correct?

18:54:54  11       A.   Yes.

18:54:55  12       Q.   And Mr. Pataki walks towards an open and

18:54:58  13   obvious condition with nothing obstructing his view,

18:55:00  14   correct?

18:55:04  15       A.   I would not say nothing is obstructing his

18:55:07  16   view.  His view is from 36 inches to 72 inches.

18:55:12  17       Q.   Okay.  But that's the same for the person

18:55:15  18   that were -- the people from Walmart that were at

18:55:17  19   least 15, 16 feet away from the area when they

18:55:21  20   turned down that corner, correct?

18:55:23  21       A.   If they are looking in the same direction.

18:55:25  22       Q.   Okay.  Well -- well, we know that Mr.

18:55:27  23   Pataki was looking in that area because he didn't

18:55:30  24   say he was looking at anything else, correct?

18:55:35  25       A.   We don't know that as a fact.

GERALD BIRNBACH                                    JOB NO. 1282576
NOVEMBER 08, 2024

```
18:55:37  1        Q.   Okay.  Well, did you put anywhere in your
18:55:39  2   report that Mr. Pataki was looking somewhere else?
18:55:42  3        A.   After the incident?
18:55:47  4        Q.   In your report.  You have a report in
18:55:49  5   front of you, correct?
18:55:50  6        A.   After the incident?
18:55:51  7        Q.   No, sir.  Before the incident he wasn't
18:55:55  8   watching where he was going, correct?
18:55:57  9        A.   He was looking -- he was walking straight
18:55:59 10   ahead.
18:56:00 11        Q.   Okay.  And he walked straight ahead into
18:56:04 12   what you described was an open and obvious
18:56:06 13   condition, correct?
18:56:07 14        A.   To a staff member, yes.
18:56:11 15        Q.   To a staff member?
18:56:14 16        A.   I said that before.  An associate.
18:56:16 17        Q.   I'm sorry.  I'm talking about Mr. Pataki.
18:56:18 18        A.   Yes.  Mr. Pataki, as I stated, has a line
18:56:21 19   of sight, when he's walking straight ahead and his
18:56:24 20   head is straight, that his line of sight on focused
18:56:27 21   items is 36 inches to 72 inches.
18:56:31 22        Q.   So, and at this point he's certainly
18:56:33 23   within that line of sight.  I'm pointing to 8:06:29
18:56:37 24   as he's walking toward that area, correct?
18:56:40 25        A.   If he's looking directly at the sign.
```

18:56:42   1        Q.   Okay.  Well, people they look ahead.  They

18:56:44   2   see things peripherally and back and forth as well,

18:56:47   3   correct?

18:56:48   4        A.   They look at the end caps that the

18:56:49   5   retailer is throwing at them to look at.

18:56:52   6        Q.   But Mr. Pataki never testified to that,

18:56:54   7   did he, that he was looking at the end cap?

18:56:57   8        A.   I don't believe so.

18:56:57   9        Q.   And would you agree, sir, that that's

18:56:59  10   stored in those end caps were paper towels and paper

18:57:04  11   plates, correct?

18:57:05  12        A.   Not -- just the one or two displays where

18:57:07  13   he fell, not prior to.

18:57:09  14        Q.   Sorry, sir.  I asked you, wasn't the area

18:57:12  15   where Mr. Pataki fell, that what was on those end

18:57:16  16   caps were paper plates and paper towels?

18:57:18  17        A.   That's correct.

18:57:19  18        Q.   So it's not like there's anything liquid

18:57:22  19   or anything like that; is that correct?

18:57:23  20        A.   That's correct.

18:57:24  21        Q.   And would you agree that despite the fact

18:57:26  22   we looked at all kinds of videos, you didn't show

18:57:29  23   any sort of stocking activities going on right in

18:57:32  24   that area where Mr. Pataki fell, correct?

18:57:35  25        A.   Other activity?  I'm sorry.  Say again.

18:57:38   1        Q.   Sure.  Would you agree that nobody was

18:57:40   2   stocking that shelf at the time of the incident?

18:57:42   3        A.   That's correct.

18:57:43   4        Q.   Okay.  In fact, the stocking activities

18:57:47   5   were in the refrigerated sections, which were some

18:57:49   6   distance away, correct?

18:57:51   7        A.   I believe so.  I don't know for sure.

18:57:53   8        Q.   As a matter of fact, Mr. Pataki came from

18:57:55   9   those areas and he didn't have any problems when he

18:57:58   10  was walking that section, correct?

18:58:00   11       A.   Correct.

18:58:00   12       Q.   Okay.  He didn't have a problem until he

18:58:02   13  walked into an open and obvious condition in front

18:58:06   14  of the paper towel, correct?

18:58:09   15       A.   Well, you keep throwing open and obvious,

18:58:10   16  so it's open and obvious to associates.  It was not

18:58:13   17  open and obvious to the customer.

18:58:16   18       Q.   Okay.  Now, sir, you didn't do any testing

18:58:19   19  of the shoes that Mr. Pataki was wearing, correct?

18:58:24   20            MR. JEAN:  Objection.

18:58:25   21            THE WITNESS:  We've established that.

18:58:26   22            MR. JEAN:  Objection.  This witness is not

18:58:28   23       a shoe expert.  He is the expert for which we

18:58:31   24       retained him.

18:58:32   25            MR. McDONNELL:  Yeah.  Yeah.  I got it.

| | | |
|---|---|---|
| 18:58:33 | 1 | BY MR. McDONNELL: |
| 18:58:34 | 2 | Q.   Sir, you would agree you didn't look at or |
| 18:58:37 | 3 | test any of the shoes that he was wearing, correct? |
| 18:58:39 | 4 | A.   Correct. |
| 18:58:40 | 5 | Q.   And you didn't do any testing of the |
| 18:58:42 | 6 | padded code that Mr. Pataki was wearing? |
| 18:58:45 | 7 | MR. JEAN:  Objection.  Motion to strike as |
| 18:58:47 | 8 | relevant.  Irrelevant. |
| 18:58:48 | 9 | THE WITNESS:  That's correct. |
| 18:58:49 | 10 | BY MR. McDONNELL: |
| 18:58:50 | 11 | Q.   Now, would you agree you don't criticize |
| 18:58:51 | 12 | Walmart's handbook or safety policies at all, |
| 18:58:55 | 13 | correct? |
| 18:58:55 | 14 | A.   That's correct. |
| 18:58:56 | 15 | Q.   In fact, you say they are exceptional; |
| 18:58:58 | 16 | correct? |
| 18:58:59 | 17 | A.   That is correct. |
| 18:58:59 | 18 | Q.   And although Mr. Pataki said it might have |
| 18:59:02 | 19 | been plastic wrap, you also don't know whether it |
| 18:59:04 | 20 | might have just been a plastic bag that a customer |
| 18:59:07 | 21 | dropped from a produce aisle, correct? |
| 18:59:08 | 22 | A.   A definitive view might have allowed me to |
| 18:59:11 | 23 | evaluate that. |
| 18:59:13 | 24 | Q.   I'm sorry.  I don't even know what you |
| 18:59:14 | 25 | said. |

| | | |
|---|---|---|
| 18:59:15 | 1 | Sir, you don't know what the plastic |
| 18:59:17 | 2 | actually was, correct? |
| 18:59:20 | 3 | A.   Well, if it's not plastic, it doesn't |
| 18:59:23 | 4 | matter.   There's a foreign object, debris, on the |
| 18:59:27 | 5 | floor. |
| 18:59:27 | 6 | Q.   Well, my question is, you agree that it |
| 18:59:29 | 7 | could be a plastic bag, correct? |
| 18:59:31 | 8 | A.   I suppose. |
| 18:59:32 | 9 | Q.   Okay.   In fact, it could be a relatively |
| 18:59:35 | 10 | small bag, as we saw all those people walk back and |
| 18:59:39 | 11 | forth and nobody else had a problem where he slipped |
| 18:59:41 | 12 | and fell, correct? |
| 18:59:42 | 13 | A.   Doesn't matter.   Correct. |
| 18:59:44 | 14 | Q.   Okay, sir.   Whether it matters or not, I'm |
| 18:59:46 | 15 | saying you don't even know how big the piece of |
| 18:59:49 | 16 | plastic was, correct? |
| 18:59:50 | 17 | A.   It doesn't belong there.   Correct. |
| 18:59:52 | 18 | Q.   Sir, whether it belongs there or not, |
| 18:59:55 | 19 | listen to my question.   Isn't it a fact you don't |
| 18:59:57 | 20 | know how big that piece of plastic was? |
| 18:59:59 | 21 | A.   That's correct. |
| 19:00:00 | 22 | Q.   Okay.   Thank you. |
| 19:00:01 | 23 | And you don't know where that plastic came |
| 19:00:03 | 24 | from, correct? |
| 19:00:04 | 25 | A.   Correct. |

| | | |
|---|---|---|
| 19:00:06 | 1 | Q.   And you agree that Mr. Pataki, at no point |
| 19:00:12 | 2 | in time, tripped over a display, an unattended |
| 19:00:14 | 3 | trolley cart, or anything else like that, correct? |
| 19:00:18 | 4 | A.   Correct. |
| 19:00:18 | 5 | Q.   And Mr. Pataki didn't trip over an empty |
| 19:00:21 | 6 | pallet, correct? |
| 19:00:22 | 7 | A.   Correct. |
| 19:00:23 | 8 | Q.   And he didn't run into or trip over any of |
| 19:00:26 | 9 | those carts the gentlemen were removing the trash |
| 19:00:28 | 10 | about the store, correct? |
| 19:00:29 | 11 | A.   Correct. |
| 19:00:30 | 12 | Q.   And you don't have an opinion that any |
| 19:00:32 | 13 | sort of unattended cart or a display, or anything |
| 19:00:35 | 14 | else like that, caused Mr. Pataki's fall, correct? |
| 19:00:46 | 15 | A.   I suppose using the word "unattended," I |
| 19:00:49 | 16 | would say correct. |
| 19:00:50 | 17 | Q.   Okay.  Now, you've done a lot of cases |
| 19:00:52 | 18 | where Mr. DeZao, correct, the prior lawyer in this |
| 19:00:56 | 19 | case? |
| 19:00:56 | 20 | A.   You used the word "Dow."  I'm sorry.  I'm |
| 19:01:01 | 21 | not hearing you well. |
| 19:01:02 | 22 | Q.   Sure.  You've done other cases with Mr. |
| 19:01:04 | 23 | DeZao, correct? |
| 19:01:06 | 24 | A.   With what?  I'm sorry. |
| 19:01:07 | 25 | Q.   With Mr. DeZao. |

19:01:09   1        A.   Oh, DeZao, yes.

19:01:13   2        Q.   Okay.  And would you agree that at least,

19:01:16   3   for example, in June 2023 you gave a deposition for

19:01:19   4   Mr. DeZao, correct, in Union County?

19:01:24   5        A.   Yes, that's correct.

19:01:24   6        Q.   That was the Netta case, right?

19:01:27   7        A.   I don't know the case name, but I do know

19:01:30   8   that I did work for Mr. DeZao.

19:01:40   9        Q.   Okay.  And -- so do you remember when you

19:01:42  10   were testifying, even when a customer is pushing a

19:01:45  11   shopping cart --

19:01:51  12             Question.  And as they navigate through

19:01:53  13   life, more often not, they're looking through their

19:01:54  14   eyes in the front of our head, so if they're walking

19:01:57  15   forward they're looking forward and --

19:02:00  16             MR. JEAN:  Objection.  What is this thing?

19:02:01  17        Objection.  What are you showing this jury?

19:02:03  18        You haven't identified it.  What is this thing?

19:02:06  19        You can't just pop it on the screen.  What are

19:02:08  20        we looking at?

19:02:09  21             MR. McDONNELL:  Sir, this is

19:02:10  22        cross-examination and I'm impeaching him with

19:02:14  23        prior testimony.

19:02:14  24             MR. JEAN:  Counsel, you are showing --

19:02:14  25        what is the thing that you are -- what is this?

19:02:18  1        You are showing the jury a thing that we

19:02:20  2        haven't identified.  You haven't give it to me.

19:02:23  3        I don't know what it is.

19:02:26  4  BY MR. McDONNELL:

19:02:26  5        Q.   Sir, do you remember testifying in the

19:02:27  6  Netta case, that it was in Union County on June 28,

19:02:29  7  2023?

19:02:32  8             MR. JEAN:  Objection.  Motion to strike.

19:02:33  9        Can you provide me with that transcript,

19:02:35 10        please?

19:02:36 11             MR. McDONNELL:  Sure.  After the

19:02:37 12        deposition, after I impeach the witness,

19:02:38 13        because that's what impeachment testimony is.

19:02:38 14        I don't have to provide it beforehand.

19:02:41 15  BY MR. McDONNELL:

19:02:42 16        Q.   Mr. Birnbach, do you remember giving this

19:02:44 17  testimony?

19:02:45 18        A.   It's a testimony for Netta versus Walmart.

19:02:49 19        Q.   Yeah.  And that was -- and you did that

19:02:50 20  for the same lawyer you are doing in this case, Mr.

19:02:52 21  DeZao, correct?

19:02:55 22        A.   I did it Mr. DeZao, yes.

19:02:57 23        Q.   Okay.  Remember we already looked on your

19:02:58 24  list.  You've done three prior cases for Mr. DeZao,

19:03:01 25  so this is the fourth case you did for Mr. DeZao,

| | | |
|---|---|---|
| 19:03:04 | 1 | correct? |
| 19:03:05 | 2 | A.  Yes. |
| 19:03:06 | 3 | Q.  At least four. |
| 19:03:06 | 4 | So then we go to the testimony I was |
| 19:03:08 | 5 | getting.  I asked you earlier in the deposition, |
| 19:03:11 | 6 | didn't you testify that a person could see in front |
| 19:03:16 | 7 | of them, correct? |
| 19:03:18 | 8 | A.  It's the case facts.  People -- they are |
| 19:03:20 | 9 | looking in front.  They are looking in front, then |
| 19:03:23 | 10 | they are looking in front. |
| 19:03:25 | 11 | Q.  Okay.  So you are saying that depending |
| 19:03:27 | 12 | upon the case is where, so this is the question that |
| 19:03:29 | 13 | was asked. |
| 19:03:30 | 14 | Okay.  Well, of course, then.  When you |
| 19:03:32 | 15 | are going shopping and pushing a cart and walking |
| 19:03:35 | 16 | forward, you expect a customer to be looking forward |
| 19:03:37 | 17 | and to be visualizing ahead of them. |
| 19:03:39 | 18 | There you said, correct, forward and left |
| 19:03:42 | 19 | or right. |
| 19:03:43 | 20 | Do you remember that? |
| 19:03:45 | 21 | A.  I remember saying it, yes.  That's |
| 19:03:47 | 22 | correct. |
| 19:03:48 | 23 | Q.  So you expect customers, while they are in |
| 19:03:49 | 24 | the store, to be looking forward and looking left to |
| 19:03:52 | 25 | right, correct? |

19:03:54   1        A.    No, that's not correct.

19:03:55   2        Q.    Okay.  So what we are seeing in plain

19:03:58   3   language, you testified under oath in this case,

19:03:59   4   correct?

19:04:03   5        A.    That's correct.

19:04:04   6        Q.    Okay.  And when you testify under oath,

19:04:06   7   you understand this isn't a game.  You don't just

19:04:09   8   come in and say one thing for one case and one thing

19:04:11   9   for another, correct?

19:04:13  10        A.    That's correct.

19:04:14  11        Q.    And you testified under oath, very

19:04:15  12   affirmatively in this case, that customers, when

19:04:19  13   they are pushing a shopping cart, they are walking

19:04:21  14   forward, you expect to be looking forward and to be

19:04:24  15   visualizing ahead of them, correct?

19:04:26  16        A.    That depends on the venue.

19:04:28  17        Q.    Well, sir, you didn't say anything about

19:04:30  18   being distracted by this or being distracted by

19:04:33  19   that.  You said "correct."  This is your answer.

19:04:36  20        A.    It's to that venue.

19:04:38  21        Q.    Okay.  So what you are saying is you'll

19:04:40  22   give an answer depending upon the venue.

19:04:44  23        A.    That's correct.

19:04:45  24        Q.    Okay.  So when you testify that customers

19:04:48  25   should be expected to look forward and left or

| | | |
|---|---|---|
| 19:04:51 | 1 | right, that only applies that Mr. DeZao is paying |
| 19:04:54 | 2 | you for in that case, correct? |
| 19:04:55 | 3 | A.   This is a Quick -- is this is a Quick |
| 19:04:57 | 4 | Stop? |
| 19:04:59 | 5 | Q.   Sir, I'm -- it's Netta.  This is the case |
| 19:05:02 | 6 | that you said -- |
| 19:05:04 | 7 | A.   No, who is the defendant? |
| 19:05:08 | 8 | Q.   Sir, I told you, and I'll go back to it, |
| 19:05:11 | 9 | okay.  I'll remind you. |
| 19:05:14 | 10 | You testified on behalf of Joanna Netta. |
| 19:05:20 | 11 | A.   Okay. |
| 19:05:21 | 12 | Q.   Jerry Birnbach.  This was January 28, |
| 19:05:23 | 13 | 2023 -- or June. |
| 19:05:25 | 14 | A.   Okay. |
| 19:05:25 | 15 | Q.   Okay?  A little more than a year ago. |
| 19:05:27 | 16 | A.   Yes. |
| 19:05:28 | 17 | Q.   You testified for Mr. DeZao, correct? |
| 19:05:31 | 18 | A.   Yes. |
| 19:05:32 | 19 | Q.   And this is a deposition that you gave at |
| 19:05:34 | 20 | two o'clock, just like what you are doing here, |
| 19:05:36 | 21 | correct? |
| 19:05:37 | 22 | A.   That's correct. |
| 19:05:37 | 23 | Q.   And just like in that deposition, you were |
| 19:05:40 | 24 | sworn and you promised you were going to tell the |
| 19:05:42 | 25 | truth, correct? |

```
19:05:43  1        A.   Right.

19:05:44  2             Are we in this same part of the store?

19:05:47  3        Q.   Okay.  And what you are saying is, the

19:05:48  4   court reporter is Cara Savo of Veritext, and you

19:05:50  5   testified under oath, correct?

19:05:54  6        A.   Yes.

19:05:54  7        Q.   Okay.  And then you were asked -- here we

19:06:01  8   go.  First report we have appears -- and we'll go up

19:06:05  9   to line nine.  You see two reports.  This is page

19:06:07  10  24.

19:06:08  11            The first report that we have here appears

19:06:11  12  to be dated December 16, 2021; is that correct?

19:06:13  13            You said yes.

19:06:14  14            The second report looks like it's dated

19:06:16  15  September 18, 2023.

19:06:18  16            You say yes.

19:06:19  17            And you said, sir, just to be clear, part

19:06:22  18  of your training regarding human factors dealt with

19:06:25  19  a person's field of vision, correct?

19:06:27  20            And you said yes, correct?

19:06:29  21       A.   Yes.

19:06:29  22       Q.   And it says, and of course for most humans

19:06:31  23  their field of vision is in front of them, correct?

19:06:34  24            And then you said depends what activity

19:06:35  25  they're involved with.
```

19:06:36   1          A.    In front of them.

19:06:38   2          Q.    Yeah.

19:06:38   3                You said what activity involved.

19:06:39   4                Well, person has eyes in the front of

19:06:41   5    their head, correct?

19:06:42   6                Yes.

19:06:44   7                And then the question is:  And as they

19:06:45   8    navigate through life, more often than not they're

19:06:46   9    looking through their eyes in the front of our head

19:06:46  10    so if they're walking forward they're looking

19:06:46  11    forward.

19:06:49  12                And your answer was --

19:06:51  13          A.    Correct.

19:06:52  14          Q.    -- if that's their activity.  In this

19:06:54  15    case, which is shopping, that's not their activity.

19:06:57  16                Then the question is okay.  Well, of

19:06:59  17    course, then, when you are going shopping and

19:07:00  18    purchasing a shopping cart and walking forward, you

19:07:04  19    expect the customer to be looking forward and be

19:07:08  20    visualizing ahead of them.

19:07:09  21                And this is this your answer.

19:07:11  22                Correct, forward, left to right, correct?

19:07:14  23          A.    The correct answer, which I am stating

19:07:17  24    there, is that an individual has the ability to see

19:07:20  25    from 36 inches above the floor to 72 inches above

19:07:25   1   the floor.  That is correct.  That is what I stand

19:07:27   2   by.

19:07:28   3        Q.   Okay.  So what you've said in this

19:07:32   4   particular case, when Mr. DeZao was paying you to

19:07:35   5   say that people should be expected to look behind

19:07:38   6   them, which is what this case involved, and then you

19:07:40   7   said, periphery does come into play, but it's

19:07:44   8   periphery.

19:07:44   9             Do you see that?

19:07:45  10             And then the person is saying, so if a

19:07:47  11   person is looking forward, they can't simultaneously

19:07:48  12   see behind him.  Fair to say?

19:07:50  13             Well, that's correct.

19:07:51  14             So, generally walking, safe walking would

19:07:51  15   entail a person looking forward in the direction

19:07:51  16   they're walking --

19:07:58  17             THE REPORTER:  You need to slow down on

19:07:59  18        reading that.

19:07:59  19             MR. McDONNELL:  Sure.  I'm sorry.  Thank

19:08:00  20        you for stopping me.

19:08:02  21   BY MR. McDONNELL:

19:08:03  22        Q.   So here where's I asked you earlier in the

19:08:06  23   deposition.  I said, did you ever say that,

19:08:08  24   generally speaking, safe walking would entail a

19:08:11  25   person looking forward?

19:08:12  1          You said, so, generally speaking, safe

19:08:14  2   walking would entail a person looking in the

19:08:17  3   direction for walking.

19:08:21  4          And your answer was -- sir, let's read it

19:08:23  5   together.

19:08:24  6          Answer.  That would be, well, yes, they

19:08:26  7   would be if they were walking forward they would be

19:08:29  8   looking forward and to their left and forward to the

19:08:32  9   right.

19:08:33 10          And then the question was, at page 26,

19:08:35 11   line 1, and whatever direction a person is walking

19:08:39 12   you expect them to be looking in that general

19:08:42 13   direction.  Fair to say?

19:08:44 14          You say correct, right?  That was your

19:08:48 15   answer?

19:08:49 16      A.   Correct.

19:08:49 17      Q.   And then it's saying so it's fair to say

19:08:51 18   that in the retail setting there are often several

19:08:55 19   contributing factors that can lead to a trip and

19:08:55 20   fall answer [sic]?

