# No. 24-3321

========================================================

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

========================================================

PETER PATAKI

Appellant,

v.

WALMART, INC.; WALMART
STORES, INC.; WAL-MART STORES,
INC.; WAL-MART STORES EAST,
INC.; WAL-MART STORES EAST I, LP;
WALMART STORE NUMBER 5447;
JANE DOE 1-5, MARY DOE 1-5; and/or
DOE CORPORATION 1-5,

Appellees.

ON APPEAL FROM A FINAL ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
No. 1:16-cv-01109-CPO-AMD;  Hon. Christine O'Hearn, U.S.D.J.

---

## APPELLANT'S REPLY BRIEF

---

Michael Confusione (MC-6855)
HEGGE & CONFUSIONE, LLC
P.O. Box 366, Mullica Hill, NJ 08062-0366
(800) 790-1550; mc@heggelaw.com
Counsel for Appellant

## **TABLE OF CONTENTS**

ARGUMENT ........................................................................... 1

CONCLUSION ..................................................................... 12

Certifications of Compliance ............................... attached

## **TABLE OF AUTHORITIES**

Page(s)

*Cases*

Gov't of the Virgin Islands v. Mills,
   821 F.3d 448 (3d Cir. 2016) ............................................... 11

Herman v. Hess Oil Virgin Islands Corp.,
   524 F.2d 767 (3d Cir. 1975) ............................................... 11

Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.,
   87 F. Supp. 3d 928 (N.D. Cal. 2015) .................................. 4

In re Niaspan Antitrust Litig.,
   464 F. Supp. 3d 678 (E.D. Pa. 2020) ................................. 4

*Rules*

Fed. R. Evid. 702 .................................................................. 4

## <u>ARGUMENT</u>

### <u>The Critical Expert Testimony that was Excluded</u>

***Mr. Birnbach had personal knowledge of relevant facts because he visited the site where the plaintiff slipped and fell.*** He received facts as a lay witness in this regard. The District Court should not have excluded his testimony about what he observed during his site visit. The time between the plaintiff's fall and Mr. Birnbach's visit goes to the weight of this testimony, not its admissibility.

Birnbach's testimony was crucial in refuting Walmart's claim that the plaintiff was "hiding" evidence and in supporting the plaintiff's counterclaim that Walmart had concealed evidence and failed to produce all the surveillance footage.

The jury struggled to evaluate the surveillance footage, which was limited in duration and of poor quality. During discovery, the plaintiff received only distant, low-quality, and short-span surveillance images from Walmart. Walmart claimed that the nearby cameras were not working. However, a few seconds of live surveillance footage showed the accident scene from very close, contradicting Walmart's claim of non-functioning cameras. The plaintiff also alleged that about 2 hours of surveillance footage had been removed.

Birnbach's testimony combated Walmart's argument and permitted the jury to conclude that Walmart, not the plaintiff, failed to secure the accident scene, preserve the accident report, and complete surveillance footage. During discovery,

Walmart stated that close-capture surveillance cameras near the accident scene were not operational at the time of the incident. Consequently, Walmart provided only far-distance, poor-quality, limited-time-frame footage. However, at trial, Walmart's attorney contradicted this position by suggesting to the jury that the plaintiff had received close-capture surveillance images but was deliberately hiding them. Walmart's attorney suggested that the plaintiff was hiding close-capture surveillance footage, urging the jury to question why those images were not presented. Walmart's counsel addressed the surveillance video from 2015, noting that while the footage was available, it was of low quality and did not provide conclusive evidence. Counsel said the plaintiff had access to hours of surveillance footage and the opportunity to request specific video evidence. The existing surveillance system was described as an older, fixed camera system, with no evidence that Walmart made any changes to it. Counsel highlighted that the plaintiff had the opportunity to request timecards and depose employees who were working on the night of the incident, but failed to do so. It was emphasized that the burden of gathering and presenting evidence rested with the plaintiff, not Walmart. The absence of any Walmart witness being called to testify was attributed to the plaintiff's lack of substantive evidence in support of their claims.