19:08:56 21          And your answer was, yes, correct?

19:08:58 22      A.   Yes.  Yep.

19:08:59 23      Q.   Okay.  And then you were asked, question,

19:09:03 24   and even a customer could be a factor in their own

19:09:09 25   accident.  Fair to say, right?

19:09:10   1        A.   Yes.

19:09:10   2        Q.   And then the question, and you say, at

19:09:12   3   times.  (Talking simultaneously).

19:09:12   4             And here's the question.  Okay.  And you

19:09:17   5   say, directly on point.  And, generally, a customer

19:09:24   6   must exercise due care for their own safety as well

19:09:27   7   while they are navigating with a retail setting such

19:09:31   8   as Walmart.

19:09:31   9             And your answer was -- let's read it

19:09:33  10   together.  It's correct, right?

19:09:35  11        A.   Yes.

19:09:36  12        Q.   So why is it, when Mr. DeZao was paying

19:09:38  13   you money to say that a customer should be expected

19:09:41  14   to look behind them and backwards, that you gave a

19:09:45  15   different answer in that case?

19:09:48  16        A.   Because this is dealing with navigating

19:09:50  17   and you are dealing with looking at a product.

19:09:52  18        Q.   Okay.  Well, sir, we agree that Mr. Pataki

19:09:56  19   didn't say he was looking at a product when he was

19:09:59  20   walking forward.  There's no evidence of that,

19:10:01  21   correct?

19:10:02  22        A.   Correct.

19:10:03  23        Q.   Okay.

19:10:04  24        A.   But your question about what was he

19:10:06  25   looking for.

19:10:07  1       Q.   What you are saying is that -- is that a

19:10:11  2   customer -- let's read it again.

19:10:17  3            Whatever direction a person is walking,

19:10:19  4   you expect them to be looking in that general

19:10:22  5   direction.  Fair to say?

19:10:23  6            And your answer was correct, right?

19:10:24  7       A.   General direction, correct.

19:10:26  8       Q.   And then your answer was, and, generally,

19:10:28  9   a customer must exercise due care for their own

19:10:31 10   safety as well while they are navigating within a

19:10:35 11   retail setting such as Walmart, correct?

19:10:37 12       A.   That is correct.

19:10:38 13       Q.   Okay.  And it's fair to say that for safe

19:10:43 14   walking, a customer should not walk backward without

19:10:45 15   first looking at their path of travel.  That's what

19:10:48 16   that involved, right?

19:10:50 17       A.   Yes.

19:10:50 18       Q.   So in this case you were trying to explain

19:10:52 19   that a person walking backwards and not looking

19:10:58 20   where they are going is okay, right?

19:11:01 21       A.   Correct.

19:11:01 22       Q.   Okay.  But you testified under oath in

19:11:03 23   this case that regardless of whether or not somebody

19:11:07 24   has a right to walk backwards and not look where

19:11:10 25   they are going, but they definitely should be

19:11:12   1    looking where they are going when they are walking

19:11:13   2    forwards, correct?

19:11:15   3           A.    Right.   Which what Mr. Pataki was doing.

19:11:18   4           Q.    Okay.   Well, if he was exercising due care

19:11:20   5    for his own safety, and he was walking forward and

19:11:23   6    there was nothing obstructing his vision, and he's

19:11:27   7    expected, just as you said, to exercise due care for

19:11:30   8    his own safety, you agree that Mr. Pataki was

19:11:34   9    negligent?

19:11:36   10          MR. JEAN:   Object.

19:11:37   11          THE WITNESS:   No, I don't agree with that.

19:11:38   12      We've been down this road four times and for

19:11:41   13      the fifth time I will tell you that the line of

19:11:43   14      sight of an individual is from 36 inches above

19:11:46   15      the floor to 72 inches.   Anything below

19:11:49   16      36 inches is not in focus.   That's a proven

19:11:52   17      point.

19:11:53   18   BY MR. McDONNELL:

19:11:53   19          Q.    Okay.   Whether it's a proven point or not,

19:11:55   20   you are saying people can't see things on the floor

19:11:58   21   when they are walking forward.   That's your

19:11:58   22   testimony today?

19:12:01   23          A.    Below 36 inches.   Below 36 inches.   I've

19:12:02   24   gladly reached that conclusion.

19:12:04   25          Q.    Okay.   Well, that's not what you testified

19:12:06   1   to for Mr. DeZao in the other case, is it?

19:12:09   2        A.   The other case is irrelevant because it's

19:12:11   3   a completely different situation.

19:12:14   4        Q.   Okay.  So -- so is it different because

19:12:16   5   Mr. DeZao paid you for a different case?

19:12:19   6        A.   No, it's a different set of circumstances

19:12:21   7   and factors -- fact documents.

19:12:23   8        Q.   Okay.  Do you remember testifying for Mr.

19:12:26   9   DeZao in another case?

19:12:28  10        A.   Of course.

19:12:29  11        Q.   Okay.  How many cases have you testified

19:12:31  12   for Mr. DeZao?

19:12:32  13        A.   I believe it's four, maybe five.

19:12:35  14        Q.   Okay.

19:12:37  15        A.   Why didn't this come up in the initial

19:12:40  16   line of questioning?

19:12:41  17        Q.   Again, sir, I promise you that I will not

19:12:44  18   go into architectural design and try to impede on

19:12:48  19   what you do.

19:12:49  20        A.   But you are definitely impeding on time

19:12:51  21   frame.

19:12:51  22        Q.   So would you agree also there's another

19:12:54  23   case you testified for Mr. DeZao, and this was -- I

19:12:57  24   want to describe the date, right?

19:13:00  25             Again, it was a trial in Morris County,

| | | |
|---|---|---|
| 19:13:02 | 1 | and this was March 15, 2023, correct? |
| 19:13:08 | 2 | MR. JEAN:  Objection.  Relevance and |
| 19:13:09 | 3 | foundation. |
| 19:13:11 | 4 | THE WITNESS:  I don't even know what you |
| 19:13:12 | 5 | are talking about.  I don't know -- |
| 19:13:13 | 6 | BY MR. McDONNELL: |
| 19:13:14 | 7 | Q.   I'll show you. |
| 19:13:15 | 8 | MR. JEAN:  What is it?  What is it? |
| 19:13:17 | 9 | BY MR. McDONNELL: |
| 19:13:17 | 10 | Q.   Sir, do you remember testifying in the |
| 19:13:19 | 11 | Rivera case -- |
| 19:13:21 | 12 | MR. JEAN:  What is this thing that you are |
| 19:13:22 | 13 | showing the witness?  You haven't given it to |
| 19:13:25 | 14 | me and you are popping it on the screen.  I |
| 19:13:29 | 15 | don't know what the relevance is.  What is it |
| 19:13:31 | 16 | that you are showing? |
| 19:13:32 | 17 | MR. McDONNELL:  It's called -- it's called |
| 19:13:33 | 18 | cross-examination and impeachment, sir. |
| 19:13:35 | 19 | MR. JEAN:  What is the thing that you are |
| 19:13:37 | 20 | showing the witness?  What is it? |
| 19:13:39 | 21 | MR. McDONNELL:  Give me a second.  I'll |
| 19:13:40 | 22 | lay it down. |
| 19:13:41 | 23 | Do you see that -- this is a caption of a |
| 19:13:43 | 24 | case in Morris County for Mr. DeZao.  It's |
| 19:13:47 | 25 | impeachment.  For Mr. DeZao again -- |

19:13:51  1          MR. JEAN:  You still have to give it to

19:13:52  2      me.

19:13:53  3          MR. McDONNELL:  Sir.  Sir, you can't

19:13:54  4      interrupt my questioning.

19:13:56  5          MR. JEAN:  You have to give me what you

19:13:57  6      are showing the witness.

19:14:02  7  BY MR. McDONNELL:

19:14:03  8      Q.   So -- so when we look at this particular

19:14:05  9  case, this is another case for Mr. DeZao where you

19:14:08  10  testified --

19:14:11  11          MR. JEAN:  Objection.  Relevance.  Motion

19:14:13  12      to strike.

19:14:14  13          MR. McDONNELL:  Okay.

19:14:14  14  BY MR. McDONNELL:

19:14:15  15      Q.   Do you remember testifying in this case?

19:14:19  16      A.   My name is all over it.  Yes, I remember.

19:14:23  17      Q.   Okay.  So this is another case you

19:14:25  18  testified for Mr. DeZao within -- I guess this will

19:14:31  19  be the third case you testified for one of Mr.

19:14:33  20  DeZao's clients.

19:14:42  21          And did you testify what people see in

19:14:44  22  that case, if you remember?

19:14:47  23      A.   I testified what my evaluation of the

19:14:51  24  documentation provided to me was.

19:15:02  25          MR. JEAN:  Again, objection.  Motion to

```
19:15:04   1        strike as relevance.
19:15:05   2             I don't know what this has to do with the
19:15:06   3        issues that we are talking about.  It's far
19:15:09   4        beyond my direct examination.
19:15:14   5             MR. McDONNELL:  Has to do with
19:15:15   6        relationships between the parties and the
19:15:16   7        witnesses.
19:15:17   8             MR. JEAN:  I'm not a party to this.  I'm
19:15:20   9        not Mr. DeZao.  My name is Roosevelt Jean,
19:15:22  10        Esquire, not Mr. DeZao.
19:15:26  11   BY MR. McDONNELL:
19:15:26  12        Q.   That -- sir, you were hired by Mr. DeZao
19:15:28  13   initially, correct?
19:15:29  14             MR. JEAN:  Are you talking to me, sir?
19:15:33  15             MR. McDONNELL:  I'm talking to the
19:15:34  16        witness, Mr. Jean.
19:15:37  17   BY MR. McDONNELL:
19:15:37  18        Q.   You agree, sir, Mr. Birnbach, that you
19:15:39  19   were hired in this case by Mr. DeZao?
19:15:42  20        A.   That's correct.  DeZao.
19:15:43  21        Q.   DeZao.
19:15:56  22             Now, Mr. -- you've done at least six cases
19:16:00  23   in the past couple years with Mr. DeZao.  You agree
19:16:03  24   that he's paid you almost $100,000 in the past?
19:16:07  25             MR. JEAN:  Objection.  Motion to strike.
```

19:16:08  1      Relevance and far beyond my cross -- my direct

19:16:12  2      examination.

19:16:12  3  BY MR. McDONNELL:

19:16:13  4      Q.   You can answer.

19:16:14  5      A.   You are saying that I collected $100,000?

19:16:18  6      Q.   Well, how much -- you were involved in six

19:16:19  7  cases, correct, and don't you charge 12 to $15,000

19:16:22  8  per case?

19:16:23  9      A.   No.

19:16:23  10      Q.   What did you charge for this case?

19:16:26  11      A.   I change every two years, so I started out

19:16:28  12  at 225 or 250.

19:16:31  13      Q.   And how many hours did you work on this

19:16:33  14  case?

19:16:34  15      A.   I don't know.  I don't have those facts in

19:16:36  16  front of me.

19:16:36  17      Q.   Sir, you understand that when you come

19:16:37  18  into federal court you are expected to say how much

19:16:41  19  that you've charge for -- (Talking simultaneously).

19:16:42  20      A.   Currently -- currently, I charge 330.

19:16:45  21  This case goes back three attorneys.  I don't recall

19:16:48  22  exactly what I'm charging.

19:16:50  23      Q.   Okay.  Well, how many hours did you work

19:16:52  24  on this case?

19:16:53  25      A.   Less than 23.

19:16:55  1      Q.   Okay.  And how much did you charge for

19:16:57  2  your deposition today?

19:16:58  3      A.   Today?  It would have been around 360 or

19:17:02  4  350.  It's probably -- it's probably past.  I'll

19:17:08  5  probably doing today based on older, but I don't

19:17:13  6  recall.

19:17:15  7      Q.   I'm sorry.  Do you charge a per diem

19:17:17  8  charge?

19:17:18  9      A.   No, I do not.

19:17:27 10      Q.   So I just want to kind of go over some of

19:17:29 11  the things that -- was Mr. -- was Mr. Pataki in the

19:17:40 12  store with any person that he knew?

19:17:43 13           MR. JEAN:  Objection.  Irrelevant.

19:17:45 14           THE WITNESS:  Mr. Pataki what?

19:17:47 15           MR. JEAN:  Objection.

19:17:48 16  BY MR. McDONNELL:

19:17:48 17      Q.   Sure.  Was Mr. Pataki in the store --

19:17:51 18           MR. JEAN:  Hello.  Let me make my

19:17:53 19       objection for the record.  Give me that respect

19:17:55 20       as a lawyer, then you can move on.

19:17:57 21           MR. McDONNELL:  I'm sorry.  You cut off.

19:17:58 22           MR. JEAN:  Let me make my objection.  Let

19:18:00 23       me make my objection.  That's it.

19:18:03 24           MR. McDONNELL:  Okay.

19:18:05 25           MR. JEAN:  Objection.  Not relevant.

19:18:08  1       Objection, relevance, and far beyond my

19:18:11  2       questioning of this witness on direct exam.

19:18:16  3              MR. McDONNELL:  Okay.  I was just going to

19:18:19  4       say, Roosevelt, sometimes you might even have

19:18:23  5       problems with your feed or something else like

19:18:25  6       that.  All right.

19:18:25  7  BY MR. McDONNELL:

19:18:26  8       Q.   So let's talk about a couple of your

19:18:28  9  opinions.  Your first opinion is that the Walmart

19:18:32 10  people that are walking right in front, right before

19:18:34 11  the accident, should have seen the plastic on the

19:18:36 12  floor, correct?

19:18:37 13       A.   You are referring to this particular case?

19:18:40 14       Q.   Good question.  Yes, in this case.  I'm

19:18:42 15  going to ask about your opinions in this case.

19:18:45 16       A.   I don't recall.  I haven't reviewed this

19:18:47 17  case.

19:18:47 18       Q.   I'm talking about this case.  Mr. Pataki's

19:18:49 19  case.

19:18:49 20       A.   Oh, I'm sorry.  Let me -- let me ask you

19:18:52 21  to please repeat the question.

19:18:54 22       Q.   Sure.  So your first opinion sounds like

19:18:59 23  you claim that Walmart's employees that were working

19:19:01 24  that time, the two guys with the carts, should have

19:19:05 25  seen the plastic on the floor, correct?

19:19:07  1        A.   I don't know if it's the two guys that are

19:19:09  2   with the cart, but someone from Walmart, who is in

19:19:12  3   charge of that department, should have seen the

19:19:15  4   debris.

19:19:15  5        Q.   Okay.  What you are saying is that Mr.

19:19:18  6   Pataki, he had no obligation to see the debris?

19:19:22  7        A.   That's correct.

19:19:26  8        Q.   Okay.  And would you agree that for the

19:19:28  9   first question, Mr. -- Walmart employees should have

19:19:33 10   seen the plastic on the ground, that's not based

19:19:35 11   upon any scientific process that you follow?

19:19:39 12        A.   Based on Walmart mandate.

19:19:41 13        Q.   Okay.  When you say "Walmart mandate," you

19:19:43 14   are saying you read the manual and you say they

19:19:46 15   should have followed the manual, correct?

19:19:49 16        A.   That's correct.  I didn't see it done.

19:19:50 17        Q.   And do you think there's any juror that

19:19:53 18   can't read the language in the manual and understand

19:19:57 19   what it means?

19:19:58 20        A.   I think you're trying --

19:20:00 21        MR. JEAN:  Objection.  Objection as to

19:20:03 22        what a jury thinks or doesn't think.

19:20:06 23        MR. McDONNELL:  I'll rephrase it.

19:20:07 24   BY MR. McDONNELL:

19:20:07 25        Q.   What is the grade level that the manual is

19:20:09  1   written at?  Is it third grade?  Fifth grade?  Sixth

19:20:10  2   grade?

19:20:12  3        A.   I don't know.  You have to ask them.

19:20:13  4        Q.   Is the manual written in plain English?

19:20:16  5        A.   As far as I can tell, yes.

19:20:19  6        Q.   Does the manual use difficult grammar or

19:20:21  7   specialized language?

19:20:22  8        A.   No.

19:20:26  9        Q.   Would a person with an eighth grade

19:20:28  10  education be able to read that manual and understand

19:20:31  11  it?

19:20:31  12       A.   I don't know what an eighth grader is

19:20:34  13  capable of doing.

19:20:35  14       Q.   Okay.  Would you think you would need to

19:20:37  15  be a tenth grader to understand that manual?

19:20:39  16       A.   I don't know what -- what people in a

19:20:41  17  particular grade are responsible for understanding.

19:20:44  18       Q.   Okay.  But it is plain English and it's

19:20:47  19  not complicated or technical, correct?

19:20:49  20       A.   You've established that, yes.

19:20:50  21       Q.   Okay.  What technical aspect?  Is there

19:20:53  22  any kind of, like, science they have to know to

19:20:55  23  understand the language in that manual?

19:20:56  24       A.   No, that's why I question why they didn't

19:20:59  25  do it.

19:21:00  1        Q.   Sir, was there any -- so this manual that

19:21:06  2    you are saying forms the basis of your opinion is

19:21:10  3    written in plain English so that somebody would be

19:21:12  4    able to understand it?

19:21:13  5        A.   A new Walmart employee should be able to

19:21:15  6    understand it.

19:21:16  7        Q.   Right.  And it didn't -- it doesn't

19:21:21  8    require any special education or technical know-how

19:21:25  9    to understand that manual, correct?

19:21:28  10       A.   That's beyond my level of expertise.  I

19:21:30  11   can't comment on it.

19:21:31  12       Q.   Okay.  So what level of expertise do you

19:21:33  13   think you need to understand the manual?

19:21:37  14       A.   All I know is the manual was very

19:21:39  15   specific.  It says if you see debris, pick it up.

19:21:43  16       Q.   Okay.  So what type of specialized

19:21:45  17   education or training do you think people have to go

19:21:49  18   through to understand the concept if you see debris,

19:21:52  19   you should pick it up?

19:21:54  20       A.   I don't know, but there was not done.

19:21:58  21       Q.   So you understand my question.  I'm not

19:22:00  22   asking you whether it was done or not done, okay, so

19:22:03  23   listen to my question.

19:22:05  24            Was there any type of special education,

19:22:08  25   degree or experience to understand if you see debris

19:22:13   1   on the ground, you should pick it up?

19:22:15   2        A.   Just training.

19:22:16   3        Q.   Training.  Okay.

19:22:29   4             Now, you testified earlier that you were

19:22:30   5   involved with 500 cases.  Didn't you testify one of

19:22:34   6   Mr. DeZao's other cases you only had 50 cases?

19:22:40   7        A.   I think I stated before I don't know

19:22:41   8   offhand how many cases I've testified before for Mr.

19:22:44   9   DeZao.

19:22:47  10        Q.   Okay.  But I'm not asking about Mr. DeZao.

19:22:51  11   I saying all total I think you said you've been

19:22:54  12   involved in roughly 50 cases, correct?

19:22:56  13        A.   No, I've been involved with 500 cases of

19:22:58  14   which I've been appearing -- I've had depositions in

19:23:02  15   about over 50.

19:23:05  16        Q.   All right.  And in the deposition of 50,

19:23:07  17   we already looked at about at least six or seven

19:23:11  18   where courts have limited your opinion.  Do you know

19:23:13  19   anything that happened in either the case or the

19:23:15  20   Netta case or the Rivera case?

19:23:16  21             MR. JEAN:  Objection.

19:23:17  22             THE WITNESS:  I think we looked at four

19:23:18  23        cases, but not seven, and I do not recall these

19:23:21  24        cases without examining them.

19:23:25  25             I don't understand the relevance.

19:23:26   1    BY MR. McDONNELL:

19:23:27   2      Q.    Whether you understand the relevance or

19:23:30   3    not, sir, you understand that you generally

19:23:31   4    shouldn't go and offer yourself as an expert on a

19:23:34   5    subject matter that you might not be an expert,

19:23:36   6    correct?

19:23:37   7      A.    That's a matter of your opinion.

19:23:38   8      Q.    Okay.   Sir, would you agree that at least

19:23:40   9    on these six occasions you attempted to go in a

19:23:45 10    court and claim that a subject that required an

19:23:48 11    expert really didn't require an expert, right?

19:23:52 12         MR. JEAN:   Objection.   Foundation.

19:23:54 13         THE WITNESS:   According to the judge --

19:23:56 14         MR. JEAN:   You can answer.

19:23:57 15         THE WITNESS:   According to a judge, in two

19:23:59 16       of those testimonies that you showed me, the

19:24:01 17       judge decided that my opinion was irrelevant

19:24:05 18       because the jury can make up their own mind,

19:24:07 19       and I guess that's what you are trying to

19:24:10 20       allude to in this particular case.

19:24:13 21         MR. McDONNELL:   I have no further

19:24:14 22       questions.   Thank you.

19:24:16 23         MR. JEAN:   Thank you.

         24

         25

```
19:24:17   1              REDIRECT EXAMINATION

19:24:17   2   BY MR. JEAN:

19:24:18   3       Q.   Mr. Birnbach, from your knowledge of

19:24:20   4   Walmart's policy, does it say anything about the

19:24:24   5   obligations to protect customers from open and

19:24:29   6   obvious conditions?

19:24:30   7            MR. McDONNELL:  Objection.  I'm sorry.

19:24:32   8       Objection.  Move to strike.

19:24:33   9       Right now you are simply asking this

19:24:35  10       witness to repeat the policy.

19:24:38  11            MR. JEAN:  Yeah.  I got it.  I got it.

19:24:39  12            MR. McDONNELL:  The policy could be turned

19:24:41  13       into evidence.  It could be used.  It's not

19:24:42  14       expert testimony.

19:24:44  15            MR. JEAN:  My question stands.  My

19:24:45  16       question stands.

19:24:46  17   BY MR. JEAN:

19:24:47  18       Q.   Which is, Mr. Birnbach, we have a lot of

19:24:50  19   testimony about open and obvious conditions.  You

19:24:54  20   heard Mr. McDonnell talk about that, open and

19:24:56  21   obvious?

19:24:57  22       A.   Yes.

19:24:58  23       Q.   Okay.  I want to focus on that language

19:24:58  24   used by Mr. McDonnell repeatedly, about open and

19:25:02  25   obvious, quote, unquote.
```

```
19:25:03   1            Does the Walmart manual that you have

19:25:05   2    intimate knowledge of talk about the duty of a

19:25:09   3    Walmart to protect customers from open and obvious

19:25:13   4    conditions?  Does it talk about that?

19:25:15   5        A.   Yes.  Yes.

19:25:16   6        Q.   Tell the jury what it says.

19:25:19   7            MR. McDONNELL:  Objection.  Objection to

19:25:22   8        just simply asking the witness to read

19:25:24   9        something.

19:25:24  10            MR. JEAN:  No.  I'm asking him, based on

19:25:26  11        his special expertise that only he knows about,

19:25:30  12        that an average juror of a tenth grade or

19:25:33  13        eighth grade education doesn't know.  I want

19:25:36  14        him to educate this jury and I want to hear

19:25:38  15        what his knowledge is, so tell the jury.

19:25:42  16            MR. McDONNELL:  And I'm going to object

19:25:43  17        because --

19:25:43  18            MR. JEAN:  I understand.

19:25:44  19            MR. McDONNELL:  -- it's the obligation of

19:25:45  20        the judge to instruct the jury with respect to

19:25:47  21        the law of open and obvious, and this person

19:25:50  22        can't give a testimony that's different as to

19:25:54  23        whether or not what the court is going to give.

19:25:57  24        It's improper.

19:25:58  25            MR. JEAN:  Got it.  Noted.
```

19:25:59  1    BY MR. JEAN:

19:26:00  2         Q.   Mr. Birnbach, can you answer the question,

19:26:01  3    please?