This shift in Walmart's narrative was misleading, and the plaintiff was denied the chance to combat it through Birnbach's testimony. Birnbach's testimony would

have directly refuted Walmart's false claim by explaining what surveillance footage was provided and why close-capture footage was unavailable. His testimony would have clarified that Walmart never produced any close-up surveillance images and that the only images provided were far-distance, low-quality footage. The importance of his testimony is further underscored by the fact that, in 2017, two years after the accident, he conducted an independent visit to the Kearny Walmart store and documented the presence of surveillance cameras near the accident site. If cameras were installed and working in 2017, it is highly unlikely that none of them were functional in 2015. By excluding his testimony, the court deprived the jury of the opportunity to evaluate whether Walmart had misrepresented the functionality of its surveillance system. Without Birnbach, the plaintiff had no witness to counter Walmart's assertion, allowing a misrepresentation of the evidence to go unchallenged.

The prejudice caused by the district court's exclusion of even this part of Birnbach's testimony became evident during jury deliberations. The jury submitted a note requesting additional images to determine what was on the floor at the time of the accident, indicating that they struggled to assess the evidence. They also asked about pictures taken by the plaintiff, possibly suggesting they believed Walmart's argument that the plaintiff was concealing footage. These jury questions show that they were struggling to evaluate the poor-quality surveillance images that Walmart

3

provided and were influenced by Walmart's attorney's suggestion that the plaintiff was hiding footage. If Mr. Birnbach had been permitted to testify, he would have clarified that no such close-capture footage had ever been turned over to the plaintiff and that Walmart's claims were misleading. Instead, Walmart was able to mislead the jury into believing the plaintiff had hidden evidence that had never actually been produced. The jury was deprived of all of Birnbach's testimony, including his factual observations that were crucial in undermining Walmart's claim that the plaintiff had hidden evidence. The result was that the jury was misled by false information and arguments about the surveillance.

***Birnbach's Expert Opinion Was Admissible and a Critical Part of the Plaintiff's Case.*** Respondent states, "Birnbach is not a licensed professional in any field. SA24-27, 24:22-27:2." Fed. R. Evid. 702 does not mandate licensing or formal credentials. A witness can qualify as an expert based on practical experience alone, without a formal degree, title, or educational specialty. In re Niaspan Antitrust Litig., 464 F. Supp. 3d 678 (E.D. Pa. 2020); Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc., 87 F. Supp. 3d 928 (N.D. Cal. 2015).

Respondent states, "Birnbach's ultimate opinion was nothing more than the proposition that retail employees should pick up trash they see while they are working. SA108-109, 108:11-109:18; see also SA113, 113:8-9 ("An employee, when they see debris on the floor, is required to pick it up."). This is not a proper

subject for expert testimony." Birnbach's testimony was more than that. Birnbach's testimony informed the jury about what type of hazard identification, safety standards, and protocols apply to a large retailer like Walmart.  How else would a jury be able to determine, for example, how often and in what manner a large retailer like Walmart must inspect for hazards?  Is it once a day?  Once an hour?  Once every 15 minutes?  Is the inspection protocol the same for all hazards, or are some considered more pressing?  Is the inspection duty the same for all store areas, or are some areas, such as the grocery aisles and the area where Plaintiff Pataki fell, subject to more frequent inspections than, for instance, an employee-only area back in the storage area?  The average juror would have no way of knowing any of this, let alone trying to apply such standards to assess the reasonableness of Walmart's conduct in this case.  Birnbach's testimony answers these questions that the average juror would have, enabling the jury to reasonably assess whether Walmart breached its duty of care to its invitee, Mr. Pataki (*see* arguments in Opening Brief).

Birnbach underscored the importance of comparing industry standards with a retailer's safety protocols to determine the cause of slip, trip, and fall incidents in retail environments. Birnbach noted that a company's safety manual, an Injury, Illness, and Prevention Program (IIPP), must comply with federal Occupational Safety and Health Administration (OSHA) regulations and other applicable safety standards. These requirements include:

5

• A written safety manual: All businesses with employees must have a safety manual covering OSHA standards.

• Hazard communication: Employers must maintain a hazard communication program, including labels on hazardous chemicals and safety data sheets for employees.

• Compliance with safety standards: Employers must always comply with OSHA and other national safety standards.