19:26:03  4         A.   You have to repeat the question, please.

19:26:05  5         Q.   Sure.  And I understand there's an

19:26:06  6    objection, but I want -- I'm going to keep asking

19:26:09  7    the question.  The question is, what does Walmart's

19:26:12  8    policy state regarding the obligation to protect its

19:26:16  9    customers from open and obvious conditions?

19:26:23  10        A.   Walmart states in their employee handbook

19:26:26  11   that if an associate sees a hazardous condition,

19:26:30  12   they are to cure that hazardous condition

19:26:34  13   immediately, and that Walmart is ensuring the

19:26:38  14   customer, through federal regulation, that the venue

19:26:41  15   in which they are shopping is hazard free and safe.

19:26:49  16        Q.   Are you offering that statement based upon

19:26:51  17   a reasonable degree of certainty?

19:26:53  18             MR. McDONNELL:  Objection to the question

19:26:55  19        and move to strike.  His prior answer is

19:26:57  20        impeding on the province of the jury.

19:27:01  21             MR. JEAN:  Okay.  Great.

19:27:02  22   BY MR. JEAN:

19:27:02  23        Q.   Could you answer that question, please?

19:27:04  24        A.   Please repeat the question.

19:27:06  25        Q.   Was your answer based upon a reasonable

| | | |
|---|---|---|
| 19:27:08 | 1 | degree of certainty? |
| 19:27:09 | 2 | A. Yes, it is. |
| 19:27:10 | 3 | Q. Was it always based upon your over 40 |
| 19:27:12 | 4 | years of knowledge of Walmart's inner workings? |
| 19:27:16 | 5 | A. Yes. |
| 19:27:16 | 6 | MR. McDONNELL: Objection to that |
| 19:27:17 | 7 | question. Just simply trying to bolster this |
| 19:27:19 | 8 | particular individual. |
| 19:27:21 | 9 | BY MR. JEAN: |
| 19:27:21 | 10 | Q. Can you get it -- |
| 19:27:22 | 11 | MR. JEAN: Well, yes, exactly. I'm trying |
| 19:27:24 | 12 | to get clarity for the jury. |
| 19:27:27 | 13 | THE WITNESS: The answer is yes to your |
| 19:27:29 | 14 | prior question. |
| 19:27:31 | 15 | MR. JEAN: That's all I have. Thank you. |
| 19:27:40 | 16 | MR. McDONNELL: All right. I'm done. |
| 19:27:43 | 17 | THE VIDEOGRAPHER: If there are no further |
| 19:27:44 | 18 | questions, I would like to take video orders at |
| 19:27:46 | 19 | this time. |
| 19:27:47 | 20 | Mr. Jean, is the standard still okay with |
| 19:27:49 | 21 | you, or would you like to add anything to that? |
| 19:27:53 | 22 | MR. JEAN: No, I sent a correspondence to |
| 19:27:54 | 23 | the reporter regarding the trial that's coming |
| 19:27:56 | 24 | up. I think there's a record of it. If you |
| 19:27:58 | 25 | have any questions, just send me an email. |

19:28:01  1      THE VIDEOGRAPHER:  Sure.  So the standard

19:28:02  2  order for the video is okay?  Or do you want

19:28:07  3  the video expedited with the transcript?

19:28:09  4      MR. JEAN:  Yes.  And my brain is fried,

19:28:11  5  but I think there was -- I think I answered

19:28:15  6  these questions because I think I anticipated

19:28:16  7  that we would have trial, and I think -- it was

19:28:18  8  a long email of what I need.  Whatever I had

19:28:22  9  said in that email.

19:28:24  10     THE VIDEOGRAPHER:  Sure.  No problem.

19:28:25  11     Okay.  All right.  And, Mr. McDonnell,

19:28:26  12  would you like to place a video order?

19:28:30  13     MR. McDONNELL:  No, I don't need a video

19:28:32  14  order, but I do want to expedite the

19:28:34  15  transcript.

19:28:35  16     THE VIDEOGRAPHER:  Okay.  Sounds good.

19:28:36  17  Thank you very much.

19:28:39  18     THE WITNESS:  Mr. Birnbach would like a

19:28:41  19  transcript.

19:28:43  20     THE VIDEOGRAPHER:  Ms. Ohman, did you

19:28:45  21  catch that?

19:28:46  22     THE REPORTER:  Yes.  Thank you.

19:28:49  23     THE VIDEOGRAPHER:  Thank you.  And this

19:28:50  24  concludes the deposition of Gerald Birnbach in

19:28:52  25  the matter of Peter Pataki versus Walmart,

19:28:54  1  Incorporated, et al.

19:28:56  2       We are now off the record.  The time is

19:28:58  3  7:28 p.m. Eastern time.

19:29:01  4       (The deposition concluded at 7:28 p.m.)

19:29:01  5       (Defendants' Exhibits 1 through 6 were

19:29:01  6  marked for purposes of identification.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   CERTIFICATE OF OATH

 2

 3    STATE OF OHIO

 4    COUNTY OF FRANKLIN

 5         I, the undersigned authority, certify that

 6    GERALD BIRNBACH remotely appeared before me and was

 7    duly sworn.

 8

 9         WITNESS my hand and official seal this 11th day

10    of November, 2024.

11

12

13    _____

14    Kathleen K. Ohman

15    Notary Public - State of Ohio

16    My Commission Expires: 5/19/29

17

18

19

20

21

22

23

24

25
```

1                    REPORTER'S CERTIFICATE

2

3     STATE OF OHIO

4     COUNTY OF FRANKLIN

5         I, KATHLEEN K. OHMAN, Registered Merit

6     Reporter, certify that I was authorized to and did

7     stenographically report the deposition of GERALD

8     BIRNBACH; that a review of the transcript WAS

9     requested; and that the transcript is a true and

10    complete record of my stenographic notes.

11

12        I further certify that I am not a relative,

13    employee, attorney, or counsel of any of the

14    parties, nor am I a relative or employee of any of

15    the parties' attorney or counsel connected with the

16    action, nor am I financially interested in the

17    action.

18

19        DATED this 11th day of November, 2024.

20

21

22    _____

23                    KATHLEEN K. OHMAN, RMR

24

25

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
NO. 1-16-cv-01109-CPO-AMD

_____

PETER PATAKI,

             Plaintiff(s),

           -vs-

WALMART, INC., et al,

             Defendant(s).

_____

DE BENE ESSE
TESTIMONY OF:

ROBERT A.
DeFALCO, JR., MD

    *    *    *    *

THURSDAY, MARCH 28, 2024

    *    *    *    *

MASTROIANNI & FORMAROLI, INC.

Certified Court Reporting & Videoconferencing

P.O. Box 368

Haddon Heights, New Jersey 08035

856-546-1100

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 2

1

2

3

4                    Transcript of proceedings in the

5     above matter taken stenographically by

6     Theresa Mastroianni Kugler, Licensed by the State of

7     New Jersey as a Certified Court Reporter, license

8     number 30X100085700, Notary Public of the State of

9     New Jersey and the Commonwealth of Pennsylvania, VIA

10    ZOOM REMOTE VIDEOCONFERENCE, commencing at 6:30 PM.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 3

```
 1
    A P P E A R A N C E S:
 2

 3
            THE KING LAW FIRM
 4          BY:  JOHN W. KING, ESQUIRE
            60 PARK PLACE
 5          SUITE 1104
            NEWARK, NEW JERSEY  07102
 6          973-862-1949
            kingjohnw@hotmail.com
 7          ATTORNEYS FOR THE PLAINTIFF

 8

 9          LAW OFFICES OF McDONNELL & ASSOCIATES
            BY:  ELISA M. BOODY, ESQUIRE
10             - and -
            BY:  PATRICK J. McDONNELL, ESQUIRE
11          METROPOLITAN BUSINESS CENTER
            860 FIRST AVENUE - UNIT 5B
12          KING OF PRUSSIA, PENNSYLVANIA  19406
            610-337-2087
13          FAX - 610-337-2575
            ATTORNEYS FOR THE DEFENDANT,
14          WAL-MART STORES, INC.

15

16

17

18

19

20

21

22

23

24

25
```

Electronically signed by Theresa Kugler (001-297-027-4278)                2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 4

1

2               W I T N E S S   I N D E X

3
    DR. ROBERT A. DeFALCO, MD
4

5   Direct Examination By Ms. Boody        Page  6

6
    Voir Dire Examination By Mr. King       Page  17
7

8   Continued Direct Examination
    By Ms. Boody                            Page  19
9

10  Cross-Examination By Mr. King           Page  78

11
    Redirect Examination By Ms. Boody       Page  121
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 5

1              (On the video record at 6:30 PM.)

2              VIDEOGRAPHER:  The following is a video

3      deposition.  My name is Lee Bitman, I represent

4      Expert Legal Video Productions.  Today is March 28th,

5      the year 2024.  It's now 6:30 PM.

6              This deposition is being held over Zoom

7      video teleconference in the matter of Peter Pataki

8      versus Walmart, Inc, which is filed in the U.S.

9      District Court for the Eastern District of New

10     Jersey, case number 1:16-cv-01109.

11             Present for this deposition is the

12     witness, Dr. Robert A. DeFalco.

13             At this point will counsel please

14     introduce themselves for the record?

15             MR. KING:  Yes.  John King from the

16     King Law Firm, 60 Park Place, Newark, New Jersey on

17     behalf of the plaintiff, Peter Pataki.

18             MS. BOODY:  Hello.  This is a Elisa

19     Boody from McDonnell & Associates.  I represent the

20     defendant, Walmart.  McDonnell & Associates is

21     located at 500 Route 70 West, Cherry Hill, New

22     Jersey, and that's where I'm seated today.

23             VIDEOGRAPHER:  Our court reporter today

24     is Theresa Kugler of Mastroianni & Formaroli

25     Reporting.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 6

1                  At this point, will the court reporter

2      kindly swear in the witness.

3      (R O B E R T   A.   D e F A L C O   J R.,   M D,

4      having been duly sworn, was examined and testified as

5      follows:)

6      (DIRECT EXAMINATION OF DR. DeFALCO

7      BY MS. BOODY:)

8           Q.      Can you please state your name for the

9      record?

10          **A.**      Yes.  It's Robert Anthony DeFalco,

11      Junior.

12          Q.      And what is your profession?

13          **A.**      I'm an orthopaedic surgeon.

14          Q.      What does an orthopaedic surgeon do?

15          **A.**      So an orthopaedic surgeon operates on

16      patients with problems associated with bones and

17      joints and muscles and tendons.

18                  The other thing we do is we see

19      patients in the office, evaluating orthopaedic or

20      musculoskeletal injuries, athletic injuries, traumas.

21      We give shots in the office, we'll obtain X-rays,

22      we'll look at X-rays, we'll look at MRIs and, you

23      know, top to bottom full evaluation of anything wrong

24      with the musculoskeletal system.

25          Q.      And can you tell us a little bit about

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 7

1    your education?

2         **A.**      Sure.

3              I went to the University of Maryland at

4    College Park for college, graduated in 1992.  Went

5    off to medical school from 1994 to 1998, University

6    of Illinois College of Osteopathic Medicine.  And

7    then did an internship following that in 1999 at

8    UMBNJ, Kennedy Health System down in South Jersey.

9              From there I did an orthopaedic

10   residency for the next four years leading up to 2003,

11   graduating from orthopaedic surgery residency.  And

12   then I did a fellowship which is a year of

13   specialized training in sports medicine at Hahnemann

14   University Hospital in Philadelphia.

15        Q.      All right.  So in addition to medical

16   school, you were an internal and then you did a

17   residency and then you also did a fellowship, is that

18   correct?

19        **A.**      That's right.

20        Q.      And your fellowship, you said that was

21   in sports medicine, correct?

22        **A.**      That's correct.

23        Q.      And what is sports medicine?

24        **A.**      Sports medicine is treating athletic

25   injuries.  And it could be any injury going from the

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 8

1    toes all the way up to the cervical spine.

2         Q.     Okay.  And does that involve -- also

3    involve traumatic and acute injuries?

4         A.     It does.

5         Q.     Does part of sports medicine include

6    specifically the neck and spine?

7         A.     Yes, it does.  I cover a lot of

8    football games, high school football around here up,

9    in North Jersey.  We have a college we're associated

10   with, I cover their games, the football games on the

11   sideline.  There is a lot of trauma associated with

12   these games.

13              I also cover the Philadelphia Eagles as

14   one of their orthopaedists.  So depending on the

15   year, I'll do eight to ten games on their sidelines.

16   There is two orthopaedists that go to all the games

17   and I'm one of the two orthopaedists.  And it is,

18   unfortunately, a frequent thing where we're sorting

19   out a neck or a back injury.  In fact, this past

20   August we had -- and this is highly unusual, but we

21   had a pre-season game in Philadelphia where we had to

22   spine board two players and they went off to the

23   hospital.  Our spine surgeon went with one, I went

24   with the other one.

25         Q.     In addition to some of your work that

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 9

1   you do on the sidelines of some of these games, are

2   you also treating injuries to the neck and back in

3   your practice?

4        **A.**     Yeah, on a daily/weekly basis, I do.

5   And we've got a very specialized practice here with a

6   non-operative spine team and operative spine time,

7   but a lot of times athletes will call up and they'll

8   say, hey, you know, I think I hurt my shoulder here

9   and it ends up being the neck.  So I'll see them for

10  their neck.

11            There are some injuries where I'll see

12  them for their neck anyway if they're having

13  stingers, which is an acute cervical injury that can

14  cause tingling and pain and sometimes even weakness

15  down the arms.

16            I'll see high school athletes for back

17  problems, stress fractures in their back.  That's a

18  sports injury.  And I'll evaluate these folks and if

19  they need an operation or a shot, I'll send them to

20  the appropriate specialist within my group, which is

21  a pretty specialized group here.

22       Q.     And what is your group, what is it

23  called?

24       **A.**     It's the Orthopaedic Institute of New

25  Jersey.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                March 28, 2024

Page 10

```
 1        Q.      Approximately how many doctors work in

 2   your group?

 3        A.      We just hired another one, so we're up

 4   to 16 doctors and I think we have 12 physician

 5   assistants and nurse practitioners.

 6        Q.      As a part of your practice, do you

 7   regularly review MRIs of the neck and back?

 8        A.      I do.  Again, on a daily/weekly basis I

 9   do that.