As a leading retailer, Walmart has comprehensive safety manuals and employee handbooks outlining proper procedures for maintaining a safe store environment. Birnbach set forth the specific Walmart regulations that were violated. A112-116. Birnbach confirmed Walmart's violations of its own safety policies in his *de bene esse* testimony, noting that Walmart employees are responsible for knowing these policies. Birnbach testified that his expert opinion was that plastic should be removed from products in the warehouse and not be brought out to the sales floor of the store in the first place because they are a major slipping hazard should they become detached and left on the floor, particularly in heavily trafficked areas like where the plaintiff slipped. Birnbach based his opinion on his review of the facts and site visit, as well as his 40 years of experience with Walmart. Birnbach noted that Walmart's policy, as stated in its employee handbook, requires associates to immediately address (or "cure") any hazardous condition they observe. Walmart

commits to providing customers with a hazard-free and safe shopping environment. There is also store lingo that states, "Clean as you go," which means that when you see debris, clean it up immediately – do not wait and come back to get it.  Further, a term, "Continual Zone Defense," is used in retail stores.  This means that every area of the store is required to be inspected.  Birnbach stated that the grocery section where the plaintiff slipped needs to be inspected more often, at least on an hourly basis.  The area in question in this case was a cross aisle in the grocery area and would need continual inspection, the expert said. A112-16.

Birnbach further noted that, in his expertise and experience in retail, a person's line of sight is between 36 inches and 72 inches off the floor.  Also, in this Walmart store, end caps and signage distract customers from watching where they are going and what is on the floor.  This makes it even more imperative for Walmart employees to follow the store's directives and look for anything hazardous on the floor, such as plastic or other debris, and remove it immediately. A112-116.

Birnbach set forth the specific Walmart regulations that he opined were violated and showed negligence. A112-116. Birnbach's report (in its addendum) included illustrations and deposition excerpts supporting his opinion regarding the negligence of store staff in hazard identification, incident documentation, and customer assistance. Figure 1 in his report highlights where Mr. Pataki slipped, identifying it as a high-traffic area that, according to Walmart's handbook, should

have been inspected more frequently. Figure 2 presents the camera view of the incident area, noting discrepancies between Walmart's claims and the actual camera coverage. A112-116.

During his inspection, Birnbach observed a corn husk left on the floor, indicating a failure in floor inspection and maintenance, as no employee addressed the hazard within a 30-minute interval. Additionally, rubber residue streaks were visible on the floor, suggesting improper maintenance practices, as industry standards require regular stripping and waxing to prevent such buildup. A112-116.

Further safety concerns identified by Birnbach included an unattended cleanup water bucket left in a hazardous position due to its low profile and extended mop handle, a direct violation of Walmart's safety guidelines. Figure 5, though not taken at the exact location of the incident, showed further deficiencies in safety protocols, including a liquid spill that remained unaddressed for approximately 60 minutes. Figure 6 illustrates that the floor sweep schedule was not followed, as observed over 30 minutes by Birnbach during his inspection. A112-116.

Birnbach noted further, in Figure 10 of his report, an unattended pallet in the main aisle, violating industry and Walmart standards, with plastic wrap left on boxes that could fall onto the floor. Birnbach's report identified multiple violations of Walmart's policy regarding the movement of pallets across the sales floor during store hours, noting that stacks of boxes were piled too high for employees to monitor

effectively. Figures 12 through 28 documented breaches of Walmart's posted safety regulations and non-compliance with Americans with Disabilities Act (ADA) requirements for aisle widths. A112-116.

Birnbach's testimony answers these questions that an average juror would have, enabling the jury to reasonably assess whether Walmart breached its duty of care to its invitee, Mr. Pataki. Birnbach noted that the area where the plaintiff slipped was by an "endcap filled with paper towel[s] that was situated in the main access aisle to the backroom stock area. This area of [the] aisle was heavily trafficked by shoppers as well as employees." A102. Birnbach opined that the slip and fall was a direct result of the negligence of Walmart's staff to keep the store safe and hazard-free. A102. Birnbach explained his assessment and opinion:

> It has been my experience that in order to determine the cause of a slip, trip and fall incident in a retail setting that it is essential to review Industry Standards and compare those with the actual retailer's safety rules and regulations.