10               This has been particularly a big couple

11   of weeks of review.  I'm reviewing NFL Combine

12   players for the Philadelphia Eagles and what that

13   involves is we go to Indianapolis and we, you know,

14   end up divvying it up, but we examine three -- the

15   325 best college kids out there get invited to this

16   and at this stage of the game we've already done all

17   the physicals, but all the imaging comes in and I

18   think I did about ten players last night and then

19   this week I think I'm up to 25 players.  But there is

20   a ton of cervical MRIs, a ton of cervical X-rays,

21   X-rays of the lumbar spine, thoracic spine, MRIs.

22   You know, these are common things, these players are

23   evaluated with these studies in Indianapolis.  These

24   teams are not going to take a chance on drafting

25   somebody without proper imaging.  So this has been a
```

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 11

1    particularly heavy couple weeks for me as I

2    go through -- I have 80 or 85 players that I need to

3    review and give them a grade of whether we're -- you

4    know, you pass them or fail them or if there is any

5    risk with these players.  So a lot of imaging and a

6    lot of histories I'm reviewing currently.

7         Q.      Understood.

8                 So my question was specific to MRIs,

9    but I think that you appropriately responded and said

10   that in addition to MRIs you're also looking at

11   X-rays and CT scans, is that correct?

12        **A.**      That's correct.

13        Q.      Have you operated on the neck or back?

14        **A.**      I have.  As a part of my residency, we

15   did a lot of spine surgery.  I spent nine months at

16   Cooper Medical Center which is a trauma center.  At

17   that time there were only three major trauma centers

18   in the state and they would fly folks in there on a

19   continuous basis.  And unfortunately there would be a

20   lot of spine injuries, so we did a fair amount of

21   spine surgery.

22        Q.      Are you regularly operating on the

23   spine now?

24        **A.**      I am not.

25        Q.      Typically, if you were to see someone

Electronically signed by Theresa Kugler (001-297-027-4278)                2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 12

1    in your office that required spine surgery, what

2    would happen?

3         **A.**      Well, we have two spine surgeons here.

4    So if someone needed a surgical procedure on their

5    spine, I would just send them over to our spine

6    surgical team.

7         Q.      Dr. DeFalco, are you board certified?

8         **A.**      I am.

9         Q.      How many board certifications do you

10   have?

11        **A.**      I have three.  I'm bored certified in

12   orthopaedic surgery, I'm board certified in sports

13   medicine and I'm board certified in independent

14   medical examinations.

15        Q.      Can you tell me briefly what it takes

16   in order to be board certified in orthopaedic

17   surgery?  What did you have to do?

18        **A.**      Sure.

19              So for orthopaedic surgery you have to

20   pass a written test.  And then since I have done

21   that, I've had to recertify because I've been in

22   the -- in orthopaedics for 21 years, so you got to

23   recertify.  So I've passed a couple of board exams.

24   So there is a written test.

25              When you first come out of fellowship

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 13

1    and you're ready to start your practice, what happens

2    is you need to take 200 operations, prepare the

3    charts, somebody comes and looks at those charts,

4    every one of those charts top to bottom, and then

5    they watch you operate for a day to make sure you're

6    doing the right things, the indications are proper

7    and that you can actually proficiently operate.  So I

8    had to do that as well.

9              And after you get your 200 surgical

10   cases and someone comes and watches you and they go

11   through all the charts, then you're officially board

12   certified.

13        Q.      Understood.

14              And what did you have to do in order to

15   be a board certified independent medical examiner?

16        A.      So for independent medical examinations

17   I had to fly out to a course, and it was a four-day

18   course.  And at the conclusion of that course there

19   was approximately a three-hour board exam that we --

20   that you had to pass in order to become board

21   certified.  That course was about six or seven years

22   ago and since then I had to recertify in that.  And

23   that was -- it's every five years you got to

24   recertify there.  This was a course where you had to

25   log in essentially for two days.  You didn't have to

Page 14

1   take a new examination, but you had to be on the Zoom

2   for two days.  And they considered you recertified by

3   doing that update.

4        Q.      And then finally you said you're also

5   board certified in orthopaedic sports medicine.  What

6   kind of things did you have to do in order to get

7   that specific certification?

8        A.      So this is a subspecialty within

9   orthopaedics, so, you know, this was a case where I

10  had to fly down to Florida and take -- this was

11  another three-hour board examination.  I think I

12  studied, you know, a month or two for this, and I did

13  real well on it and passed the exam and that gave you

14  the board certification in sports medicine.

15       Q.      Are all physicians board certified?

16       A.      No.  No.  Not every physician is board

17  certified.

18       Q.      Have you received any honors or awards?

19       A.      Yeah, one of the things that's voted on

20  in New Jersey every year is top doctors.  And the way

21  this works, it's a magazine called New Jersey Monthly

22  and they send out to every doctor in the state, as

23  far as I'm aware, every doctor get a survey.  And the

24  doctors pick who they think amongst their peers are

25  the top doctors in the state.  And all this goes to

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 15

1    an accounting firm and they tally it up.  And I think
2    I'm up to 12 out of 13 -- 12 out of the last 13 years
3    as a top doctor, including last year.
4         Q.      Did you also receive any honors or
5    awards while you were in training?
6         A.      Yeah.  I wrote a -- did some research
7    and I received a -- it's called a SmithKline Beecham
8    award, it was an honor for doing some research in my
9    training.
10        Q.      Are you currently a member of any
11   professional societies?
12        A.      Yes.  The American Osteopathic
13   Association, the American Arthroscopy Association of
14   North America, I'm also a member of the NFL
15   Physicians Society and the New Jersey Orthopaedic
16   Society.
17        Q.      What does it mean to be a member of the
18   NFL Team Physician Society?
19        A.      Well, if you're a team physician,
20   you're invited to join the society.  And there is
21   lots of good interaction.  There is a scientific
22   meeting at the NFL Combine that you go to.  There is
23   a lot of emails.  There is some Zoom stuff that you
24   get invited to.  There is a lot of different
25   dialogue.  And it's all good and this is really high

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                March 28, 2024

Page 16

1    level sports medicine.  And I think that the folks in

2    this particular society are some of the best doctors

3    in the world.  These are folks that I think some

4    people see on ESPN, some of these doctors, and hear

5    about, you know, with operating on some of the top

6    athletes in the world.  So it's a really good group

7    of doctors and it's a great way to exchange ideas at

8    meetings and such.

9         Q.       And what about the American Board of

10   Osteopathic Orthopaedic Surgeons?

11        **A.**       Yes.  So that is the board that

12   certifies us for orthopaedic surgery.  So I am

13   certified by that board.

14        Q.       Have you been published in any medical

15   journals?

16        **A.**       I have.  I was published when I was a

17   resident in a couple of orthopaedic articles I wrote.

18   And then before I went to medical school, I --

19   between the University of Maryland and medical school

20   at the University of Illinois College of Osteopathic

21   Medicine I did cardiology research down in

22   Washington, DC and I was able to get on I believe it

23   was four papers with interventional cardiology where

24   they put stents and things like that up in the

25   coronary arteries.  It was pretty cool stuff.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 17

1       Q.       Currently, as you sit here today, I

2   imagine that most of your practice is patients and

3   not research, is that correct?

4       **A.**      Yeah, that's correct.  I spend my

5   professional time seeing patients, doing operations.

6   I will spend some time doing independent medical

7   examination work or legal work like this.  That's 20

8   percent of my practice.

9               I cover a lot of sporting events.  I

10  think this year it's looking like ten games for

11  Philadelphia.  And then I also cover high schools up

12  here and I have fun doing that, but that doesn't

13  leave a lot of time for publishing.

14      Q.       Thank you.

15              MS. BOODY:  I now move for the

16  acceptance of Dr. DeFalco as an expert in orthopaedic

17  surgery, sports medicine, and as an independent

18  medical examiner.

19              Mr. King, do you have any questions on

20  qualifications?

21  (VOIR DIRE EXAMINATION OF DR. DeFALCO

22  BY MR. KING:)

23      Q.       One question, Doctor.

24              You stated that you -- as a resident

25  you did some spine surgeries as a resident, is that

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 18

 1   correct?

 2        **A.**      That's correct.

 3        Q.        And what year was that?

 4        **A.**      My residency was from 2000 to 2003,

 5   four years of orthopaedic surgery residency.

 6        Q.        Have you done a spine surgery since

 7   that time?

 8        **A.**      I have not.

 9        Q.        And in your daily practice, how often

10   do you see spine-related injuries?

11        **A.**      I would say it's daily that someone

12   will come in with a neck or a back.  And as I

13   explained earlier, sometimes it's not necessarily

14   intended as a neck or a back, but they -- you know,

15   it's radicular pain, radiating pain into the shoulder

16   and it ends up being the neck.

17                   So this happens more days than not.

18                   Or, for example, it's -- a hip is sent

19   to me, our call center is very good, the people that

20   answer the phone and schedule appointments, and they

21   try to get patients to the right specialists.  Right?

22                   As I said, our group is very

23   sub-specialized, but if the person is complaining of

24   hip pain, a lot of times that's coming from the back.

25   So I'll see them for the back.

Electronically signed by Theresa Kugler (001-297-027-4278)        2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 19

1                Like I said, in these athletes, I will
2   see these stress fractures in the back, I'll see
3   stingers because these are sports-related injuries.
4   Stingers are, as I said earlier, pain that shoots
5   down the arms that's coming from the neck.  It's
6   common in football players.  We see it on the
7   sidelines at the high school, college and
8   professional levels.  And then once in a while I get
9   somebody who says I will not see anybody else but
10  DeFalco.  Right?  And they -- they'll say I want to
11  start with him.  And then I'll see them and if it's
12  appropriate, I'll send them to our non-operative
13  spine team or our operative spine team.  So that
14  happens as well.  So on a weekly basis I'm seeing
15  these cervical and lumbar and thoracic spine
16  injuries.
17                MR. KING:  I have nothing further.
18                MS. BOODY:  Mr. King, do you have any
19  objections to Dr. DeFalco rendering expert opinions
20  in the areas that I've proffered, which are
21  orthopaedics, sports medicine and independent medical
22  exams?
23                MR. KING:  I do not.
24                MS. BOODY:  Thank you.
25  (CONTINUED DIRECT EXAMINATION OF DR. DeFALCO

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 20

1    BY MS. BOODY:)

2         Q.      Dr. DeFalco, in connection with this

3    case that we're here to talk about today, did you

4    perform an independent medical exam?

5         **A.**      I did.

6         Q.      And did you provide opinions to a

7    reasonable degree of medical probability in

8    connection with that exam?

9         **A.**      I did.

10        Q.      Can you please tell us what you did to

11   arrive at those opinions?

12        **A.**      Sure.

13               On October 24th, 2019 I performed an

14   independent medical examination on Mr. Pataki, so I

15   went through the history, I looked at all the

16   provided records that were sent to me, and I did a

17   physical examination on him.  Also had the

18   opportunity to ask him questions.

19        Q.      Did you -- what all did you review in

20   preparation for that as well?

21        **A.**      Well, I reviewed a good amount of

22   medical documents, which I list in the -- in my

23   medical record review.  There were X-ray reports,

24   there were MRI reports, there were procedure reports,

25   there were operative reports, there were records from

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 21

1    the Clara Maass Medical Center Emergency Department

2    on two occasions, and there were also treatment

3    records sent to me by multiple providers who --

4    multiple doctors who had seen Mr. Pataki.

5        Q.        Understood.

6                  So that the jury understands, you

7    mentioned writing a report.  And did you author a

8    report?

9        A.        I did.

10        Q.        Would it be helpful to review your

11    report to refresh your recollection while you

12    testify?

13        A.        Yes.

14        Q.        And do you have that report in front of

15    you?

16        A.        I do.

17        Q.        Excellent.

18                  In your medical record review, were

19    there any particular medical records that you found

20    significant?

21        A.        Yes.  There were a few.  A couple that

22    jumped out to me certainly would be the emergency

23    room records from the Clara Maass Medical Center.

24        Q.        Okay.  In reviewing those records,

25    there are multiple aspects of those records and some

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

                                                    Page 22

1    of them are subjective and some of them are

2    objective.  Can you please explain to the jury the

3    difference between a subjective and objective

4    finding?

5         **A.**      Sure.

6                     I mean first as it pertains to the

7    physical examination, anything that the patient can

8    control the answer to is subjective.  Okay?

9                     So examples of physical examination

10   findings that are subjective would be range of

11   motion.  The patient controls that, how much they can

12   move.

13                    If they say there is tenderness, okay,

14   that is a subjective examination finding, a

15   subjective historical finding, because the patient is

16   controlling that answer.  Okay?

17                    Conversely, something that would be

18   objective would be is there a -- on a physical

19   examination, is there a scar there.  Okay?  The

20   patient can't control that answer.  The scar is there

21   or it's not.  Is there redness?  Is there swelling?

22   Is there spasm?  All those things are objective.

23   Okay?  The patient doesn't get to control that.

24   Okay?

25                    Now, as far as it's concerned in an

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 23

1   emergency room visit, the history is subjective,

2   meaning that the patient can answer that history as

3   he or she would like.  That's subjective.  They

4   control the answer.

5        Q.       And did you review the purported reason

6   for the emergency room visit?

7        **A.**       Yes.

8        Q.       And what did it state?

9        **A.**       It stated that about an hour-and-a-half

10  before arriving in the emergency department Mr.

11  Pataki's leg gave out.  He can't remember which leg

12  it was.  And at the time of the emergency department

13  visit on 6-7-15, he was complaining of neck and back

14  pain.

15       Q.       And as a part of that emergency room

16  exam, would they also go through a history of

17  presence illness?

18       **A.**       They did.

19       Q.       And what kinds of things would they be

20  evaluating or asking about?

21       **A.**       Well, in history of present illness

22  they're trying to figure out what happened and

23  they're trying to figure out what's wrong with the

24  patient.  So they're going to ask what happened at

25  Walmart, they're going to ask, you know, was there

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 24

1   any problems on the floor, did he trip, did he bump

2   into something, did a cart run into him.  Those sort

3   of things are important in the history of present

4   illness.

5           They're also going to ask him did he

6   hurt anything else.  You know, what did you injure?

7   Is it your neck and your back or is it other things?

8   So they're going to try to get -- get a good story on

9   what happened.

10      Q.      Now, typically I think you explained

11  that a physical exam portion is considered objective,

12  but parts of that physical exam are also subjective,

13  is that correct?

14      A.      I would say -- I think you've got it

15  pretty much right.  I would say there are objective

16  findings and there are subjective finding.  And

17  again, the subjective findings are the part of the

18  exam that the patient controls the answer to.

19      Q.      Understood.

20          So for example, one of the tests that

21  might be done in the emergency department is

22  something called a straight leg test.  Was that

23  performed here?

24      A.      It was performed here and that was

25  negative bilaterally at the 6-7-15 emergency room

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 25

1   visit.

2        Q.      And what is the significance of the

3   straight leg test?

4                Can you please explain that?

5        **A.**     Sure.

6                So what you want to do, and the way I

7   perform, there is a couple ways to perform it, but I

8   perform it with the patient sitting at the table and

9   you're going to raise the leg up, first on the right

10  and then on the left, and you're going to extend that

11  leg up.  Okay?

12               And the purpose of the test, if the

13  patient were to say I have pain shooting down my leg

14  when you do that, it suggests there is a herniated

15  disk in the back.  It suggests that there is nerve

16  irritation in your back that's being caused by a

17  herniated disk.  Okay?

18               In this particular case that was

19  negative at this physical examination.

20       Q.      And can you talk just a little bit

21  about tenderness.  When a medical record discusses

22  tenderness, what does that mean?

23       **A.**     Yeah.  Tenderness is a physical

24  examination finding.  What the provider will do, the

25  doctor will do, whether it's an ER doctor or an

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 26

1    orthopaedist, is he'll just push on the neck or the

2    back and you'll ask the patient does it hurt.  Okay?

3    And if they say yes, it hurts, you would consider

4    that tenderness.

5         Q.      So even though that is a part of the

6    physical exam, the doctor is still relying on the

7    patient to report back to them, is that fair?

8         A.      That's correct.  That would be, again,

9    to bring it back, that is a subjective finding.  The

10   patient controls the answer.  He or she can say, yes

11   it hurts or no it doesn't.

12        Q.      Did you also review the portion of the

13   emergency room records that involved the neurological

14   exam?

15        A.      I did.

16        Q.      And what did it note?

17        A.      He was not complaining of any weakness.

18               Weakness or strength is a neurologic --

19   is part of the neurologic exam.  And what that means

20   is that if you had a disk or something pushing on the

21   nerves, it could affect your strength.  And so the

22   strength is an important part of a neurologic exam.

23               He notes in the history of present

24   illness that he had no weakness.

25        Q.      When a doctor documents something as

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                        March 28, 2024

Page 27

1    being negative, what does that mean?

2         **A.**     I think you'd have to ask the specific

3    doctor.  I can tell you what it means for me.  It

4    means it's normal.

5         Q.     Understood.

6              Did you also have an opportunity to

7    review some of the nurses' observations?

8         **A.**     I did.

9         Q.     And are observations made by nurses

10   important?  Are they -- are they supposed to be

11   documenting things like distress or how the patient

12   is acting?

13        **A.**     Yes.

14        Q.     And in this case, did you see any of

15   the nurses' notes saying that plaintiff was in

16   distress or acute distress?

17              MR. KING:  I'm going to object.

18              (Off the video record at 10:58.)

19              MR. KING:  Are we on the record or off

20   the record?

21              VIDEOGRAPHER:  We're off the record,

22   sir.  Go ahead.

23              MR. KING:  You're referencing nurses'

24   records from -- because I don't see that in the

25   report.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                March 28, 2024

Page 28

1                   MS. BOODY:  They're emergency room

2       records, which would be one of items that he reviewed

3       on -- listed on page four.

4                   MR. KING:  Yeah, there are no emergency

5       room records --

6                   MS. BOODY:  I'm sorry.  It's five.

7       EDR -- the EDR records.  It's item 22 on page five.

8                   MR. KING:  Oh, okay.  Fair enough.  I

9       didn't see that.  All right.

10                  (On the video record at 6:59 PM.)

11      BY MS. BOODY:

12          Q.      Dr. DeFalco, before we went off briefly

13      I was asking you if you had reviewed the nurses'

14      observations as a part of the emergency department

15      records?

16          **A.**      I did.

17          Q.      And when you review those records, is

18      it important to note or review what the nurses have

19      observed?

20          **A.**      It is.  And in a lot of cases the

21      nurses will add information into the record and be

22      part of the history-taking process in the emergency

23      department.

24          Q.      Did you review anything that indicated

25      that plaintiff was in any sort of acute distress in

Electronically signed by Theresa Kugler (001-297-027-4278)                          2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                March 28, 2024

Page 29

1    the emergency room?

2        **A.**      I did not.  I'm going through the notes

3    now and I do not see anything that he was in acute

4    distress.

5        Q.      And was plaintiff ultimately discharged

6    from the emergency department?

7        **A.**      He was.

8        Q.      As a part of that emergency department

9    visit, it is my understanding that X-rays were done

10   and you had an opportunity to review those X-rays, is

11   that correct?

12       **A.**      That's correct.

13       Q.      And what were their findings?

14       **A.**      The X-rays of the cervical spine dated

15   6-8-15, no evidence of fracture or mal-alignment, no

16   significant degenerative changes were noted.

17            X-rays of the lumbar spine 6-8-15, no

18   evidence of fracture or mal-alignment, no significant

19   degenerative changes were noted.

20       Q.      What does that mean in a layperson's

21   language?

22       **A.**      Simply it means there weren't any

23   broken bones, okay, that's the first thing.  There

24   wasn't any mal-alignment meaning, you know, in the

25   most traumatic situations vertebrae can shift.  Okay.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 30

1    In high-energy accidents, you can have vertebrae

2    shift and that's where somebody can become paralyzed.

3    So they say here there was no mal-alignment, meaning

4    there was no shift in the vertebraes.  And they

5    report no significant degenerative changes, meaning

6    that there wasn't any significant arthritis in the

7    cervical or lumbar spines on the X-rays.

8         Q.      As a part of your medical record

9    review, did you also review records specific to a Dr.

10   Hajalla (ph)?

11        **A.**     I did.

12        Q.      And what was notable about some of the

13   complaints there?

14             This is the bottom of page one of your

15   October 24, 2019 report.

16        **A.**     Yeah.  So he sees Dr. Hajalla (ph) and

17   he was complaining of neck and back pain.  He was

18   provided medication, referred for MRI studies for the

19   cervical and lumbar spine, and then he returned to

20   Dr. Hajalla (ph) with the ongoing complaints.  And he

21   told us that he was advised by his attorney to change