> Walmart is one of the nation's leading retailers and has an exceptional series of Employee Handbooks, Safety Manuals, Training aids all of which clearly stipulate the required practice for preserving a safe and hazard free store. In my examination of the Walmart mandates, which are similar to the Industry Standard, many of the rules were not adhered to which compromised the level of safety at the time that Mr. Pataki was shopping on June 6, 2015.

> To avoid duplication, the specific Walmart regulations that were violated by the store employees are addressed in the Addendum portion of this report. A factor which was prevalent, front and center, is that within the limited time frame that I reviewed the store and video, the

employee lack of compliance was rampant. I can only conclude that this activity was condoned by Store upper management.  A103

Birnbach noted that the location where the plaintiff slipped revealed that Walmart had violated two of its Safety Manual regulations.  A104.

Respondent states that expert testimony cannot "usurp the district court's pivotal role in explaining the law to the jury" or "testify to the legal conclusion of whether appropriate people had actual knowledge."  The plaintiff's expert did not so testify.  Birnbach testified not about whether Walmart owed any duty of care—which is a legal decision for a court—but about whether Walmart acted reasonably or negligently, failing to do what a reasonable retailer would have done before the plaintiff's slip and fall. Birnbach's expert testimony provided a standard for the jury to use, explaining what large retailers typically do to prevent slipping hazards, what Walmart's own store policies stated about this, what Birnbach observed during his inspection of the store, and then offered an opinion on whether Walmart deviated from the standard of care required of a large retailer.

The caselaw that Respondent cites on page 21 of its Brief holding that jurors do not require expert testify about "common knowledge" is not analogous to Pataki's case here for the reasons explained in the preceding paragraph.  It is not common knowledge what a large retailer does or does not do to protect customers from slip and falls. Birnbach provided the jury with the standards that apply to such retailers and his opinion on whether Walmart met the standard of care.

10

Respondent states, "The district court also explained the concepts of actual and constructive notice, which includes the duty of correcting any defects an employee sees or should have seen."  Yes, but the plaintiff's expert provided the jury with the information needed to determine constructive notice, because constructive notice was established in this case, in part, by the measures a reasonably large retailer takes to prevent customer slip and falls.

## The Defendant's Summation Comments

 Respondent notes there was no objection lodged, which appellant acknowledged in this opening brief, and this issue is reviewable on plain error anyway. Even when such error is not objected to at trial (as in this case), the Court of Appeals can provide relief to the prejudiced party if the error is (1) plain, (2) affects substantial rights, and (3) seriously affects the fairness, integrity, or public reputation of judicial proceedings. Gov't of the Virgin Islands v. Mills, 821 F.3d 448 (3d Cir. 2016); see Herman v. Hess Oil Virgin Islands Corp., 524 F.2d 767, 772 (3d Cir. 1975) (reviewing error though noting that no objection was lodged at trial).  The comments were egregious because Walmart's counsel smeared the plaintiff, his trial lawyer, and his doctors with testimony and arguments suggesting a criminal "ring" to unlawfully obtain medical benefits and compensation through faked or exaggerated accidents. That's clearly very damaging to an injured plaintiff's case. Walmart's repeated insinuation of this was grossly improper

because there was no evidence that, at least, the plaintiff and his lawyer were involved in such a ring.

## **<u>CONCLUSION</u>**

The Court should vacate the judgment entered for Walmart and remand for a new trial on the plaintiff's claim.

Respectfully submitted,

/s/ Michael Confusione
Hegge & Confusione, LLC
P.O. Box 366, Mullica Hill, NJ 08062
(800) 790-1550; mc@heggelaw.com
Counsel for Appellant

Dated: August 14, 2025

## CERTIFICATION OF BAR MEMBERSHIP, WORD COUNT, SERVICE, <u>IDENTICAL COMPLIANCE OF BRIEFS, VIRUS CHECK</u>

I certify that I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

I certify that the word count is less than 6,500 words.

I certify that today PDF copies of Appellant's Reply Brief were served electronically on counsel of record for Appellee; the required paper copies are being filed via United States Mail upon Office of the Clerk, United States Court of Appeals for the Third Circuit, 21400 United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania 19106-1790.

I certify that the text of the electronic filings and hard copies are identical.

I certify that a virus check was performed with Norton Anti-Virus software, Norton Security Suite Version 5.2.2.3 and that no virus was found.

/s/ Michael Confusione

Dated: August 14, 2025