22   to a different doctor.

23        Q.      Would you think that's significant?

24        **A.**     I would say this, that in my practice,

25   I think in general patients, when they're picking a

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 31

1    doctor, ask a friend, they ask their primary care

2    physician, they ask, you know, an athletic trainer at

3    a school, someone who is in the medical field.  I

4    don't see as a care pathway folks in my practice

5    calling an attorney for a referral.  I just don't see

6    that.

7        Q.      So it was notable to you that within

8    the medical record it is specifically written that an

9    attorney was involved in directing some of his care?

10       A.      Yeah, I mean at the bottom of my IME I

11   state in quotations, he was advised by his attorney

12   to change physicians and then saw Dr. Koppel.

13       Q.      And did you also have an opportunity to

14   review some of the chiropractic care that plaintiff

15   received?

16       A.      I did.

17       Q.      And what was notable about that?  How

18   long did he treat?

19       A.      He had pretty steady chiropractic care

20   for five months and reported no relief.

21       Q.      And your report notes that plaintiff

22   tried getting an EMG done.  What does that mean?

23       A.      An EMG is a nerve test.  And an EMG is

24   a provocative test in the sense that the person doing

25   the EMG, the doctor doing the EMG has to really like

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 32

1    essentially prick the patient to elicit nerve

2    responses to check the nerves.  So it's an

3    electroconductive study where there is a little bit

4    of electricity used to check nerves, so.  And it is

5    operator dependent in multiple different ways.  I

6    mean there are doctors who do this that -- where

7    folks come back and they're mad because you sent them

8    there because it hurt so much.  And then there is

9    other doctors who seem to be able to get the

10   information at a high level without violating the

11   Geneva Convention, if you know what I mean, and

12   torturing the patient.

13        Q.       Understood.

14                 And in this case, what was your

15   understanding of what happened next?

16        A.       Well, he tried to get the EMG, couldn't

17   complete the test due to discomfort.  And then he was

18   seen by Dr. Vizzone and further treatment was planned

19   for the following week.

20        Q.       Is anything notable about that?

21        A.       Well, it is possible for folks not to

22   be able to complete the test and, you know, at some

23   point it is possible for someone to say, okay, let's

24   move to a different doctor.  And I think that's what

25   happened here.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 33

1        Q.        Understood.

2                  And was that the extent of the records

3    that you were able to review for Dr. Hajalla?

4        A.        That was it for Dr. Hajalla.  Nothing

5    further is seen from him.  It seems as though they

6    moved on as per his attorney and that was it for Dr.

7    Hajalla at that point.  And it was on to Dr. Vizzone.

8        Q.        Did you also have an opportunity to

9    review some of the treatment notes from Dr. Vizzone?

10       A.        I did.

11       Q.        And in reviewing some of that, did you

12   look at the first exam that Dr. Vizzone did?

13       A.        I did look at that.  I was provided

14   those notes.  It looked like he -- June 10th, 2015,

15   complaints of neck and back pain, upper and lower

16   extremity complaints.  He was referred to the

17   chiropractor and then he saw Dr. Vizzone again

18   February 22nd, 2016 with ongoing complaints.

19                 He went on to see him April 25th, 2016

20   and Dr. Vizzone wrote that he -- the patient

21   understands that he will most likely require surgery

22   and ultimately Dr. Vizzone performs surgery in the

23   form of an anterior cervical discectomy fusion C5-6

24   on June 1st, 2016.  And then he does a lumbar fusion

25   L5-S1 on his back and that was July 11th, 2016.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 34

1      Q.      And plaintiff's treatment didn't stop

2  there, correct?

3      **A.**      It did not.

4      Q.      What other records did you review?

5      **A.**      Well, he had post-operative physical

6  therapy, he had an injection of Lidocaine in the

7  hardware site post operatively where some of the

8  hardware was.  It says that on November 23rd, 2016 he

9  had worsened cervical neck complaints and they

10  decided to do another MRI.  The notes go on to talk

11  about some treatment with Dr. Koppel, but that goes

12  back to November 3rd, 2015 which pre-dates what we're

13  talking about with Dr. Vizzone.

14      Q.      And now the records that you reviewed

15  from Dr. Koppel, it seems that plaintiff stopped

16  treating there, is that correct?

17      **A.**      That's correct.

18      Q.      And that surgery was not going to be an

19  option with Dr. Koppel, is that correct?

20      **A.**      Well, it seems like one of things that

21  I report in this IME is that the patient does not

22  have identification and we would not be able to

23  perform treatment at a surgery center --

24              MR. KING:  I'm going to object.

25              (Off the video record at 7:09 PM.)

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 35

1                    MR. KING:  Okay.  So we have --

2                    MS. BOODY:  I understand.  I know

3       exactly where you're going.

4                    MR. KING:  You can testify, we're just

5       going to ask --

6                    MS. BOODY:  I understand.  Do you mind

7       if I explain to Dr. DeFalco what he can't say?

8                    MR. KING:  In the middle of -- I mean

9       not in the middle of the testimony.

10                   MS. BOODY:  Why don't you articulate

11      your objection and then he will understand what it is

12      he cannot say.

13                   MR. KING:  Fair enough.  Fair enough.

14      Point well taken.

15                   All right.  Go ahead, explain it to

16      him.

17                   MS. BOODY:  Dr. DeFalco, we're going to

18      ask that you not mention the lack of identification

19      specifically as it is an issue that Mr. King wants to

20      raise with the judge and does not want the jury to

21      hear.  So if you're able to give your testimony

22      explaining that he did not have that surgery without

23      reference to the identification, that would be

24      helpful.

25                   THE WITNESS:  Okay.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 36

1                    MS. BOODY:  And I think it will resolve

2    Mr. King's objection.

3                    THE WITNESS:  Fair enough.

4                    MS. BOODY:  Theresa, before we go back

5    on, can you read back my question so that I can reask

6    it so that we can then splice the video in such a way

7    that we don't get that portion, if that makes sense.

8                    (Designated portion of the transcript

9    is read by the court reporter.)

10                   (On the video record at 7:11 PM.)

11   BY MS. BOODY:

12        Q.       Dr. DeFalco, in the records that you

13   reviewed, was Dr. Koppel going to move forward with

14   any surgery for the plaintiff?

15        **A.**       No.  In the records I reviewed from Dr.

16   Koppel, he was talking about referrals for cervical

17   and lumbar facet and epidural steroid injections, not

18   surgery.

19        Q.       Thank you.

20                   Did you also review diagnostic studies

21   as a part of your record review?

22        **A.**       I did.

23        Q.       All right.  So I'm going to come back

24   to those.  And I'd like to ask you about the physical

25   exam that you performed on plaintiff.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 37

1              So first of all, I imagine that as a
2     part of your exam you ask about any complaints, is
3     that correct?
4          A.      I do.
5          Q.      And what did plaintiff report?
6          A.      Are you referring to the history part
7     of this --
8          Q.      I'm referring to his current status.
9          A.      Oh.
10             At the present time, Mr. Pataki did not
11    offer any ongoing complaints.
12         Q.      How would you have arrived at that
13    conclusion?
14         A.      He did not voice to me any ongoing
15    complaints.
16         Q.      So you asked him, do you have any
17    complaints today, is that fair or can you explain?
18         A.      That's fair.
19             As part of every examination that I've
20    done for 21 years, the basis for the visit is what's
21    going on, how are you feeling, what problems do you
22    have.  Generally speaking, people don't come in to
23    see me for, you know, to tell me everything is great.
24    Right?  They're here for a reason.
25             So what problems are you having, what

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 38

1    complaints are you having?  In this particular case,

2    Mr. Pataki did not offer any ongoing complaints.

3         Q.       Understood.

4                  And did you also ask him about past

5    medical history?

6         **A.**       I did.  He denied any similar injury in

7    the past.

8         Q.       And from there did you do a physical

9    exam?

10        **A.**       I did.

11        Q.       And what kind of testing did you do as

12   a part of that physical exam?

13                 Can you walk me through some of your

14   findings?

15        **A.**       Sure.

16                 So the first thing we do is we observe

17   the patient and how they ambulate, are they using any

18   assistive devices.  So the bottom line is are they

19   using any canes, are they using any walkers,

20   crutches, anything like that?  Are they having

21   trouble walking?  Are they having trouble getting on

22   and off the examination table?  And what I would say

23   here, what I reported was that he was ambulating

24   normally, he climbed on and off the examination table

25   without any difficulty, he was alert, oriented and

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 39

1    cooperative.  He was well groomed, he was appropriate

2    to the situation and he was not using any assistive

3    devices to ambulate.  He didn't have any braces on

4    either.  I would report that here.  If he was wearing

5    a cervical brace or a lumbar brace or a corset, which

6    is a lumbar, you know, type of brace, I would put

7    that there.  He didn't have any of those things.

8    That's the first part.

9            From there, the examination is

10   comprehensive in the sense that I see if there is any

11   scars there.  I do a reflex examination, so I take my

12   reflex hammer and I tap reflexes for the cervical and

13   the lumbar spine.  I check strength, I check range of

14   motion, and I do some testing to see if there is any

15   radicular pain.

16           Radicular pain is when pain shoots down

17   from the neck, down the arms and sometimes all the

18   way to the fingers.  Okay?  I see if there is any

19   radicular pain or shooting pain coming down the legs

20   through the rear-end, into the legs down to the toes.

21   I think most people know that to be sciatica, okay,

22   is what people refer to that.

23           And on both the cervical and the lumbar

24   exams, there was no evidence of any radicular pain.

25   There wasn't any evidence of sciatica, there wasn't

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 40

1  any evidence of nerve impingement or disk bulging or

2  herniation.

3           On the cervical spine he did have a

4  scar, 1.5 inch.  He did report tenderness to touch on

5  his cervical spine.  He had no pain on range of

6  motion.  His motion was checked, his strength was

7  checked, that was five out of five.

8           On his lumbar spine or his back, he had

9  a one inch scar which was well healed.  He had

10  tenderness to palpation, so when I pushed on him, he

11  said it hurt.  He didn't have any pain on range of

12  motion though.  He was able to do the range of motion

13  without complaining of any pain.

14          I did that straight leg raise test that

15  we talked about earlier that they did in the

16  emergency department, and like the emergency

17  department, it was negative for me.  What that means

18  is when he's sitting on the table, I extend his legs

19  and if he has pain shooting down his leg and pain

20  shooting through his rear-end down -- it can

21  sometimes go all the way to the toes with numbness

22  and tingling, that would be positive.  He was -- he

23  had negative test bilaterally.

24          I checked his motion in his back, I

25  checked his strength, which was five out of five.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 41

1    And that was it for the neck and back.

2              There is one last part of the exam that

3    we did, I don't know if you want me to stop there for

4    the moment.

5        Q.      Yeah, why don't you stop there for one

6    moment.  I'd like to ask you a little bit about range

7    of motion testing.

8        A.      Sure.

9        Q.      So can you talk about how that is done?

10       A.      Yeah.  So I instruct the patient what

11   to do in terms of the different range of motion.

12             For example, there is six range of

13   motion tests I use for the cervical spine.  And it's

14   really quite simple.  I ask them to bend their neck

15   down -- bend their head down like this, that's

16   flexion of the neck, extend it back, go side to side

17   like that, that's side bending.  And rotation is when

18   I ask them to turn like they're looking behind their

19   back.  Okay?

20             I measure all these things with a

21   goniometer.  A goniometer is just a fancy term for a

22   protractor.  Okay?  And I'll measure the angulation.

23   These are subjective findings.  The patient controls

24   the outcome here.  I'm not moving the neck for them.

25   They're doing it.

Electronically signed by Theresa Kugler (001-297-027-4278)                2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 42

1      Q.      When you reviewed the range of motion

2   results for plaintiff for the cervical spine, are

3   they consistent with the injury that he alleges to

4   have had and other parts of the exam that you did?

5      **A.**      Well, he had had surgery at this time

6   and the physical examination is not consistent with

7   his subjective complaints.  And here is what I'll say

8   about that.  He did not have any radicular signs, as

9   I mentioned.  There is no signs of any shooting pain

10   or pinched nerves or herniated disks on his physical

11   examination.  His strength was five out of five.  He

12   didn't have any pain on range of motion and his

13   reflexes were all equal.  His sensation was intact as

14   well.  So neurologically he was intact.  But when you

15   go back to the history here --

16              MR. KING:  I'm going to object.

17              (Off the video record at 7:19 PM.)

18              MR. KING:  In the range of motion test

19   for both the lumbar and cervical, he's testifying to

20   the fact that there was -- he reported no pain.

21   There is nothing in here that I can see again, I mean

22   if you want to point that out to me regarding pain

23   with respect 20 those two -- you know, both of

24   those --

25              THE WITNESS:  I have it here, sir, page

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 43

1    3 of --

2                    MR. KING:  Excuse me, Doctor, if I can

3    speak to counsel.

4                    THE WITNESS:  Sure.  Yes.

5                    MR. KING:  SO I don't see any reference

6    to pain, any measure of pain, any question to the --

7    Mr. Pataki regarding pain in either of page three and

8    four regarding the range of motion tests, so I don't

9    think he should -- I don't think he can testify to

10   that because it's not in his report and so.

11                   MS. BOODY:  Sure.

12                   Mr. King, on page 3, third paragraph

13   down, second line:  There was no pain on range of

14   motion.

15                   And then when we moved to the lumbar,

16   if you look at the last paragraph of the report,

17   second to the last line, there was no pain on range

18   of motion.

19                   MR. KING:  Got it.  Objection

20   withdrawn.

21   BY MS. BOODY:

22        Q.    Dr. DeFalco.  Do you remember where you

23   were?  Because he objected when you were speaking,

24   not to my question.

25        A.    Yeah, maybe you could read the last

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 44

1   line back to me and I could pick it up from there.  I

2   was just -- I think the question was with regard to

3   the consistencies with the physical examination, if

4   I'm not mistaken.

5           Do you want me to just start over with

6   the answer?  Can we do that?  I'll do whatever you

7   want.  I'll continue it or I'll start over.

8           MS. BOODY:  So, Lee, the video will

9   stop when he says objection, right, so he'll

10  essentially be cut off?

11          (Off-the-record discussion.)

12          (On the video record at 7:23 PM.)

13          THE WITNESS:  Yeah, so as I look at the

14  physical examination, in summary here of both

15  cervical and lumbar spines, his range of motion is

16  down on his neck and his back exams.

17          Relative to the rest of his exam, this

18  is the outlier because he doesn't have any pain on

19  range of motion, his neurological testing is all

20  intact, meaning his strength is five out of five, his

21  sensation is intact, his reflexes are equal with both

22  the neck and the back exam, and he has no radicular

23  signs, as I've indicated earlier, no evidence of a

24  herniated disk or an irritated nerve in his neck or

25  back.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

1              He does have tenderness when I pushed

2    on his neck and his back, but you would say that the

3    range of motion being down and the tenderness in his

4    neck and his back are the outliers here.  Everything

5    else on his exam looked fine.

6    BY MS. BOODY:

7        Q.     Now, in part of your testimony you've

8    explained it, but I'd like to highlight it for the

9    jury.

10             Can you explain what it means to have

11   radicular pain?

12       A.     Yeah.  Radicular pain is simply

13   shooting pain from the neck going down the arms into

14   the fingers.  It doesn't always have to go all the

15   way to your fingers.  Sometimes it just goes to your

16   elbow.  But radicular pain is shooting pain down the

17   arm.  Radicular pain coming from the back is shooting

18   pain going down the legs, through the rear-end, down

19   the legs and sometimes it will can go all the way to

20   the foot in extreme cases.

21       Q.     And when someone is complaining about

22   radicular pain, what does that indicate to you?

23       A.     It more than likely indicates that

24   there is compression on the nerve root coming from a

25   herniated disk, a disk bulge irritation, sometimes a

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 46

1    fracture which is a crack in the bone.  But an

2    irritated nerve root.  And most of the time that's

3    caused from a herniated disk.

4         Q.      So if someone is not complaining about

5    radicular pain, what does that tell you?

6         **A.**      It tells take you that it is unlikely

7    there is a herniated disk.

8         Q.      And just to close that loop on

9    radicular pain, what would be done if someone did

10   have radicular pain?

11              What are the treatment options?

12        **A.**      Well, the -- if someone has radicular

13   pain, you would always start with a conservative

14   treatment; physical therapy, home stretching,

15   activity modification, anti-inflammatory medicine,

16   that's your first line.

17              Secondly, you might consider an

18   injection.  Okay?  In combination with the physical

19   therapy, that's your second line.

20              And then as your third line of

21   treatment, and, of course, you want to exercise

22   conservative non-operative treatment first, but if

23   that doesn't work, your third line is to operate.

24        Q.      So I'd like to return to your physical

25   exam.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 47

1          You were telling us about range of

2   motion and motor strength, but what about grip

3   testing?

4      **A.**      Sure.

5          So Jamar testing is grip testing.  And

6   it's a simple test that we use on just about every

7   independent medical examination that I do.  Okay?

8          What we have the patient do is they sit

9   in a chair with their feet on the floor and they hold

10  their arm out like so at a 90 degree angle here.  And

11  it's just a device that we ask them to squeeze it as

12  hard as they can.  And we do it with each hand and

13  there is five stations.  Okay?  It actually starts

14  out very close and then it goes to very wide.  Okay?

15         The bottom line is you should be able

16  to get your best score on station number three,

17  meaning right in the middle.  It's easier to squeeze

18  something when it's not too far apart or too close.

19  You should get your big biggest score in the middle.

20  So what you look for is a bell curve here, with the

21  middle being the highest scores and then the other

22  scores will be less in a bell curve-type fashion.

23         The other thing you can do is you can

24  make, I think, some assumptions here based on the

25  total score.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 48

1                    For example, the average male that we

2      see puts up about a hundred on these things, you

3      know, in general.  The average female 60 or so.  So

4      when you see scores that are really, really low, I

5      would consider them outliers.

6           Q.      So in this case, you performed this

7      bilateral grip testing on plaintiff and first you had

8      him do it in his left hand, correct?

9           A.      That's right.

10          Q.      And what were those scores?

11          A.      Yeah, those scores looked pretty

12     normal.  Like I said, the average male puts up

13     somewhere in the neighborhood of a hundred and you

14     look for a bell curve.  This is actually really like

15     a perfect bell curve.

16                   One and five, the really close and

17     really far, are the hardest scores.  And you can see

18     he scores -- the hardest scores to get a higher

19     number on he scores lowest there.  Then as it gets

20     closer to the sweet spot, which is right in the

21     middle, he puts up the highest number at a hundred.

22     So I'd say with the left hand, that looks pretty

23     normal.

24          Q.      Okay.  And what about when you tested

25     his right hand?

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 49

1          **A.**        You can't explain this.  Okay?

2                        The first station should be a harder

3     score to get.  He gets a 42.  Then he puts up a 90 at

4     the second station.  The third station where you

5     should be able to get your highest score, he gets a

6     36.  And then this just starts to tail.

7                        At station number four and five he puts

8     up a 15 and a nine.  I just can't explain that.

9                        Like I said, I -- the average female in

10    the office can put up 60.  The average male a

11    hundred.  I saw an IME not too long ago on an

12    85-year-old lady who put up 40, 45 across the board.

13    So I don't know what happened for him to score a 15

14    and a nine.  Those are really low numbers.

15         Q.        I imagine that the bilateral grip

16    testing is dependent the patient's effort, is that

17    correct?

18         **A.**        Absolutely.  He's doing it, not me.

19         Q.        And did you make a visual evaluation of

20    the plaintiff when he was leaving your exam?

21         **A.**        I did.  I commented in my report that

22    he left the examination room with no apparent signs

23    of distress or dissatisfaction.

24         Q.        Now, Dr. DeFalco, I would like to

25    return to some of the diagnostic imaging that you

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 50

1    reviewed for this case.

2         **A.**        Sure.

3         Q.        Before we do that, I think it makes

4    sense for you to potentially show and explain to the

5    jury some of the parts of the body that we're going

6    to talk about and the films that we may look at.

7         **A.**        I'd be happy to.

8         Q.        Would you like to start with the

9    cervical spine?

10        **A.**        Yeah, why don't we -- can we pull up a

11   medical illustration of a -- of the cervical spine

12   and maybe the lumbar spine and then the animated disk

13   images that I provided?

14                   Can folks see my cursor or not on this

15   share screen?

16                   (Off-the-record discussion.)

17                   THE WITNESS:  So the view we're looking

18   at here is the side-view of the cervical spine.

19                   So this is called a sagittal view where

20   you're actually just slicing straight down this

21   direction and you're looking at the person from the

22   side.

23                   And to orient folks here, this is the

24   front of the cervical spine or the neck.  And this is

25   the back of the cervical spine right here.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 51

```
 1                  There are seven cervical vertebraes and
 2    these are numbered one through seven.  This is number
 3    one and two and three and so forth all the way down
 4    here.
 5                  So people understand what these are,
 6    these are spinous processes.  And if you push on your
 7    own neck, you can actually feel the tips of these
 8    spinous processes.  They come right up, you know,
 9    right against the skin there.  So you can feel that.
10                  Now, here is how this is constructed.
11    You've got these cervical vertebrae.  Okay?  And in
12    between the vertebrae are these green disks.  Okay?
13    They're green on this animation here, here, here.
14    Think about those disks as shock absorbers.  Okay?
15    And you live your whole life, you're running around
16    playing sports, whatever, this is what is shock
17    absorbing the two bones right here.  You can't have
18    the bone hitting the bone here.  You want a shock
19    absorber there.  Okay?
20                  Now, look at these yellow structures
21    here.  Through this little hole here, that's the
22    spinal cord.  Here, here, here.  And these are nerve
23    roots.  I referred to these nerve roots earlier as
24    causing radicular pain or shooting pain.  Okay?
25                  And if you follow me here, if you had a
```

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 52

1    herniated disk, okay, let's just say at the 5-6 level

2    right here, C5 C6, this green disk here is the disk

3    between those two vertebrae, picture this that if you

4    had a herniated disk, that disk could push against

5    this nerve root, cause compression, and that could

6    cause radicular neurologic problems.  Shooting pain,

7    sometimes weakness, loss of sensation, decreased

8    reflexes.  This is where you would see a positive

9    Spurling's test where you push the -- you ask the

10   patient to roll their neck around, sometimes you give

11   a little push on the neck to see if there is any

12   compression there.

13             The straight leg raise test that I

14   referred to, that's in the lumbar spine, would see if

15   there was any pushing that would accentuate that disk

16   against the nerve root there.

17             So that's the cervical spine.

18   BY MS. BOODY:

19        Q.    Would like to move to the lumbar spine?

20        A.    I would.  If you could pull that lumbar

21   spine up, that would be great.

22             So same orientation here.  These are

23   called sagittal images.  So you're looking at the

24   back from the side here.

25             This is the front.  This is the back.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 53

1   These are the spinous processes.  This is actually

2   the tail bone.  Okay?  I think people can feel that

3   when they push along the very low part of their back.

4   This is the tail bone.  These are the spinous

5   processes.  People can feel those when you push on

6   your back, all the way in the back.

7              There are five lumbar vertebrae.  This

8   is one, two, three, four, five and this is the

9   sacrum.  So this is the S1 vertebrae here.  The disks

10  are labeled as whatever they are in between.  For

11  example, this is the L5-S1 disk, this green structure

12  right here.  Okay?  And again, this is where the

13  spinal cord ends at about the L1 level and then you

14  have the spinous -- the spinal roots that come out

15  here.

16             And again, picture if you had a

17  herniated disk, for example, at this L5-S1 area, it

18  could push on this nerve root here and that would

19  cause shooting pain.  Again, it could cause decreased

20  reflexes, decreased sensation, decreased strength,

21  but that's where people refer to this as sciatic

22  pain, if you had a pinched nerve in that position.

23             I think the last illustration that you

24  might want to pull up here is that of a disk since

25  we've been talking about disks for a while.  There is

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 54

1    a nice picture of a disk again that I could show.

2                (Off-the-record discussion.)

3                THE WITNESS:  So this is a

4    cross-section, okay, or an axial image is what we

5    refer to these as.  So this is like you're chopping

6    like this looking straight down.  Okay?  This is the

7    front.  This is the back.  This is the spinous

8    process.  I talked about that.  This is the spinal

9    cord.  These are the nerve roots here that we've

10   talked about.  Here is the disk.  This is called the

11   nucleus pulposus.  This is called the annulus

12   fibrosus.  Okay?

13               The easiest way to sort of think about

14   this, I think about this, everybody knows what a

15   jelly donut is.  Okay?  The jelly in the donut is

16   this, the nucleus pulposus.  The rim or what keeps

17   the jelly in the donut, the outer part of the donut,

18   is the annulus fibrosus.

19               So picture if you push the donut

20   together, you might get something's called a disk

21   bulge.  Okay?  Where this would push out a little bit

22   here or push out a little bit there.  Okay?  Pushing

23   that donut together might give you that disk bulge

24   type of analogy.  Let's say that this jelly here,

25   this nucleus pulposus was able to get out through a

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 55

1    tear here, a herniated disk.  Okay?  What a herniated

2    disk is is when this jelly gets through this lining

3    here, okay, this would be like really compressing the

4    donut.  Eventually the jelly is coming out if you

5    push it hard enough.  Okay?  Let's say that jelly got

6    pushed back here, you can see it could hit your nice

7    nerve root here and that's what would cause that

8    compression and we keep talking about it, the

9    shooting pain.  In the case of the back, that's

10   sciatica, with pain, weakness, shooting down to the

11   foot, tingling, loss of sensation, loss of reflexes

12   and in some cases loss of strength.

13              That's what I have to say about that

14   one.

15        Q.      Okay.  So now that we have reviewed

16   that for the jury, I would like to show you one of

17   the MRIs that you reviewed and I'd like you to walk

18   us through what you can see there.

19        A.      Sure.

20        Q.      Let's pop up the MRI of the cervical

21   spine dated June 15th of 2015 and that would have

22   been taken about eight days after the accident.

23        A.      That's right.  And I do believe we have

24   a blown-up view of a particular -- that's it.

25              Thank you very much.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 56

1                    (Off-the-record discussion.)

2                    MR. KING:  I have objected, so that's

3      what we're dealing with right now.

4                    (Off the video record at 7:39 PM.)

5                    MR. KING:  Okay.  So I'm going

6      to object -- Counsel, can you hear me?

7                    MS. BOODY:  If you objected, I didn't

8      hear it.

9                    MR. KING:  Yeah, I apologize.  Can you

10     hear me?

11                   MS. BOODY:  We can hear you now.

12                   (Off-the-record discussion.)

13                   MR. KING:  Before he started, I

14     objected.  I don't know if you just didn't hear me or

15     not.

16                   But my objection, we're getting very

17     close to his providing what I view as an opinion

18     about whether he had a herniated disk or not.  That's

19     not in his report.  That's not what he's providing an

20     opinion on.  So I'm going to object to this entire

21     line of questioning.  You've been getting pretty

22     close to going outside the scope of his actual report

23     and his opinions, so you can continue, but I want to

24     note for the record my objection.  And, you know, if

25     he's going to opine as to whether or not Mr. Pataki

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 57

1   had a herniation or not, which he's already suggested

2   that there was no herniation, and so now we're

3   getting -- you're going to review the -- if you want

4   to factually go through what a herniation is, which

5   is what he just did, that's fine.  But now he's going

6   to review Mr. Pataki's records and then say, I guess,

7   whether there is a herniation or not.  And that's not

8   what he opined to in his report.

9              So I'm objecting, but you can move

10  forward.

11             MS. BOODY:  Okay.  So I'd like to

12  respond to your objection.

13             So yes, it is my intention and it is

14  our intention that he will explain what it is that he

15  viewed because he personally reviewed these studies.

16  So the MRI that has been put on the screen was

17  reviewed by Dr. DeFalco and is a part of his report.

18  So I'm not really sure what your objection is.

19             MR. KING:  My objection is that he is

20  getting very close to providing an opinion.  And

21  again, I understand -- if he says in my view there

22  was -- he can describe whatever he wants to describe.

23  But again, my objection is if he's offering an

24  opinion as to whether there was a herniation or not,

25  then that's my objection and I'm noting it for the

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 58

1   record and we'll let the judge decide.  So you can

2   move forward with whatever you're doing.

3              MS. BOODY:  Well, I want to make sure

4   that we've addressed it before we go back on because

5   yes, he has already reviewed the films as a part of

6   his report and in his report he specifically gave his

7   review.  He said I'm in receipt of several radiology

8   studies which I reviewed personally.

9              MR. KING:  Again, I guess it's going to

10  depend on what he says, but --

11             MS. BOODY:  Well, I imagine he's going

12  to say there is no herniated disk there because

13  that's what it says directly in his report.

14             MR. KING:  He doesn't say that in the

15  report.  And again, if he does, show me where he says

16  that.  Because again we're back to --

17             MS. BOODY:  This is his March 2023

18  addendum.

19             MR. KING:  March 2023 addendum?

20             So again, we're back to the records

21  that we have and records we don't have.  But the

22  addendum that I have, I only have a November 11th,

23  2019 -- I have a November 6th and a November 11th --

24  I'm sorry -- okay.  I have an October 24th report and

25  then I have a November 6th --

Electronically signed by Theresa Kugler (001-297-027-4278)                2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 59

1              MS. BOODY:  There is a March 17 of 2023

2      report and it addresses the MRIs that did not

3      previously produce in discovery.  There are a series

4      of MRIs back from 2015 and 2016 and 2017 that

5      plaintiff did not produce.

6              MR. KING:  Okay.

7              MS. BOODY:  And so when those -- as

8      soon as those were received, Dr. DeFalco submitted an

9      amendment to his report, which you should have.

10             MR. KING:  Okay.  Well, I don't have

11     it, so can you provide it to me?  I mean if he's on

12     the stand, I think I have a right to review what he's

13     going to report on.  So if you want to put that up on

14     the screen or email it to me or however you want to

15     do it, but given the constraints of a Zoom call, we

16     still have to follow the rules which would be that I

17     have the report and I don't have the report.

18             MS. BOODY:  Sure.  I'm happy to email

19     it to you right now.  I certainly cannot explain to

20     you why you wouldn't have that report.  I understand

21     that you inherited a file from another attorney who

22     did receive the report, but the report was absolutely

23     served.

24             MR. KING:  Okay.  Yeah, I mean I don't

25     think I'm disputing that the report was served.  I

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 60

1    just said this is part of the reason I asked so that
2    we could get the file, but for some reason I was told
3    you don't have the resources to provide me with the
4    file so that I could cross-reference everything that
5    I have that is not there.
6              So this would be one example, and I
7    guess I just need to go to the court on this issue
8    because obviously this will come up in trial, but
9    either way, I don't have it, you're examining him on
10   that, and I need to see it.  So the court rules
11   require that I see at least what you're examining him
12   on.  And so if you want to put that up, we can at
13   least view it.
14             THE WITNESS:  Can I step away for like
15   two minutes as you guys sort this out?  Be back in
16   like two minutes?
17             MS. BOODY:  That's fine, Dr. DeFalco.
18             MR. KING:  In addition, he reviewed the
19   records, he's not providing an opinion -- he can say,
20   you know, what he saw, but he can't render an opinion
21   that he has a herniation or not.
22             MS. BOODY:  He can absolutely render an
23   opinion on what he sees on an MRI.  That's the
24   purpose of him reviewing it.
25             MR. KING:  Again, then why didn't he

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 61

1    note that in his report?

2                   MS. BOODY:  It is noted.  I'm sending

3    it to you right now.

4                   MR. KING:  Okay.  I mean he --

5                   MS. BOODY:  I mean just to be clear, I

6    mean just like the November 6th addendum, he

7    personally reviewed studies and provides a detailed

8    account of what it is he sees there.

9                   MR. KING:  Again, I don't see an

10   opinion on the findings of the -- yeah, again, that's

11   my objection.  I'll let the judge, you know, deal

12   with that.  We can go on and on.

13                  But again, I don't see -- he's got --

14   first of all, there is a reference in the March

15   4th -- in the March 4 -- I'm sorry, page 4 of this

16   record here, the October 24 report.  He references

17   X-rays, he references MRIs that he reviewed, status

18   post disk, moderate disk bulging is present, moderate

19   residual disk bulge.  These are all factual

20   statements.  But again, he can make factual

21   statements, but he can't provide an opinion.  My

22   position is that he cannot provide an opinion as to

23   the existence or nonexistence of a herniation.

24                  MS. BOODY:  If he personally reviewed

25   the film, then he is able to provide an opinion on

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 62

1    what he sees in that film.

2                MR. KING:  Okay.  I mean we don't have

3    to be -- if I'm wrong, the judge will tell me.  But

4    again, I didn't see that opinion in his report and I

5    thought, under the rules, he had to stick to the

6    report.  But maybe I'm wrong.  But I guess we'll find

7    that out.

8                So you can continue, we don't have to

9    belabor the point.  I'm just --

10               MS. BOODY:  Did you receive my email?

11               MR. KING:  Yeah.  I've never seen that

12   document, but okay.

13               MS. BOODY:  The March 17, 2023

14   addendum.

15               MR. KING:  I'm going to object.  This

16   document was not turned over in discovery.

17               If you have -- if you have evidence, if

18   you have a certificate -- I mean do you have the

19   certificate of service with it?

20               Hold on.  Every other document that I

21   have has a certificate of service from Floyd

22   Cottrell, Esquire with a date and a signature,

23   et cetera that it was served and it was timely

24   served.

25               Do you have that document as well?

Electronically signed by Theresa Kugler (001-297-027-4278)                2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 63

1             MS. BOODY:  I'd have to look for it.  I

2   certainly wasn't expecting for you to say that you

3   didn't receive it when it was sent over a year ago.

4   So give me a moment and I will look for it.

5             MR. KING:  No problem.

6             But again, I mean it's not going to

7   change my objection.  That's my objection.  I'm

8   objecting to the entire line of questioning related

9   to that letter.  That's not been turned over in

10  discovery.  And why don't you just go forward rather

11  than -- so that we don't -- I mean I don't want to be

12  here all night, nor do you.  But you'll produce it or

13  you'll not produce it.  You'll have evidence that it

14  was served or not.  That's -- and then we can -- the

15  judge will make a decision.  But if you have --

16            MS. BOODY:  Yes, I have it.

17            I mean, John, I just want to nip this

18  in the bud, to be honest.

19            MR. KING:  Nip what in the bud?

20            MS. BOODY:  You're essentially saying

21  that something wasn't served.  You actually just said

22  that on the record, that it wasn't served.  Well, it

23  was served.  And I have to prove to you that it was

24  served.

25            MR. KING:  Not on the record.  Are we

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 64

1   on the record?

2               MS. BOODY:  We are on the record, we're

3   just not on the video.

4               MR. KING:  Okay.

5               MS. BOODY:  So there you go.

6               It was sent via email and mail, so if

7   you need to see the email too, I'm sure we can do

8   that.

9               THE WITNESS:  Are you guys ready for me

10  or do you want to --

11              MS. BOODY:  We are ready for you.

12              THE WITNESS:  Okay.  Hold on.  Okay.

13              (Off-the-record discussion.)

14              MS. BOODY:  Here is what I'm going to

15  do in fairness, because I don't want to have an

16  argument.  I'm going to lay a little bit of other

17  foundation and then have him show the image again.

18              John, if you objected, I didn't hear it

19  and the court reporter didn't hear it either and Lee

20  didn't hear it because he didn't stop the video.

21              MR. KING:  That's fine.  So I'll just

22  note my objection again.

23              (Off-the-record discussion.)

24              (On the video record at 7:54.)

25  BY MS. BOODY:

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 65

 1       Q.      Dr. DeFalco, as part of your review,
 2  did you personally review MRIs of the cervical spine
 3  dated June 15th, 2015?
 4       A.      I did.
 5       Q.      Now I'd like to show you those images.
 6       A.      Okay.
 7       Q.      Dr. DeFalco, can you tell us what we're
 8  looking at now?
 9       A.      I can, but I'd like if our video person
10  could pull up the large image of the cervical spine.
11  That's it.
12       Q.      Perfect.
13       A.      Would you like me to click on that?
14       Q.      Yes, I think you can double click now.
15       A.      Can you see the cursor?
16               VIDEOGRAPHER:  Yes.
17               THE WITNESS:  Can you repeat the
18  question?
19               (Off-the-record discussion.)
20  BY MS. BOODY:
21       Q.      Dr. DeFalco, could you please explain
22  to us what we're looking at right now?
23       A.      Sure.
24               So this is the real MRI version of what
25  we were looking at earlier on our animated model.

Page 66

1    Okay?

2              This is a sagittal view, I'll go

3    through it again.  It's simply a side view and we're

4    slicing in three millimeter cuts like this looking

5    this way.  Okay?  So this is one of those cuts.

6              I'll use my cursor, which is this

7    magnifying glass here.  This is the front of the MRI,

8    the front of the neck.  This is the back, back here.

9    This is actually the brain and out of the brain comes

10   the spinal cord.  This is the spinal cord coming down

11   in this direction heading down all the way down the

12   spine here.  Okay?

13             Here are the vertebrae of the spine.

14   This is the second cervical vertebrae.  The third,

15   the fourth, the fifth, the sixth, the seventh.  This

16   is just like what we looked at earlier.

17             These are the disks right here.  Okay?

18   The disks are the cushions between the bones.  This

19   is the two-three disk here.  This is the three-four,

20   four-five and the five-six disk.  Okay?

21             The first thing I want to point out is

22   this is a degenerative disk here.  Okay?  This is a

23   better looking disk here and it's got some cushion or

24   some white left in it here.  When these disks turn a

25   little darker, I would consider that a degenerative

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 67

1    disk here at the C5-6 level.  Okay?

2              The other thing I want to say about

3    this disk, this is a disk bulge right here.  See the

4    way this disk comes through and protrudes here?

5    That's a disk bulge.  It's not a herniation.  Again,

6    that jelly of the disk is not squirting all the way

7    into the spinal canal here.  There is there a bulge

8    right there.  And that is a disk bulge and not a

9    herniation.  Okay?

10              You can see at this level here,

11    four-five, three-four, two-three, you don't see any

12    of these protrusions, okay, or bulges right here.

13    This is a disk bulge and a degenerative disk at the

14    C5-6 level.

15        Q.    So in your opinion, upon your personal

16    review of this image, did you observe any disk

17    herniations?

18        **A.**    No, I did not.

19              MR. KING:  I'm going to object to --

20              (Off the video record at 7:58 PM.)

21              MR. KING:  I'm going to object.  I see

22    the letter that you have there.  I'm going to put on

23    the record I have not seen that before.  I'm going to

24    put on the record that if you have some -- that was

25    not provided in discovery, that I have.  I'm going to

Electronically signed by Theresa Kugler (001-297-027-4278)                2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 68

1  put on the record that if you have some confirmation

2  of it being emailed, like an email string, sent

3  email, you stated here it was emailed and sent

4  regular mail.  If you have evidence of that, either

5  of those, you should be prepared to provide that to

6  the court.

7              And I'm also going to put on -- I'm

8  going to note to the court because of this situation

9  which I thought might happen, that we get a copy of

10  the file.  This is going to be prejudicial to my

11  client.  Ms. DeFeo is dead.  I've gotten copies of

12  his file, what I thought was a complete file.  We

13  have gone through this thoroughly, through his file,

14  at least with respect to what I've been provided --

15             MS. BOODY:  With all due respect to Mr.

16  DeFeo, my firm is not responsible for his poor record

17  keeping and my firm is not responsible for him giving

18  you the entire file.

19             MR. KING:  Again, I think that I'm not

20  suggesting that you are.  I'm just suggesting that,

21  you know, this is a document that I don't have.

22  That's a fact.  It's not before me.  I don't see it

23  in the file.  I guess in theory I could have missed

24  it, but I don't have it.  And I would anticipate that

25  this could come up again.  And I think given the

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 69

1    circumstances, that's going to be prejudicial to my

2    client.  I don't think this is the first time this

3    has ever happened, so there is a process to deal with

4    that.  I would think that the process is that, you

5    know, we get a copy of your file and -- you know,

6    it's sort of like I'm not suggesting you're trying to

7    ambush us, but given the --

8              MS. BOODY:  We certainly are not.  This

9    is dated over a year ago.  I don't even appreciate

10   the word being used, because that is not what is

11   happening here.

12             MR. KING:  Just hear me out.  I said

13   it's like, in terms of the practical effect.  You

14   seem like an ethical, Mr. McDonnell -- I don't

15   suggest there is anything untoward going on here.  I

16   think it's simply possibly what I had anticipated,

17   which is there are documents that you have that I

18   might not have, which is why a month ago I asked so

19   that we could get a duplicate file, I was told we

20   could get it.  Then Mr. McDonnell interjected and

21   said you don't have the resources and he's not going

22   to give it to us.  So I left it alone.  In

23   anticipation of something like this.

24             I'm not trying to create --  what's the

25   purpose of me creating a problem that only hurts me,

Electronically signed by Theresa Kugler (001-297-027-4278)    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 70

1   right?  So I'm just asking for a fair opportunity to

2   review the records that are going to be presented at

3   trial so that we can have a fair process.  I think

4   the judge is going to order that and so, you know, I

5   don't think it would be a fair process.

6              Again, we can -- you know, so I don't

7   know how you resolve it.  You can either send me the

8   files so that we can make sure we have everything

9   that you have, everything you're presenting in court,

10  that's what I meant by ambush.  Again, it's a natural

11  consequence of not -- not having all the documents.

12  It would be the same as that kind of approach.  I'm

13  not suggesting that you're ambushing us.  Okay?  I'm

14  just saying because we don't have -- we may not, as

15  evidenced by this particular document, have the file,

16  you know, so why don't we do this.

17             We can either agree to present the

18  entire file after this so that we can get clear on

19  that so we don't have this problem, which I think

20  ultimately will delay the trial.  Because I mean

21  we're prepared to have the trial, but I can tell you

22  right now, I'm going to put -- I'm going to note my

23  objection and I think that would be grounds for

24  appeal.  But okay.  And if the judge says no we're

25  not entitled to the record and you have a dead

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 71

1   attorney and whether or not he kept good records or

2   not it's prejudicial and I think it would be

3   reasonable grounds for appeal if she didn't order

4   that we get the records that you turned over.  If

5   it's too much for a firm with a billion dollar

6   corporation that they're representing to handle when

7   you say resources, I don't know what the world that

8   means.

9         MS. BOODY:  All right, John.  We've

10  gone well beyond what we're here today to do.  Let's

11  just take the deposition of Dr. DeFalco.

12         You've made your objection, I

13  understand that you're saying that you don't have the

14  document.  I represented very clearly and proven to

15  you that it was provided to the prior counsel.

16  You've made yourself clear.  Obviously this is not

17  something that's going to be resolved right here

18  right now.  So let's get through Dr. DeFalco's

19  deposition and we'll have to take it -- obviously

20  you'll have to take it up with the court.  You'll

21  have to tell the court that you have an incomplete

22  file from a deceased attorney.

23         I apologize, Dr. DeFalco.

24         THE WITNESS:  That's okay.

25         (Off-the-record discussion.)

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 72

1                    (Designated portion of the transcript

2    is read by the court reporter.)

3                    MS. BOODY:  We can actually move to the

4    lumbar spine when we go back on the video.

5                    (On the video record at 8:05 PM.)

6    BY MS. BOODY:

7         Q.    Dr. DeFalco, we just finished up

8    looking at the MRI of the cervical spine from June of

9    2015.  I'd now like to turn to the MRI of the lumbar

10   spine dated June 15th of 2015.

11                   Could we pop that on the screen,

12   please?

13                   So Dr. DeFalco, did you personally

14   review the MRI of the lumbar spine dated June 15,

15   2015?

16        A.    I did personally review those images.

17        Q.    Okay.  So on our screen now are a

18   series of images.  I imagine that you'd like us to

19   Zoom in on a particular one.

20        A.    I would.  If you can pull the -- yes,

21   that's fine.

22        Q.    All right.  Dr. DeFalco, can you

23   explain to the jury what we're looking at?

24        A.    I can.  I just want to confirm that you

25   can see my cursor, a little magnifying glass here?

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 73

1        Q.      Yes, I can.

2        **A.**     Fantastic.  Okay.

3              So this is a sagittal or a side-view
4    image of the lumbar spine of the back.  This is the
5    MRI version of what we just looked at on animation
6    where we're actually slicing this way and looking
7    from the side here.  Again a sagittal image.

8              To orient folks, this is the front of
9    the back, this is the back of the back here, the
10   posterior aspect.  These are the spinous processes
11   back here which you can feel.

12             These are the lumbar vertebrae.  This
13   is L5 here, L4, L3 L2 and L1.  You can see, as I
14   mentioned in my animated slide before, the spinal
15   cord ends at about right here, the L1 neighborhood
16   here.  And then it sends nerve roots down.  This is
17   the sacrum or the tail bone right here.  Okay?

18             What I want to point out is the L5-S1
19   disk right here.  I think folks can appreciate here
20   that this disk here, the L4-5, the L3-4, the L2-3 and
21   all the way up look very different than this disk.
22   Okay?  This is a healthy disk right here.  This is a
23   healthy disk right here.  This is healthy.  Right
24   here, this is a degenerative disk.  Okay?  This has
25   been -- this is a degenerative disk.  You can see

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 74

1    that it's narrowed.  Look at this disk is gray and

2    black on the MRI as opposed to this juicer white disk

3    right here.  This is that jelly or that annulus that

4    we talked about -- I'm sorry, the nucleus pulposus

5    that we talked about earlier.  This is a degenerative

6    disk.  And you can see here, this is different than

7    the cervical MRI we just looked at.  This is a

8    herniated disk.  This is a disk that is pushed back

9    into this area right here.  This is a degenerative

10   herniated disk at the L5-S1 level.

11        Q.      Understood.

12                So in your personal review of these

13   images, did you observe any herniated disk?

14        **A.**      I would say this is a herniated disk

15   right here at the L5-S1 level on this particular

16   image.  There is the herniation right here.

17        Q.      And all the other levels, this is what,

18   degenerative disk disease?

19        **A.**      I would say at this level there is

20   degenerative disk disease, these disks look okay.

21        Q.      As a whole, in all of your review,

22   including the physical exam, the review of medical

23   records, and the review of the diagnostic images, in

24   your opinion were the surgeries that were performed

25   for plaintiff, were they causally related to the

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 75

1    incident?

2         **A.**        In my opinion, considering the history,

3    the physical examination, the provided records and

4    the MRI imaging that we just looked at, I would say

5    they were not indicated in terms of being causally

6    related to this accident.

7         Q.        Did you observe any rank disk root

8    impingement in any of the films or diagnostic studies

9    that you observed?

10        **A.**        I did not.

11        Q.        In your review, taken as a whole, do

12   you believe that plaintiff will be in need of any

13   further treatment?

14        **A.**        I do not.  This is based on the

15   independent medical examination that I performed

16   October 24th, 2019.

17        Q.        In your view, why were these surgeries

18   performed?

19        **A.**        Well, I can't answer that.  I wasn't

20   the treating spine surgeon and I think that would be

21   a better question for the treating spine surgeon.

22             I will say this, that the surgeries

23   don't make sense to me in the sense that I can't find

24   anywhere in the records where there is reported

25   radicular pain, shooting pain that we discussed

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 76

1    earlier in this discussion.  When you're talking

2    about doing a surgery on the neck or the back, you

3    are doing that -- the indication is radicular pain,

4    sciatica, shooting pain.  And I'm not able to locate

5    anything in the records that suggest there was

6    shooting pain, which would be the reason for the

7    surgery.

8         Q.      Having personally examined plaintiff,

9    do you believe that he is limited in any of his

10   activities of daily living?

11        **A.**      I do not.

12        Q.      In your exam of plaintiff, did you

13   observe anything that would require that he has any

14   sort of restrictions from doing any activities?

15        **A.**      I would say that he has no

16   restrictions.

17        Q.      I imagine that you have seen patients,

18   maybe athletes in the past that have had the types of

19   procedures that plaintiff has, is that correct?

20        **A.**      That's right.

21        Q.      And do these people return to normal

22   function after the procedures?

23        **A.**      They can.  In fact, single level

24   fusions, like Mr. Pataki had, is not a

25   contraindication itself of playing in the National

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 77

1    Football League.

2         Q.       You also reviewed -- you reviewed MRIs

3    from 2015 and then you also reviewed some MRIs from

4    after the surgery was completed.  When you reviewed

5    those surgeries after -- I'm sorry -- the films that

6    were taken after surgery, did any of those films show

7    any impingement on any nerve roots?

8         A.       They did not.

9         Q.       Dr. DeFalco, have you stated all of

10   your testimony today within a reasonable degree of

11   medical certainty?

12        A.       That's correct.

13             MS. BOODY:  I don't have any further

14   questions at this time.

15             MR. KING:  Just for the record, I'm

16   going to note my objection again to that testimony --

17             (Off the video record at 8:14 PM.)

18             MR. KING:  I'm just going to note it

19   for the record.  It's outside the -- even his -- I'm

20   looking at his -- the report and I think that this

21   testimony is even outside the scope of that

22   particular report, but -- so I'm just going to note

23   it for the record again.

24             I have to look at it a little closer,

25   but I'm just putting it on the record.  Okay?  His

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 78

1    entire testimony related to the MRI films that he
2    claims to have reviewed.
3              We can go back on.
4              (On the video record at 8:14 PM.)
5    (CROSS-EXAMINATION OF DR. DeFALCO
6    BY MR. KING:)
7         Q.    Dr. DeFalco, you probably know me by
8    now, John King.  I represent Mr. Pataki.
9              So I want to just cover a few items
10   that you talked about.  Let's start a little bit with
11   your background.  So you stated you specialize in
12   sports medicine, is that correct?
13        A.    That's right.
14        Q.    And you've been an orthopaedic surgeon
15   for how long now?
16        A.    Since 2004.  So this is about my 20th
17   or 21st year.
18        Q.    And you testified that the last time
19   you did a spine surgery was as a resident in 2023,
20   correct?
21             MS. BOODY:  Objection.
22             (Off the video record at 8:15 PM.)
23             MS. BOODY:  John, we already -- you had
24   an opportunity to ask about qualifications and I
25   specifically asked you if you had any objection, I

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 79

1   specifically asked if you had any questions and you

2   said no.  So I think you need to move on.

3           MR. KING:  No, I didn't say -- well, I

4   didn't object to what you were stating.  I still have

5   a right to cross-examine him with respect to his

6   background, so I don't know where you get the idea

7   that I'm not going to ask him questions about his

8   background.

9           But again, you can object and then you

10  can go on.  I didn't say he wasn't qualified as an

11  expert.  He's qualified as an expert.  I'm going to

12  ask him some questions about that.

13          MS. BOODY:  I specifically asked you

14  earlier if you had any questions on qualifications

15  and you said you did and you asked a question and

16  then after you asked your question, I made sure you

17  didn't have any objection and you said none.  So I'd

18  like to move past qualifications because I'm certain

19  that I did ask you if you had any questions on

20  qualifications.

21          MR. KING:  Your objection is noted.  If

22  the questions that I'm going to ask are barred, the

23  judge will make that decision.

24          So can we move on?

25          MS. BOODY:  Yes, let's go back on.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 80

1                    (On the video record at 8:17 PM.)

2    BY MR. KING:

3         Q.        Mr. DeFalco, on your website, you are

4    noted as a specialist in knee, shoulder and ankle,

5    correct?

6         **A.**    Correct.

7         Q.        And so you're not a specialist in the

8    back or neck of the spine, is that correct?

9                    MS. BOODY:  Objection.

10                   (Off the video record at 8:17 PM.)

11                   MS. BOODY:  I'd like to note for the

12   record that I did already give you an opportunity to

13   ask you questions based on qualifications, so I'm

14   hoping that you'll give me an ongoing objection as

15   you seem to be proceeding through qualifications.

16                   MR. KING:  Absolutely.  And I'm not

17   saying he's not qualified, so I don't -- I mean these

18   are not whether he's qualified or not.  He's clearly

19   an expert, so that's not the line of my questions.

20                   MS. BOODY:  Okay.  Great.  We can go

21   back.

22                   And Dr. DeFalco, you can answer.

23                   (On the video record at 8:18 PM.)

24                   THE WITNESS:  Could you repeat the

25   question, sir?

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 81

 1   BY MR. KING:

 2       Q.      So my question is that you're a

 3   specialist in knee, shoulder and I believe ankle,

 4   correct?

 5       A.      Well, I would say that I'm a sports

 6   medicine specialist and those are the most frequent

 7   body parts that I see.  But as I said earlier, I'll

 8   see sports injuries from head to toe.

 9       Q.      So again, I'm looking at what is a

10   website advertisement from Atlantic Health, it notes

11   your specialization as shoulder, rotator cuff, arm

12   disorders, knee surgery.  There is not one reference

13   to ankle -- reference to cervical or lumbar or the

14   back.  Is there a reason why?

15       A.      Well, a couple of comments there.

16               First of all, I don't work for Atlantic

17   Health.  I'm on staff at Morristown Memorial

18   Hospital, which is Atlantic Health, so I can't speak

19   to what they're advertising or not advertising.  It's

20   not my website.

21               But I would say this, with regard to

22   our website which you referenced earlier, as I've

23   stated earlier, we have a very specialized practice

24   here.  We have a rheumatologist, we have

25   non-operative sports medicine, we have an operative

Electronically signed by Theresa Kugler (001-297-027-4278)                2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 82

1   spine, non-operative spine, foot and ankle people,

2   hand and wrist people, shoulder and knee people, hip

3   people, and joint replacement folks.  So we have

4   someone for everybody.  And that's the way

5   orthopaedics has evolved, certainly in the northeast

6   is into a sub-specialized type of practice.  So if

7   you're seeing on my website that I'm a specialist in

8   sports medicine, that's correct.  And as I've stated,

9   we -- I see, you know, head-to-toe-type sports

10  injuries including the neck and the back.

11        Q.        So again, I would just ask, there are

12  several other doctors in your practice, Drs.

13  Markowitz, Salari, Gutkin, Castro -- actually strike

14  that.

15              Dr. Markowitz, Dr. Behnam Salari, they,

16  based on the website, appear to specialize in spine

17  surgery, herniated disks, spine trauma, neck and back

18  pine pain.  Is there a reason why they have clear

19  specializations noted on their background and

20  expertise, but yours does not include any of those

21  specializations?

22              MS. BOODY:  Objection.

23              (Off the video record at 8:20 PM.)

24              MS. BOODY:  I don't think it's

25  appropriate.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 83

```
 1                  MR. KING:  I thought there was an

 2      ongoing objection.

 3                  MS. BOODY:  But I have a different

 4      objection.

 5                  I don't think it's appropriate for you

 6      to be reading something from a website in front of

 7      the jury.  Because remember, this is a trial dep.

 8      You wouldn't be permitted to do that at trial.

 9      You're reading something from a website that Dr.

10      DeFalco cannot see.

11                  MR. KING:  I just asked him about the

12      website, whether or not that is consistent with his

13      belief.  So I mean if it is, it is.  If it isn't, it

14      isn't.

15                  MS. BOODY:  I've noted my objection.

16      We can go back on.

17                  (On the video record at 8:21 PM.)

18      BY MR. KING:

19           Q.    So again, Doctor, Drs. Markowitz -- are

20      Dr. Markowitz and Dr. Salari part of your practice?

21           A.    They are.

22           Q.    And are they specialists in spine

23      surgery, herniated disks, spine trauma, neck and back

24      pain?

25           A.    They are.
```

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 84

 1      Q.      And you are not, is that correct?

 2      **A.**      No, I wouldn't say that.  And I think

 3   I've answered this question.

 4              (Overlapping speakers.)

 5              THE WITNESS:  They are operative --

 6   they're operative spine surgeons.  And again, we have

 7   a very specialized practice here.  And I think I've

 8   indicated that when I see a back that I feel needs an

 9   operation, they are specialists with regard to

10   operative spine.

11              As you mentioned earlier, Dr. Castro

12   and Dr. Gutkin are our non-operative spine team and

13   they're specialists in neck and back non-operatively.

14   So again, a very specialized practice, which I think

15   is really where orthopaedics has gone in 2024.  You

16   want someone who is operating on nothing but the neck

17   and the back if they're doing your neck and back

18   surgery.  And that's what Dr. Markowitz and Dr.

19   Salari do.

20      Q.      But again, just for the record, but you

21   have not performed any surgery related to neck or

22   back or spine, is that correct?

23              MS. BOODY:  Objection.  Asked and

24   answered.  You can answer.

25              THE WITNESS:  I have -- I operate on

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 85

1  sports medicine cases in my current practice,

2  emphasis on the shoulder and the knee.  And I have

3  operated, it was in my residency, which I indicated

4  was the years 2000 to 2003, that's when I did the

5  spine training operatively.

6  BY MR. KING:

7      Q.    So it's fair to say in about 20 years

8  you have not done a surgical procedure on the spine,

9  is that correct?

10              MS. BOODY:  Objection.  Asked and

11  answered.

12              THE WITNESS:  I have not operated on a

13  spine since 2003 in my residency.

14  BY MR. KING:

15      Q.    In your -- let's talk a little bit

16  about your company -- well, let me ask you this:  Do

17  you own any of the company called IME?

18      A.    Yes, I'm one of 11 partners in

19  IME-Plus.

20      Q.    Okay.  And what's the relationship

21  between IME-Plus and your other practice, Orthopaedic

22  Institute, is it?

23      A.    They're separate companies, but our --

24  some folks in our OINJ, Orthopaedic Institute company

25  perform independent medical examinations and will

Electronically signed by Theresa Kugler (001-297-027-4278)          2801a837-e6e6-4e2f-84dd-37a791abc1f0

Page 86

1    work in both places.

2         Q.      So and you work for both organizations?

3         A.      I do.

4         Q.      And what percentage of IME do you own?

5         A.      One-eleventh.  Whatever one-eleventh is

6    mathematically.  I guess that's about nine percent or

7    so.

8         Q.      Okay.  And what does IME stand for?

9         A.      Independent Medical Examination.

10        Q.      Okay.  And who are your typical

11   clients?

12               Do you just serve attorneys in

13   litigation or who do you -- who are your clients?

14        A.      I would say that 99 percent of the

15   people who call for my services are on defense and

16   one percent plaintiff attorneys.

17        Q.      Okay.  And how did you come to get

18   involved in this particular case?

19        A.      I was asked to evaluate Mr. Pataki by

20   the law firm Cottrell Solensky.

21        Q.      Okay.  So you weren't hired by Walmart,

22   you were hired by the law firm?

23               MS. BOODY:  Objection.

24               (Off the video record at 8:26 PM.)

25               MS. BOODY:  I'm going to object to the

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 87

1    form, but we can continue.

2              (On the video record at 8:26 PM.)

3    BY MR. KING:

4        Q.      Mr. DeFalco, were you hired by Walmart

5    directly?

6        **A.**      I was asked to evaluate Mr. Pataki by

7    Cottrell Solensky Law Firm.

8        Q.      Okay.  And is that a law firm that

9    represents Walmart?

10       **A.**      Yes, it is.

11       Q.      And prior to getting this assignment or

12   at the time that you got the assignment, did you know

13   who the ultimate client was?

14       **A.**      The history that I got when I examined

15   Mr. Pataki, I don't know if this quite answers your

16   question, was that he fell at Walmart.  So I'm --

17       Q.      I'm not asking about the facts of the

18   case, I'm just asking who the client was?

19       **A.**      No, I didn't know this was a -- that

20   Cottrell Solensky was representing Walmart.

21       Q.      So you knew -- you didn't -- when you

22   got the assignment, they didn't tell you anything

23   about the facts of the case?

24       **A.**      Well, what happens is I'm given

25   documents, I'm given -- sent records.  Nobody told me

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 88

1  about the facts of the case.  You know, this stuff

2  arrives and sometimes I get an inch worth of records,

3  sometimes it's 20 inches worth of records depending

4  on the case.

5        Q.     So you didn't know anything about the

6  lawsuit prior to your report?

7        **A.**     I did not.

8        Q.     Okay.  Did you review the complaint

9  prior to the report?

10       **A.**     I would say this, I examined him and

11  dictated on this the same day I examined him, which

12  was October 24th, 2019.  Prior to that I hadn't read

13  anything about this complaint or otherwise.

14       Q.     Okay.  And it's your testimony that the

15  attorney didn't give you any guidance on the case in

16  terms of where they wanted to go with things?

17       **A.**     I've never spoke to Ms. Boody other

18  than this evening, that I'm aware.

19       Q.     No, the prior attorney, when you did

20  the report.

21       **A.**     I've never spoken to any attorney prior

22  to tonight from this law firm.

23       Q.     When you originally got the assignment

24  I'm asking, did you speak to any of the attorneys who

25  gave you the assignment?

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 89

1      **A.**      I don't remember speaking with anybody.

2              There are a lot of attorneys that

3   sometimes call and ask me a question or two or want

4   to talk about a case.  That may have been the case

5   here, but I can't remember it specifically.  If it

6   happened, I can't recall.

7      Q.      Okay.  And I guess what I'm getting at,

8   you would never let your opinions be colored by who

9   the client is or the law firm representing the

10  client, would you?

11     **A.**      I would not.

12     Q.      Did you charge a fee for this report?

13     **A.**      I did.

14     Q.      What was the fee?

15     **A.**      One thousand 425 dollars.

16     Q.      And how many of these reports do you do

17  a year, if you have an idea?

18     **A.**      I do approximately ten reports on my

19  IME days, which is one day a week.  So I would say

20  about four hundred to five hundred IMEs per year.

21     Q.      And how many of those IMEs are for

22  Walmart or for the attorneys that represent Walmart?

23     **A.**      I'd be guessing as to how many came

24  from this exact law firm.

25     Q.      Well, I don't mean this particular

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 90

1    firm, I just mean the firms that represent Walmart.

2    Is that part of the 99 percent?

3              MS. BOODY:  I'm going to object to the

4    form, but you can answer, if you understand it.

5              THE WITNESS:  I don't understand it.

6    Could you repeat the question, sir?

7    BY MR. KING:

8        Q.      My question is:  What percentage of the

9    cases that you described are for Walmart or for the

10   firms that represent Walmart, if you know?

11       A.      I don't know for sure, but it's not a

12   large number of cases that I've -- that I can recall

13   doing that are associated with Walmart.

14       Q.      Okay.  And what about -- but it's 99

15   percent for defense firms?

16       A.      That's correct.

17       Q.      So I want to kind of turn to some more

18   substantive issues.

19              Have you ever treated Mr. Pataki?

20       A.      No.

21       Q.      And you state in your report that there

22   is no doctor/patient relationship, is that correct?

23       A.      That's right.

24       Q.      What does that mean when there is no

25   doctor/patient relationship?

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 91

1      **A.**       Yeah.  So I like to tell the claimant

2    when they come in to the room or when I come into the

3    room to see them that I'm not their doctor.

4    Sometimes people don't know exactly why they're

5    there.  And so I tell them, listen, I'm not your

6    doctor, I'm not going to prescribe medication, I'm

7    not going to give you an injection, I'm not going to

8    order studies, I'm not going to operate on you.  I'm

9    here to evaluate you, I'm going to take a history,

10   I'm going to exam you.  If they send some records,

11   I'm going to look at those.  If they send some

12   imaging, I'm going to look at those, but I'm not here

13   to treat you.  I think that's important to establish

14   that so the people that see me know that they're not

15   there as a patient.  They're there to be evaluated.

16      Q.       And do you tell them that you're being

17   paid and acting on behalf of Walmart?

18      **A.**       No, I tell them that I'm there to do an

19   evaluation on them, a one-time evaluation.

20      Q.       Okay.  Do you tell them that you're an

21   independent medical examiner?

22      **A.**       Yes.

23      Q.       Wouldn't you say that's a bit

24   misleading, the fact -- the court doesn't appoint

25   you, do they?

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 92

1       **A.**      I'd have to think about that, if I've

2   ever had a court-appointed independent medical

3   examination.

4       Q.      In this case, did the court appoint you

5   in this case?

6       **A.**      No, the court did not.

7       Q.      Did one of the parties appoint you?

8       **A.**      As I said, I was hired by the law firm

9   to evaluate Mr. Pataki.

10      Q.      So you're working on behalf of the law

11  firm that represents Walmart, correct?

12      **A.**      I would say that they --

13              MS. BOODY:  Objection.  Asked and

14  answered multiple times at this point.

15  BY MR. KING:

16      Q.      And so would you characterize that as

17  independent?

18      **A.**      I would.

19      Q.      Okay.  Would you say that your one-day

20  relationship with Mr. Pataki is similar to his

21  treating physicians, like Dr. Vizzone?

22      **A.**      I would say that it's different.  And

23  here is how it's different.  Dr. Vizzone had the

24  opportunity to operate on him, see him many, many

25  times in person.  I saw him once in person.  But in

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 93

1   addition to seeing him once in person, I was provided

2   a voluminous amount of records, all kinds of imaging

3   which we've alluded to.  I was able to do a good

4   physical examination on him, so I think it was a

5   comprehensive evaluation, but I would agree with your

6   point that it is -- it's different than being the

7   treating physician.

8        Q.     Okay.  And would you agree with the

9   statement that a treating physician has more insight

10  to a patient's condition than a doctor who sees a

11  patient one day?

12       A.     I would disagree with that and here is

13  why.  Even in my own practice I see a lot of second,

14  third and sometimes fourth opinions.  And when folks

15  come in and see me and sometimes I'll just see them

16  once and give them my opinion, I've got a lot of

17  imaging, like I had in this case.  I've got a lot

18  records, like I had in this case.  I have a lot of

19  comments from other doctors and that's very -- it's

20  very easy for me to sort that out because so much has

21  happened, so many records are available.  So I would

22  say this:  That Dr. Vizzone doesn't necessarily have

23  an edge on -- in terms of an evaluation.  I think I

24  was provided everything I need to make a good

25  evaluation here.  So I wouldn't say that his

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 94

1    evaluation is better or more meaningful than mine.  I

2    can say that you can make an argument both ways and

3    that I had a very good opportunity to get the facts

4    in this particular case.

5        Q.    Okay.  So it's your opinion that

6    someone who has treated a patient for let's just say

7    four years in this case, in the case of Dr. Vizzone,

8    you have as much -- again, just as much insight as

9    that particular doctor having seen the patient one

10   time, is that your testimony?

11       A.    My testimony is this:  That with all of

12   the records I was provided, all of the imaging I was

13   provided, the physical examination that I performed,

14   the different records that came back to me after the

15   fact, the addendums that I provided in this

16   particular case, those records were more than enough

17   to render a good, objective opinion here in this

18   particular case.

19            I will also say this, that as an

20   independent evaluator here, I don't have the personal

21   relationship with Mr. Pataki, so I think my opinions

22   can be very objective.  As opposed to someone who has

23   operated on him on two occasions.

24       Q.    Why do you -- when you say you're more

25   objective than someone who has operated on him,

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 95

1    what's the basis of that?  Why do you think you're

2    more objective than a doctor who has operated on him?

3        A.        Well, let me clarify it.

4                  I think I can be very objective.  Okay?

5    I don't want to suggest that I'm more objective than

6    somebody else, but I don't have a personal

7    relationship with Mr. Pataki and when I operate on

8    people and I get to know their significant others and

9    their kids and their families and they come back for

10   more operations and their families come in, that is a

11   personal relationship.  And sometimes it's hard to

12   separate out that relationship when you're trying to

13   be objective and get to the facts of the case like

14   this.  I didn't have that in this case and to me I

15   think that's a distinct advantage.

16       Q.        Okay.  Just so I'm clear, you

17   received -- when you were asked to do -- let me ask

18   you this question:  Were you hired to provide a

19   report and analysis on causation related to Mr.

20   Pataki?

21       A.        As I've answered a few times before, I

22   was asked to evaluate Mr. Pataki by the Cottrell

23   Solensky Law Firm.  I don't have the cover letter,

24   but what I like to do is, you know, sometimes folks

25   ask me in a cover letter to address certain things.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 96

1   I don't have that right in front of me so I can't

2   answer your question about causality.  I know that

3   earlier in this deposition I was asked about

4   causality a few minutes ago.  Well, quite a while

5   ago.  But I don't remember exactly what the cover

6   letter said that they wanted in this particular case.

7       Q.     Okay.  And is there a reason why you

8   did not -- assuming they asked you to address

9   causality, why didn't you address causality in your

10  first report of October 24th 2019?

11      A.     Well, I think I did.

12      Q.     If you can direct me where you stated

13  your opinion about causality.

14             You do have your report in front of

15  you?

16      A.     I do, if you'll allow me to look at it

17  here.  Let me look through it.

18             Yeah, in this particular report, I

19  opined that he had undergone cervical surgery, lumbar

20  surgery and --

21      Q.     Respectfully, Doctor, that's a fact,

22  that's not an opinion.  Those are facts.

23      A.     Agreed.

24      Q.     I'm asking you where the opinion is

25  because if you got the -- if you got the order to

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 97

1  provide an opinion on causation, why wouldn't you

2  reference that in here, at least at a minimum say in

3  order to provide a report, you know, analysis on

4  causation, I need to review the films?

5            MS. BOODY:  Objection.

6            (Off the video record at 8:40 PM.)

7            MS. BOODY:  I think you misstated, so

8  I'll object to the form.  And I'll say that I think

9  you misstated prior testimony.  Dr. DeFalco already

10  told you that he did not have the cover letter in

11  front of him.

12           MR. KING:  Okay.  It's noted.

13           (On the video record at 8:41 PM.)

14  BY MR. KING:

15      Q.    Again, Dr. DeFalco, I'd just like to

16  understand why you did not reference -- you stated

17  earlier that you had done an exam, you reviewed 32

18  records, you met with the patient.  If you were asked

19  and you were reporting on causation, why didn't you

20  do that in this particular report?

21      A.    I think I've answered that, so I'll

22  answer it again, and I apologize if I wasn't clear

23  about that.  You know, I think I said that I will do,

24  in some days, you know ten IMEs a day.  Today I did

25  six on my IME day.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 98

1                    The cover letter, which I don't have in

2    front of me, is usually very specific as to what they

3    want answered in an independent medical examination.

4    Sometimes they want to know if additional treatment

5    is needed.  Sometimes they want causality addressed.

6    Sometimes they want to know, does the claimant

7    need -- is the current claimant able to work.  Has

8    there been any permanency or disability.  So these

9    cover letters are very specific and they're all

10   different in terms of what they ask for.  So the

11   answer to my question -- the answer to your question

12   is I don't have the cover letter, I don't know

13   exactly what they asked for here, but I follow that

14   cover letter and do the IME and answer the questions

15   that they want answered.

16        Q.      How many reports -- you say you do

17   weekly reports, how many reports weekly do you do on

18   causation related to neck and back?

19        A.      Boy, I would say that there are

20   frequently reports that involve the neck and back

21   that ask for causation, but I wouldn't want to guess

22   here as to exactly how many.  Because a lot of times,

23   you know, they'll send a neck or a back and someone

24   will -- and they'll want a -- from a work standpoint,

25   they'll want to know if they can go back to work.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 99

1    And they're able to come back.  And they won't even

2    ask about causation.  So sometimes they ask,

3    sometimes they don't.  But in answer to your

4    question, I wouldn't want to guess as to the exact

5    number.

6         Q.        Respectfully, Doctor, I'm simply asking

7    when one of the law firms that work for in this case

8    Walmart or any other company, when they send a

9    request over related to getting a -- as you

10   described, an IME for, you know, the neck and back,

11   how often do you provide, in your practice, how often

12   do you provide that opinion?

13        A.        I can't give you the exact answer

14   because as I've stated, a lot of times folks will ask

15   it just to address whether or not they can work, has

16   there been permanency, has there been disability.  A

17   lot of times if it's a work-related accident,

18   causation has already been established and they don't

19   care, they don't -- they couldn't care less about

20   that aspect of it.  They want to know what the

21   claimant can do and whether there is a permanent

22   injury.  So I would say very frequently I'm asked to

23   comment on causality and more than likely just as

24   frequently they're asking other things in the cover

25   letter.  And I do what the cover letter asks me to do

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 100

1    in these IME reports, generally speaking.

2        Q.       When you say frequently, you're

3    referring to neck and back, so your testimony is that

4    you frequently offer opinions as to neck and back as

5    to causation and other matters, is that correct?

6        A.       I would say this:  That I see a lot of

7    neck and back IMEs and depending on the cover letter,

8    sometimes to know they want to know causation,

9    sometimes they want to ask me other things.

10       Q.       Respectfully, Doctor, you testify

11   frequently, which means -- so that's a little

12   different than what you just said, but that's fine.

13   We'll move on.

14               You noted no preexisting injuries to

15   the neck or back prior to the Walmart fall, is that

16   correct?

17       A.       That's correct.

18       Q.       And how did you learn -- you might have

19   testified, but if you can just repeat, how did you

20   learn much this history?

21       A.       Provided records.

22       Q.       I'm sorry?

23       A.       Provided records.

24       Q.       Did you also learn -- so the records

25   that were provided to you stated no prior injuries or

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 101

1    history there?

2                 MS. BOODY:  Objection.

3                 (Off the video record at 8:46 PM.)

4                 MS. BOODY:  I think you're misstating

5    his testimony.

6                 MR. KING:  Okay.  I'll clarify it.

7                 (On the video record at 8:46 PM.)

8    BY MR. KING:

9         Q.     Doctor, you testified that the -- you

10   learned of his past medical history through prior

11   records, is that correct?

12        A.     Yes.  I'm looking at my report here and

13   in the independent medical examination on page 4 I

14   list all the medical records and I talked about the

15   emergency room visits which provided a lot of the

16   history.

17               Now, on page 2, I talk about his past

18   medical history and I write here that Mr. Pataki

19   denied similar injury in the past.

20        Q.     Okay.  And you learned that from him

21   directly as well?

22        A.     That's correct.

23        Q.     Okay.  Is that normally how you get a

24   prior history?

25        A.     Yeah, the history is simply asking in

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 102

1   my office the patient what happened and then, of

2   course, looking at any of the records that come along

3   with the patient or the claimant.

4        Q.      Okay.  And so you normally rely on that

5   history directly from the patient, correct?

6        **A.**      I rely on the history from the patient,

7   I rely on the provided records.

8        Q.      Okay.  And do you generally trust the

9   honesty and truthfulness of the patient in that

10  regard?

11       **A.**      I do.

12       Q.      And because most people are honest when

13  they're talking to their doctor and want to get a

14  diagnosis and some treatment, correct?

15       **A.**      I think it's a really general question.

16  I would say that in my own practice I would like to

17  think that folks are honest.

18       Q.      Do you do any pain management in your

19  practice with the Orthopaedic Institute?

20       **A.**      I do not.

21       Q.      Is there a reason why?

22       **A.**      Yes.  We're very specialized practice

23  and we have two terrific pain management physicians,

24  non-operative spine specialists, Dr. Castro and Dr.

25  Gutkin.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                March 28, 2024

Page 103

1          Q.        Do you, in your practice, see patients
2     who have traumatic -- who have experienced traumatic
3     events like car accidents or falls?
4          A.        Yes.
5          Q.        And do those patients -- let me ask you
6     this:  Is it your experience that patients who have
7     traumatic injuries have delayed pain, in other words,
8     pain the next day?
9          A.        It's my experience that sometimes
10    people have pain the next day, it's my experience
11    that sometimes people have pain immediately.
12         Q.        So it wouldn't be unusual for someone
13    to experience a traumatic event and not have any
14    symptoms that day or at the time of the event and
15    then experience pain the next day or a couple days
16    after?
17         A.        Are you referring to this specific
18    case, sir, or in general?
19         Q.        I'm just asking in general.
20         A.        Yeah, it would be the same answer.  I
21    sometimes see folks who are in the emergency
22    department complaining of ten out of ten pain and
23    then other times people go home and they wake up sore
24    the next day and they decide to seek medical
25    attention at that time.  So it could go either way.

Electronically signed by Theresa Kugler (001-297-027-4278)                2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 104

 1       Q.      Okay.  So with respect to this
 2  particular case, you stated in your report, under
 3  mechanism on page 6, when Mr. Pataki stated he fell
 4  flat on his back striking the back of his head and
 5  that he could not get out of bed the next day, is
 6  there any reason why you would not trust that version
 7  of the facts?
 8                MS. BOODY:  Objection.
 9                (Off the video record at 8:50 PM.)
10                MS. BOODY:  Mr. King, are you asking
11  the doctor to make a decision on the credibility of
12  your own client?
13                MR. KING:  No.  Just asking him facts.
14  He noted it in his report and I'm just asking him a
15  question.
16                MS. BOODY:  No, it seems like you're
17  asking whether or not he believes him.
18                MR. KING:  Okay.  I mean --
19                MS. BOODY:  Credibility is not Dr.
20  DeFalco's purpose here.  You're asking him whether or
21  not he believes your client.
22                MR. KING:  Yeah, your objection is
23  noted and, you know, he should answer the question
24  and let the judge make a decision about the -- about
25  whether or not it's an appropriate question.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 105

```
 1                  MS. BOODY:  Well, it's inappropriate.
 2      It's a question for the jury.
 3                  (On the video record at 8:52 PM.)
 4                  MR. KING:  Could you read the question
 5      back?
 6                  (Designated portion of the record is
 7      read by the court reporter.)
 8                  MS. BOODY:  Same objection.  You can
 9      answer.
10                  THE WITNESS:  I have no reason not to
11      believe what Mr. Pataki told me.
12      BY MR. KING:
13          Q.      All right.  Thank you, Doctor.
14                  And so there would be nothing unusual
15      about that occurrence, correct?
16          A.      As I've stated, sometimes folks have
17      pain in the emergency department and sometimes they
18      have pain the next day.
19          Q.      Let's discuss your -- we've discussed
20      the range of motion.  In your report I didn't hear
21      you, if you did, note that -- did you note that -- I
22      didn't hear in your testimony that you -- for the
23      range of motion, what were the results -- if you have
24      your report, what were the results of the range of
25      motion test regarding the cervical spine?
```

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 106

1                    In other words, the difference between

2    what was -- what's normal and what the resulting test

3    that you did revealed?  What were those percentages,

4    reductions, et cetera?  I didn't hear a discussion of

5    that.

6         A.    So flexion, normal is 45, his result

7    was 34.

8                    Extension, normal 45, his result was

9    11.

10                   Left lateral flexion, normal 45, result

11   was 24.

12                   Right lateral flexion, normal 45,

13   result was 23.

14                   Left rotation, normal is 60, his result

15   was 37.

16                   And right rotation, normal is 60, his

17   result was 30.

18        Q.    So is it fair to say that at least in

19   those particular tests he was 50 percent -- or around

20   50 percent below normal in each of them?

21        A.    In some of them above 50 percent, some

22   of them around 50, and some below 50 percent.

23        Q.    Okay.  And what about for the lumbar?

24        A.    So for lumbar, four ranges of motion.

25                   Flexion, normal 80, he was 31.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 107

1                  Extension, 25, he was seven.

2                  Left lateral flexion, 35, he was 29.

3                  Right lateral flexion, normal is 35, he

4      was 26.

5          Q.      And when he did those tests, did he

6      state any pain associated with them?

7          A.      He stated that he didn't have any pain

8      while doing the tests.

9          Q.      How do you measure pain when you ask

10     someone -- well, just let me ask you this:  If they

11     don't tell you they're in pain, how do you measure

12     pain?

13         A.      Well, we ask them, are you having any

14     pain with anything we're doing.

15         Q.      Okay.  And if they don't answer that

16     they're -- if you don't ask or if they don't answer,

17     then you assume what?

18         A.      Well, I asked and we have them answer.

19         Q.      Okay.  And did you note, again, just

20     for the record, when you said there was no pain on

21     range of motion, that's what you were referencing, is

22     that correct?

23         A.      When he was doing his motion, which he

24     does himself, I'm not doing the motion for him, I ask

25     him if he had any pain with any of those maneuvers.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 108

1    And if he were to say yes, we would have noted it.

2    He said no, we noted that.  If he chose not to answer

3    the question, we would have noted that, that he chose

4    not to answer the question.

5         Q.    Okay.  So let me ask you about your

6    review of the MRIs.

7              So you're aware of the fact that at

8    least two doctors -- well, actually, let me

9    establish.

10             Is it your testimony that Mr. Pataki

11   did or did not have a herniation of his cervical

12   spine?

13             Yes or no?

14        A.    It is my testimony that he had a disk

15   bulge, not a herniation of his cervical spine,

16   specifically at the C5-6 level, which I pointed out

17   on the MRI.

18        Q.    Okay.  And is it your testimony that

19   there was a herniation for the lumbar spine or not?

20        A.    It is my testimony that there was a

21   herniation at L5-S1 with a degenerative disk.

22        Q.    Okay.  And are you aware that Dr. -- I

23   think it says Dr. Damien noted a herniation at C5-6?

24             MS. BOODY:  Objection.

25             (Off the video record at 8:58 PM.)

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 109

 1                    MS. BOODY:  I'm not sure what you're

 2      referring to, Mr. King, but if you're trying to read

 3      from a report of a radiologist, it's not permissible.

 4                    MR. KING:  I'm reading from his report.

 5                    MS. BOODY:  Where are you reading from?

 6                    MR. KING:  Page 4 of the report.  MRI

 7      of the cervical spine report, Natalio Damien,

 8      broad-based disk herniation.

 9                    MS. BOODY:  I see.  But you're --

10      right.  But you're essentially giving hearsay.  This

11      is Dr. Damien --

12                    MR. KING:  It's not hearsay, it's

13      what's on the -- on his report.  That's not hearsay.

14      I'm just asking what is on the report.

15                    MS. BOODY:  So this is -- here is a

16      recitation, this is not based on Dr. DeFalco's

17      review.  This is just regurgitation from another

18      record.

19                    MR. KING:  No.  No.  No.  The report

20      states what he relied on, these various reports.

21      It's all in the record.  So I'm just asking him that

22      there seems to be a --

23                    MS. BOODY:  It's still hearsay.  So you

24      can ask him if he looked at the report, you can say

25      did you look at the report by Dr. Damien, yes/no, but

Electronically signed by Theresa Kugler (001-297-027-4278)                2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 110

1   as far as what Dr. Damien opined on or what Dr.

2   Damien diagnosed, you cannot ask that because Dr.

3   Damien would have to be called to trial to give that

4   testimony.

5           It's a complex medical diagnosis.

6           MR. KING:  Okay.

7           (On the video record at 9:00 PM.)

8   BY MR. KING:

9       Q.    Dr. DeFalco, do you have your report?

10      A.    I do.

11      Q.    And this is the report you prepared on

12  or about October 24, 2019, correct?

13      A.    Correct.

14      Q.    And on page 4 it says:  Medical record

15  review, correct?

16      A.    Yes.

17      Q.    Okay.  And could you read line item

18  one?

19          I'm sorry.  I'm sorry.  Strike that.

20  Line item three.

21      A.    MRI of the cervical spine, 6-15-15,

22  Natalio Damien, MD, broad-based disk herniation at

23  C5-6, impressing on the anterior thecal sac, and

24  narrowing of the neuro foramina at this level as

25  discussed above.  Disk bulge at C3-4, moderately

Electronically signed by Theresa Kugler (001-297-027-4278)                2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 111

1    impressing on the anterior thecal sac at this level.

2         Q.      Okay.  And, Doctor, can you read item

3    number four?

4         **A.**     MRI of the lumbar spine, 6-15-15,

5    Natalio Damien, MD, broad-based disk herniation

6    L5-S1, impressing on the anterior thecal sac and

7    narrowing of the lateral recess at this level, as

8    discussed above.

9         Q.      Okay.  And could you read --

10               MS. BOODY:  No, I'm going to ask for a

11   continuing objection at this point because basically

12   what you're trying to do is you're just having him

13   read this into the record and it's still not

14   permitted.

15               MR. KING:  All right.  No problem.

16   BY MR. KING:

17        Q.      Doctor, can you read item five?

18        **A.**     MRI of the lumbar spine without

19   contrast, report 6-20-16, Natalio Damien, broad-based

20   disk herniation at L5-S1, impressing on the anterior

21   thecal sac and narrowing of the lateral recesses at

22   this level.  The overall findings are not

23   significantly changed from the previous exam,

24   6-15-15.

25        Q.      Doctor, you disagree with these

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 112

1    reports, is that correct?

2              MS. BOODY:  Objection.

3              (Off the video record at 9:02 PM.)

4              MS. BOODY:  Mr. King, I have the same

5    objection.  You're essentially trying to enter into

6    evidence or enter into the record a report by a

7    different doctor who, as far as I'm aware, you're not

8    calling to testify at the time of trial.

9              MR. KING:  Well --

10             MS. BOODY:  There is a series of cases

11   in New Jersey which specifically state that you

12   cannot put a report of another doctor and admit it

13   into evidence without calling that doctor because

14   (overlapping speakers) let me finish, is a complex

15   medical opinion.

16             If you want that, you have to call that

17   doctor to state that opinion.

18             MR. KING:  I don't know that that is

19   true, but I guess we'll have to call that doctor.  No

20   problem.

21             (On the video record at 9:03 PM.)

22   BY MR. KING:

23        Q.    Dr. DeFalco, were any of your other

24   colleagues available to serve as experts for this

25   case?

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 113

1          **A.**      I don't know what you mean.

2          Q.      So, again, you've acknowledged your

3     specialty is not back or neck and there are others in

4     your office that are objectively more qualified.  I'm

5     just curious why they would not have been called to

6     provide opinions on this neck and back case?

7               MS. BOODY:  Objection.  That grossly

8     mischaracterizes former testimony.

9               Mr. King, you know that.

10    BY MR. KING:

11         Q.      Can you answer the question, Doctor?

12         **A.**      Well, I think there were multiple

13    questions within the question.  Let me answer the

14    first part and then I'll ask for you to read back the

15    other part of that question.

16               The first part is why did they ask me

17    to evaluate Mr. Pataki.  I guess you'd have to ask

18    the law firm.

19               As far as was anyone available that

20    particular day?  I don't know who was in surgery, who

21    might have been on vacation, who was seeing patients

22    in the office or whatever.

23               As far as the other parts of the

24    question I think had to do with when you said that

25    I'm not a specialist and I think you referred to this

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                March 28, 2024

Page 114

1   is not my area of expertise or whatever it may have

2   been, I think I've been pretty clear about that.  I

3   see spine patients on a weekly basis with my own

4   practice.  I see NFL players with spine injuries,

5   I've spine boarded them.  I'm evaluating NFL Combine

6   athletes now with tons of neck and back imaging.  I

7   exam them in Indianapolis at the combine, so I think

8   I'm well-equipped to evaluate somebody.

9              I don't operate on these folks, those

10  operations go to our spine surgery specialists.

11  Surgery is the key word there.  And then we have

12  non-operative spine specialists as well, and I think

13  I've been pretty clear about that, and how this

14  practice works in terms of specialization.

15  BY MR. KING:

16      Q.      Okay.  I don't have very much more.

17              So, Doctor, would you operate -- let me

18  ask you this question:  Would you accept that two

19  doctors could have differing opinions on a film and

20  whether or not a herniation or some other disease

21  exists?

22      A.      I can certainly accept that there could

23  be two different opinions, yes.

24      Q.      And would you accept the fact that if

25  one doctor saw that -- saw a herniation and he in

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 115

1    good faith treated them appropriately, would you

2    accept that as appropriate?

3        **A.**      I would ask you this:  What are you

4    referring to as appropriate treatment in this

5    particular question?

6        Q.      Okay.  So let's say Dr. Vizzone, for

7    example, saw a herniation and recommended pain

8    management, epidural injections, would that be

9    appropriate?

10       **A.**      I think the question doesn't fully

11   grasp what you're getting at here.

12       Q.      Doctor, respectfully, if you can just

13   answer my question.  That's all.

14       **A.**      I don't fully understand the question.

15              Can you repeat the question and maybe

16   rephrase it in a different way?

17              I don't understand what you're trying

18   to ask me, but I'll do my best to answer it.

19              MR. KING:  Court reporter, could you

20   read the question back to him.

21              (Designated portion of the transcript

22   is read by the court reporter.)

23   BY MR. KING:

24       Q.      Doctor, you can answer it if you heard

25   the question.

Electronically signed by Theresa Kugler (001-297-027-4278)          2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 116

1        **A.**      Sure.

2               So here is what I would say:  It's not

3    just looking at an MRI that would draw you to the

4    conclusion as to what to do for the patient.  You

5    would want to consider the history, which isn't

6    included in this question which is why I couldn't

7    answer it initially.  The history matters, right?

8    What's going on with the history, how is the patient

9    feeling?  The imaging matters and the physical

10   examination matters in this particular case.  And

11   that's how you're drawing your treatment

12   recommendations.  You're not treating just on one

13   thing.

14       Q.      So in Mr. Pataki's case, Dr. Vizzone

15   was his treating physician, Dr. Vizzone knew his

16   history, Dr. Vizzone reviewed the MRI films, the

17   X-rays, and examined the patient.  So would it -- and

18   given his -- given all these factors, would it be

19   appropriate for him to review the films in addition

20   to these things and recommend conservative treatment

21   in this case would be pain management or epidural

22   injections?

23       **A.**      I think you'd have to ask Dr. Vizzone

24   that question.  You're asking me to answer on behalf

25   of Dr. Vizzone.

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 117

1              I think I testified earlier that it was

2    my opinion that these surgeries were not causally

3    related to the accident.  So if you're asking me

4    whether the pain management led to the surgery and

5    what Dr. Vizzone was thinking, I think you'd have to

6    ask Dr. Vizzone that.  I don't want to speculate as

7    to what his treatment protocol was, but I guess you'd

8    have to ask him.

9         Q.    Let me ask you, what is your typical

10   treatment protocol if someone has a herniated disk in

11   their back?

12        **A.**    Right.  As I said earlier, there is

13   three phases of that treatment.

14              The first would be conservative with

15   physical therapy, activity modification,

16   non-steroidal anti-inflammatory medicines like Advil

17   or Aleve.

18              Phase two would be to consider an

19   injection in combination with the physical therapy.

20              And phase III, if it got that far,

21   would be to consider an operation.

22        Q.    And are you aware whether Dr. Vizzone

23   followed that protocol or not?

24        **A.**    If my memory serves me correctly, I

25   believe Dr. Vizzone recommended chiropractic

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 118

1   treatment.  I think he recommended injections and

2   then I think he did an operation.

3        Q.      Okay.  And all of those are appropriate

4   recommendations given Dr. Vizzone's view of Mr.

5   Pataki's injuries, is that correct?

6              MS. BOODY:  Objection.

7              THE WITNESS:  I think that's impossible

8   for me to answer --

9              (Off the video record at 9:11 PM.)

10             MS. BOODY:  I'm going to object to the

11   form, but we can continue.

12             (On the video record at 9:11 PM.)

13   BY MR. KING:

14        Q.      Doctor, you can answer if you recall

15   the question.

16        **A.**      Right.  Yeah, Sir, to borrow your exact

17   words from the question, you're asking me to comment

18   on Dr. Vizzone's view and I think it's unfair to ask

19   me what Dr. Vizzone's view was.  That would be a

20   question for Dr. Vizzone, as I indicated earlier.

21        Q.      I'm just asking --

22        **A.**      If you ask me about my views, you can

23   ask about my views which I think I've been pretty

24   forthcoming with stating, but I can't speculate as to

25   what Dr. Vizzone was thinking at any particular time

Electronically signed by Theresa Kugler (001-297-027-4278)              2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 119

1    in his treatment protocol here.

2         Q.        Again, respectfully, Doctor, I'm just

3    asking about -- it could be any doctor, but was that

4    protocol appropriate?

5         A.        Are you referring to this case or in

6    general with a spine problem?

7         Q.        This case.

8         A.        Yes.  So in my opinion in this

9    particular case, okay, I didn't have the chance to

10   examine him.  I would say when I examined him and the

11   records that I reviewed at the time of the MRIs, the

12   protocol would be inappropriate.  And here is why:

13   There were no radicular signs in the emergency

14   department on two occasions, on the 7th and the 9th

15   of June, no signs of any radicular symptoms at either

16   one of those.

17             The MRIs support that in the sense that

18   we're seeing degenerative changes here consistent

19   with someone who was 44 years old or maybe a little

20   less at the time.  So in my opinion, the protocol is

21   not correct because from what I see through

22   everything that's been provided to me, you're not

23   doing a surgery, a fusion surgery on the neck or the

24   back, in the absence of radicular symptoms.

25        Q.        Okay.  And the radicular symptoms that

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 120

1    you're referencing, were those when you examined Mr.

2    Pataki, is that correct?

3        **A.**        No, he didn't have any radicular

4    symptoms at that time either.  The radicular symptoms

5    I'm specifically referencing in answer to your

6    question are related to the 6-7-15 and the 6-9-15

7    emergency room visits where there is a negative

8    straight leg raise two times in a row on the lumbar

9    spine and they don't report any radicular symptoms

10   with regard to the cervical spine.  This is

11   consistent with the MRIs not showing any compressive

12   pathology with the disk.

13       Q.        So you've answered.

14                 So, Doctor, if I told you that Dr.

15   Vizzone noted radicular symptoms, would it have been

16   appropriate for him to engage his protocol, which

17   also involved surgery given that?

18       **A.**        I think I've answered this, you know,

19   many, many times.  I can't opine as to what Dr.

20   Vizzone's protocol is, what he was thinking at the

21   time.  I don't know exactly what his surgical

22   indications were at that time.  I didn't examine the

23   patient at that time.  This was, I believe, a year

24   down the road after the subject accident.

25       Q.        Okay.  But you did -- you did review

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Page 121

1    Dr. Vizzone's records, correct?

2         **A.**      I did.

3         Q.      And you don't recall what he noted with

4    respect to that, radicular symptoms or not?

5         **A.**      I think you'd have to be specific.  Do

6    you want me to look up a particular note or so?  I --

7         Q.      No.  That's fine.

8              MR. KING:  I don't think I have

9    anything else.

10             Yeah, I'm done.

11             MS. BOODY:  I just have a couple

12   questions.

13   (REDIRECT EXAMINATION OF DR. DeFALCO

14   BY MS. BOODY:)

15        Q.      Dr. DeFalco, do you ever testify on

16   behalf of your own patients, meaning patients that

17   you treat as opposed to your IME practice?

18        **A.**      I do.

19        Q.      So in addition to completing IMEs, you

20   have testified for patients that you treat?

21        **A.**      The two times I've been to court in

22   person, not doing something like this, in-person

23   court, have been on behalf of my own patients.

24        Q.      You were asked some questions about

25   prior medical records.  Were any of the records that

Electronically signed by Theresa Kugler (001-297-027-4278)                                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 122

1   you reviewed from before the accident?

2          **A.**     No.

3          **Q.**     Did you see or review any primary care

4   records for plaintiff?

5          **A.**     I did not.

6          **Q.**     Is it unusual for an approximately

7   44-year-old man to not have a single prior medical

8   record for your review?

9          **A.**     It's extremely unusual.

10          **Q.**     Does the absence of these prior medical

11   records indicate anything to you that is notable?

12          **A.**     As I've stated, it's really unique to

13   have a 44-year-old come and see me for an independent

14   medical examination with absolutely no prior records

15   from primary care physicians or any other doctors.

16          **Q.**     So in your --

17                 MR. KING:  I'm going to object to that,

18   speculation.

19                 (Off the video record at 9:17 PM.)

20                 MS. BOODY:  There wasn't a pending

21   question.

22                 MR. KING:  You can go ahead.

23                 (On the video record at 9:18 PM.)

24   BY MS. BOODY:

25          **Q.**     So Dr. DeFalco, in your report when you

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 123

1    discussed past medical history and you noted that

2    plaintiff denied similar injury in the past, you were

3    relying solely on him telling you whether or not he

4    had any relevant prior medical history?

5         **A.**      That's correct.

6                    MS. BOODY:  I don't have any other

7    questions.

8                    MR. KING:  No, I have no further

9    questions.

10                    (Off the video record at 9:18 PM.)

11                    (Videotape deposition concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Electronically signed by Theresa Kugler (001-297-027-4278)                    2801a837-26e6-4e2f-84dd-37a791abc1f0

Robert A. DeFalco, Jr., M.D.                    March 28, 2024

Page 124

1                    C E R T I F I C A T E

2

3          I, Theresa Mastroianni Kugler, a Notary Public

4     and Certified Court Reporter of the State of New

5     Jersey, do hereby certify that prior to the

6     commencement of the examination,

7               R O B E R T   A.   D e F A L C O,

8     was duly sworn by me to testify the truth, the whole

9     truth, and nothing but the truth.

10         I DO FURTHER CERTIFY that the foregoing is a

11    true and accurate transcript of the testimony as

12    taken stenographically by and before me at the time,

13    place, and on the date hereinbefore set forth, to the

14    best of my ability.

15         I DO FURTHER CERTIFY that I am neither a

16    relative nor employee nor attorney nor counsel of any

17    of the parties to this action, and that I am neither

18    a relative nor employee of such attorney or counsel,

19    and that I am not financially interested in the

20    action.

21

22    _____
      Theresa Mastroianni Kugler,
23    Certified Court Reporter
      Certificate No. XIO857
24    Notary Public, State of New Jersey
      Commission Expires July 11, 2026
25    Commission No. 2410394

Electronically signed by Theresa Kugler (001-297-027-4278)          2801a837-26e6-4e2f-84dd-37a791abc1f0

## <u>CERTIFICATE OF SERVICE</u>

I, Patrick J. McDonnell, Esquire, hereby certify that on July 29, 2025, Appellee's Supplemental Appendix was filed via ECF and served upon the following counsel of record for Appellant:

Michael Confusione, Esquire
HEGGE & CONFUSIONE, LLC
P.O. Box 366, Mullica Hill, NJ 08062-0366
mc@heggelaw.com
*Attorneys for Appellant*

**McDONNELL & ASSOCIATES, P.C.**

By:   */s/ Patrick J. McDonnell*
Patrick J. McDonnell, Esquire
*Attorneys for Appellee*